Joyce W. Lindauer
State Bar No. 21555700
Sydney A. Ollar
State Bar No. 24125932
Austin Y. Taylor
Louisiana Bar No. 37325
Joyce W. Lindauer Attorney, PLLC
1412 Main St., Suite 500
Dallas, Texas 75202
Telephone: (972) 503-4033
Facsimile: (972) 503-4034
ATTORNEYS FOR DEBTOR/PLAINTIFF

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **BM318, LLC,** | § | **CASE NO. 20-42789-mxm-11** |
| | § | |
| **DEBTOR.** | § | **CHAPTER 11** |
| **BM318, LLC,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **ADVERSARY NO. 21-04051** |
| | § | |
| **DIXON WATER FOUNDATION,** | § | |
| **Defendant.** | § | |
| | § | |
| **LUMAR LAND & CATTLE, LLC** | § | |
| **Plaintiff-in-Intervention** | § | |

# PLAINTIFF'S ORIGINAL ANSWER TO PLAINTIFF-IN-INTERVENTION LUMAR LAND AND CATTLE, LLC'S ORIGINAL COMPLAINT IN INTERVENTION FOR DECLARATORY JUDGMENT AND COUNTERCLAIMS AGAINST INTERVENOR

TO THE HONORABLE UNITED STATES BANKRUPTCY COURT:

COMES NOW BM318, LLC, Plaintiff in the above-styled and numbered cause, and files this its *Original Answer to Plaintiff-in-Intervention Lumar Land & Cattle, LLC's Original Complaint and Counterclaims Against Intervenor* (respectively, "**Lumar**", "**Answer**", "**Complaint**," and "**Counterclaim**"), and would respectfully show the Court as follows:



EXHIBIT "11"

## I. PARTIES

1. Plaintiff admits the allegation in Paragraph 1 of the Complaint concerning Lumar's status as a Texas limited liability company.

2. Plaintiff admits the allegation in Paragraph 2 of the Complaint concerning Plaintiff's status as a Texas limited liability company

3. Plaintiff admits the allegation in Paragraph 3 of the Complaint concerning The Dixon Water Foundation's ("**Dixon**" or "**Defendant**") status as a Texas non-profit corporation.

## II. JURISDICTION AND VENUE

4. Plaintiff admits the allegations in Paragraph 4 of the Complaint regarding the Court's jurisdiction over this core adversary proceeding.

5. Plaintiff admits the allegation in Paragraph 5 of the Complaint that the Court has jurisdiction over this declaratory judgment action pursuant to the referenced authorities, but denies that declaratory judgment is appropriate in this instance. Plaintiff denies that an actual and substantial controversy exists between the parties because Lumar is unable to qualify as a good faith transferee and bona fide purchaser for value of the real property implicated in this adversary proceeding.

6. Plaintiff admits the allegation in Paragraph 6 of the Complaint that venue is proper in this district.

## III. FACTUAL BACKGROUND

7. Plaintiff admits the allegation in Paragraph 7 of the Complaint concerning Plaintiff's execution of a Special Warranty Deed to Dixon conveying approximately 1,531.75

acres ("**Remaining Property**")[1], which remained out of the 2055,70 ("**Original Property**") acres that had been acquired by Plaintiff from Dixon, that occurred on February 18, 2020, but that such Deed was held in escrow and subsequently filed on the referenced date of July 2, 2020 upon which any conveyance under such deed became effective

8. Plaintiff admits the allegation in Paragraph 8 of the Complaint regarding Dixon's execution of a Special Warranty Deed with Vendor's Lien conveying the referenced 204.50-acre parcel of the aforementioned tract to Lumar on the referenced date to the extent such document is an accurate reflection of such allegation.

9. Plaintiff admits the allegations in Paragraph 9 concerning the facts that no adversary proceeding, lis pendens, or claims for possession of or title to the aforementioned parcel had been filed against Lumar at the time Lumar purchased the parcel. Notably, however, a right to avoid the transfer of the Remaining Property from Plaintiff to Dixon existed at the time of the subsequent transfer of the 204.50 parcel, and Lumar, knew or should have known that Plaintiff had a right to avoid the original transfer. Such claims were identified in the bankruptcy case. Lumar is imputed with the knowledge of Jim Martin ("**Martin**") as its managing member. Martin represented, consulted to, and/or served as the real estate agent to Plaintiff, including with regard to the transaction giving rise to Plaintiff's adversary proceeding and who physically managed the Property including all tracts that had been originally acquired by Plaintiff and subsequently sold. Martin is a Texas licensed real estate agent (License #190058) for Railhead Realty, LLC ("**Railhead**"), whose real estate broker, Ron Hughes ("**Hughes**"), serves as his sponsoring broker. As a licensed real estate agent to Plaintiff, Martin owed certain fiduciary duties to Plaintiff

[1] As further described in this Complaint, the 1,531,75 acres making up the Remaining Property was the result of (i) Plaintiff acquiring an unencumbered 118.34 acres free and clear upon acquisition of the Original Property; (ii) conveying 381.66 acres to GH Lumar JV which is related to Lumar; (iii) conveying 23.95 acres also to GH Lumar JV.

including duties of loyalty and care, to maintain confidentiality and not use confidential information for his own purposes, and to disclose any relevant and material information to Plaintiff that was related to the Remaining Property. Martin also worked for Plaintiff to obtain a municipal utility district known as the Bear Creek Ranch Municipal Utility District No. 1 of Parker County ("**MUD**") on the Original Property. Furthermore, Martin, through Railhead, provided Plaintiff with valuations in the form of Broker's Opinions of Value regarding the Remaining Property. In so doing, Martin, on behalf of Plaintiff, corresponded with the attorney who set up the MUD on or about December 4, 2020 to get a status of the MUD in order to include the MUD as part of the valuation of the Remaining Property.

10. Plaintiff admits the allegation in Paragraph 10 of the Complaint concerning Plaintiff's complaint seeking to avoid the preferential and/or fraudulent transfer of the Remaining Property but not the entire 2055.70 acres which were originally acquired by Plaintiff from Defendant.

11. Plaintiff admits the allegation in Paragraph 11 of the Complaint to the extent that Dixon filed its Answer, Affirmative Defenses and Counterclaim to the Plaintiff's complaint on the referenced date, but denies the applicability of the defenses, affirmative defenses, and counterclaims contained therein.

12. Plaintiff admits the allegation in Paragraph 12 of the Complaint concerning Plaintiff's filing of its Notice of Lis Pendens but which was filed against the Remaining Property and not the Original Property and allegations concerning the location and date of said filing. Plaintiff admits that Lumar did not receive Notice of the Lis Pendens to the extent notice is required under section of the Texas Property Code. Plaintiff can neither admit nor deny how much time

passed "since Lumar's purchase of the Lumar Property and Lumar had begun development of the Lumar Property."

13. Plaintiff is unable to admit or deny the allegation in Paragraph 13 of the Complaint as to when Lumar became aware of the Lis Pendens. Despite this, Plaintiff would reiterate that Dixon's transfer of the 204.50-acre parcel out of the Remaining Property to Lumar occurred while Plaintiff had the right to avoid the transfer of the entire tract from Plaintiff to Dixon and that Lumar had knowledge that Plaintiff intended to dispute or assert certain rights and claims related to the Remaining Property prior to Lumar's acquisition of the 204.50-acre parcel. Plaintiff also restates that Lumar, through Martin, either knew or should have known of such encumbrance.

14. Plaintiff denies the allegation in Paragraph 14 of the Complaint that the Lis Pendens was improperly filed or that Lumar is a good faith transferee and bona fide purchaser for value of the 204.50-acre parcel, and as such is not entitled to a declaration of such status by this Court. Plaintiff denies the allegation that the lis pendens should be expunged as to the 204.50-acre parcel for the aforementioned reasons.

15. Plaintiff reasserts its admissions and denials to the allegations in Paragraph 15 of the Complaint as stated *supra*.

16. Plaintiff admits the allegations in Paragraph 16 of the Complaint as to the timing of Lumar's purchase of the 204.50-acre parcel to the extent such purchase occurred as reflected in the documents referenced by Lumar, and that said real property is affected by the Adversary Proceeding and Lis Pendens. For reasons mentioned heretofore, Plaintiff's claims to this real property is not improper despite Lumar's assertion to the contrary.

17. Plaintiff denies the allegations in Paragraph 17 concerning Lumar's status as a good faith transferee and bona fide purchaser since Lumar either knew or should have known of the

aforementioned encumbrance on the real property. Furthermore, Martin used Plaintiff's confidential information and breached his fiduciary duties to Plaintiff when he acquired the Property on behalf of Lumar. Lumar cannot be the beneficiary of such bad acts.

18. Plaintiff admits the allegation in Paragraph 18 to the extent Plaintiff did not send actual written notice of the Lis Pendens to Lumar. Plaintiff denies the assertion that the lis pendens is improper for the reason that it further denies the assertion that Lumar is a good faith transferee and bona fide purchaser for value as previously mentioned.

19. Plaintiff denies the allegation in Paragraph 19 of the Complaint to the extent that 11 U.S.C. § 550(b) is not applicable since Lumar is not a good faith transferee since it either knew or should have known of the aforementioned encumbrance on the real property and because Lumar was the beneficiary of the aforementioned bad acts of its managing member, Martin

20. Plaintiff denies the allegation in Paragraph 20 of the Complaint noting that Lumar is neither a good faith transferee nor a bona fide purchaser of the real property, and that expunging the Lis Pendens as to that real property is inappropriate.

## IV. PLAINTIFF'S COUNTERCLAIMS AGAINST INTERVENOR

21. Plaintiff incorporates by reference the foregoing facts and allegations asserted by Plaintiff and further asserts the following.

22. Lumar is managed by its managing member, Martin, and as such, all actions and conduct of Lumar occur through Martin. Furthermore, Lumar possesses and acts with the knowledge of Martin and is imputed with the actions of Martin.

23. Since 2018, Martin has served as the exclusive real estate agent for Plaintiff and its related entities for the purpose of identifying potential real estate acquisitions in Parker County and the surrounding areas, contracting to acquire such properties, and selling such properties.

During the period following Plaintiff's acquisition of the Original Property through the recording of the Deed in Lieu on the Remaining Property, Martin physically managed the Remaining Property along with all property owned by Plaintiff's related entities in Parker County and nearby areas, including controlling access and managing hunting and grazing leases. Martin assisted with certain predevelopment work on the Remaining Land and all properties owned by Plaintiff's related entities in Parker County and nearby areas such as surveying, platting, permitting, budgeting, and land planning. Martin was also tasked with securing proposals from builders to purchase lots once developed on the Remaining Property. Martin was further involved with Plaintiff's efforts to modify the Loan with Dixon and refinance the Loan with potential third party lenders.

24. On September 25, 2018, Plaintiff entered into the contract to acquire the Original Property from Defendant on which Martin is designated as the real estate agent and Railhead is listed as the broker. Dixon agreed to provide seller financing ("**Loan**") on the acquisition of the Property and secured the Loan with a first lien deed of trust on the Original Property less 118.34 acres which Plaintiff acquired free and clear. Such contract closed on November 27, 2018 upon which Martin was paid a real estate agent fee. Martin has also served as the real estate agent for other related entities of Plaintiff and their principal before and after this date.

25. Martin worked on behalf of Plaintiff to obtain the MUD on the Property which was approved by Parker county on February 25, 2019 and enacted by the state legislature on or about May 16, 2019. On December 8, 2020, Martin further obtained an opinion from the law firm of Coats Rose regarding the status of the MUD and necessary action to correct the failure to obtain approval from the city of Weatherford as required.

Case 21-04051-mxm Doc 5 Filed 11/16/21 Entered 11/16/21 12:24:04 Desc

26. Martin worked with and/or retained Chris Chevreaux ("**Chevreaux**") of Chevreaux & Associates to obtain appraisals on multiple tracts within the Original Property including (i) 46 lots on 118.34 acres on April 15, 2019; (ii) 118.34 acres on May 26, 2019; (iii) 381.66 acres on May 30, 2019; (iv) 405.61 acres on May 29, 2020. Similarly, Martin worked through or with his broker, Hughes at Railhead, to provide a broker's opinion of value on (i) June 4, 2019 for 118.34 acres including development of two acre lots on such property and (ii) August 22, 2020 for the Remaining Property which was who valued the property at $51,633,001 (an average of $33,708.50 per acre). From around September 11, 2020 through January of 2021 Martin and Hughes, the individual broker at Railhead, were working with Chevreaux to obtain additional appraisals on the Remaining Tracts for Plaintiff.

27. Prior to the end of May 2019, Martin represented Plaintiff as its real estate agent in attempts to negotiate the purchase of 95 acres which was adjacent to the Original Property. However, the parties were unable to agree on terms.

28. On July 26, 2019, Plaintiff entered into a contract to sell 381.66 acres of the Original Property to Lumar. Martin was designated as the real estate agent for both the buyer and seller. On the same date, Plaintiff and Lumar executed a contract under which Plaintiff would buyback the 381.66 acres. Martin was also designated as the real estate agent for both the buyer and seller for this transaction. Martin, on behalf of Lumar, assigned such agreement to GH Lumar JV, a Texas joint venture and general partnership between Lumar and Aledo West, LLC[2] ("**Aledo West**") which is an assumed name of both Lumar and Aledo West according to separate assumed name certificates filed with the Texas Secretary of State on September 11, 2019. On or about

[2] Aledo West LLC is owned and managed by Gary Hazlewood.

September 1, 2019, the 381 acres was conveyed to GH Lumar JV.[3] The Plaintiff and Dixon had amended the terms of the Loan under which the sale proceeds would be paid to Dixon. Given that the sale proceeds were to be paid to the lender, Lumar was actually a party to the "Tri-Party Agreement" related to the first amendment on the loan from Dixon, which also included a deed in lieu of foreclosure. Similarly on or about January 31, 2020, Plaintiff sold 23.95 acres to GH Lumar JV, the proceeds of which were paid to Dixon as part of a modification of the Loan.

29. On or about February 27, 2020 Dixon and Plaintiff further modified the terms of the Loan which included a final payoff that was due on July 1, 2020 and which required a deed conveying the Remaining Property to Dixon to be held in escrow and recorded upon a default by Plaintiff ("**Deed in Lieu"**).

30. On or about March 18, 2020 Martin served as the real estate agent on a contract to sell 118.34 acres to "Gary Hazlewood and/or assigns" ("**Hazlewood**"), which did not close. Hazlewood and Martin are both managers and/or owners of GH Lumar JV.

31. On or about June 26, 2020 Plaintiff and Dixon executed an agreement under which Plaintiff could buy back the Remaining Property for an amount equal to the remaining amount owed under the Loan in the event Plaintiff defaulted and Dixon recorded the Deed in Lieu ("**First Buy Back Agreement**"). The closing was scheduled for August 31, 2020 but could be extended up to three times in thirty day increments upon paying a $50,000 extension fee for each extension.

32. On July 1, 2020 Dixon asserted that Plaintiff was in default of the Loan. Dixon recorded the Deed in Lieu on July 2, 2020.

[3] Not to be confused with GH Lumar, LLC which was formed on June 5, 2020 by Lumar and Aledo West as a separate entity from GH Lumar JV because there is no plan of conversion filed and no record of GH Lumar JV being converted into GH Lumar, LLC.

33. Although Plaintiff executed one or more extensions, Plaintiff did not close on the First Buy Back Agreement. However, Robert Potts, CEO and President of Dixon, had informed Plaintiff that Dixon would still execute and close on a new buy back agreement based on similar terms including paying off the amount remaining under the Loan once Plaintiff had secured the necessary financing ("**Second Buy Back Agreement**") – thus Plaintiff was essentially receiving credit for the prior loan payments.

34. In December 2020, Plaintiff began working with AgAmerica Lending to refinance the remaining portion of the Loan with Dixon. Martin was involved in communications and/or participated in discussions with AgAmerica in order to assist Plaintiff including by working to get the necessary appraisal(s) on the Remaining Property for AgAmerica to provide the requested financing.

35. Between January 18, 2021 and January 21, 2021, Martin and Hughes negotiated to purchase 118.34 acres from Plaintiff and appeared to have agreed to final terms including purchase price on behalf of the buyer, "Jim Martin and/or his assigns." At the last minute, however, Martin did not execute the agreement.

36. Around the same period that AgAmerica had completed its due diligence and expressed its desire to finance the Second Buy Back Agreement, Plaintiff was negotiating with Potts the final terms of the agreement. Martin participated in and/or was copied on communications between Plaintiff and Dixon about these negotiations. On January 21, 2021 Plaintiff and Potts had seemingly agreed to the final terms of the Second Buy Back Agreement, but such agreement was subject to final approval from the Dixon board of directors at a meeting that was scheduled to be held on January 23, 2021.

37. Apparently on or about January 23, 2021 in lieu of executing the contract for the purchase of the 118 acres, Martin, on behalf of Lumar and without the knowledge of Plaintiff, contracted with Dixon to purchase 204.50-acre parcel from the Remaining Property. Additionally, Martin obtained an option and/or right of first refusal ("**ROFR**") to purchase the remaining portion of the Remaining Property.

38. As a result of Martin's conduct including on behalf of Lumar, the board of directors decided not to formally execute Plaintiff's buyback agreement on the Remaining Property.

39. On January 27, 2021, Dixon deeded 6.15 acres from the Remaining Property to Martin.

40. On April 23, 2021 Dixon deeded the 204.5 acre tract to Lumar and recorded a Memorandum of Option Agreement to Martin on the remaining portion of the Remaining Property.

41. On October 4, 2021 Martin deeded to GH Lumar, LLC 5.48 acres apparently from the 6.15 acres he had acquired.

## V. CLAIMS FOR RELIEF

### COUNT I

### (Tortious Interference with a Contract)

42. On information and belief, Lumar, acting through Martin, interfered with Plaintiff's First Buyback Agreement when they negotiated and closed on the acquisition of 6.15 acres out of the Remaining Property. Given that the standard periods to perform due diligence and to close on a real estate purchase contract, Lumar apparently began negotiating and/or entered into the contract to purchase the 6.15 acres out of the Remaining Contract while Plaintiff had an agreement to buy back the Remaining Property under the First Buy Back Agreement which Lumar was aware of.

On information and belief, they also began negotiating the purchase of the 204.5 acre property and/or other agreements related to the Remaining Property.

43. Texas law protects existing contracts from interference. *See Juliette Fowler Homes, Inc. v. Welch Assoc., Inc.*., 793 S.W.2d 660, 665-66 (Tex. 1990). Thus, a party to a contract has a cause of action for tortious interference against any nonparty to the contract who wrongly induces another contracting party to breach the contract. *Holloway v. Skinner*, 898 S.W.2d 793, 794-95 (Tex. 1995). The elements of the cause of action for tortious interference are: (1) the existence of a contract subject to interference, (2) willful and intentional interference (3) that proximately causes damage, and (4) actual damage or loss. *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997); *SITQ E.U., Inc. v. Reata Rests., Inc*., 111 S.W.3d 638, 647 n.7 (Tex. App.--Fort Worth 2003, pet. denied). *All Am. Tel., Inc. v. USLD Communs., Inc.*, 291 S.W.3d 518, 531 (Tex. App.—Fort Worth 2009).

44. Plaintiff and Dixon had negotiated and agreed to execute the contract referred to as First Buyback Agreement. Lumar, through Martin, willfully and intentionally interfered with the First Buyback Agreement. Lumar, with knowledge of the history and negotiations between Plaintiff and Dixon, negotiated to purchase the 6.14 acres of the Remaining Property at the same time Plaintiff and Dixon were negotiating the execution of the First Buyback Agreement. If not for Lumar's interference, Plaintiff would have been able to execute the First Buyback Agreement and prevent the loss of property. Plaintiff suffered an actual loss of 6.14 acres of the Remaining Property as well as damages for money and time spent negotiating with Dixon.

45. As a result of such actions, Lumar interfered with the parties' performance under such contract including further negotiations related to such contract. Plaintiff requests that Lumar's

Case 21-04051-mxm Doc 40 Filed 03/21/22 Entered 03/21/22 20:14:04 Page 13 of 24

Complaint be denied, and that Lumar be ordered to return the property, and that Plaintiff be awarded damages.

**COUNT II**

**(Tortious Interference – Prospective Contract)**

46. Plaintiff incorporates the allegations in the preceding paragraphs as if fully set forth herein.

47. On information and belief, Lumar, acting through Martin, interfered with Plaintiff's Second Buyback Agreement when they negotiated and closed on the acquisition of 6.15 acres out of the Remaining Property. The closing of the 6.15 acres occurred only 4 days after the board of directors for Dixon decided not to proceed with the Second Buyback Contract. Given the short time period, Martin and Lumar had apparently been negotiating and/or entered into a contract for the 6.15 acres around the time Plaintiff had negotiated and seemingly agreed with Potts on the Second Buyback Agreement.

48. Likewise, Dixon decided not to proceed with the Second Buyback Agreement because Dixon instead chose to sell the 204.5 acres to Lumar and Martin along with granting an option and ROFR on the remaining portion of the Remaining Property. Lumar and Martin had obviously made an offer to purchase the 204.5 acres and obtain an option and/or ROFR on remaining portion of the Remaining Property prior to Dixon's board of directors deciding not to proceed with the Second Buyback Agreement. At no time did Lumar and Martin disclose to Plaintiff that that they were negotiating or had entered into any agreement related to any of the Remaining Property.

49. The elements of tortious interference with prospective contract are: (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third

party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result. *Gil Ramirez Grp., L.L.C. v. Houston Indep. Sch. Dist.*, 786 F.3d 400, 417 (5th Cir. 2015) (quoting *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013)). *Santander Consumer USA, Inc. v. Zeigler Chrysler Dodge Jeep-Downers Grove, LLC*, No. 3:16-CV-3310-B, 2017 U.S. Dist. LEXIS 98041, at *22-23 (N.D. Tex. 2017).

50. There was a reasonable probability that Plaintiff and Dixon would have entered into a contract under the Second Buyback Agreement. Dixon was willing to agree to the terms of the Second Buyback Agreement as indicated by Robert Potts, president and CEO of Dixon. Lumar acted with a conscious desire to prevent the contract or at least knew the interference was certain or substantially certain to occur as a result of Lumar's conduct. Lumar's personal knowledge of the relationship between Plaintiff and Dixon allowed it to usurp any potential deal between Plaintiff and Dixon for its own personal gain. Lumar's conduct was independently tortious or unlawful in that it used insider information to create a negative result for Plaintiff. If not for Lumar's interference, Plaintiff and Dixon would have completed their contract. Plaintiff suffered actual damage and loss in that Lumar deprived Plaintiff the ability to preserve its right in property.

51. As a result of Martin and Lumar's action as related to the 204.5 acres and the ROFR/Option, Dixon chose not to proceed with the Second Buyback Agreement causing Plaintiff to suffer damages. Plaintiff requests that Lumar's Complaint be denied, that Lumar be ordered to return the property, and that Plaintiff be awarded damages.

## COUNT III

## (Breach of Fiduciary Duties)

52. Lumar was owned and operated by Martin. Lumar along with Martin owed certain formal and informal fiduciary duties to Plaintiff which were breached. Under the rules enacted and promulgated by the Texas Real Estate Commission ("**TREC**"), Martin as the licensed real estate agent for Plaintiff, owed the highest fiduciary obligations to Plaintiff such as the duties of loyalty, care, honesty, good faith and fair dealing, and maintain confidentiality including that they represent the interests of Plaintiff, be faithful and observant to the trust placed by Plaintiff, place no personal interest above that of Plaintiff, exercise integrity, deal honestly and fairly with all parties, and convey all known information that could affect decisions of the Plaintiff related to a property.[4]

53. Furthermore, Lumar should be held liable for Martin's actions because an alter ego relationship existed between Martin and Lumar. The alter-ego doctrine and veil piercing principles may be applied in reverse including under §21.223 of the Texas Business Organizations Code to hold a company such as Lumar liable for the for the liabilities of the individual member(s) such as Martin on the basis that the company is the alter-ego of the members or on the basis of fraud or other similar theories such as the breach of fiduciary duties described herein. *Clement v. Blackwood*, 2018 WL 826856 *11 (Tex. App.—Eastland 2018, pet. denied). This alter ego relationship is evidenced by the fact that Martin owns and operated Lumar. Holding only Martin liable would result in injustice. Martin had personal, insider knowledge of the relationship between Plaintiff and Dixon. Martin used Lumar as a veil to hide from his fiduciary duty.

[4] See §§ 531.1, 531.2, 535.2, 535.156 in Chapter 531 Canons of Professional Ethics and Conduct in the TREC Rules

Case 21-04051-mxm Doc 58 Filed 03/21/23 Entered 03/21/23 10:21:20 Page 16 of 24

54. Not only did Martin and Lumar owe formal fiduciary duties to Plaintiff, but they also owed the same fiduciary duties on an informal basis because of the special relationship that existed between Plaintiff (including its related entities) and Martin (including Lumar). Fiduciary duties can arise from informal relationships between the parties such as moral, social, domestic, or purely personal relationships. *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962). Whether such a fiduciary relationship exists is determined from the actualities of the relationship between the persons involved and evidence of the justifiable trust and confidence that is necessary to create a fiduciary relationship. *Id*.

55. As previously described, Martin not only served as the real estate agent for Plaintiff, but Martin also physically managed the Original Property along with all property owned by Plaintiff's related entities in Parker County and nearby areas including controlling access, managing hunting and grazing leases. Martin also advised Plaintiff and assisted Plaintiff with obtaining the MUD on the Original Property and performing certain predevelopment work on the Remaining Land and other properties owned by Plaintiff's related entities such as surveying, platting, permitting, budgeting, and land planning. Martin had also been tasked with securing proposals from builders to purchase lots once Plaintiff developed the Remaining Property. Additionally, Martin was involved with Plaintiff's efforts to modify the Loan with Dixon and refinance the Loan with potential third party lenders including a part of the Second Buyback Agreement. Additionally, Plaintiff relied on Martin's physical knowledge of the Original Property, knowledge of the area including the real estate market, and land development knowledge and experience. As a result, Plaintiff developed a special relationship of trust and confidence with Martin which gave rise to Martin and Lumar owing informal fiduciary duties including duties of loyalty, care, and good faith and fair dealing to Plaintiff. Lumar and Martin failed to adhere to their

fiduciary obligations as a result of the allegations described above including as related to their contract and acquisition of the 6.15 acres, the 204.5 acres, and the option/ROFR on the remaining portion of the Remaining Property and their efforts to develop such property (collectively, "**Lumar Transactions**") which he and Lumar benefited from and which damaged Plaintiff.

56. Moreover, they also utilized and benefited from Plaintiff's confidential information that they acquired from Plaintiff during the course of Martins' representation and relationship with Plaintiff which they utilized in the performance of the Lumar Transactions.

57. As a result, Martin and Lumar breached their fiduciary duty and obligation to maintain confidentiality and not use or disclose Plaintiff's confidential information for their own purposes. Plaintiff requests that Lumar's Complaint be denied, that Lumar be ordered to return the property, and that Plaintiff be awarded damages.

**COUNT IV**

**(Fraud)**

58. Martin and Lumar committed fraud including when Martin falsely represented to Plaintiff that he was there to do what he could and to help Plaintiff and its principal, Tim Barton, as related to the Original Property including to refinance, purchase the Remaining Property back from Dixon, and develop the Remaining Property. Instead, Martin and Lumar utilized such misrepresentations and their relationship of trust and confidence to obtain confidential and proprietary information which he used for his and Lumar's benefit without the knowledge or consent of Plaintiff in furtherance of the Lumar Transactions, and which was in direct conflict with Plaintiff's efforts to buy back the Remaining Property.

59. The elements of fraud include: 1) a misstatement or omission; 2) of material fact; 3) made with the intent to defraud; 4) on which the plaintiff relied; and 5) which proximately caused the plaintiff's injury. *Cyrak v. Lemon*, 919 F.2d 320 (5th Cir. 1990).

60. Lumar, through its owner and operator Martin, made a misstatement that it would help Plaintiff in relation to the Original Property and the Remaining Property. This was a material fact as Lumar used the information obtained through this process to cause harm to Plaintiff. Lumar intended to defraud Plaintiff, as evidenced by the eventual sale of property from Dixon to Lumar. Plaintiff relied on Lumar's owner and operator, Martin, as he was Plaintiff's real estate agent. The misstatement proximately caused the injury. The information Lumar obtained would not have been available if not for Plaintiff's reliance on the misstatements.

61. Furthermore, Lumar should be held liable because an alter ego relationship existed between Martin and Lumar. This alter ego relationship is evidenced by the fact that Martin owns and operates Lumar. Holding only Martin liable would result in injustice. Martin had personal, insider knowledge of the relationship between Plaintiff and Dixon. Martin used Lumar as a veil to perpetrate a fraud. The alter-ego doctrine and veil piercing principles may be applied in reverse including under §21.223 of the Texas Business Organizations Code to hold a company such as Lumar liable for the for the liabilities of the individual member(s) such as Martin on the basis that the company is the alter-ego of the members or on the basis of fraud. *Clement v. Blackwood*, 2018 WL 826856 at *11.

62. Plaintiff requests that Lumar's Complaint be denied, that Lumar be ordered to return the property, and that Plaintiff be awarded damages.

**COUNT V**

**(Conversion)**

63. Through Martin's work with and representation of Plaintiff, Martin and Lumar possessed certain intellectual property and work product of Plaintiff related to the acquisition and development of the Original Property and Remaining Property including as related to the MUD, land planning, surveys, valuations, costs, platting, permitting, and land planning. (collectively, "**Work Produc**t") Martin and Lumar have utilized such Work Product for their own purposes as related to the Lumar Transactions without consent of Plaintiff resulting in Martin and Lumar's conversion of Plaintiff's Work Product and Plaintiff being damaged.

64. There are four elements to a conversion claim: (1) Plaintiff owned, had legal possession of, or was entitled to possession of the property; (2) Defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with plaintiff's rights; (3) Plaintiff made a demand for the property; (4) Defendant refused to return the property. *Apple Imports, Inc. v. Koole*, 945 S.W.2d 895, 899.

65. Plaintiff had negotiated with Dixon for an agreement to repurchase, giving Plaintiff entitlement to possession of the property. Lumar used Work Product of Plaintiff to sour the agreement and cause Dixon to pursue an alternative agreement with Lumar. Plaintiff has made demand for the property. Lumar now as a part owner of the Property has not returned the portion of the property it obtained from Dixon. Lumar thus has converted property of the Plaintiff to its own use and enjoyment.

66. Plaintiff requests that Lumar's Complaint be denied, that Lumar be ordered to return the property, and that Plaintiff be awarded damages.

## COUNT VI

### (Fraud in Real Estate Transaction (Tex. Bus. Comm. Code §27.01))

67. Plaintiff incorporates the allegations in the preceding paragraphs as if fully set forth herein. In addition to the foregoing causes of action, Lumar through Martin's actions committed statutory fraud in a real estate transaction (Tex. Bus. Comm. Code §27.01) including through the fraudulent conduct described in the preceding paragraphs that they utilized in furtherance of the Lumar Transactions to acquire all or part of the Remaining Property which Plaintiffs seek to recover.

68. Fraud in a transaction involving real estate consists of a (1) false representation of a past or existing material fact, when the false representation is (A)made to the person for the purpose of inducing that person to enter into a contract; and (B) relied on by that person in entering into that contract . . . Tex. Bus. & Com. Code. Ann. § 27.01(a) (West 2009).

69. Lumar, through its owner and operator Martin, made false representations to Plaintiff that it would help in negotiating with Dixon. Lumar instead made a personal deal with Dixon for the purchase of the property in lieu of Dixon negotiating with Plaintiff. Plaintiff relied on Lumar's representations and negotiated a contract with Dixon under Martin's advisement. Lumar caused the negotiations to ultimately fail, causing harm to Plaintiff.

70. Furthermore, Lumar should be held liable because an alter ego relationship existed between Martin and Lumar. This alter ego relationship is evidenced by the fact that Martin owns and operates Lumar. Holding only Martin liable would result in injustice. Martin had personal, insider knowledge of the relationship between Plaintiff and Dixon. Martin used Lumar as a veil to perpetrate a fraud. The alter-ego doctrine and veil piercing principles may be applied in reverse including under §21.223 of the Texas Business Organizations Code to hold a company such as

Lumar liable for the for the liabilities of the individual member(s) such as Martin on the basis that the company is the alter-ego of the members or on the basis of fraud or other similar theories. *Clement v. Blackwood*, 2018 WL 826856 at *11.

71. Plaintiff requests that Lumar's Complaint be denied, that Lumar be ordered to return the property, and that Plaintiff be awarded damages.

**COUNT VII**

**(Conspiracy)**

72. Plaintiff incorporates the allegations in the preceding paragraphs as if fully set forth herein. Lumar conspired with Martin; Hazlewood; Aledo West, Hughes; Railhead; GH Lumar JV; and/or GH Lumar, LLC to commit fraud including fraud in a real estate transaction , converted Plaintiff's Work Product, tortiously interfered with the First Buyback Agreement, tortiously interfered with the Second Buyback Agreement, and breached the fiduciary duties that were owed to Plaintiff as previously described in the foregoing counts in order to further the Lumar Transactions causing Plaintiff to be damaged.

73. "A conspiracy to defraud involves (1) two or more persons; (2) with a common purpose; (3) undertaking a common action to defraud; (4) where each person possesses intent to defraud; and (5) each person understands that the other conspirators share the common purpose." *Durrschmidt v. Frost Nat'l Bank (In re R&K Fabricating, Inc.)*, Nos. 10-33878, 12-03177, 2013 Bankr. LEXIS 1192, at *17 (Bankr. S.D. Tex. 2013) (citing *Bayou Terrace Investment Corp. et al. v. Lyles*, 881 S.W. 2d 810, 815 (Tex. App.—Hous. [1st Dist.] 1994)).

74. Here, Martin along with Lumar acted in common with the several aforementioned persons for the purpose of, and intent to, defraud the Plaintiff.

75. Plaintiff requests that Lumar's Complaint be denied, that Lumar be ordered to return the property, and that Plaintiff be awarded damages.

**COUNT VIII**

**Declaratory Judgment**

76. Plaintiff incorporates the allegations in the preceding paragraphs as if fully set forth herein. Plaintiff seeks a declaratory judgment that Lumar is not a bona fide purchaser related to the Lumar Transactions. A bona fide purchaser is one who acquires property in good faith, for value, and without notice, constructive or actual, of any third party claim or interest. *Madison v. Gordon,* 39 S.W.3d 604, 606 (Tex. 2001); *Houston Oil Co. v. Hayden*, 135 S.W. 1149, 1152 (Tex. 1911); *Carter v. Converse*, 550 S.W.2d 322, 329 (Tex. Civ. App.--Tyler 1977, writ ref'd n.r.e.). Notice may be constructive or actual. *Madison,* 39 S.W.3d at 606. *Flack v. First Nat'l Bank*, 226 S.W.2d 628, 631 (Tex. 1950); *American Surety Co. v. Bache*, 82 S.W.2d 181, 183 (Tex. Civ. App.--Fort Worth 1935, writ ref'd). Actual notice rests on personal information or knowledge. *Madison,* 39 S.W.3d at 606 Constructive notice is notice the law imputes to a person not having personal information or knowledge. *Id*.

77. Given Lumar's notice of the claims and interest of Plaintiff in the Remaining Property, Lumar had constructive and/or actual knowledge of Plaintiff's claims to the Property. Furthermore, Lumar did not acquire any of the Remaining Property including the ROFR or Option in good faith based on the preceding allegations.

78. Either because of Lumar's knowledge of Plaintiff's claims or because of Lumar's lack of good faith, it was not a bona fide purchaser of any of the Remaining Property, the ROFR, or the Option.

79. Plaintiff requests that Lumar's Complaint be denied, that Lumar be ordered to return the property, and that Plaintiff be awarded damages.

## VI. PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests that this Court deny relief requested in Lumar Land & Cattle, LLC's Complaint for the reasons that it is (i) not a good faith transferee pursuant to the provisions of 11 U.S.C. § 550(b); (ii) not a bona fide purchaser for value of the subject real property; and that (iii) expunging the Notice of Lis Pendens as to the subject real property is inappropriate for lack of status as a good faith transferee and bona fide purchaser. Finally, Plaintiff seeks return of the Property acquired by Lumar from Dixon as well as damages against Lumar, including costs and fees and further requests that the Court grant such other and further relief to which it may show itself justly entitled.

DATED: March 21, 2022.

Respectfully submitted,

*/s/ Joyce W. Lindauer*

Joyce W. Lindauer
State Bar No. 21555700
Sydney A. Ollar
State Bar No. 24125932
Austin Y. Taylor
Louisiana Bar No. 37325
Joyce W. Lindauer Attorney, PLLC
1412 Main St., Suite 500
Dallas, Texas 75202
Telephone: (972) 503-4033
Facsimile: (972) 503-4034
Email: joyce@joycelindauer.com
austin@joycelindauer.com
sydney@joycelindauer.com
ATTORNEYS FOR DEBTOR/PLAINTIFF

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on March 21, 2022, a true and correct copy of the foregoing document was served via email pursuant to the Court's ECF system upon the parties receiving electronic notice in this case.

*/s/ Joyce W. Lindauer*
Joyce W. Lindauer