UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| BM318, LLC, et al., | Case No. 21-04051-mxm |
| Plaintiff, | Eldon B. Mahon U.S. Courthouse<br>501 W. 10th Sex trafficking. |
| v. | Fort Worth, TX 76102-3643 |
| Dixon Water Foundation, et al., | June 30, 2022 |
| Defendant. | 2:31 p.m. |

EXCERPT OF PROCEEDINGS
WITNESS TESTIMONY ONLY
BEFORE THE HONORABLE JUDGE MARK X. MULLIN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff BM318, LLC: | JOYCE W. LINDAUER, ESQ.<br>Joyce W. Lindauer Attorney, PLLC<br>1412 Main Street, Suite 500<br>Dallas, Texas 75202 |
| For the Defendant Dixon Water Foundation: | DEBORAH M. PERRY, ESQ.<br>JULIAN PRESTON VASEK, ESQ.<br>Munsch Hardt Kopf & Harr P.C.<br>500 North Akard Street<br>Dallas, Texas 75201 |
| For the Intervener-Plaintiff Lumar Land & Cattle LLC: | JOSHUA LEE SHEPHERD<br>Quilling, Selander, Lownds, et al.<br>2001 Bryan Street, Suite 1800<br>Dallas, Texas 75202 |
| | J. ROBERT FORSHEY<br>FORSHEY & PROSTOK, LLP<br>777 Main Street, Suite 1550<br>Fort Worth, Texas, 76102 |
| Transcribed by: | GILLIAN LAWRENCE, CER-255, CET-255<br>Lawrence Court Transcription & Video<br>P.O. Box 530790<br>DeBary, FL 32753 |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

# I N D E X


| (PARTIAL TRANSCRIPT OF PROCEEDINGS) | PAGE |
|---|---|
| TESTIMONY OF LARRY MARTIN | |
| DIRECT EXAMINATION BY MS. LINDAUER | 3 |
| CROSS-EXAMINATION BY MS. PERRY | 21 |
| CROSS-EXAMINATION BY MR. FORSHEY | 24 |
| REDIRECT EXAMINATION BY MS. LINDAUER | 46 |
| CERTIFICATE OF CERTIFIED COURT TRANSCRIBER | 56 |

FORT WORTH, TEXAS - JUNE 30, 2022 - 2:31 P.M.

(The following is an excerpt of proceedings: testimony of Larry Martin only.)

LARRY MARTIN, WITNESS, SWORN

DIRECT EXAMINATION

BY MS. LINDAUER:

Q Mr. Martin, would you state your full name for the record?

A Larry Howard Martin.

Q And Mr. Martin, could you just briefly describe for us your educational background?

A I have an engineering degree through the University of Missouri. I also have a law degree from the University of Maryland and also a patent degree from Kutztown University in patent law and intellectual property.

Q And, Mr. Martin, for a number of years, did you actually work as a patent attorney?

A Yes, I worked as a patent attorney from 1975 til about 1985, '86.

Q Okay. All right. Since you ceased working as a patent attorney, have you worked in any other areas of law?

A I've worked in the areas of -- in the areas of law, I've worked in the tax law area, I've worked in structuring real estate transactions, medical devices and a number of entrepreneurial activities over the last 30-some odd years. Maybe it was 40 by now.

Q Under structuring real estate transactions, that category, have you had involvement with an entity called BM318, LLC?
A Yes, I did.
Q Okay. And can you generally describe for us what your involvement for BM318, LLC has been?
A Yes. I was asked by the parent company that owns 318 to act as an advisor to 318 in the refinancing -- well, that would be -- in the purchasing of the property from Dixon Water, and that was in about July of 2020.
Q Okay. All right. Any other role in connection with your work with BM318?
A Primarily dealing with various lending institutions and dealing directly with Dixon Water and in particular Robert Potts.
Q Okay. You're mentioning the name Robert Potts. Who do you understand Mr. Potts to be in connection with Dixon Water?
A I believe he was the -- either the CEO of Dixon Water Foundation or maybe the president of Dixon Water Foundation, but for sure he was the individual that I was working with and who apparently had negotiating authority or at least the ability to discuss a transaction with me.
Q And prior to BM318 filing its bankruptcy petition, which I'll represent to you was on August 10th, 2021. Is that correct? No, that's not correct. I'm sorry. A later date. I believe actually it was in November, I believe, of 2020, if I

recall correctly. Were you working on behalf of BM318 in connection with the Dixon Water Foundation matter?

A Yes, I was.

Q And do you recognize the name Jim Martin?

A Yes, I do.

Q Okay. And what was Mr. Martin's involvement with the Dixon Water negotiations prior to the debtor filing for bankruptcy?

A I was introduced to Jim Martin through Tim Barton and I had numerous, numerous phone calls with him. Jim Martin was introduced to me as an individual who is very knowledgeable in real estate transactions in that particular county. Also had assisted Mr. Barton in the original acquisition of the Dixon Water Property from the Foundation prior to -- prior to me coming in, and he was the broker of record there and had numerous conversations with Jim Martin from, I would say June, July 2020 all the way through January of 2021.

Q You mentioned Mr. Barton having some relationship as a broker. Do you recall that testimony?

A Yes. Mr. Barton had said that Jim Martin had functioned as a broker representing BM318 when they initially acquired the property, that was the broker of record. He also had informed me that Jim Martin was also --

MR. FORSHEY: Your Honor --

THE COURT: Yes, hold on.

MR. FORSHEY: Your Honor?

THE COURT: Hold on, sir. Yes. Go ahead.

MR. FORSHEY: I think I object to that. I mean he states -- he’s testifying what he was told by another person. And it sounds like hearsay to me.

THE COURT: All right. The objection to hearsay is sustained. So the answer to extend that came through will be stricken.

Now it’s to you.

BY MS. LINDAUER:

Q Mr. Martin, what was Jim Martin’s role on behalf of BM318?

A At what time?

Q At -- let’s go to prior to the filing of the bankruptcy. So you were talking about, I believe, June or July of 2020; is that correct?

A Yes. I had asked Jim Martin to assist us in getting an appraiser for the property. Also if he had any knowledge of any other properties that were sold in the area, from a value situation as well as asking Jim Martin some questions about the particular zoning of the property that he had handled. I think it was that -- I can’t remember the exact time he did it, because it was before I became engaged by BM318.

Q Okay. Well, after you were engaged, did you actually have direct conversations with Mr. Martin?

A Yes. I had numerous conversations with Jim Martin

throughout that period of time, from June of 2020 to January of 2021.

Q Is there, to the best of your knowledge, any agreements between BM318 and Mr. Martin that would have provided any type of compensation to Mr. Martin for the work that he was doing?

A Could you please repeat the question? I didn't quite hear it.

Q Were you aware, Mr. Martin, of any agreements between Jim Martin and BM318 that would have provided Mr. Martin with any compensation in connection with the matters that he was working on with BM318?

A I'm not aware of any written agreement that was entered into.

Q Did BM318 ever enter into any brokerage agreement with Mr. Martin?

A The only brokerage agreement that I was aware of was the one that existed on the original transaction when I had reviewed the filing.

Q Was Mr. Martin at any time in or about June or July of 2020 acting in an agency -- or as an agent of BM318?

A It was my understanding that Jim Martin was acting as an agent on behalf of BM318 continuing his role as a fiduciary representing that -- that entity.

Q And as a fiduciary representing that entity, what was the scope of his responsibilities during that period of time?

A To assist the --

MS. PERRY: Your Honor, I'm going to object.

THE COURT: Hold on. Hold on. Hold on. Yes, go ahead.

MS. PERRY: Assumes facts not in evidence. Whether or not Mr. Martin was in fact a fiduciary is a question of law for the Court to decide. And Ms. Lindauer is assuming that's the case in her question, so I would object.

THE COURT: All right. The objection is sustained. You may rephrase the question, Ms. Lindauer.

BY MS. LINDAUER:

Q Well, what -- what was -- starting in June or July of 2020, based on your testimony, Mr. Martin, what was the scope of Mr. -- I'm sorry, Mr. Martin's -- Jim Martin -- what was the scope of his work for BM318?

A In discussions with Jim Martin, he told me directly that he would do anything he could --

MS. PERRY: Objection, Your Honor.

THE COURT: Hold on. Hold on. Hold on. Hold on.

MS. PERRY: Objection, Your Honor.

THE COURT: Yes. Go ahead.

MS. PERRY: I believe that calls for hearsay.

THE COURT: Sustained.

Hold on. Hold on. Let me see what -- do you think you could move the camera so that they can see.

We're going to move the camera so that hopefully -- I think I have a (Indiscernible), but maybe not. So that Ms. Lindauer or her witness if you see Ms. Perry stand up will know to -- a little bit more over.

UNIDENTIFIED FEMALE: (Indiscernible).

MS. LINDAUER: Don't zoom in too close.

THE COURT: There we go. All right. Thank you. Can you now -- can you all see Ms. Perry sitting there?

Perfect. If you see her standing up, especially Mr. Martin, if you're about to answer a question, if you happen to see her stand up, please hold your thought for a minute to allow Ms. Perry an opportunity to voice your objection.

All right. Thank you. Thank you very much.

All right. You may proceed, Ms. Lindauer.

MS. LINDAUER: Your Honor, I didn't get an opportunity to respond to the last hearsay objection. When I asked about the scope of the retention of Mr. Martin and of Mr. Larry Martin, started to tell us what Mr. Jim Martin had said. And then there was a hearsay objection had been posed. Your Honor, Mr. Jim Martin is a party opponent. He is a proposed defendant in this proceeding. There have been claims identified to be asserted against him. Moreover, my understanding is he is the corporate representative of Lumar Land & Cattle Company, which is also already a party to these proceedings. So I think whatever he may have told Mr. Martin

will be in the capacity as a party opponent, and therefore, would be an exception to the hearsay rule at this time. So I do think we have an opportunity to make inquiry about what Mr. Martin may or may not have told Mr. Larry Martin.

So I would ask the Court to reconsider your ruling on the hearsay objection.

THE COURT: All right. Ms. Perry, any response? I know that Mr. Martin is currently not a party, but --

MS. PERRY: Correct.

THE COURT: -- it’s a --

MS. PERRY: Let me just look to my rules of evidence, Your Honor.

THE COURT: I think for purposes of today because the issue -- the issue that’s before the Court today is whether or not that Danner (Phonetic) knew or had knowledge of these alleged causes of action prior to confirmation. I think the argument, Ms. Lindauer, at the last hearing was that how could Danner (Phonetic) specify causes of action to retain them and to assign them to the reorganized debtor. I’m not -- I’m not ruling one way or the other but I decided to have the full to give her the opportunity to put on a full record to at least put on the record if the evidence establishes whether or not the debtor knew or didn’t know. And that may or may not have a legal implication. I just don’t know.

But for purposes of this hearing -- he’s not a party

opponent but plaintiff wants to add him, if he were a party opponent, then the objection would have been overruled.

Help me out with that, Ms. Perry. Why should I just not allow the testimony just for the limited purpose and scope of the matter before the Court today?

MS. PERRY: I think a couple of points there, Your Honor. You know, as -- as we've noted, and I'm looking here at my -- my exceptions here, you know, I don't have case law that says this, but it seems to me like Jim Martin is not a party opponent, he is not a party to this litigation in his individual capacity.

And they are eliciting -- attempting to elicit testimony about his -- whether or not he was acting in his individual capacity as a broker or whatever capacity. So in my view is trying to shoehorn in a party -- shoehorn in to the party opponent exception when that was not applied.

Secondarily, I would also object on the grounds of relevance. What is the relevance of this to the question of whether or not BM318 knew that they would have supported these claims they now seek to bring, which was my understanding from the transcript was what Ms. Lindauer was going to call Mr. Martin for and why Your Honor reopened the evidence. So we would also object on those grounds.

THE COURT: All right.

MS. LINDAUER: Your Honor, if I might -- if I might

briefly respond.

THE COURT: Yes.

MS. LINDAUER: And I think the Court actually hit the nail on the head, which is for purposes of that testimony, and it's not so much the truth of the matters that are being asserted coming out of Mr. Martin's mouth. The question is, who knew what and when as it relates to the claims that are being asserted in connection with the amended complaint, to the extent that Mr. Martin has been designated as a proposed defendant, and to the extent that there have been claims asserted against him both prior to the filing of the bankruptcy and then after the filing of the bankruptcy, and to the extent that he is the representative of Lumar Land & Cattle, LLC. Again, I think it goes to who not what when, and what the roles of the parties were.

So it's not so much what he was talking about, it's more the fact of his involvement in June and July of 2020 with Mr. Larry Martin. And I think for that purpose the Court can accept the testimony of Mr. Martin without going into whether -- what they were actually talking about was true or not, just the fact that they were, in fact, talking.

So I think, Your Honor, on that limited basis, the Court should permit the testimony.

THE COURT: All right. Based upon the arguments of counsel, the Court is going to reverse my prior ruling. I'm

going to allow the witness to testify for the limited purpose, not for the truth of the matter since it would be technically hearsay if the party opponent section didn't apply. I'm not going to have to get there because it's for the limited purpose of what did the debtor believe it knew.

And with -- with respect to the relevance objection, I was thinking about actually myself as well, but I'm usually pretty liberal or conservative, depending upon your point of view on overruling relevance objections since I'm the jury in this case, that will just go to the weight of the evidence, if any, that I give it.

So I'll overrule the relevance objection as well.

So, Mr. Martin, to the extent you remember the question, you may answer it. If not, we can have Ms. Lindauer restate the question for you.

THE WITNESS: If you could restate the initial question, Ms. Lindauer, and I'll go from there.

BY MS. LINDAUER:

Q Okay. Mr. Martin, I think the question involved the scope of Mr. Martin's relationship with BM318 in June and July of 2020. If you could just -- and I -- I asked it a little differently, but if you could just describe for us the scope of Mr. Martin's involvement in June and July of 2020 with the entity BM318.

A I asked Mr. Martin whether or not he could refer us to an

appraiser for the property, if he had any knowledge of other properties that sold in the area, if he knew of any other financial institutions that may be interested in a refinancing of the project, and whether or not the -- oh, and also an update on the zoning of the property, since he owned it, and I also asked him if he owned any adjacent property to the BM318 property. And those --

Q Okay.

A Excuse me? And those conversations --

Q No (Indiscernible).

A -- went from -- on and off from June and through January of 2021.

Q Is there any reason that the conversations ended in January of 2021?

A The conversation ended, I would say on or about January 21st of 2021, when I submitted a proposed offer to purchase to Dixon Water.

Q And you're the person on behalf of BM318 that submitted that particular offer; is that correct?

A That is correct. I drafted the offer and submitted it to Dixon Water Foundation to be considered by their board of directors and that was under the recommendation of Robert Potts.

Q And for the record, who is -- I think you already told us this, but who is Robert Potts in connection with Dixon Water?

A To the best of my recollection, he's an officer of Dixon Water Foundation.
Q Is he a person that you worked with during the time that we've been discussing? That would be the summer of 2020 through January of 2021.
A Right. I spoke with Robert Potts numerous times during that period of time and additionally met with Robert Potts on the property at issue. I think it was maybe July of 2020.
Q And Mr. Martin, other than yourself, were there any other persons -- I should say individuals -- who, on behalf of BM318, were directly working on the Dixon Water matter?
A I was the primary individual that was working on that matter. I recall Mr. Barton telling me that he spoke to Jim Martin, but you would have to ask Mr. Barton about that.
Q Okay. In connection with Mr. Martin's -- Jim Martin's involvement with this particular project, do you know if he was provided with information regarding the debtor's -- BM318's real estate holdings?
A The holding -- yes, he would have known of the property in question, which was owned by BM318, who, through myself -- he also was the individual responsible for obtaining the new zoning for that particular tract of property. So he was very familiar with that piece of property.
Q Who was Mr. Martin obtaining new zoning on that tract of property for?

A BM318, as well as his adjacent piece of property.

Q And do you know if Mr. Martin has a real estate license or brokerage license in the State of Texas?

A I can't tell you that he does, because I've never seen it.

Q Okay. Mr. Martin, were you involved in connection with the filing of bankruptcy by BM318?

A I may have been asked some questions, but I do not recall specifically what input I may have given.

Q Okay. Do you recall attending any hearings on behalf of BM318?

A I cannot recall.

Q Okay. You were aware, though, that BM318 filed for bankruptcy?

A Yes, I was aware of that.

Q And your conversations with Dixon Water, Mr. Potts, and Mr. Jim Martin, when was the last time you had conversations with any of those persons of representative of those persons relating to the real estate transaction between BM318 and Dixon Water?

A I spoke to Jim -- excuse me. I spoke to Robert Potts, I would say, on or about January 20th of 2021. And there -- and I know that for a fact, since I was commuting with Mr. Potts about any comments that he may have had on the document I finally submitted on the 21st of January.

Q After January 20th of 2021, did it come to your attention

from Dixon Water, Mr. Potts, or Mr. Jim Martin that there had been any real estate transactions between Dixon Water and Lumar Land & Cattle?
A Not to my recollection. Was there any conversation ever on Lumar? I did receive an email from Robert Potts that Jim Martin was acquiring a parcel on January 28th of 2021.
Q And other than that Mr. Martin might be acquiring a parcel, did that specifically tell you what property Mr. Martin was acquiring?
A No. I would have to look at that piece of property, or look at that email. But as I recall, without looking at the document, it was that he was acquiring a -- a couple hundred acres from that tract and that Dixon was going to give him an option to acquire the remaining parcels over a period of time.
Q Do you ever recall receiving any notification prior to the plan of reorganization being approved by this court that Lumar Land & Cattle Company had acquired any interest in the same property that BM318 had originally owned that had been dated back to Dixon Water?
A No. Never we had any communication whatsoever.
Q When was the first time you learned about Lumar Land & Cattle actually acquiring an interest in property that had belonged to BM318 from Dixon Water?
A I'd say in the first quarter of 2022, probably some time in the late part of January, first part of February or the end

of February.

Q And how is that you became aware of that particular transfer between Dixon Water and Lumar Land & Cattle?

A I believe there was some legal matter that was filed, and that's how it came to my attention.

Q Okay. Tell you what. Mr. Martin, are you familiar with the plaintiff in intervention, Lumar Land & Cattle, original complainant intervention, filed in connection with this particular matter?

A I probably read it, but not recently.

Q If I represented to you that that has a filing date on it of February 16th, 2022, does that refresh your recollection on when you first became aware of the involvement of Lumar Land & Cattle, LLC?

A It would have to be in around that particular timeframe, because I had never heard of Lumar before that period of time.

Q When Dixon Water transferred property to Lumar in April of 2021 on behalf of BM318, did you receive any notice from any party regarding that particular transfer?

A No, I did not.

Q At the time that the debtor had its plan approved in this bankruptcy case -- get that date for you. I'll represent to you that -- Mr. Martin, that's August 2nd of 2021. Were you aware of any transactions between Dixon Water Company and Lumar Land & Cattle Company?

A No, I was not.

Q Were you still involved in the Dixon Water matter during the bankruptcy case and up until August of 2021?

A I was involved with -- I know I was involved through January of 2021. I'm not -- probably would have answered some questions that would have been asked to me after that, but I cannot recall exactly what questions or what my answers would have been.

Q Okay. If the information had been provided to BM318 regarding transactions involving Dixon Water or Lumar Land & Cattle, would you have been the person at BM318 that would have received that information?

(Other matters in this case at 3:03 p.m.)

Q Okay. Mr. Martin, are you the person at BM318 that has the greatest knowledge during the time that the debtor was in bankruptcy, about the Dixon Water transactions that would have occurred after the bankruptcy case was filed?

A Yes, I was.

Q And Mr. Martin, I know you're going to be asked some questions about this. The debtor did amend its bankruptcy schedules to list some certain claims that it believed that it had as part of the bankruptcy. Are you familiar with those amendments?

A I recall looking at them, but I can't recall exactly when or what they said.

Q Okay. Do you remember the debtor listing claims, possible causes of action, against Dixon Water Foundation?

A Yes, I did.

(Other matters in this case at 3:04 p.m.)

Q Mr. Martin, were you familiar with various claims and causes of action that BM318 might hold and seek to pursue either before or after its plan was confirmed?

A Yes, I am.

Q And were you involved in identifying those various causes of action that ultimately were included in amended schedules that were filed with this court?

A Yes, I was.

Q Did those claims and causes of action include claims against Dixon Water Foundation?

A Yes, they did.

Q Did those claims include claims against a gentleman named Jim Martin?

A Yes, they did.

Q Did those also include claims against a gentleman named Chuck Stark?

A I cannot recall.

Q As we sit here today, Mr. Martin, you're aware that claims have been filed against Dixon Water Foundation by BM318; is that right?

A That is correct.

Q You are also aware of claims that are being asked to be filed against a gentleman named Jim Martin; is that correct?
A That is correct.
Q And you are also aware that the debtor has requested to file additional claims against Lumar Land & Cattle Company; is that correct?
A That is correct.
(Other matters in this case from 3:06 p.m. to 3:07 p.m.)

CROSS-EXAMINATION

BY MS. PERRY:
Q Good afternoon, Mr. Martin. My name is Deborah Perry. We haven't met before; have we?
A Not to my recollection.
Q And you understand that I represent the Dixon Water Foundation?
A Yes, I do.
Q Mr. Martin, you were referencing a letter on January 28th, 2021, in your direct testimony; correct?
A That is correct. To the best of my recollection, that was about the date that I received an email from Mr. Potts.
Q Thank you. I'm going to ask Mr. Vasek to please put up on the screen what's been labeled Dixon 011175, which I believe is that email. So you can take a look at it, Mr. Martin.
A Yes, that is the email I was referring to.
Q Okay. And in this email, dated January 28th, 2021, I'm

going read it. Let me know if I'm reading it incorrectly. Larry, this is to confirm that the Dixon Water Foundation has a contract to sell to Jim Martin 204 acres of our Bear Creek Ranch. We plan on closing this sale within the next 90 days. Then it says, at the closing of the 204 acres tract, Jim will obtain an option, right of first refusal, to acquire the remaining part of Bear Creek Ranch (approximately 1,320). If JMJ is interested in a cash acquisition of some or all of this remaining 1,320 acres, then Jim and I would be willing to discuss it with you. I am available next week to get on a phone call with you, Tim Barton and Jim Martin to discuss it. Did I read that correctly?
A You did.
Q Okay. And Mr. Martin, you know that that 204 acres was part of the property that Dixon took back in the deed in lieu transaction in July of 2020 -- in July of 2020; correct?
A That is my understanding.
Q Also, do you know who JMJ is referring to in this email?
A Referring to a -- an entity owned -- or I would say affiliated with Tim Barton.
Q And would it be fair to say that JMJ is referring to JMJ Development, LLC?
A I don't know what Mr. Potts was referring to.
Q Okay.
A There are a number of entities JMJ.

Q You are aware, though, given your involvement in the summer of 2020, that there was a -- what is referred to as the first buyback agreement, that was entered into between Dixon Water Foundation and JMJ Development, LLC; correct?

A I'm aware of that.

Q And you testified earlier that you did not have any conversations with Mr. Potts after January 20th, 2021; is that correct?

A I believe the last conversation I had with Mr. Potts was around that time, prior to the -- on or about January 21 of 2021.

Q So it's your testimony that the first time you found out that Dixon had a contract to sell the 204 acres was on January 28th, 2021?

A That -- that was the first time I learned that Dixon Water was selling the property -- considering selling the property to Jim Martin, correct.

Q And, Mr. Martin, you've held yourself out as someone who's done various real estate transactions. In your time working on real estate transactions, have you seen situations where initially a contract has one purchaser listed, but at the time of closing, the property is assigned to another party?

A Yes, I have seen contracts like that that typically have a clause in it where the contract can be assigned to another party with, usually, the written consent of the other party.

Q And certainly no later than January 28th, 2021, you knew that Dixon was going -- had the intention to sell the 204.5 acres, correct?
A The only knowledge I had is what was written in that email from Robert Potts to me.
(Other matters in this case from 3:12 to 3:15)

CROSS-EXAMINATION

BY MR. FORSHEY:
Q Mr. Martin, in connection with the land, is it called the Bear Creek Ranch? Is that what it's called?
A That's what it was referred to.
Q Okay. Did BM318 ever hire a broker or real estate person other than Jim Martin?
A Not to my knowledge.
Q Okay. So to your knowledge, the only person that was assisting BM318 and selling that was Mr. Jim Martin; correct?
A I don't know prior to me.
Q But after you got involved, he was the only one you know of?
A That was the only one that I knew of, correct.
Q The Exhibit that's been marked as Dixon Exhibit F as in Frank, is that the first time that you learned about the sale, the 204 acres, by Dixon Water to Mr. Jim Martin?
A That is correct. I learned about a proposed sale to Jim Martin.

Q Okay. Do you have our exhibits in hard copy, or do I need to put them up on the screen, Mr. Martin?
A I have no copies.

MR. FORSHEY: Ms. Lavorio (Phonetic) would you go to Exhibit Number 12.

Which, Your Honor, that is Lumar Exhibit 12, which is the Plaintiff's Motion for Leave to File the Amended Complaint. And I'd like you to go there to page 9 of 38.

THE COURT: Just so the record is clear, and, Mr. Forshey, I'm assuming you were referring to page 9 of 38, which is in the lower right hand corner of the document.

MR. FORSHEY: Yes, sir.

THE COURT: All right.

MR. FORSHEY: And I'd like to go Paragraph 6 -- I'm sorry, under the Complaint, actually, Your Honor. Make sure we're clear, that Paragraph 26 of the complaint that's attached. But keep on going, Ms. Lavorio (Phonetic), you'll get there. There.

Your Honor, I'd like the Court to take judicial notice of the contents of this document, which were filed by the Plaintiff as the plea that they were requested to be filed.

THE COURT: Any objection?

MS. LINDAUER: No objection to the Court taking judicial notice of the Plaintiff's First Amended Complaint.

THE COURT: All right. The Court will so take

judicial notice.

BY MR. FORSHEY:

Q Mr. Martin, could you come back on the screen, please?

A I'm on the screen.

Q I don't see you.

THE COURT: You'll just have to reset -- Mr. Martin, it looks like you lost your video. We need to get your video back.

(Pause)

THE WITNESS: I'm going to have to go off and come back on, I think.

THE COURT: All right. We'll give a short break for Mr. Martin to log off and log back in.

(Pause)

THE WITNESS: Okay.

THE COURT: There you go. Thank you, sir.

THE WITNESS: All right. No problem at all, Your Honor.

BY MR. FORSHEY:

Q Mr. Martin, can you see Paragraph 26 --

A Yes, I can.

Q -- of the amended complaint?

A Yes, I can.

Q Have you read that pleading before?

A Yes, I have.

Q And you reviewed it for authorizing it to be filed on behalf of the plaintiff?
A I reviewed it for my own education of the --
Q Do you --
A -- second part.
Q -- consider it to be accurate?
A This paragraph?
Q No, the -- when you reviewed the pleading, did you see anything that you thought was inaccurate in it?
A I don't recall. I'd have to read the entire document again.
Q Well, I don't want to take that time. Do you recall anything, sitting here today, that you remember being inaccurate?
A I can't tell you either way.
Q Okay. Well then, let's --
A But I --
Q -- look at Exhibit 26.
A All right.
Q Let's look at Paragraph 26. Would you take just a second and read that to yourself?
A Sure. Okay.
Q Is that paragraph accurate?
A I'd have to see the agreement that I was referring to.
Q Okay. Subject to that, do you see any -- any wrong

statements in that paragraph?
A I'm not about to guess.
Q I'm not asking you to guess. I'm saying subject to the -- the agreement, the agreement says what it says. Do you see any misstatements or wrong statements in that Paragraph 26?
A I don't know unless I compare it with the agreement that they're referring to.
Q All right. Well, there was a deed in lieu of foreclosure that was delivered by the debtor to Dixon; is that correct?
A Yes, that is correct.
Q And then on June 26th, 2020, anticipation defendant Dixon, according to the Dixon and JMJ Development LLC and any related complainant entered into a real estate sales agreement for the purchase of the remaining land from Dixon. Do you see that, sir?
A Yes, I do.
Q And is that correct?
A I'd have to see the agreement again. I would be happy to --
Q Okay.
A -- review the agreement and see if that is the agreement they are referring to.
Q Okay. Now, below that it gives the terms of the agreement for a purchase price of 27,500,658 which is closed August 31, 2020. JMJ had three options to extend the closing date for 30

days, each in exchange for depositing $50,000 with the title company for each option; is that correct, sir?

A As I stated, let me look at the agreement and I will tell you.

Q Okay. Now, let's go next to Exhibit 27 -- or Paragraph 27.

MR. FORSHEY: Could you roll down just a little bit please, Tandy (Phonetic).

BY MR. FORSHEY:

Q And would you read that to yourself, please, sir?

A Sure. I've read it, sir.

Q Okay. Now, is there anything that you think is inaccurate in Paragraph 27?

A I don't know about the dates, but I do know that a deed in lieu was entered into.

Q And the deed in lieu was recorded in early July of 2020, correct?

A I have no idea when it was recorded.

Q All right. If it says here that the deed in lieu was recorded on July 2, 2020, do you have any reason to dispute that, sir?

A I don't guess when I testify. Show me the reclamation --

Q I --

A -- and I would tell you if -- when it was recorded.

Q I didn't ask you that, sir. I asked you, do you have any

reason to doubt the truth of this statement in the plaintiff's pleading?

A I don't have any reason to doubt that.

Q Okay. Next, let's go over to Paragraph Number -- let's go to Paragraph 32. Would you look at Paragraph 32 with me, sir?

A Yes, I will.

Q Do you see anything inaccurate in Paragraph 32, sir?

A I don't know what shortly means, but they sold a portion to Defendant Lumar. I don't know what they're referring to.

Q Okay. Well, that -- you do agree that the first buyback contract was terminated by Dixon on or about October 15, 2020; do you agree to that?

A No, I do not.

Q Okay. Why do you disagree with that, sir? That's what it says here, isn't it?

A I believe -- and I would have to see. There were a number of agreements circulated or signed between Dixon Water and JMJ about the extending the timeframe to purchase the property.

Q Here it says, though, that Dixon asserted the default and terminated the first buyback on or about October 15, 2020. Do you disagree with that statement? Is that statement, in this proposed pleading, in your view, inaccurate or untrue?

A I do know that a time came where they terminated the agreement for failure to make a specific extension payment. I don't recall the exact date.

Q Do you have any reason to quarrel with October 15, 2020? What the debtors inform with claims alleged there?
A No, I have no reason to doubt that they had looked at the document.
Q Okay. Then the next thing, it says shortly thereafter, Dixon sold a portion of the remaining land to Defendant Lumar, entity owned, managed and controlled by Defendant Martin, despite Martin having represented clients as a real estate agent under the original purchase agreement to buy the original property from Dixon; do you see that?
A Yes, I do.
Q Okay. Now, it says here that Martin was someone in the -- Lumar was an entity owned, managed and controlled by Defendant Martin. That is Defendant Jim Martin. Do you agree with that statement?
A I agree with what was written there to be the truth.
Q Okay. When you were testifying earlier, you said something to the effect, you considered Jim Martin to be a corporate representative of Lumar Land & Cattle.
A I did not say that at all.
Q Well, what did you say, then, sir?
A I said, in -- that I did not even know the name Lumar until February of 2022.
Q All right. What's your understanding of Mr. Martin's -- his -- what is your understanding of his relationship to Lumar?

A I have no idea what his relationship is to Lumar.

Q Okay. But now, you're -- you're sure, the first time you learned about the sale, that 204 acres, was in the -- the email that we've marked as Dixon Exhibit F, which was in January of 2021. Is that your testimony?

A That is my testimony.

Q All right.

MS. LINDAUER: Actually, Mr. Forshey's statement misstates the -- the letter was 2021. I think you said 2020, so just to clarify. Unless I misheard.

MR. FORSHEY: I had not meant to say 2021. If I did, I apologize, Ms. Lindauer. I misspoke.

MS. LINDAUER: No -- no problem. I just wanted to make sure the record is correct.

BY MR. FORSHEY:

Q All right, now look at Paragraph Number 36. Now, Paragraph 36, could you read that to yourself too, sir?

A Yes.

Q All right. Is that paragraph accurate?

A That's a correct statement.

Q All right. So there's nothing in Paragraph 36 you disagree with?

A I may have started working with AC (Phonetic) America prior to December of 2020.

Q All right. Other than that it's correct?

A That's correct.

Q All right. Now let's go to Exhibit -- pardon me, Paragraph 41. Now there it says, on January 27, 2021, Dixon deeded 6.5 acres of remaining property to Martin, which was in addition to the 204.5 acre parcel under contract to Lumar. Do you see that?

A I see that.

Q Now, that appears to turn -- to tie back to the earlier paragraph, where it referred to -- that there was a parcel -- Paragraph 32 -- where it says that Dixon sold a portion of the remaining land to Defendant Lumar. Do you agree with that statement?

A I did not write this complaint, so I don't know what the author had, what they were referring to.

Q All right. Well, you do agree, in Exhibit -- in Paragraph 32, that they said that shortly after October 15, 2020, Dixon sold a portion of land to Lumar; do you see that?

A I saw that.

Q All right. And then comes over here on Paragraph 41 and it says that on January 27th, 2021, which it's the day before the email; right?

A Correct.

Q That Dixon deeded 6.51 acres of the main property to Martin in addition to the 204.5 acre parcel under contract to Lumar; do you see that?

A I see that.

Q All right. So there's only -- as I can see, there's only been one reference to one piece of property that was sold to Lumar, and that's the 204.5 acres; do you agree with that?

MS. PERRY: Your Honor, that's not --

MS. LINDAUER: No. Your Honor, that's not correct. There were actually several parcels sold to Lumar. Mr. Forshey should know that. So we have --

THE COURT: Ms. Lindauer -- Ms. Lindauer -- Mis. Lindauer -- you let the witness answer the question. If you have redirect --

MS. LINDAUER: Sorry, Your Honor.

THE COURT: -- that's the time to raise it. But don't coach the witness.

Well, sir, you may -- you may answer the -- you may answer the question, sir.

BY MR. FORSHEY:

A As I stated before, I do not know what parcel that paragraph is referring to.

Q Okay. And then Paragraph 42 says, on April the 23, 2021, Dixon provided financing to Lumar for the purchase of 204.5 acre tract and deeded 204.5 acres to Lumar and recorded a memorandum of option agreement to Martin as to the remaining portion of the remaining property; do you see that?

A I see that.

Q Is that true?
A It would, I guess, confirm what was written in that -- I'd have to see that email again on January 28th as to what that exactly said.
Q Okay.
MR. FORSHEY: Mr. Vasek, could you put that email up for us? Is he still on?
MS. PERRY: He should be.
BY MR. FORSHEY:
Q Okay. Up on the screen now is Dixon Exhibit F as in Frank. That refers to the 204 acres. Do you see that?
A It will refer to an option of first refusal to acquire the remaining parcel.
Q Okay. But it says at closing, the 204 acres Jim will obtain an option of first refusal. It's talking there about a sale of 204 acres out of the Bear Creek Ranch; right?
A That is correct.
Q And there was only one sale of 204 acres out of the Bear Creek Ranch; wasn't there?
A I have no idea.
Q Do you know of another sale of any acreage, of 204 acres?
A I don't know what Dixon Water may or may not have sold.
Q So the answer is you don't know of --
A I don't know.
Q -- any other 204 acre sale.

A I know of this -- I don't know what -- if there was anything else sold to Jim Martin.
Q Okay. All right. Now, let's go to Exhibit Number 16, which is the complaint, the original complaint filed by the debtor.
MR. FORSHEY: Can you put that up, Ms. Lavorio (Phonetic).
Your Honor, I'd like you to take judicial notice as well of the contents of that complaint. Would you?
THE COURT: Any objection?
Hearing no objection, the Court will take judicial notice of the complaint, which is Lumar Exhibit 16, which is also EC -- Adversary ECF Number 1.
MR. FORSHEY: Thank you.
BY MR. FORSHEY:
Q Could you read that to yourself quickly, sir?
A Okay.
Q All right. Now, the first sentence of that references a default in termination buyback contract on or about October 15, 2020; do you see that?
A Yes, I do.
Q Was there any -- there was only one termination of a buyback contract in about October 15, 2020; correct, sir?
A I don't recall if there was only one.
Q Or do you recall any other than the one that's referenced

in the complaint here and in the proposed amended complaint?
A I think there was another buyback agreement prior to me coming, being involved that I may have seen, but I can't recall.
Q It -- but was it terminated on or about October 15, 2020?
A The one that I am familiar with was terminated on or about October 15, 2020.
Q All right. So it appears that -- that there was one buyback agreement terminated at that time; correct, sir?
A The one that I am familiar with, that I was involved in, was terminated --
Q All right.
A -- on October 15th.
Q Then it says, shortly thereafter, Defendant sold a portion of encumbered land to the broker and a related person or entity who had represented Plaintiff under the original purchase agreement to acquire the 2,055 acres from Defendant; do you see that?
A Yes, I do.
Q Now, we've already agreed there was only one broker involved, and that was Jim Martin; wasn't it?
A That is correct.
Q So that paragraph has to be referring to a sale to Jim Martin; correct?
A A sale to Jim Martin, that is correct.

Q Okay. Then it says, or related person or entity; is that correct?
A That is correct.
Q And over in the proposed amended complaint, it alleges that Martin was the person who owned, managed and controlled Lumar. Do you remember that?
A Yes, I do.
Q Which I guess would make Lumar a related person or entity to Jim Martin; wouldn't it?
A That's what I understand today.
Q All right. Now, look up there. What's the date on which that was filed?
A August 10th, 2021.
Q All right. So would you agree that no later than August 10th, 2021, someone with the debtor was aware of the sale to Jim Martin?
A Somebody -- maybe not.
Q Well, one -- the debtor already knew about the sale to Jim Martin, as based in his pleading; didn't they, sir?
A They could have discovered that after the fact.
Q The pleading says this -- what date's it filed, sir?
A August 10th, 2021.
Q Okay. So by that date, they had to know about the sale of the property; didn't they?
A Somebody had to know about the sale of the property prior

to filing that complaint, correct.

Q All right. I'd like you to go and look --

MR. FORSHEY: Ms. Lavorio, could you take us back to our Exhibit Number 4, which are amended schedules, and go to page 6 of 9.

BY MR. FORSHEY:

Q Now there, you see that they identify certain potential claims against Jim Martin. It says, possible cause of action against Jim Martin for claims including but not limited to tortious interference, breach of contract, misrepresentation, fraud, breach of fiduciary duty, and all related claims and causes of action; do you see that?

A Yes, I do.

Q And are you aware of any other piece of property that had been sold to Jim Martin by the date this was filed on May 12, 2021?

A To Jim Martin specifically?

Q Yeah.

A I don't know of any property sold to Jim Martin specifically.

Q All right. Do you know what this is referring to, sir? Exhibit 4.

A It's referring to the piece of property that was sold to an entity controlled by Jim Martin.

Q Okay. And --

A I assume.

Q -- what -- all right. Correct that.

A Sold to Jim Martin. I don't know about any entity. I take that back after reading that.

Q Okay.

MR. FORSHEY: Now, scroll up to the top of the page, Ms. Lavorio (Phonetic) and show him what -- when that was sold -- was filed.

BY MR. FORSHEY:

Q So it looks like that was filed on May 12th, 2021; do you see that?

A Yes, I do.

Q Okay. So would you agree by that point in time, the debtor was aware of the sale of the property to Mr. Martin?

A By 5/12/21, it would appear to -- it would appear to be so.

Q Okay. So now, when you say that the first time you heard about the sale of the property, the debtor sale to Lumar, the debtor already knew about the sale of the property to Jim Martin, the 204 acres; didn't he?

A I did not know about the sale to Lumar, and never even heard the name Lumar until February of 2022.

Q Okay. But I'm asking you about the 204.5 acres. The --

A I --

Q -- debtor knew that that was sold to Jim Martin --

A It was sold --

Q -- well -- well before that; didn't it?

A It was sold to Jim Martin. That is correct. Jim Martin.

Q All right. And Jim Martin, we've agreed, the record shows, and it's alleged in that pleading, was a principal of Lumar Land & Cattle; correct?

A That's what is alleged in the complaint.

Q All right. So the debtor already knew that that property had been transferred to -- by Dixon to Martin; correct?

A I don't know what else anybody within the debtor knew. I knew that I did not know.

Q Fine. But what we're seeing from the documents, the debtor had to know that that property had been transferred from Dixon to Martin; didn't it?

A I guess that's your opinion.

Q Well, there was an email sent to you January 21 that it happened; correct?

A That they sold a piece of property -- that they were contemplating selling a piece of property to Jim Martin, that's correct.

Q All right. And then we have in -- that'll be marked as Exhibit 16, which was filed in August '21. We also have a record to the same property being sold to Jim Martin; correct?

A I can't tell you without -- the same 204 acres?

Q Yes.

A I assume that could be correct, but it may have been another 204 acres, but I will assume it was the same 204 acres sold to Jim Martin.
Q Okay. And so you know that the debtor, before it got its plan done, then, knew that the acreage had been sold to Jim Martin and that they knew that Jim was also a principal in Lumar Land & Cattle?
A I don't know what the debtor knew. I can only testify as to what I knew.
Q Okay. Now, wait a second. You can't testify that other people in the debtor didn't know about that sale to Lumar Cattle; can you?
A I can only testify about myself and what I knew.
Q Okay. So if somebody else in the debtor knew about that sale, you can't testify to that; can you?
A How would I know what anybody else knew? I can only tell you that I was the individual representing the debtor. I was the only one having conversations directly with Robert Potts. And I had no knowledge of any property being sold to Lumar until February of '22.
Q Okay. But to make sure the record's clear, you did know about that same property being sold, allegedly to Mr. Martin, in January of '21; correct?
A I knew that in January 28th, pursuant to that letter, that Dixon was selling to Jim Martin a parcel of -- a 204 acre

parcel.

Q Okay. So what you're really arguing about is not that you didn't know about the 204 acre parcel being sold, you didn't know about it being sold to Lumar. That's what you're saying, isn't it?

A I don't like you putting words in my mouth.

Q Well, you knew about the 204.5 acres being sold to Jim Martin; correct?

A I knew about that by the letter that Jim -- that Robert Potts sent to me.

Q But what you're saying is, you didn't know that it had been sold to Lumar, but you knew it'd been sold?

A I -- that letter does not say it was sold, does it?

Q Well, it says it has a contract of sale. Let me ask you --

A Like, when -- when --

Q -- this, then. You knew there was a contract of sale between Dixon and Jim Martin; correct?

MS. LINDAUER: Your Honor, I think -- Your Honor, I think this has been asked and answered several times. And Mr. Forshey is being very argumentative with Mr. Martin. So I would object. We've already covered this. The email says what the email says. And I know Mr. Forshey would like Mr. Martin to say something different. But I think we've covered this. The email speaks for itself as to what was put in the email.

It's already been admitted. So grilling Mr. Martin over and over and over on this is really not a productive use of any -- of this Court or any party's time at this point.

THE COURT: The objection is overruled. You may answer the question, sir.

THE WITNESS: Please ask the question again.

BY MR. FORSHEY:

Q Okay.

Q Okay. Dixon Exhibit F, the email, says that Dixon Water Foundation has a contract to sell to Jim Martin 204 acres of our Bear Creek Ranch; is that correct?

A Okay. I'm going to tell you what --

MS. LINDAUER: Your Honor -- Your Honor, objection. Your Honor, objection. The email speaks for itself. We don't need Mr. Martin to confirm what's already in an email that's been admitted by the Court.

THE COURT: The objection is overruled.

Mr. Martin is being very, very careful with is responses. So I think that Mr. Forshey has a -- has a right, just like you would when a witness is being very, very careful in each response to try to --

MS. LINDAUER: Sure.

THE COURT: -- inquire around that. So, and again, the witness is being very, very careful with the words he is using and so I'm going to give Mr. Forshey the latitude, as I

would you if you were in those shoes, to try to pin the witness down because he is being a bit evasive, because he's being very, very careful with his responses.

So you may proceed, Mr. Forshey.

BY MR. FORSHEY:

Q The email says the Dixon Water Foundation has a contract to sell Jim Martin 204 acres of our Bear Creek Ranch; is that correct?

A I'd have to look at the letter again, but I thought it said a plan to sell it, if I'm not mistaken. Could you put up the letter again?

Q Sure, Mr. --

A The email?

MR. FORSHEY: Sure. Mr. Vasek, would you -- would you oblige us.

MR. VASEK: Certainly. Just a moment.

BY MR. FORSHEY:

Q Okay. You see it says, Dixon -- Dixon Water Company has a contract to sell to Jim Martin 204 acres of our Bear Creek Ranch. We plan on closing this sale in the next 90 days; do you see that?

A That's what I see.

Q Okay. So based on that, the person that -- you knew that they had a contract to sell that 204 acres to Jim Martin; correct?

A I know what the letter said. They have a contract to sell to Jim Martin.

Q And then they also told you they plan on closing within 90 days; correct?

A That's what it says, but I do not know by this letter if they really had a contract. It doesn't say that. There's no copy of the contract there. I never saw a copy of the contract there. I only know, I said this is -- they're confirming that Dixon Water has a contract to sell to Jim Martin.

Q All right.

MR. FORSHEY: All right. I'll pass the witness, Your Honor.

THE COURT: All right. Thank you, Mr. Forshey. Any other counsel have any cross-examination questions for Mr. Martin?

Mr. Shepherd is shaking his head no. All right.

Ms. Lindauer, any redirect?

MS. LINDAUER: Yes, Your Honor.

Ms. Umai (Phonetic) I don't have a copy of the Exhibit F, which was just produced. So if Counsel would be kind enough to put that document up again.

REDIRECT EXAMINATION

BY MS. LINDAUER:

Q Mr. Martin, you testified on direct regarding this particular email; is that correct?

A I -- I didn't hear you. There was some background noise.
Q Sorry. Mr. Martin, you testified on direct that you were in receipt of this particular email; is that correct?
A Hold -- hold on one minute. I'm sorry, Ms. Lindauer. Could you repeat the question? I'm sorry for that, there was something closing in my house at that time.
Q Sure. Mr. Martin, you testified on direct before you even had this email in front of you that, in fact, you had received an email in January 2021 from Mr. Potts regarding a possible sale of property to Mr. Martin; is that correct?
A That is correct. I do recall receiving that.
Q Okay. And this is the email that you were referring to; correct?
A That is correct.
Q And I think you already testified to this, but you had -- did not ever see a copy of the contract to Jim Martin; is that right?
A That is correct.
Q Were you ever provided notice by Dixon Water or Jim Martin or any other person that a sale to Jim Martin of 204 acres had actually closed?
A No, I had not.
MS. PERRY: Objection, Your Honor. I think that actually --
THE COURT: Hold on, hold on, hold on.

MS. PERRY: I think that calls for a legal conclusion whether he received notice.

THE COURT: The objection is overruled. The answer will stand.

You may proceed, Ms. Lindauer.

BY MS. LINDAUER:

Q You were also told that Jim Martin will receive an option to acquire the remaining portion, 1,320 acres as part of this closing or contract, right?

A That is the clear reading of that email.

Q Okay. Do you see any mention in that email of the name Lumar Land & Cattle?

A No, I do not.

Q As you sit here today, you've told us repeatedly, the first time that you heard the name Lumar Land & Cattle was when they intervened in connection with the pending lawsuit; is that right?

A That is correct. In February -- kind of -- some time in February of '22.

Q Mr. Forshey asked you about some allegations or statements made in connection with an amended pleading that was filed with this Court; is that right?

A That is correct.

Q Okay.

MS. LINDAUER: Ms. Ollar, if you're online with us, which I believe you are. Can you pull up for me Plaintiff's Exhibit 13, which is the Motion for Leave to Amend?

It's Plaintiff's Exhibits. I think you might be over in the Defendant's Exhibits. There we go.

And if you could go back, Ms. Ollar, to the first page you had up of that exhibit.

BY MS. LINDAUER:

Q Do you see, Mr. Martin, the date that this particular filing occurred with regard to the Motion for Leave to File Amended Complaint?

A 8/10/21.

Q No, look at the very -- the following transaction was received. I'm not sure what you're looking at, but do you see that?

A The following transaction was received -- 5/9/22, correct.

Q Okay. All right. So 5/9 of '22, when the Motion for Leave was filed asking to amend the complaint; correct?

A Correct.

Q Mr. Martin, are you aware that there has been a great deal of discovery that has occurred in this case between the debtor and Dixon Water Foundation?

A Yes, I am.

Q And had that discovery occurred prior to this Motion for Leave to File an Amended Complaint?

A I can't recall when that discovery was done, but I assume it was done before 5/9/2022.

Q So the facts that are included in the amended complaint would be in part the result of receiving discovery in connection with this proceeding?

MS. PERRY: Objection, Your Honor. Is counsel now testifying or asking a question -- a question of the witness?

MS. LINDAUER: Your Honor, I'll phrase -- I'll rephrase the question.

THE COURT: All right. Thank you.

BY MS. LINDAUER:

Q Mr. Martin, Dixon Water and other parties have provided responses to discovery in connection to this proceeding; is that correct?

A Yes.

MS. PERRY: Objection, Your Honor. Leading.

MS. LINDAUER: Your Honor, I think that's a foundational question.

THE COURT: I think so. I'm going to overrule the objection, but to the extent you can avoid leading questions, that would be terrific.

MS. LINDAUER: Sure.

BY MS. LINDAUER:

Q Mr. Martin, what use has the debtor made of the discovery that it's received from Dixon Water and other parties?

A They filed an amended complaint.

Q And so facts contained in that amended complaint, is it your understanding that -- what's your understanding of where some of those facts had actually come from?

A It's my understanding that some of those facts came from discovery that was -- that was filed by the debtor in this case.

Q Okay.

A Or the plaintiff --

Q You --

A -- I guess, in this case.

Q If we -- if we look at, on this Motion for Leave, look at the amended complaint.

MS. LINDAUER: Ms. Ollar, if you if you could go to that actual document. There you go. And go to Page 14 of 38. Okay. And run back up a little bit.

BY MS. LINDAUER:

Q And if you'll look at Paragraph 41. Does that state, Mr. Martin, that on January 27th, Dixon deeded 6.15 acres of the remaining property to Martin, which was in addition to the 204.5 acre parcel under contract to Lumar; do you see that?

A Yes, that's exactly what it says.

Q Right. Do you have any understanding, Mr. Martin, of -- of whether there were several transfers of property by Dixon to either Jim Martin and now, at this point, to Lumar?

A Yes, I'm aware of some parcels that were transferred to Jim Martin or some other entities that I've learned subsequent to January 28th.

Q All right.

A Or --

Q All right. If you look at Paragraph 42, on April 23rd, 2021, Dixon provided financing to Lumar for the purchase of 204.5 acre tract and then deeded the 204.5 acres to Lumar. Is that the way that reads?

A That's exactly what it says.

Q Okay. So it appears, Mr. Martin, that what we're talking about are two tracts: the 6.15 acre track and a 204.5 acre track; is that right?

A Yes, Paragraph 41 refers to 6.15 acres and we -- which was in addition to the 204.5 acres, and then Paragraph 42 states that they provided financing for the 204.5 acres.

MS. LINDAUER: Ms. Ollar, if you would pull up for me -- and, again, this would be in the Plaintiff's exhibits.

BY MS. LINDAUER:

Q If you look at Exhibit 6, just for the record. What's the date of this particular order, Mr. Martin?

A August 2nd, 2021.

Q Thank you. And the Motion for Leave to Amend, you already told us, was in May of 2022; is that right?

A Correct.

Q If you could take a look at Plaintiff's Exhibit 7.

MS. LINDAUER: And if we take a look -- Ms. Ollar, it would be easier to go from the very end. Four pages from the end.

BY MS. LINDAUER:

Q Counsel asked you about these provisions that were included in the schedules; do you see those?

A Yes, I do.

Q Okay. And is --

MS. LINDAUER: And is -- go down a little further. Go a little further. There you go.

BY MS. LINDAUER:

Q One of the claim's possible causes of action against Jim Martin were claims including but not limited to tortious interference, breach of contract, misrepresentation, fraud, breach of fiduciary duty, and all related claims and causes of action; do you see that?

A Yes, I do.

Q This claim was added to the debtor's schedules prior to the approval of the debtor's plan. Is that your understanding, Mr. Martin?

A I'd have to look at the date, but I think so.

Q Okay.

A I'm a little confused with dates right now.

Q Okay. If you'll look at the last page of that document.

MS. LINDAUER: Ms. Ollar, if you would go to the last page. There you go.

BY MS. LINDAUER:

Q 5/12/2021, do you see that date?

A Yeah, May 12th, 2021. Correct.

Q And that was before the plan was approved in the bankruptcy case; correct?

A That is correct.

Q Looking at Exhibit F, again, the letter -- or the email that you looked at, just to be clear, the only mention in that letter is of a gentleman named Jim Martin; is that right?

A That is correct.

Q And if you believed that BM318 -- or BM318 believed it had claims against Mr. Martin, would they relate to that particular letter or claim?

MS. PERRY: Objection, Your Honor. Calls for speculation.

THE COURT: Sustained.

Rephrase the question.

MS. LINDAUER: Thank you. I poorly worded that question, Your Honor. I'm sorry.

BY MS. LINDAUER:

Q Just to be clear, Mr. Martin, claims against Mr. Jim Martin, those are part of the claims that the debtor is requesting to include as part of its amended complaint; is that

right?

A Correct.

MS. LINDAUER: Your Honor, I'll pass the witness.

THE COURT: All right. Thank you, Ms. Lindauer.

Ms. Perry, any other -- any cross for this witness?

MS. PERRY: No, Your Honor.

THE COURT: All right. Thank you.

Mr. Forshey?

MR. FORSHEY: No, sir.

THE COURT: All right. Anyone else have any further questions for Mr. Martin?

All right. Thank you, Mr. Martin for your testimony, sir. You are excused as a witness.

THE WITNESS: Thank you very much.

(This concludes the portion of the proceedings requested to be transcribed: witness testimony only)

* * * * *

**C E R T I F I C A T I O N**

I, Gillian Lawrence, CER-255, CET-255, court approved transcriber, certify that the foregoing pages 1 to 55 is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.

____________________________________

CER-255, CET-255, COURT TRANSCRIBER DATE: August 5, 2022