**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| IN RE: | ) Case No. 4:20-bk-42789-mxm11 |
| | ) Chapter 11 |
| BM318, LLC, | ) |
| Debtor. | ) |
| BM318, LLC, *et al.*, | ) Adversary No. 4:21-ap-04051-mxm |
| Plaintiffs, | ) |
| | ) 1100 Commerce Street |
| versus | ) Dallas, Texas 75242-1496 |
| THE DIXON WATER FOUNDATION, *et al.*, | ) |
| | ) August 1, 2022 |
| Defendants. | ) 1:03 p.m. |

TRANSCRIPT OF MOTION TO COMPEL RE: DISCOVERY ANSWERS TO INTERROGATORIES AND PRODUCTION OF RESPONSIVE DOCUMENTS FILED BY DEFENDANT THE DIXON WATER FOUNDATION (VASEK, JULIAN) (76)
BEFORE HONORABLE JUDGE MARK X. MULLIN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Defendants: Munsch Hardt Kopf & Harr, P.C.
By: DEBORAH M. PERRY, ESQ.
JULIAN VASEK, ESQ.
3800 Lincoln Plaza
500 North Akard Street
Dallas, TX 75201-6659

APPEARANCES VIA WEBEX:

For the Plaintiffs: Joyce W. Lindauer Attorney, PLLC
By: JOYCE W. LINDAUER, ESQ.
1412 Main Street, Suite 500
Dallas, TX 75202

Courtroom Deputy: Jennifer Calfee

**TRANSCRIPTION SERVICE:** **TRANSCRIPTS PLUS, INC.**
**435 Riverview Circle**
**New Hope, Pennsylvania 18938**
**Telephone: 215-862-1115**
**e-mail CourtTranscripts@aol.com**

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

APPEARANCES VIA WEBEX:
(Continued)

| | |
|---|---|
| For the Plaintiffs: | Law Office of K. Walji<br>By: KHUDABUKSH K. WALJI, ESQ.<br>10701 Corporate Drive, Suite 350<br>Stafford, TX 77477 |
| For Lumar Land & Cattle, LLC: | Quilling, Selander, Lownds, et al.<br>By: KIMBERLY P. HARRIS, ESQ.<br>2001 Bryan Street, Suite 1800<br>Dallas, TX 75201 |

THE COURT: Good afternoon; please be seated. All right, we're here this afternoon for the 1 o'clock docket. And this afternoon, we're taking up a continuation of the hearing we started last week in BM318, LLC.

We'll go ahead and take appearances here in the courtroom.

MS. PERRY: Good afternoon, Your Honor. Deborah Perry and Julian Vasek on behalf of the Dixon Water Foundation.

THE COURT: All right, good afternoon, to you, too.

And that's all we have here in the courtroom. So the remainder of you will be appearing by video. Good afternoon, Ms. Lindauer, how are you?

MS. LINDAUER: Good; thank you, Your Honor. Joyce Lindauer here on behalf of BM318. I also have co-counsel, Khudabuksh Walji, he's on the screen here, as well.

THE COURT: All right, terrific. And, good afternoon, Ms. Harris.

MS. HARRIS: Your Honor, it's Kimberly Harris here on behalf of Lumar Land.

THE COURT: All right. Any other counsel wishing to make an appearance today?

(No audible response heard)

THE COURT: All right, hearing none. Ms. Perry?

MS. PERRY: Good afternoon, Your Honor. Deborah Perry on behalf of the Dixon Water Foundation.

As Your Honor knows, we're here on a continued hearing on Dixon Water Foundation's motion to compel. This morning, Ms. Lindauer filed a -- what is styled as a status report, but which also raises, you know, additional legal arguments with respect to the native production, which I will address, in part. And then Mr. Vasek can get into more detail. We've been trying to kind of, you know, review that document, try to review some of the cases to kind of get up to speed.

But in the event that the Court, as we go through this, determines that it may need additional information, we would certainly appreciate the opportunity to provide additional briefing, if the Court thinks that's necessary. We, frankly, don't think it's necessary. We think the case law is clear, and these cases that BM318 has cited to are distinguishable, but wanted to mention that on the front end.

So since we were here on Wednesday, Your Honor, on Friday morning, we met in person at the offices of JMJ Development, who's an affiliate of BM318. And we certainly made some progress there; there is still some significant outstanding issues.

Ms. Lindauer late Thursday night, I think about 9 p.m., served us with amended responses to the interrogatories and requests for production, and I have a copy of those for Your Honor, if I can approach?

THE COURT: Yes, of course.

MS. PERRY: And we may or may not need to get into some of those, but to the extent we did, I wanted Your Honor to have a copy of this. And we certainly, you know, appreciate Ms. Lindauer providing us with those.

Of course, some of those amendments raise, you know, additional questions. But I think it's fair to say that with respect to the outstanding issues on the interrogatories, while I don't necessarily agree that the responses are accurate or necessarily complete, I think for purposes of the motion to compel, they're acceptable and we'll, you know, delve into the issues further as discovery progresses.

So with respect to the interrogatories, I think that has been addressed.

When we turn to the requests for production, there are a couple of categories. Really, it breaks down into, I think, two categories that are left:

And so if Your Honor looks at the first amended objections and responses, it goes to Page 26 of those. Starting with request for production number 19, there's about ten requests for production there where the statement is, "Plaintiff will produce the documents responsive to this request that are in its possession, custody, or control." And there are -- RFPs 19, 20, 33, 37, 38, 49, 50, 51, 52, and 53 all have that same response.

In the status report, Ms. Lindauer represents that

they intend to produce supplemental responsive documents within a week of today, which I think is acceptable. But clearly all responsive documents have not yet been produced.

And so one thing I might suggest is that with respect to that issue, and there may also be an open issue on the financials which we'll get to, that we perhaps carry the motion to compel to a date mid to the end of next week in the event that that supplemental production is insufficient; I would rather do that than having to start over. And so that is sort of issue one, broad issue one.

Broad issue two, setting aside, of course, the native production, which we'll get to, is that BM318 takes the position -- and we can see this starting on Page 27 of those first amended responses, in request for production number 21 that they have none of these financial statements, balance sheets, general ledgers, etc.

And if I may approach, I have a copy of one of their monthly operating reports.

(Pause)

MS. PERRY: So if we turn, Your Honor, this is -- and for Ms. Lindauer's benefit, this is Docket Number 29, it was filed on October 21st, 2020, which is several months after the deed in escrow was filed. And if we flip to the back, there are two pages here that list other current assets and other liabilities. And while I'm not familiar with QuickBooks, and I

know the accountant is appalled, my understanding is that this looks like it was generated from QuickBooks.

Now I don't want to get completely into discussions that we had with the opposing counsel, but it's my understanding there may be some kind of issue with preservation of that QuickBooks information. We don't have a clear answer from BM318 as to what the status of that is. Obviously that could potentially raise spoliation questions that are not -- we're not here on that today, but that is an open question, and it's a serious issue in this case because, as Your Honor knows, you know, insolvency is an issue in both 547 and 548, so we have serious concerns about that.

And I think that also plays into the request for things to be provided in native format. Because if the QuickBooks is in the possession, custody, and control of BM318, then we want access to it -- to that data. And if BM318 is going to run these reports themselves, we absolutely need to have access to the metadata which is, you know, part of the document which you'll see when Mr. Vasek kind of gets into the native. You know, it's our position, and I don't think that this is an unusual position, I think this is simply accurate, that with electronic documents, the metadata is part of the document. So when you print out an email, and PDF it to create a PDF from it, and produce it, you are actually taking away data.

And so with -- so that -- specifically the financials is going to be critically important. That to the extent they exist, we get them. And that they be produced in the appropriate electronic format for us to test them. So those are two broad issues.

In addition, request for production number 31 is kind of an interesting response. And Your Honor may actually have a better knowledge of this than I do with your background, but we asked for tax returns for BM318 for 2019 and 2020, and the response is, "Plaintiff has no documents responsive to this request since BM318 did not earn taxable income during the referenced period." Now I'm not a tax attorney, but my tax attorneys tell me that statement doesn't really make sense.

Now perhaps it's a pass-through or disregarded entity, but in that case, it would be our position that then we want the tax returns for the entity -- for the entities that flow up, wherever the BM318 data resides. And so part of our request today, in connection with any order, would be that the Court orders that, all right, so now we know if there's not tax returns for BM318, that the debtor provide the disregarded entity tax returns up the chain.

And with regard to what we were discussing with respect to the QuickBooks information, Your Honor, under the native format documents section of this status report, the debtor says, "Some documents originally creative in native

format have been lost to the debtor." And so that also raises additional questions because if they've been lost, we sort of need to know what has been lost and where is it? When was it lost, and that type of thing? And this is the first time that that's been -- that information has been provided to so.

So, you know, while we've certainly made progress in narrowing the issues, there are certainly some, you know, serious issues here for consideration.

When we look at -- and then when we go to native format, I'm going to ask Mr. Vasek to address that simply because he's a bit more versed in it than I am. But I did take the opportunity to take a look at some of the cases that were cited by opposing counsel and, you know, there were a few there where the documents had been produced in native format, but then the party was asking for, like, a forensic accountant or something else in addition.

I also would say this, which I think is important, in our request for production, we specifically specified the format in which the documents were to be produced. The debtor did not object to that, they did not. There is no objection in their objections and responses to the format in which we requested it to be provided. And the format that we requested comports with the Federal Rules.

So in the argument that they make now with respect to not having to comply with this, they've waived. There may be a

general objection in their objections about not having to do anything that is -- you know, goes beyond the Federal Rules that, A, this doesn't go beyond this; and, B, that's a general objection that is not valid.

So as a threshold matter, I don't think we get to any of these issues with respect to the -- whether or not they have to produce in native format. I think they've waived that objection.

And I would also say that with respect to sort of these arguments in the status report about how perhaps this is too onerous or too expensive, if Your Honor will turn to BM318's response to interrogatory number 16, they're now essentially stating that they've been damaged to the tune of $100 million. So I think it's perfectly appropriate that they do be required to comport with the rules, and produce these documents in the format requested, and it's a standard format. And certainly that burden should not be shifted to my client, a nonprofit corporation.

And I will turn it to Mr. Vasek with regard to getting into more detail on native should Your Honor have questions. I would also say that, you know, at some point in this hearing, we're also going to want to discuss, you know, the upcoming deadlines. And I have circulated a proposed scheduling order to the other parties on Friday that essentially pushes out the deadlines but keeps the trial

setting. So I would just mention that, as well, Your Honor.

THE COURT: All right; thank you, Ms. Perry.

Mr. Vasek?

MR. VASEK: Thank you, Your Honor.

Ms. Perry doesn’t give herself enough credit; she actually covered most of what I was going to say, Your Honor. But, you know, I would reiterate there was no objection to the instruction and --

THE COURT: I’m trying to go from memory, and Ms. Lindauer will probably remind me. I thought she pointed out somewhere in her objection that she did object to that, but I guess I’ll look to Ms. Lindauer to remind me of where that was in the objection, if it’s there.

MR. VASEK: Okay, Your Honor. If that’s the case, then I would stand corrected. I would point out, though, if it’s a general objection, those are forbidden --

THE COURT: Understood.

MR. VASEK: -- under the Heller case.

THE COURT: Understood. I was going back from memory from the hearing, so that we’ll have -- Ms. Lindauer will have to point us to the specific objections.

MR. VASEK: Sure.

THE COURT: All right.

MR. VASEK: And, you know, I think the issue is best described like this: In the production, we have emails that

clearly have attachments. You can see at the top that there's an attachment, but there is no attachment right behind it. Maybe it's somewhere else in the production. Without the metadata, those two documents just aren't linked.

When you have the metadata, and you load the documents in the software used, you know, it shows the relationship between an email and an attachment, is the best example.

I know that BM318 has expressed concern that you can go back and find all prior track changes. I don't believe that to be the case. I have never seen a way to do that, and I've reviewed plenty of documents in native format.

I would also point out that near native format is fine, which is where the document was produced in PDF or TIF format, but with a file that contains the metadata so that the relationship between, again, you know, emails and attachments is preserved, and the software can link them together.

As for the possibility that BM318 might need to hire an outside consultant, and that is an added expenses. Your Honor, Dixon did that; we hired a consultant to go collect native files from our client. So I think that may just be part of discovery practice in this day and age.

THE COURT: What's the easiest way to proceed? If I understood Ms. Perry correctly, on the interrogatories, there is the suggestion that we reset, at least a portion of this

hearing, for a week or two to give you the opportunity to review what Ms. Lindauer provided, is that accurate? Or --

MR. VASEK: I think the interrogatories are --

THE COURT: Or you were fine with the interrogatories?

MS. PERRY: Right. I think with respect to the interrogatories, we wouldn't need to carry the motion.

THE COURT: Okay, so that's done. So now we're just focused on the requests for production.

MS. PERRY: Correct, Your Honor.

THE COURT: So if it gets to requests for production, would it be easier -- at least it might be for me -- just to go down each one? One, two, three, to see which request for production there is a dispute? And it may get a little bit redundant, but at least hear the arguments. You know, the first few may be more fulsome, depending on the Court's ruling, may then narrow the remaining. Is that the easiest way to resolve this or -- I'm not sure a general ruling would streamline it because there may be specific issues with specific types of documents.

MR. VASEK: Your Honor, I think -- you know, there were quite a few where BM318 says -- and number one is an example, "BM318 has produced documents responsive to this request." So there are quite a few where BM318 says they have produced all responsive documents.

In that case, for all of those, I don't know that it's necessary to do it one-by-one because our only remaining issue is whether they need to reproduce those documents in native format.

THE COURT: Okay.

MR. VASEK: Is that --

MS. PERRY: I think that's right Your Honor.

THE COURT: Okay.

MS. PERRY: Because -- and I should have said this at the beginning. I think with respect to, like, the relevance objections and the vague and ambiguous objections, that BM318 has basically withdrawn those in connection with their first amended responses.

THE COURT: Okay.

MS. PERRY: So in my view, what we have left are, I think, three issues with respect to this motion to compel:

One is the requests for production -- the answers to the requests for production where the debtor says, "We will produce."

THE COURT: And that's where I -- I mixed up. So it's those --

MS. PERRY: Yes.

THE COURT: Those are the -- those responses are the ones that you suggest that we wait and -- okay, that makes sense.

MS. PERRY: Correct.

THE COURT: And then issue number two was the --

MS. PERRY: And the issue number two is the --

THE COURT: The no documents.

MS. PERRY: The no documents, which are requests for production 21 to 32 where they say there are no documents, but we can see -- and we know at some point, they had QuickBooks and, you know, the status of all of that is unclear.

THE COURT: Okay. So issue number two then are requests 21 through 32?

MS. PERRY: Yes.

THE COURT: Okay. And then the third issue was the native format kind of that's -- it's with all of them.

MS. PERRY: Yes.

THE COURT: But does that -- all 1 through whatever, or is that --

MS. PERRY: The native format applies to the whole production.

THE COURT: All right.

MS. PERRY: Yes.

THE COURT: And then number four was, for example, that was just the example of the tax return issue.

MS. PERRY: Correct.

THE COURT: Okay.

MS. PERRY: And I think the tax return -- and so

while -- so I lumped the tax returns in with RFPs 21 to 32 because it's in there because they essentially say we don't have any because they didn't have any earned income.

THE COURT: Okay, understood.

MS. PERRY: So I do think we're narrowed down to those issues in that I don't -- I don't foresee that we need to go through each one one-by-one.

THE COURT: Okay.

MS. PERRY: It's just a bucket -- it's buckets or general issues.

THE COURT: All right. Give me one minute.

(Pause)

THE COURT: I agree with you. Since 21 through 32 are all the same broad categories of types of documents, I agree with you.

MS. PERRY: Okay.

THE COURT: So then the whole native format issue, I guess, we can chat about, and I'll let you finish your comments.

And then I guess I'll let Ms. Lindauer respond to -- is that -- should we just take them up that way first? Dealing with the native document issue?

MS. PERRY: I think that's fine, Your Honor.

THE COURT: All right.

MR. VASEK: Sure.

MS. PERRY: Thank you.

THE COURT: All right. So, Mr. Vasek, anything further?

MR. VASEK: I don't, Your Honor.

THE COURT: All right.

MR. VASEK: I'll just reserve for any sort of rebuttal that may be necessary.

THE COURT: All right. All right, thank you.

All right, Ms. Lindauer, it appears that there has been a good narrowing of the issues. But as I understand it -- and, again, Ms. Perry and Mr. Vasek will correct me if I'm wrong -- that at least with all of the requests for production, which are 1 through 57, what is the concern about the native format issue? Because I have a -- I have read the papers, and I've read the papers that you filed early this morning, as well. I tend to agree that to the extent those need to be produced, and it shouldn't be that difficult. If there is a difficult reason to do so, or costly, I guess you can tell me why it would be so costly as to somehow tip the scales as to why those documents shouldn't be produced. But I just don't think it's that hard to produce the native format.

MS. LINDAUER: So let me -- let me -- first of all, let me go back and address a few things. So just to be clear, the answers to interrogatories which now include, I think, something like 20 some odd pages, I believe it's 23 pages of

answers. From what I'm gathering, the detail that we've now provided seems to have addressed most of those.

On Page 3 of the amended objections, Paragraphs 7 and 9 specifically address the requests for production of documents, and specifically say that a party is not required to produce a document or tangible thing unless it's in a person's possession, custody or control. A document that does not exist is not within our custody and control, etc.

And then on Paragraph 9, we specifically say that with regard to each request, of course, we're incorporating those objections.

So we actually went through on the request for production and answered them if the documents had actually been produced, or if there were no documents to be produced, or if there was still the possibility of locating documents that could be produced. So there's three categories there.

The problem that we're having an issue with, Your Honor, is that we have already produced thousands of pages of documents, I don't think there's any question about that. And those documents have been provided in the means in which they are kept by the debtor.

This particular debtor keeps its documents in paper format. And as we explained to Ms. Perry and Mr. Vasek on Friday, a lot of the records that BM318 -- and, again, remember, this is a real estate business. So a lot of the

records actually resided, like emails and things, on individual peoples' laptops, not owned by the company, but owned by those individuals.

THE COURT: But who owned the information?

MS. LINDAUER: And as we explained to Ms. --

THE COURT: Let me make sure I understand.

MS. LINDAUER: Sure.

THE COURT: So individual A was working for BM318, either as an employee or as an independent contractor --

MS. LINDAUER: Right.

THE COURT: -- but it was working on -- working on what I'll call the Dixon transaction, are you trying to --

MS. LINDAUER: Sure.

THE COURT: -- are you trying to tell me that that -- the information is not proprietary to BM318, and BM318, especially when litigation starts, shouldn't be responsible for making sure that information is preserved?

MS. LINDAUER: Well, so the problem that we have is some of those people still work with JMJ and related entities. So those records, like Larry Martin, we have access to his records. Though we have people like Michael Matthews, who left the company, took his laptop, and unless we have to compel him somehow, he is no longer in our custody or control as far as being able to get his records.

THE COURT: Well, wasn't --

MS. LINDAUER: So we've got --

THE COURT: Are you -- if I'm understanding you then, are you saying that BM318, either as its former employee or its former independent contractor, didn't have some obligation to maintain or preserve the BM318 documents? Now why wouldn't you have --

MS. LINDAUER: I would think that there --

THE COURT: Why wouldn't you have that -- why wouldn't the debtor have the right to say, "Give me back my stuff. Give me back my information"?

MS. LINDAUER: Well, the problem is, is number one, it's on their personal laptop.

THE COURT: Well, that's --

MS. LINDAUER: And, number two, we don't --

THE COURT: So that could -- well --

MS. LINDAUER: I know, but number two, we don't know what they have on their personal laptop because they're not under our control any longer.

THE COURT: But --

MS. LINDAUER: We'd have to basically --

THE COURT: But when they -- but when they were under your control, number one, wouldn't -- what you're -- are you telling me -- let's say you had a dispute with that individual about this -- about the Dixon transaction, which had nothing to do with Dixon, you'd have the right to say --

MS. LINDAUER: Sure.

THE COURT: -- "Give me back our stuff. Give me back our information."

MS. LINDAUER: Right.

THE COURT: And I'm assuming you still have that right to do so. Why wouldn't -- why shouldn't it be on BM318 to go back to that former employee and say, "Give me access to our proprietary information"?

Number two, once that person left the employ, why wouldn't it have been on BM318's requirement to make sure that those documents, which were proprietary to BM318 not be destroyed? Wouldn't there be a requirement to avoid spoliation of potential documents that are subject to, obviously, litigation that your client brought? And that -- I'm not -- I don't understand why it can't get that information and turn it over to Dixon.

MS. LINDAUER: Your Honor, I think it would be -- if I might call Mr. Barton, because obviously he's the businessperson on this, and let him answer some of your questions because I think he is better situated to do that than I am. All I'm doing is repeating things that I am being told.

THE COURT: But that -- I --

MS. LINDAUER: But I think what I'd like to do is call Mr. Barton, and let him answer a few of these questions

for you --

THE COURT: I don't think --

MS. LINDAUER: -- and explain to --

THE COURT: I don't think I need the testimony. I think to the extent the debtor has proprietary rights to those -- to that information, it's got an obligation and duty to get those documents, and then turn them over responsive to the request for production. That's how it's generally done. This isn't that surprising or that unusual, those things happen all the time. Employees leave the employ of businesses all the time, but the business still retains control over its proprietary information and should have had controls in place to prevent what could be very important documents to be -- to leave the building through the laptop that the company lets the employee keep, and then say, "Oop, we don't have the documents anymore." That's not -- that's just not the law.

MS. LINDAUER: So that's --

THE COURT: And so while --

MS. LINDAUER: Well, let's be clear --

THE COURT: I don't need Mr. Barton's testimony. And the fact is the company had -- to the extent the company owned those records or had proprietary rights to those records, the company has an obligation to go and retrieve those, and send the responses. Why is that a surprise? What am I missing?

MS. LINDAUER: Well, first of all, okay, you're assuming -- first of all, the laptops belong to the individuals. They don't belong to the company, and never did. That is their personal laptop. These are emails on their personal emails, on their Gmail accounts or whatever.

THE COURT: And, again --

MS. LINDAUER: So those were never --

THE COURT: But, again, you're saying the company lost documents because the company no longer has access to the computers that the employees were using, they were their employees, and the employees have left the building.

But the problem is, we're talking about --

MS. LINDAUER: Correct.

THE COURT: -- the company documents. And the responses say, "The company no longer has access to the company documents because they're gone." I'm saying they're still the company documents.

MS. LINDAUER: Well --

THE COURT: Go get them.

MS. LINDAUER: No, the company -- no, no, no, no, no, you're jumping way ahead. The company has access to records. It may not have -- so let me give you an example. On the QuickBooks, for example, that they brought up. We have a couple of months worth of QuickBooks, right? But we have the underlying financial records, I sent them to Ms. Perry this

morning. We have the bank statements. We have the underlying records that make up the reports. We may not actually have the report itself on a computer that resides at our office, okay? But we have the records that were used to generate a report.

THE COURT: All right.

MS. LINDAUER: So for example, Michael Matthews would have been a person at JMJ at one point who had some input into the financial reporting, all right? And we have the underlying records. We may not have everything that he prepared because some of that may still reside -- we -- we will make an effort, and we've told them, we'll make an effort to try to get those records, but they're not something that we readily have access to.

THE COURT: But that's --

MS. LINDAUER: We will have to subpoena those from those people.

THE COURT: But that's a different issue.

MS. LINDAUER: Yeah.

THE COURT: So you're telling me -- but that's -- the whole point is has the debtor made the effort to get that information? If the answer is no, the debtor has to do that.

If the third party is refusing to comply, then either it's BM318 or Dixon could certainly then serve a subpoena on that individual, I'm guessing --

MS. LINDAUER: Sure.

THE COURT: -- if that individual is going to be that contemptuous and not turn over documents.

But the way I read the responses were "we don't have the documents anymore." Well, okay, then we --

MS. LINDAUER: Well, some of these, we -- some of these, we have never had. We just never created.

THE COURT: Well --

MS. LINDAUER: And I don't think under the rules, we're required to create --

THE COURT: No, yeah, I --

MS. LINDAUER: -- a document that doesn't exist.

THE COURT: And I don't think --

MS. LINDAUER: But we don't have --

THE COURT: Let me ask -- let me stop you.

MS. LINDAUER: Yeah.

THE COURT: And this is going to take some jumping back and forth because discovery disputes do.

So let me ask Ms. Perry --

MS. LINDAUER: Sure.

THE COURT: -- you're not asking for the debtor to create documents that it didn't have, are you?

MS. PERRY: No, we're not. I think there's a couple of points here, Your Honor.

So, number one, if a third party -- and I have no idea who Michael Murphy [sic] is. I don't think I've ever

heard his name before -- or Michael Matthews. I know I've not ever heard his name before. And I don't think he was in their initial disclosures. Maybe I'm wrong, and Ms. Lindauer can correct me, but this is the first we've heard of that gentleman, so that's an issue.

Number two, if a third party, like a former employee, is refusing to comply, so that then the debtor cannot comply with its obligations, then the debtor needs to tell us that in responses to our request for production so that then we know we do need to potentially subpoena it. To date, we haven't seen that in any of the responses.

THE COURT: And that's sort of why I'm questioning this on this --

MS. PERRY: Correct.

THE COURT: -- okay, we're having this conversation on the record, but that was my assumption.

MS. PERRY: Correct.

THE COURT: And so the key is, Ms. Lindauer, to the extent the debtor hasn't attempted to retrieve its documents, it's got to do that. And it no longer possession because the possession is in the control of a former employee or former independent contractor X, and X is refusing to, quote, "to comply," that's a response. It's a legitimate response to which Dixon can then take whatever action Dixon believes is necessary to attempt to get that information.

But to simply say, "Our document, we no longer have possession of it," that -- I don't think that complies with the obligations under the rules.

MS. LINDAUER: And, Your Honor, I was trying to find which of the requests actually say that.

THE COURT: Well, documents 31 -- or 21 through 32, requests for production 21 through 32.

MS. LINDAUER: Okay. So those are "We have no" --

THE COURT: And they all have to deal --

MS. LINDAUER: Those are "We have no documents."

THE COURT: Oh, I'm sorry.

MS. LINDAUER: And the reason we say that is because we don't. We actually don't have, and never have had -- we don't create those.

THE COURT: My bad.

MS. LINDAUER: We don't --

THE COURT: Let me stop, because that was my bad. My bad. I limited it to 21 to 32, but I think -- and, again, Ms. Perry can correct me if I'm wrong, issue number one with the metadata -- oh, excuse me, it is just -- well, let me ask "will produce." So -- which are the ones Ms. Perry just -- they don't have them because --

MS. PERRY: So, Your Honor, I think then it --

THE COURT: Is that throughout 1 through --

MS. PERRY: Hearing this, I think that it could be

because, for example -- I'll give you an example. There is request for production number 43, so that involves Mark Adams, who we know was involved with some of the transactions, and is my understanding is no longer employed by BM318 or any of its affiliates.

So -- and I also know that Mark Adams had a JMJ Development email address based on some documents that have been produced, which is an affiliate of BM318.

What I don't know is was Mark Adams also doing company business from a Gmail account? And that, I think, would fall under what Your Honor is saying. You know, if those are corporate communications or corporate records that he has that aren't on, say, the JMJ server because all the -- I've never seen a BM318 email address, I've only seen JMJ in the documents that have been produced by Ms. Lindauer.

But if there are documents -- there could be documents that are missing because Mr. Adams left and took his own laptop, or Mr. Adams used a Gmail account; we would need to know that. And this response to request number 43, as an example, doesn't give me that information to know that, okay, now I need to -- I need to assess do I need to now go subpoena those from Mr. Adams. So that would be an example of one that's sort of outside the buckets we were talking about earlier in the hearing.

THE COURT: Okay. Let me ask a question to both of

you at the same time; I apologize. So if Ms. Lindauer and BM318 take the position we no longer have the documents because X employee has them, is the proper response -- I guess, number one, has there been an attempt to retrieve the company's documents? If so, and they've been retrieved, great, those get turned over.

If the former employee or independent contractor refuses to comply, I guess then the answer is BM318 has attempted to obtain its documents in the custody and control of John Doe --

MS. PERRY: Right.

THE COURT: -- and John Doe has refused to comply, is that what you're looking for?

MS. PERRY: Yes.

THE COURT: Okay. And what's -- and what's wrong with that, Ms. Lindauer, so long as the debtor has at least tried to make an effort? I'm assuming that it has some sort of legal rights to its documents, that may have -- that the only remaining document available is on that computer, which is no longer in the building, so to speak, why can't -- why isn't that something that's in the control -- it might not be in the custody or possession, but why is that not under the control of the debtor to at least say, "That's my document, give it back to me" --

MS. LINDAUER: I mean, we --

THE COURT: -- and then produce it?

MS. LINDAUER: Look, Your Honor, we're happy to try to do that, and we have done some of that. And, of course, we have disclosed the Mark Adams emails that we have access to. So obviously those have been provided. I mean, the response says that the plaintiff has produced documents responsive to this request.

I think that we flagged, or tried to flag, maybe I didn't do a very good job of flagging some of those, but, of course, Mark Adams no longer works for any of these parties.

And we know Mark did leave with his own laptop. And what he has stored on his laptop, I don't know. But we've produced what we have of Mark Adams' communications.

THE COURT: Understood.

MS. LINDAUER: Which is the stuff we did have access to.

THE COURT: Under --

MS. LINDAUER: So -- I mean, to the extent --

THE COURT: (Indiscernible - multiple speakers).

MS. LINDAUER: Yeah, and then the one right before that with Larry Martin, obviously we do have control over Mr. Martin still, and we have produced his emails. So -- but, you know, Mr. Adams, obviously, we don't have control over.

The only thing I can do is the same thing that Ms. Perry can do, which is send a subpoena over to Mr. Adams and

ask him to provide us with all of his records on BM318 that he still has in his possession, custody, or control on his laptop if he still has his laptop. So -- I mean, I'm happy to do that. I think that's beyond what you would normally do in this situation but, look, you know, we're willing to work with them on that.

As far as the -- so that's one issue, okay? And I think that only shows up in one or two of the answers, right? I mean, she's got the same issue with Jim Martin. I don't have any control over Jim Martin, he's an opposing person. But we've produced what records we have for Jim Martin, right, that's question 41. I don't have any control over Jim Martin, but we've produced what we have with Jim Martin.

And on the questions that were vague, we've at least tried to say what we think that they were asking for and provide those, okay?

So if we said there is no record, it's not that it's lost. It's didn't exist. So I don't think we're -- for example, we don't create financial statements. We don't have tax returns. There are just some of these things that the debtor does not have.

THE COURT: I'm not --

MS. LINDAUER: I even went --

THE COURT: Understood.

MS. LINDAUER: Yeah.

THE COURT: Understood. Understood.

So let me come back to Ms. Perry and Mr. Vasek. So to make sure I understand, because my notes I said that "no documents" was simply 21 to 32, but it could be beyond that, right?

MS. PERRY: It could --

THE COURT: How --

MS. PERRY: Right. Right, Your Honor, because it could -- it could be not just that there are no documents, but that the production is incomplete.

For example, the --

THE COURT: And which one? Which ones are incomplete?

MS. PERRY: So -- it's a good question, Your Honor. Because all documents includes correspondence, and a lot of this seems to deal with email correspondence, I think it could be quite a few of the requests for production because, for example, when all documents -- I'll take request for production number 6, "All documents concerning the value of the real property or any portion thereof." Well, if those emails out there that the debtor says they can't get from Mark Adams that deal with that, there could be some missing there. I just -- I don't -- I don't know.

And so as we sit here today, I think conceivably it could be every request for production, there could be this

problem.

THE COURT: Does it make sense -- because I'm not sure we can get the answer to that today.

MS. PERRY: Right.

THE COURT: Does it make sense to have -- since you need to wait for the documents that will be produced --

MS. PERRY: Right.

THE COURT: -- is this a category that we can allow, again, more meet and confer to see if there are such documents? And if there is a list of people who have items, that BM318 can then supplement to give Dixon the opportunity to know who to go subpoena? That might get us there, as well.

MS. PERRY: I think that's fair, Your Honor, because I don't know, as we sit here, the people who were at BM318 or JMJ and who are no longer there. I mean, I wouldn't know who to go to, right?

THE COURT: And that's fair.

MS. PERRY: So --

THE COURT: That's fair.

MS. PERRY: Yes.

THE COURT: But I'm also being sort of -- it's almost as fair to be given a list of the names.

MS. PERRY: Yes.

THE COURT: Because, frankly, a subpoena from Dixon in a lawsuit might have more oomph than the debtor calling and

saying, "Please give me back documents."

MS. PERRY: I think, Your Honor, you know, to your point, you made a very valid point there, that if these are emails and documents that relate to the time when they were employed or were an independent contractor for the debtor, then I do think that the debtor has the right, and also the obligation to ask.

Now if they won't give them to them, then I'm perfectly fine, then it's on me to do a subpoena.

THE COURT: And that's very easy to do, and that's why I'm trying to cut through some of the --

MS. PERRY: Absolutely, Your Honor.

THE COURT: -- some of the arguments, and it might just cut out one of the loops.

MS. PERRY: Absolutely.

THE COURT: Because I think Dixon would be entitled to those documents.

MS. PERRY: Yes.

THE COURT: I don't think it's, "Gee, the laptop is no longer in the building and, therefore, we have no obligation."

MS. PERRY: Correct.

THE COURT: I don't think that answers it correctly either.

MS. PERRY: Correct.

THE COURT: But it's just perhaps a point.

MS. PERRY: Yes.

THE COURT: So I think perhaps that this category -- the category of "no documents in the possession, custody, or control," and I'll put "control" in even bigger -- because there might be --

MS. PERRY: Right.

THE COURT: I don't know -- I don't know what sort of an employment agreement or independent contractor agreement --

MS. PERRY: Right.

THE COURT: -- BM318 had with those folks.

MS. PERRY: Fair.

THE COURT: In general, most people when they work for somebody, they sign documents saying we will give you your stuff back.

MS. PERRY: Um-hum.

THE COURT: So I think maybe that can be worked through.

MS. PERRY: Yes.

THE COURT: So then I think that leads us to --

MS. PERRY: I'm --

THE COURT: Yes?

MS. PERRY: I'm sorry, Your Honor. Can I go back, though?

THE COURT: Yes.

MS. PERRY: Because I do think that the financial reports --

THE COURT: That --

MS. PERRY: -- are kind of a separate issue.

THE COURT: That's what I was going to go to.

MS. PERRY: Okay; I apologize.

THE COURT: So I think -- so I still think we're down to -- down to two issues, which is the tax returns, which is basically 21 to 32, as well as the native format. I'm not sure we've button up that one yet, or have we?

MS. PERRY: So I think it's -- I think it's QuickBooks and the tax returns is one; and then native format.

And so I heard Ms. Lindauer say, well, we provided this to Ms. Perry this morning. So at around -- while I was driving over here, Your Honor, Ms. Lindauer sent some bank statements. I haven't looked at them, I don't know what they show.

But I would also say bank statements are not representative of assets and liabilities of a company. And they're not going to be representative of what we see in the MORs with respect to assets and liabilities. And we do know that they were able to generate that, you know, 40 months after the deed was recorded. And so that is still very much sort of an open question, and I do think the onus is on them to, you know, provide us with the information in a response as to what

happened to that information, and whether that information -- I mean, really what happened, so we can determine is there a way to get those.

And we're not asking them to create reports because the data's already there. It is.

THE COURT: What I understood -- Ms. Lindauer can correct me if I'm wrong on this. What I understood Ms. Lindauer say, maybe, was that for example, employee X, who's no longer with the company, had the QuickBooks file on his or her laptop. The laptop has left the building, therefore, we can't produce the QuickBooks. Is that accurate, Ms. Lindauer? Is that what you intended? Because that's how I interpreted your comments.

MS. LINDAUER: Well, that's what I was trying to just verify with the people that are on here, to be clear about that. So exactly where -- the actual reports that she's referring to that are attached to the monthly operating reports, where those documents were created from and where they reside.

THE COURT: Well, what --

MS. LINDAUER: That's -- that's what --

THE COURT: And it's not just documents, it's what -- was it QuickBooks, was it -- what sort of software system was being used, and where does that software system reside, I think? Isn't that the question?

MS. PERRY: That's correct.

THE COURT: So --

MS. LINDAUER: Yeah.

THE COURT: And so what I had interpreted, Ms. Lindauer, your comments, and, again, I could be wrong -- I may have misinterpreted, but I thought we were talking about -- and I can't remember the individual's name -- that he's no longer with the company, I thought you were talking about the QuickBooks software was on that person's laptop, that person's no longer with the company, and he has his own laptop.

And the question was what did he do with that software system or that software on his laptop? Does that make sense? Number one, is that even close to being -- close to being accurate?

MS. LINDAUER: Well, that's -- hang on, that's what I'm trying to figure out.

THE COURT: Okay. Well, clearly, BM318 or some entity that owns and controls BM318, there's got to be some financial software package that's being used that, for example, can produce not only the financial statements by hitting a button, but also Ms. Perry is correct as far as tax returns. There's got to be some tax returns out there that have been filed that include BM318 if BM318 is, in fact, a disregarded entity.

So those tax returns that deals with BM318 have to be

produced, I don't think there's any question given the causes of action that BM318 has filed.

MS. LINDAUER: And so let me -- okay, let me -- let me unbucket these for a second. So on the tax returns, I am told -- and I've got the people on the line here -- that there are no tax returns that report BM318. And it doesn't file its own returns.

I went back and looked through our original IDI information provided to the United States Trustee's Office, there were no tax returns. And I am told by Mr. Barton that this is not a disregarded entity, and does not appear on his or any related parties' tax returns.

THE COURT: So that --

MS. LINDAUER: So right or wrong, there are no tax returns. Should there be some? I don't know, I'm not an accountant.

THE COURT: Well, I guess --

MS. LINDAUER: Irrespective, there just aren't -- there aren't any, okay?

THE COURT: Well --

MS. LINDAUER: So --

THE COURT: If they don't exist, they don't exist, you know, and --

MS. LINDAUER: They're -- right. So that's the answer.

MS. PERRY: Can --

MS. LINDAUER: Whether they should exist or not is really not the discussion, it's they don't.

MS. PERRY: Can I address that for a minute, Your Honor?

THE COURT: Yes.

MS. PERRY: Okay.

THE COURT: Yes, Ms. Perry?

MS. PERRY: So in response to our interrogatory number 15, which is on Page 21 of those amended responses, and this is where we're asking about the relationship with JMJ, but there is some information about the debtor here. So it says, "JMJ is a company owned by Timothy Barton. The debtor is a separate purpose entity that was set up to own and develop this property, which is owned by TRWF LLC."

So if T --

THE COURT: Where are you, again? I'm --

MS. PERRY: I'm sorry, Page 21, the response to interrogatory number 15.

THE COURT: Oh, okay. There we go. Okay, I'm there.

MS. PERRY: So the debtor is a separate purpose entity that was set up to own and develop this property, which is owned by TRWF LLC. So there's, you know, TRWF LLC is up the line, apparently, from BM318. Does it also not have tax

returns? I think -- I mean, I understand that they can't produce what they don't have, but my understanding is, I mean, that this information has to be somewhere or else you're probably afoul of the IRS regs, which is another issue.

But, you know, if BM318 isn't filing its own tax returns, and it's not a disregarded entity, I mean, my understanding is if you own a disregarded entity, you need to be filing your tax returns. Again, I'm not a tax attorney, but I guess we can get into this in the depositions, but --

THE COURT: If that's the answer, I agree, it raises some red flags. But if that's the answer, that's the answer. And I guess maybe it does beg some questions during a deposition of -- but if the entity is included with another tax return that satisfies this entity's filing obligations, if any, I'll give it that, with the Internal Revenue Service, then whatever tax return was filed that complies with the IRS regulations, if any, it has to be produced.

Does that make sense, Ms. Lindauer?

MS. LINDAUER: Again, Your Honor, I'm not disagreeing -- I'm not disagreeing with you on that. I'm just saying that we have done that analysis --

THE COURT: Okay.

MS. LINDAUER: Ms. Perry can ask Mr. Barton in his deposition --

THE COURT: Okay.

MS. LINDAUER: -- those questions.

THE COURT: That's fine.

MS. LINDAUER: And then if there was a tax return, I'd be happy to provide it. I just don't have one, period.

THE COURT: Okay.

MS. LINDAUER: So nothing -- I can't do anything about that.

THE COURT: All right. So I think it's -- I think we're all clear now so that if down the road, there are tax returns that are produced, there are certainly no -- it's not a misunderstanding as to what tax returns we were -- Dixon was requesting. The answer today is there are none, and we'll just let the chips fall where they may, does that make sense?

MS. PERRY: Yes.

THE COURT: And I think that's the fair thing for all sides. If they don't exist, they don't exist.

And I'm not -- my comments should not be construed in any way that BM318 is running afoul of any IRS regulations because I have no idea.

But if BM318 had -- if there is a tax return that's filed by an entity that includes BM318's responsibility, again, if any, to have filed a tax return, then that entity's tax return has to be produced.

If the answer is there are none, that's the answer, all right?

So does that --

MS. LINDAUER: Right.

THE COURT: So that -- does that resolve the tax return issue for 21 through 31?

MS. PERRY: Well, I think it -- it resolves the tax return issue for that specific RFP, Your Honor. But all of the other ones we were asking for balance sheet --

THE COURT: Right.

MS. PERRY: -- general ledger, etc. --

THE COURT: Oh.

MS. PERRY: -- because we don't know the status.

And I will say we discussed this Friday morning with Ms. Lindauer and her team. There were three -- four lawyers there, and we still don't have an answer about the status of QuickBooks, or what software they use. And we -- we're entitled to an answer on that with respect to these since we do know there was some system there.

THE COURT: It certainly would appear that there is some system that's being used somewhere within the corporate umbrella that includes BM318 that includes BM318's activities, albeit it might be very small, but they're -- they would -- I would certainly have anticipated there is some financial recording software somewhere that deals with that. And simply answering, "Plaintiff has no documents responsive to this request," that doesn't appear to be an accurate statement just

as I sit here from a -- there's got to be some accounting somewhere of the activity of BM318, I would assume. It's not just -- I would hope it's not simply in Mr. Barton or Mr. Martin's head. I mean, there's got to be some accounting of expenses, and liabilities, and something somewhere, I would guess. And wherever that information resides, that software package should be produced.

And then that also then includes the whole native application issue. And generally I've seen in many, many trials where there's this huge file of QuickBooks that's zapped over electronically, and the parties go through it painstakingly in court, but those things exist. I know it's pretty easy to produce, but it may be tons of information, I just don't know.

So to say there's no documents for financial information, balance sheets, I just -- I find that odd and curious especially in light of the -- in light of the MOR that's been filed by the debtor that certainly seemed to indicate that there is some system somewhere that created -- that created -- I'm looking for it -- I just had it. Oh, well. It disappeared from my desk. It's here somewhere, it's in these papers. But the MOR that Ms. Perry passed up, and I don't remember -- you probably have it there, what the --

MS. PERRY: Document Number 29.

THE COURT: What is the document number?

MS. PERRY: Document Number 29, Your Honor.

THE COURT: So do you see what Ms. Perry is talking about, Ms. Lindauer?

MS. LINDAUER: I do, Your Honor. And what I'd like to do -- I know Mr. Walji is on here, he's better -- he has a better understanding of the QuickBooks than I do. So he is co-counsel on this, if he could click in here, and maybe address at least the QuickBooks issue that we've got.

THE COURT: Okay.

MS. LINDAUER: Mr. Walji, if you could address that, because you've actually been at their offices and have a better understanding of what is going on with their records.

MR. WALJI: May it please the Court, this is K. Walji.

THE COURT: Yes, sir.

MR. WALJI: Thank you. So with respect to the QuickBooks, the QuickBooks was licensed, and for 2019 to 2020, we had access to that. And I believe it was around 2020 when that QuickBooks service and the license was terminated. And the information that we have was provided in the MORs as best as I recollect.

Now I think the question that Ms. Perry is correctly asking is where is all the backup information. It actually does reside in the QuickBooks software, but because it has been terminated, we do not have access to that QuickBooks software

because it's been more than a year.

The source of the information is the bank statements, which is what you upload in the QuickBooks.

THE COURT: Well, I --

MR. WALJI: And so if there is any -- yes, sir?

THE COURT: I was going to say, then you're going off on another issue that's not relevant because that's not the request. The request is for the QuickBooks information.

I understand --

MR. WALJI: As far as the QuickBooks --

THE COURT: I understand the source documents come from --

MR. WALJI: Thank you.

THE COURT: -- come from documents such as bank statements, which have been produced. But that's not responsive to -- that doesn't resolve the QuickBooks issue and concern.

Ms. Perry, Mr. Vasek, any response to Mr. Walji's representation that the license is no longer in effect and they don't have access because of that? Again, I don't know, so you're going to have to educate me on that.

MR. VASEK: Well, Your Honor, I think when a party reasonably anticipates litigation, that party has a duty to preserve records. If the license has been terminated, and it can be reactivated and the data is still there, I would suggest

that the debtor needs to do that.

THE COURT: All right.

MR. VASEK: If the data has been lost because the debtor allowed the license to be terminated, we need to get into that at the deposition and figure out exactly what happened and what the consequences need to be. Perhaps bank statements are one source of information. I'm not an accountant either, but it's hard to believe it's the only source of information from QuickBooks.

I would add that -- and I think we got into this a little bit last time, Your Honor. Printing out a report from QuickBooks is not the same thing as creating a document. The reports are there.

THE COURT: And it's all part of a --

MR. VASEK: To the extent --

THE COURT: It's part of the software package, correct? You click on your computer, and boom, you can do --

MR. VASEK: Correct, Your Honor.

THE COURT: As long as you get the link to the QuickBooks, you can pretty much pull off anything you want in any format that you want, is that -- that's my understanding.

MR. VASEK: That's my understanding, correct, Your Honor.

THE COURT: Okay, that's my understanding, as well. So --

MR. WALJI: Your Honor?

THE COURT: Yes?

MR. WALJI: I'm sorry.

THE COURT: No, go right ahead, sir.

MR. WALJI: I just -- Your Honor, my apologies, but we are working on the premises that, A, there is a software that exists; B, it is active; and, C, that you can push a button and get it. That -- if that were true, we would have no issues with it.

All we -- I think the proper response is we will try again, and write to QuickBooks, and get a written response that they cannot provide us this information;

Number two, with respect to accessing this information, we don't have it. What we have, we have produced, and in good faith, we provided the source of documents.

Now beyond that, it's just this repetitious argument that is the premise that there is a system and we cannot -- we're not providing it. That's not true.

THE COURT: Understood.

MR. WALJI: If you need proof that we don't have access to the system, we will get you a written proof. If our statement is insufficient, we will get to QuickBooks, write to them, copy opposing counsel, and tell them to provide whatever they need on the software. I have no issues with it.

THE COURT: Understood.

MR. WALJI: Similar to what you said earlier, Your Honor. Let’s -- you know, we’ll communicate with the people and ask them to produce what they have.

THE COURT: Understood. Mr. Walji, I thoroughly understand. But then that’s --

MR. WALJI: Thank you, sir.

THE COURT: Then the response, I guess, is that those -- the plaintiffs have -- QuickBooks software, which the debtor has no longer has access to effective X date. And then that, as Mr. Vasek alluded to, that may raise its own issues, which I’m certainly -- I won’t comment one way or the other now, but that may -- the defendant in this case is entitled to know what happened to the software system that was in place that created, for example, the document that was attached or is part of Document 29, the MOR, which does appear to be a run from something, probably QuickBooks. But it shows other current assets, other liabilities. And this is information that is very critical, or potentially could be very critical, on a cause of action asserting a fraudulent conveyance.

And so at some point in time, BM318 had software, they might not now, but at some time, they may have. But then, I think the fulsome response would be the QuickBooks software license expired on X date, but I’m assuming that software license was utilized -- and I don’t know how long -- I didn’t go back to look to see how many years prior to the bankruptcy

filing you requested.

MR. VASEK: Beginning of 2018, Your Honor.

THE COURT: So 2018 forward, I think they're entitled to know what happened to whatever software system was in effect during those time periods. And if it's no longer available because of an expired license or any other reason, they need to be told that so that they can inquire appropriately in any subsequent depositions, if it's relevant. And if the documents are no longer accessible or obtainable for whatever reason, that, of course, can raise some other issues in litigation, which we will not get into today.

So I think the response probably should be, if that's the case -- and here, again, I may be shooing you all out to the hall again. Does this make sense, knowing that, I think, that that would be the debtor's responsibility to produce those, to chat with -- outside to see if between now and next week, if those responses could be amended, if that's the response? I don't know what else we can do. If they don't have access to the license, you know, then I -- if they can't get it, they can't get it.

MS. PERRY: Right.

THE COURT: You know, then they create other problems down the road, but it is what it is.

MR. WALJI: Your Honor?

THE COURT: Yes.

MR. WALJI: Your Honor, you're absolutely right. I think the response to our response needs to be modified to -- with some -- with specificity that would satisfy the Court and opposing counsel as to the date that we had acquired this information of the QuickBooks software, when it was terminated, what information -- that information that we have, we've already produced. But if there is another way of accessing it, we can ask QuickBooks if they can reactivate it.

THE COURT: And --

MR. WALJI: And we will inform the -- we'll inform the -- and we'll amend our responses accordingly.

THE COURT: I think that's about all I could do for today. Does that make sense, Ms. Perry?

MS. PERRY: Understood, Your Honor; I think that that makes sense.

And so I think -- so I think to kind of recap or sort of -- I think we still have to discuss native.

THE COURT: Oh, okay.

MS. PERRY: The native production.

THE COURT: Okay, you're right, okay.

MS. PERRY: But I think with respect to the supplemental production that Ms. Lindauer is going to make, we need to see that so we can determine if that satisfies some of the objections.

With respect to the tax returns, they need to either

produce something if there is something --

THE COURT: Supplement the response accordingly.

MS. PERRY: -- or determine -- or -- or amend that response.

THE COURT: And produce it, yup.

MS. PERRY: And then with respect to the RFPs that relate to the financial -- the balance sheets, etc., if -- you know, if that data existed on QuickBooks, and now it doesn't, then they need to --

(Background noise from telephonic participants)

THE COURT: Well, there we go; thank you.

MS. PERRY: Then they need to, you know, see if they're going to address that in a response.

And then that would leave us then still with the native issue, which I think can -- I would ask -- I would request that the Court address that -- that today.

THE COURT: Yeah, let's --

MS. PERRY: Unless you want additional briefing from us.

THE COURT: No, I think we can address that today because I think it's also going to then fall under the category of -- now the issue for, hopefully, the final hearing, if we need one, if there's still outstanding disputes. The -- with respect to the native application, for example, if -- let me walk through an example to make sure I understand. Let's

assume you want the native application of the QuickBooks, that generally would be simply the production of the software to QuickBooks, which then would include the metadata, right? And Mr. Vasek can respond to this --

MS. PERRY: I'll let Mr. --

THE COURT: That's fine.

MS. PERRY: Mr. Vasek is more technologically --

THE COURT: Yes, I understand.

MS. PERRY: -- inclined than I am, Your Honor.

MR. VASEK: Your Honor, I think in the QuickBooks, I don't know this for sure, but --

THE COURT: I'm going to go through a couple of examples so that Ms. Lindauer can then respond and ask questions. So if there's QuickBooks availability, how do we -- what's the native application, in your position, on --

MR. VASEK: I think QuickBooks should be able to export a single file that contains the entire database of information.

THE COURT: Okay, and I agree with that. And I'm not sure what possibly could be attorney-client privilege, but if there's something in there, we can deal with that.

MR. VASEK: Correct.

THE COURT: But generally, that's how that's produced. And that includes the -- what's called the metadata that would be there, so that's QuickBooks, which may or may not

exist.

Second, let's assume it's an email with an attachment of a document. Whether it's a -- let's assume it's a PDF document that was created -- that the original creation was a Word document. I think what you're asking for is the Word document with the metadata attached to that document, is that correct?

MR. VASEK: Right. If you produce -- okay, if it's in Word, it would be a .doc or .docx file.

THE COURT: Right.

MR. VASEK: And that would include in it the metadata.

THE COURT: Correct. And --

MR. VASEK: Yeah.

THE COURT: And a lot of times, if I remember correctly, back in the day when I practiced, you could hit a button to remove it to email it to somebody so they didn't see it, but you still don't have the metadata on the original document.

MR. VASEK: You can scrub metadata. We have a -- our firm has a metadata scrubber for when you send emails.

THE COURT: Correct, so that -- but the metadata itself, is that still on the system?

MR. VASEK: It would still be on with the original --

THE COURT: That's what I thought.

MR. VASEK: Yeah.

THE COURT: So -- and that's what you're asking for is the original document, right?

MR. VASEK: Correct, Your Honor.

THE COURT: Okay. So -- and then the same with PDF, although generally it's going to -- you're going to -- but it's the same thing there, right? You're seeking the native --

MR. VASEK: The .PDF --

THE COURT: The PDF.

MR. VASEK: Yeah.

THE COURT: Yeah, just of all those -- of the documents that you're requesting.

MR. VASEK: Correct.

THE COURT: Any other type of document other than a -- like a software file, like QuickBooks, or a Word document, or a PDF file?

MR. VASEK: I would say the same thing is true for an Excel spreadsheet or --

THE COURT: Excel, all right.

MR. VASEK: Yeah.

THE COURT: That's another good -- another good example, all right.

Ms. Lindauer, why can't those documents just be produced? Again, usually it's pretty easy to do that, it's not cost -- at least my -- again, in my experience -- I shouldn't

fall back on my experience. I'm assuming it's not that costly to produce those type of documents in response. So why can't they be produced here, to the extent they exist? And if they don't exist because it resides on another computer, we've gone down that road. Or if BM318 destroyed the document, I'm assuming the request -- they didn't, the answer would need to be the native document was destroyed on, you know, March 18th, you know, 2021. You know, something like that so at least the defendant can ask about it at a deposition.

But if it exists, I don't know why it shouldn't be produced.

MS. LINDAUER: Okay.

MR. WALJI: May I respond, Your Honor?

MS. LINDAUER: Go ahead.

THE COURT: Go ahead, sir.

MR. WALJI: Go ahead, Ms. Lindauer.

MS. LINDAUER: Go ahead.

THE COURT: I'll let you both tag team. Ms. Lindauer, do you have any -- would you like to go first? And I'll let you both talk.

MS. LINDAUER: No, Go ahead, Mr. Walji can go -- Mr. Walji can go first, and then if he doesn't --

THE COURT: All right, that's fine.

MS. LINDAUER: -- remember something, I'm happy to hop in.

THE COURT: All right, Mr. Walji?

MR. WALJI: Thank you, Your Honor.

With regards to the metadata or the attachments, including prior documents, that which is accessible to us, and you alluded to that earlier, we have provided.

With regards to those that reside in individuals that are no longer with us, and resides in their computer, we will -- once we get the list from -- from opposing counsel, we will have a communication with them, and advise Ms. Lindauer -- sorry -- Ms. Deborah Perry, and then she can issue the subpoenas accordingly.

THE COURT: Well, let me --

MR. WALJI: I think we had a very good --

THE COURT: Let me stop you right there. Let me stop you right there just so we don't -- so I don't lose my thought.

MR. WALJI: Yes, sir.

THE COURT: You just said something which kind of caused me to question it. You said as soon as you get the list from opposing counsel, I'm not sure opposing counsel has the information to give you a list.

The request for production is there. The debtor should know who would have those documents. So I don't want there to be a misunderstanding. There's no -- I don't see how Ms. Perry or motor vehicle could give you a list of your client's former employees or independent contractors.

So did I misunderstand what you said?

MR. WALJI: Your Honor, I thought I heard you say earlier to Ms. Perry that the names of individuals that they have seen in these emails, that they will provide us with that list and we will inform the opposing side. But if that is -- if I have understood it incorrectly, I stand corrected.

THE COURT: I think -- and I guess I'll let Ms. Perry or Mr. Vasek respond. I think -- we're kind of going all over the map here. I think they have requested general documents to which the response was we're no longer -- the debtor is no longer in possession, custody, or control, you know, it's on --

MR. WALJI: Yes, sir.

THE COURT: -- a former employee's laptop.

MR. WALJI: Correct.

THE COURT: Well, Ms. Perry and Mr. Vasek won't know who that former employee is, only you guys will.

MR. WALJI: Okay.

THE COURT: In their specific request for production, for example, starting like at 40 or so, where they did ask for specific people, you already have that information.

MR. WALJI: Okay.

THE COURT: It's in the request.

MR. WALJI: Maybe it -- and my understanding was that the information that they had from these individuals was insufficient to the metadata that they were requesting.

THE COURT: Well, they're requesting the metadata. So the debtors either produced it or it has not. And if the debtor has not, it needs to explain why it has not.

MS. PERRY: And the debtor has not produced documents that have metadata.

THE COURT: Okay.

MS. PERRY: They have not.

THE COURT: So then --

MS. PERRY: So I don't know what Mr. Walji was saying there, but that's not how the documents have been produced.

THE COURT: So no documents have been produced -- and I'm just clarifying this to Ms. Perry and Mr. Vasek. So you have not received any documents in response to your request for production that includes metadata, is that correct?

MR. VASEK: Correct.

MS. PERRY: Correct.

THE COURT: Okay. So there hasn't been production of any documents in its native format, so that needs to be produced. And when I say "that," it's -- you go through each request for production. If there was a document that was responsive, it's got to be produced, and it's got to be produced in its native format.

MS. PERRY: And, Your Honor, one category that we didn't go through was emails, but that would fall into that.

THE COURT: The same thing.

MR. VASEK: Yeah.

MS. LINDAUER: So, Your Honor, let me address the native versus near native issue, okay?

THE COURT: Yes.

MS. LINDAUER: So first of all, I want to be clear, we've produced thousands of pages of documents.

THE COURT: I hear you.

MS. LINDAUER: So it's not that documents haven't been produced, okay? So the issue came up when we met on Friday that they asked if some of the documents, or I guess all of them, could be provided in a native format. And we said we will see how we have the documents, okay? If we have them in a manner in which they can be provided in a native or near native format, we will provide that. But if we don't, we don't.

But -- and let me just explain how the records of BM318 work. For the most part, these people are still paper, right? So when they get documents, they print them out. And they may or may not save the actual email that generated that document.

So they print them out, and they keep them in paper files. And when the request for production came in, we went in and scanned or had scanned all of that paperwork, okay?

THE COURT: But let me ask you a question.

MS. LINDAUER: To get the native or near native --
THE COURT: Let me ask -- let me ask a question.
MS. LINDAUER: Sure.
THE COURT: I don't want to --
MS. LINDAUER: Sure.
THE COURT: And I apologize, I'm not trying to interrupt, I just want to hit one issue at a time. So for example, when the parties knew there was going to be litigation, are you saying that there are emails that have been deleted since that date?
MS. LINDAUER: No, not since that date.
THE COURT: Okay.
MS. LINDAUER: But let me just give you an example. So this transaction started in 2019.
THE COURT: Correct.
MS. LINDAUER: So in 2019, a draft of a contract may have been sent over to BM318.
THE COURT: I understand.
MS. LINDAUER: BM318 would print out the draft of the contract, and might not necessarily save the original electronic version, they would have a hard copy --
THE COURT: Understood.
MS. LINDAUER: -- right?
THE COURT: Understood.
MS. LINDAUER: And we produced to Ms. Perry all of

those hard copies.

THE COURT: Okay, understood.

MS. LINDAUER: And they've got every one of them. And then they came back and said, "Hey, wait a minute. If you have these in native or near native format, we'd like to see those, too." Which means that we have to go back, which we said we would do, and look for the emails to see if we have the email that had that original attachment attached to it so that we have it in a native or near native format. We are going to have a few of those, we are not going to have a lot of them because, again, the way the debtor maintained its business records was in hard copy more than electronic copy, okay?

But for example, if Larry Martin has on his computer emails, and he can send those to us with the original attachments, we can provide them.

THE COURT: Okay. So it sounds like there's an agreement --

MS. LINDAUER: But there's going to be a lot of those that -- yeah --

THE COURT: So let's --

MS. LINDAUER: -- that we're just not going to have.

THE COURT: Okay. So that's -- so that's part of the -- the agreement is it will be produced. It sounds like there's not a dispute that the debtor won't produce it, it just won't produce it if it doesn't have it.

MS. PERRY: Well --

MS. LINDAUER: If we don't have it, correct.

THE COURT: Okay.

MS. LINDAUER: And that's what we had left on Friday saying is that we would make a diligent search to see if we have some of these things. And if we have them, we'll provide them.

MS. PERRY: Well --

MS. LINDAUER: The other issue that we ran into -- and I don't know how you solve this -- is if you ask for an attachment, there was a draft of a document, and it's got lawyers' comments all over it, which could happen, then that document was privileged between the debtor and its attorney.

So, again, and maybe that's the subject of a privilege log that we are going to provide.

THE COURT: Okay.

MS. LINDAUER: But, again, I don't think we're under any obligation to provide that attachment if, in fact, it's an attorney's comments to the client on some kind of work product thing.

So that's, again, just another concern that came up, which is trying to address that.

THE COURT: Of course.

MS. LINDAUER: And that -- and honestly, Your Honor, that's -- to be honest, I don't think there's any dispute in

this case over any of those kinds of documents. Nobody is complaining that the deed in escrow document is false, or a forgery, or whatever. There's just not those issues, right?

The only issues that I've heard where metadata seems like it would have some issues would be on the financial side. But as far as the actual business transaction, I'm not aware, and I don't think Ms. Perry or Mr. Vasek has explained that there's any issues about drafts of documents that were executed.

THE COURT: Well, there is --

MS. LINDAUER: So that --

THE COURT: Ms. Lindauer, but they wouldn't know unless they got the discovery, and took the -- and took depositions or further discovery.

MS. LINDAUER: We told them if it's --

THE COURT: So --

MS. LINDAUER: If it's something that we can provide, we will provide it.

THE COURT: So it sounds like --

MS. LINDAUER: If it's something we have no way to provide -- yeah.

THE COURT: So it sounds like there's no dispute that the debtor is in agreement to produce the documents in native or near native format, I think that's what Ms. Lindauer is saying.

MS. LINDAUER: If we have them.

THE COURT: If they have them.

MS. LINDAUER: If --

THE COURT: If they don't have it, they're going to explain why, and who might have it.

MS. LINDAUER: Right.

THE COURT: At which point, they need to have either some information for a further deposition or for subpoenas of third parties.

MS. PERRY: I will say, Your Honor, there was no discussion about the documents only be kept in paper format. This is the first time --

THE COURT: They have --

MS. PERRY: -- I've heard it.

THE COURT: They've got to be -- they've got to come from somewhere --

MS. PERRY: That's fine.

THE COURT: -- electronically so --

MS. PERRY: And so that's fine.

THE COURT: Yeah.

MS. PERRY: But I guess, two things: One, you know, in these amended responses to interrogatories, debtor is now saying that they always told Dixon and its representatives they thought the deed in escrow agreement was unfair. Well, if that's the case --

THE COURT: Understood.

MS. PERRY: -- and they've been deleting emails in 2020 --

THE COURT: And, again, we're not saying they haven't had it -- but -- we're not saying they never had it --

MS. PERRY: Right.

THE COURT: -- but to the extent emails exist, they've got to be produced in native or near native format.

MS. PERRY: Okay.

THE COURT: That's just -- that would be the order of the Court.

MS. PERRY: All right.

THE COURT: Number two, if they no longer exist, then when was the document deleted or disposed of? I think that's a very fair response.

And then let the chips fall where they may after that if it has any relevance, one way or the other.

MS. PERRY: Agreed.

THE COURT: So as far as the request for production/motion to compel, I think I hear Ms. Lindauer saying we will produce everything that you've asked for. We will produce it in native format or near native, and I'm not sure I understand the difference personally, but whatever the request was. And if they don't have it, they have to explain why. That's just -- you have to explain that in the request for

production, you have to give that information especially since you're the -- since BM318 is the plaintiff. The defendant should be able to discover these type of -- this type of information.

So it sounds like we're narrowing the scope, and there's going to have to be another hearing potentially once the "will produce as completed" and the defendant has had an opportunity to review that to determine if it was a sufficient production in response to the request for production. And then if we have to have one last hearing, I guess we'll figure out why.

But I think the message should be pretty clear that BM318 has to produce what it has in native format, and has to explain -- if it has proprietary information documents that it no longer has custody or possession of, it's got to explain where it went.

It sounds like some -- whether it's emails, whether it's drafts, whether it's -- whatever it is, Excel spreadsheets or QuickBooks software files, where that information last resided with the debtor, I guess. I don't -- employee S -- it's on employee X's computer, and employee X was terminated on X date, that needs to be told. So that I'm guessing rather than having the debtor make the request, it's probably going to be easier once the defendant gets that information, the defendant, if it so chooses, can subpoena those individuals.

Does that make sense? Let me ask Ms. Perry and Mr. Vasek, on the motion to compel, in narrowing the issues down, is there any open issue for today?

MS. PERRY: I don't think so, Your Honor.

MR. VASEK: I agree.

THE COURT: All right. Ms. Lindauer or Mr. Walji, any questions or concerns about what I think -- it's not intended in any order yet, I guess, because we're trying to narrow the issues to determine if we have a dispute. But it seems like we're getting -- narrowing it a bit. But I will say the production has to be, whether it's emails, whether it's documents, whether it's PDFs, whether it's Excel spreadsheets, whether it's QuickBooks files, whatever is responsive to the request for production must be produced in native format. And if it's not available, why it's not available, and when it became not available, and where it might be, at least from the debtor's last known knowledge, and then we can deal with those issues.

And then, of course, the Court's not ordering the production of privileged information, whether it's attorney-client privilege or work product. But I think there will have to be -- it sounds like there will have to be a privilege log created so we at least have -- so at least the defendant, Dixon, can at least look at the privilege log. And if there's -- and if they have questions, they can file whatever they need

to file, and we can go down that road on privilege log issues and disputes.

But, Ms. Lindauer or Mr. Walji, any questions or clarification you'd like me to make?

MR. WALJI: No, Your Honor, I believe we've got clarity on, by next Monday, to work out with opposing counsel regarding the QuickBooks matters, the tax returns, and the native format issues are the three that I have on my list, unless I'm missing something.

THE COURT: Ms. Lindauer? And I don't -- I don't -- you mentioned next Monday, that was going to be my next question. When does this have to be produced by? Because we do have other scheduling orders. So, Ms. Lindauer, any follow-up?

MR. WALJI: I apologize.

THE COURT: No, that's fine, I'm glad you threw that out there. I just wanted to make sure that BM318 -- that's sufficient time for BM318 to comply.

Ms. Lindauer?

MS. LINDAUER: No, I think that's fine, Your Honor.

THE COURT: Okay.

MS. LINDAUER: My understanding is is exactly what Mr. Walji just outlined for you --

THE COURT: Okay.

MS. LINDAUER: -- which is -- and we had originally

suggested the one week.

THE COURT: Okay.

MS. LINDAUER: I think that was the timing in our status --

THE COURT: And is that --

MS. LINDAUER: -- in our status report.

THE COURT: Okay.

MS. LINDAUER: And I want to be clear, I appreciate your understanding, is that if we cannot produce something in a native or non-native format, and we can explain why we can't --

THE COURT: Yeah.

MS. LINDAUER: -- produce it, that that's sufficient. That we don't have to go hire a forensic accountant or person to comb through our software to create systems that don't exists.

THE COURT: Well, it --

MS. LINDAUER: That was our biggest concern, Your Honor, so --

THE COURT: I think you can explain why, and then if the defendant, Dixon, disputes the response, we could take that up.

MS. PERRY: Agreed, Your Honor.

THE COURT: But we don't --

MS. LINDAUER: Sure.

THE COURT: They don't need to do that now, that can

be potentially the relief at the next hearing, either granted or denied. But I think we're narrowing the issues. So is a week from Monday, was that it, or next Monday?

MS. PERRY: I think a week from this Monday was when --

THE COURT: So next Monday?

MS. PERRY: -- BM318 had said they thought they could produce by.

THE COURT: By the 18th or the 8th?

MS. PERRY: The 8th.

THE COURT: The 8th, okay.

MS. PERRY: The 8th.

THE COURT: Any issue -- then how much time do you need potentially to review that? And then the follow-up question, of course, is then when should we earmark a hearing date?

MS. PERRY: I have no idea what volume of documents we're going to be talking about here.

THE COURT: Sure.

MS. PERRY: I think that I would say that -- I would suggest a hearing no sooner than the afternoon of the 10th. Maybe if Your Honor has time on the 11th.

THE COURT: Well, the 11th is pretty full.

MS. PERRY: Okay. Is the afternoon of the 10th, is there --

THE COURT: The afternoon of the 10th, I've got one matter. We probably could do it -- does it make sense Monday, the 15th? Is that too late? Again, I don't want to mess up trial --

MS. PERRY: So due to my schedule --

THE COURT: Okay.

MS. PERRY: -- I kind of would need that follow-up hearing to be the week of the 8th --

THE COURT: Okay.

MS. PERRY: -- at some point.

THE COURT: Then the 10th --

MS. PERRY: But -- or the -- the 12th, if the 12th -- give me one second.

(The Court engaged in off-the-record colloquy)

THE COURT: Did you say Thursday, the 11th?

MS. PERRY: Thursday, the 11th. What time?

THE COURT: Would that work? Would 11 o'clock work?

MS. PERRY: That would work for me, Your Honor.

THE COURT: Okay. Yeah, we don't have anything -- that's our U.S. Trustee docket, but they haven't filed -- there's nothing on it, so --

MS. PERRY: Okay.

THE COURT: -- we'll just do it 11 o'clock on Thursday. Does that work for you, Ms. Lindauer, 11 o'clock on the 11th?

MS. LINDAUER: Yes.

THE COURT: Okay, perfect. Okay. We'll then throw that down on the calendar for -- we'll continue this matter to that date. And then hopefully, if you resolve all the issues, fabulous, just let us know. If not, we'll hear that and try to get resolution on the discovery site.

MS. PERRY: So, Your Honor, I mentioned this at the beginning, but we have a deadline to complete fact discovery on the current scheduling order of this Friday. And I circulated to the other parties a proposed fourth amended agreed scheduling order.

Now I don't know when the documents come in, and we've got to subpoena more, we may end up moving the trial date. I certainly don't want to -- you know, I'm not waiving the right to seek a longer extension. But currently, you know, we'd like to keep the current trial date.

THE COURT: When is the trial date?

MS. PERRY: It's November 15th -- 14th and 15th.

THE COURT: Okay.

MS. PERRY: And I have a proposed fourth amended scheduling order, if I can approach.

THE COURT: Sure, of course.

MS. PERRY: And, Your Honor, when we originally set the trial, it's a special setting, and so the original docket call was set, I believe Your Honor usually has them the last

Thursday of the month, so it was at the end of October under the third amended scheduling order. And so we did all the pretrial matters before that docket call.

THE COURT: Okay.

MS. PERRY: And so it seemed to me like there was some room there to shift everything a couple weeks forward, and just move the docket call up to the week before the trial. I know that would be unusual --

THE COURT: That's fine with me.

MS. PERRY: Okay.

THE COURT: That's fine with me.

MS. PERRY: And I circulated this on Friday to Ms. Lindauer and to counsel for Lumar. We discussed it, you know, briefly, the concept, but I don't know if anyone has any objection to it.

MS. LINDAUER: I sent it over to our -- my co-counsel and my client, and I have not gotten a response back from them yet. I anticipate I'll have one this afternoon.

THE COURT: I --

MS. HARRIS: Your Honor, I -- it's counsel for Lumar. I'm sorry, Judge.

THE COURT: No, no, please. Please, go ahead.

MS. HARRIS: We have no objections to the deadlines.

THE COURT: All right.

MS. HARRIS: Yeah, we're great with the extended

deadlines, Judge, on behalf of Lumar.

THE COURT: All right; thank you.

MS. PERRY: So --

THE COURT: I don't -- the only thing that matters to me is the filing of the pretrial stuff.

MS. PERRY: Got it.

THE COURT: And, of course, dispositive motions, I mean, you could have those enough ahead of time so that they'd be filed, responses, have a hearing, and rule hopefully before the trial.

MS. PERRY: Right.

THE COURT: Other than that, it's up to you all. I'm good with anything.

MS. PERRY: So, Your Honor, if opposing counsel gets back to me and says they're not in agreement with this, we're obviously going to be back in front of you with an emergency hearing later this week.

THE COURT: No, let's not do that.

MS. PERRY: An emergency motion to continue, so --

THE COURT: Let's -- let's -- we'll continue this for an oral motion to modify the trial schedule.

MS. PERRY: yes.

THE COURT: The -- the scheduling order.

MS. PERRY: Yes.

THE COURT: And why don't we take that up on the

11th, and we'll finalize it then. But there will be -- but this will toll any of the -- any time periods between now and then.

I'm not going to put anyone in a bind on discovery, whether it's the plaintiff, defendant, intervenor, or anyone else. You're going to have your opportunity for discovery so long as there has -- so long as you've been moving diligently, which you have been.

So I want to make sure there's no -- no one's going to get caught with that.

MS. PERRY: Okay.

THE COURT: It's not a license to seek further discovery deadline extensions for the purpose of delay.

MS. PERRY: Understood, Your Honor.

THE COURT: So --

MS. PERRY: I think my concern -- and I appreciate the tolling, the completion of fact discovery deadline. I think we would also need -- there's a deadline for expert disclosures --

THE COURT: Yup.

MS. PERRY: -- on the 12th. And so I don't want to, you know, get in a bind where we're here on the 11th, it's --

THE COURT: The same thing, we're tolling. So that it will stop running, so you'll have at least as many days as you do between now and then.

MS. PERRY: Got it.
THE COURT: That's why --
MS. PERRY: Understood, Your Honor.
THE COURT: That's why I used the word "tolling."
MS. PERRY: Okay, I just wanted to make sure.
THE COURT: So there will be a tolling, and it -- with the Court's final further extensions beyond that --
MS. PERRY: Got it.
THE COURT: -- if it makes sense, and it might make sense once you get this --
MS. PERRY: Right.
THE COURT: -- you get this discovery dispute behind us.
MS. PERRY: Thank you, Your Honor, I appreciate that.
THE COURT: All right. So --
MS. PERRY: I just wanted to clarify.
THE COURT: So all dates and deadlines prior to the -- prior to the November 10 -- or whatever the -- when do we have -- did you say it's actually in November?
MS. PERRY: So the current docket call is at the end of October.
THE COURT: That's fine.
MS. PERRY: Right.
THE COURT: And the other deadline prior to that date is now tolled pending a new scheduling order.

MS. PERRY: Thank you, Your Honor.

THE COURT: All right.

MS. PERRY: I appreciate that.

THE COURT: Makes sense? All right? And the hopefully --

MR. WALJI: Your Honor?

THE COURT: Yes, go ahead, sir.

MR. WALJI: I just wanted to inform the Court that my wife is going -- a knee replacement surgery on Wednesday, so I might be a little delayed, and I just wanted to inform opposing counsel that I will not be in Dallas, as I had scheduled to be. But I'll be there as soon as I can to make sure that we can meet the August 8 deadline as best as we can. I just wanted to just inform, you know, ahead of time, depending on how the surgery works out.

THE COURT: Understood. And, first and foremost, best of luck to your wife with her knee replacement, and I hope all goes well with that.

MR. WALJI: Thank you.

THE COURT: First things first.

If there's a day or so that needs -- that the debtor may need, I know that Ms. Perry and Mr. Vasek are very good counsel, I'm sure a day or so is not going to make that much of a difference. But my giving the deadlines, we'll chat about that, if need be.

MR. WALJI: Right.

THE COURT: But just be diligent to get as much as you can produced prior to the 8th, and if there's a couple things that might bleed into the 9th, I'll just let counsel deal with that. And if there's an issue, we'll take it up on the 11th.

MS. PERRY: Thank you, Your Honor.

THE COURT: All right.

MR. WALJI: It's just that I happen to be in Houston, and all the materials are in Dallas. As soon as the surgery's done, and hopefully it's -- it goes well, I'll be getting over to Dallas over the time frame to be able to provide all the information that we have talked about. I just want to bring it to the Court's notice, and not in any way to compromise the timeline. I just wanted to inform you; thank you, Your Honor.

THE COURT: All right. No, thank you for letting us know. And, again, first things first, your wife's health comes first, all right?

MR. WALJI: Thank you.

THE COURT: All right. Anything else for today? I think we made a little bit of progress.

MS. PERRY: I think so, Your Honor.

THE COURT: All right, okay. Ms. Lindauer, anything form your end?

MS. LINDAUER: No, Your Honor.

THE COURT: All right. Ms. Harris, any final word from your end?

MS. HARRIS: Nothing, Your Honor.

THE COURT: All right. Then with that, court will be adjourned in BM318, and Court will be in recess.

Thank you.

MS. HARRIS: Thank you, Your Honor.

MS. LINDAUER: Thank you, Your Honor.

MS. PERRY: Thank you.

(Whereupon, at 2:38 p.m., the hearing was adjourned.)

<u>CERTIFICATE OF TRANSCRIBER</u>

I, KAREN HARTMANN, a certified Electronic Court Transcriber, certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.



Karen Hartmann, AAERT CET 475 Date: August 9, 2022
TRANSCRIPTS PLUS, INC.