UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| BM318, LLC, et al., | . | Case No. 21-04051-mxm |
| | . | |
| Plaintiff, | . | Eldon B. Mahon U.S. Courthouse |
| | . | 501 W. 10th Sex trafficking. |
| v. | . | Fort Worth, TX 76102-3643 |
| | . | |
| Dixon Water Foundation, | . | June 30, 2022 |
| et al., | . | |
| | . | |
| Defendant. | . | 2:31 p.m. |
| . . . . . . . . . . . . . . .. | | |

MOTION FOR LEAVE TO AMEND
BEFORE THE HONORABLE JUDGE MARK X. MULLIN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff BM318, LLC: | JOYCE W. LINDAUER, ESQ.<br>Joyce W. Lindauer Attorney, PLLC<br>1412 Main Street, Suite 500<br>Dallas, Texas 75202 |
| For the Defendant Dixon Water Foundation: | DEBORAH M. PERRY, ESQ.<br>JULIAN PRESTON VASEK, ESQ.<br>Munsch Hardt Kopf & Harr P.C.<br>500 North Akard Street<br>Dallas, Texas 75201 |
| For the Intervener-Plaintiff Lumar Land & Cattle LLC: | JOSHUA LEE SHEPHERD<br>Quilling, Selander, Lownds, et al.<br>2001 Bryan Street, Suite 1800<br>Dallas, Texas 75202 |
| | J. ROBERT FORSHEY<br>EMILY CHOU<br>Forshey & Prostok, LLP<br>777 Main Street, Suite 1550<br>Fort Worth, Texas, 76102 |
| Transcribed by: | GILLIAN LAWRENCE, CER-255, CET-255<br>KELLI RAY, CER-349, CET-349<br>Lawrence Court Transcription & Video<br>P.O. Box 530790<br>DeBary, FL 32753 |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

# I N D E X


| | PAGE |
|---|---|
| MOTION FOR LEAVE TO AMEND | 3 |
| TESTIMONY OF LARRY MARTIN | |
| DIRECT EXAMINATION BY MS. LINDAUER | 5 |
| CROSS-EXAMINATION BY MS. PERRY | 24 |
| CROSS-EXAMINATION BY MR. FORSHEY | 30 |
| REDIRECT EXAMINATION BY MS. LINDAUER | 52 |
| ARGUMENT | |
| BY MS. LINDAUER | 67 |
| BY MS. PERRY | 75 |
| BY MR. FORSHEY | 88 |
| BY MS. LINDAUER (response) | 94 |
| COURT TAKES UNDER ADVISEMENT | 97 |
| CERTIFICATE OF CERTIFIED COURT TRANSCRIBERS | 100 |


# E X H I B I T S


| | **ID.** | **EVD** |
|---|---|---|
| **Exhibits for the Intervener-Plaintiff** | | |
| Ex. 19 = email | | 62 |
| **Exhibits for the Defendant** | | |
| Ex. F = email | | 29 |
| Ex. G = document | | 65 |

FORT WORTH, TEXAS - JUNE 30, 2022 - 2:31 P.M.

THE COURT: Good afternoon. Please be seated.

All right. We're -- this is the Court's 2:30 docket. And we're back on the BM318, LLC vs. The Dixon Water Foundation Case. Now, first -- first we'll take who's here in the courtroom and then after that we'll go to the video.

Good afternoon.

MS. PERRY: Good afternoon, Your Honor. Deborah Perry on behalf of the Dixon Water Foundation. Today I have with me virtually Julian Vasek, my partner at Munsch Hardt, and also client representative Robert Potts.

THE COURT: All right. Thank you.

MS. CHOU: Good afternoon, Your Honor. Emily Chou, Forshey and Prostok for Lumar Land and Cattle. And I -- I have with me the -- on Webex Mr. Bobby Forshey.

THE COURT: All right. Thank you very much. And that's all we have here in the courtroom, so I'll go to the video. And I'll go ahead and recognize a few of you so we can avoid as much talk-over as possible.

Good afternoon, Mr. Forshey. I'll just recognize you are there, but your counsel here has already made your appearance. Good afternoon to you.

And let's see. We have Mr. Shepherd. How are you today?

MR. SHEPHERD: I'm doing well, Your Honor. Thank

you. Josh Shepherd on behalf of Lumar Land and Cattle, LLC, along with Ms. Chou and Mr. Forshey.

THE COURT: All right.

Ms. Lindauer, how are you this afternoon?

MS. LINDAUER: I'm good, Your Honor. Thank you. Joyce Lindauer on behalf of BM318, and I have joining me also Paul Gailik, who is also appearing, and then our witness Mr. Larry Martin, who is in the -- a live screen in the box right next to -- to Your Honor.

THE COURT: All right. Thank you.

Any other counsel wishing to make an appearance?

All right. First, I appreciate all the parties that agreed to come back. I did decide after the conclusion of the last hearing that it would probably be best to allow Ms. Lindauer to put on her -- her witness that I originally denied so we can get a complete record, and then we'll see where we go from there.

So with that, I will continue the hearing, turn it to Ms. Lindauer, and she can turn it over to -- just call her witness.

MS. LINDAUER: Thank you, Your Honor. Your Honor, at this time I would call Larry Martin to the stand.

THE COURT: All right. Good afternoon, Mr. Martin. Please raise your right hand. And you'll have to unmute yourself first. Yeah, you'll need to unmute yourself, Mr.

Martin. Do you know how to do that? There's a button on your end somewhere that -- that -- that you have to unmute. There we go.

THE WITNESS: Sorry, Your Honor.

THE COURT: That's fine. Please raise your right hand, sir.

LARRY MARTIN, WITNESS, SWORN

THE WITNESS: I do.

THE COURT: All right. Thank you, sir.

Ms. Lindauer, it is to you.

MS. LINDAUER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. LINDAUER:

Q Mr. Martin, would you state your full name for the record?

A Larry Howard Martin.

Q And Mr. Martin, could you just briefly describe for us your educational background?

A I have an engineering degree through the University of Missouri. I also have a law degree from the University of Maryland and also a patent degree from Kutztown University in patent law and intellectual property.

Q And, Mr. Martin, for a number of years, did you actually work as a patent attorney?

A Yes, I worked as a patent attorney from 1975 til about 1985, '86.

Q Okay. All right. Since you ceased working as a patent attorney, have you worked in any other areas of law?
A I've worked in the areas of -- in the areas of law, I've worked in the tax law area, I've worked in structuring real estate transactions, medical devices and a number of entrepreneurial activities over the last 30-some odd years. Maybe it was 40 by now.
Q Under structuring real estate transactions, that category, have you had involvement with an entity called BM318, LLC?
A Yes, I did.
Q Okay. And can you generally describe for us what your involvement for BM318, LLC has been?
A Yes. I was asked by the parent company that owns 318 to act as an advisor to 318 in the refinancing -- well, that would be -- in the purchasing of the property from Dixon Water, and that was in about July of 2020.
Q Okay. All right. Any other role in connection with your work with BM318?
A Primarily dealing with various lending institutions and dealing directly with Dixon Water and in particular Robert Potts.
Q Okay. You're mentioning the name Robert Potts. Who do you understand Mr. Potts to be in connection with Dixon Water?
A I believe he was the -- either the CEO of Dixon Water Foundation or maybe the president of Dixon Water Foundation,

but for sure he was the individual that I was working with and who apparently had negotiating authority or at least the ability to discuss a transaction with me.

Q And prior to BM318 filing its bankruptcy petition, which I'll represent to you was on August 10th, 2021. Is that correct? No, that's not correct. I'm sorry. A later date. I believe actually it was in November, I believe, of 2020, if I recall correctly. Were you working on behalf of BM318 in connection with the Dixon Water Foundation matter?

A Yes, I was.

Q And do you recognize the name Jim Martin?

A Yes, I do.

Q Okay. And what was Mr. Martin's involvement with the Dixon Water negotiations prior to the debtor filing for bankruptcy?

A I was introduced to Jim Martin through Tim Barton and I had numerous, numerous phone calls with him. Jim Martin was introduced to me as an individual who is very knowledgeable in real estate transactions in that particular county. Also had assisted Mr. Barton in the original acquisition of the Dixon Water Property from the Foundation prior to -- prior to me coming in, and he was the broker of record there and had numerous conversations with Jim Martin from, I would say June, July 2020 all the way through January of 2021.

Q You mentioned Mr. Barton having some relationship as a

broker. Do you recall that testimony?

A Yes. Mr. Barton had said that Jim Martin had functioned as a broker representing BM318 when they initially acquired the property, that was the broker of record. He also had informed me that Jim Martin was also --

MR. FORSHEY: Your Honor --

THE COURT: Yes, hold on.

MR. FORSHEY: Your Honor?

THE COURT: Hold on, sir. Yes. Go ahead.

MR. FORSHEY: I think I object to that. I mean he states -- he's testifying what he was told by another person. And it sounds like hearsay to me.

THE COURT: All right. The objection to hearsay is sustained. So the answer to extend that came through will be stricken.

Now it's to you.

BY MS. LINDAUER:

Q Mr. Martin, what was Jim Martin's role on behalf of BM318?

A At what time?

Q At -- let's go to prior to the filing of the bankruptcy. So you were talking about, I believe, June or July of 2020; is that correct?

A Yes. I had asked Jim Martin to assist us in getting an appraiser for the property. Also if he had any knowledge of any other properties that were sold in the area, from a value

situation as well as asking Jim Martin some questions about the particular zoning of the property that he had handled. I think it was that -- I can't remember the exact time he did it, because it was before I became engaged by BM318.

Q Okay. Well, after you were engaged, did you actually have direct conversations with Mr. Martin?

A Yes. I had numerous conversations with Jim Martin throughout that period of time, from June of 2020 to January of 2021.

Q Is there, to the best of your knowledge, any agreements between BM318 and Mr. Martin that would have provided any type of compensation to Mr. Martin for the work that he was doing?

A Could you please repeat the question? I didn't quite hear it.

Q Were you aware, Mr. Martin, of any agreements between Jim Martin and BM318 that would have provided Mr. Martin with any compensation in connection with the matters that he was working on with BM318?

A I'm not aware of any written agreement that was entered into.

Q Did BM318 ever enter into any brokerage agreement with Mr. Martin?

A The only brokerage agreement that I was aware of was the one that existed on the original transaction when I had reviewed the filing.

Q Was Mr. Martin at any time in or about June or July of 2020 acting in an agency -- or as an agent of BM318?

A It was my understanding that Jim Martin was acting as an agent on behalf of BM318 continuing his role as a fiduciary representing that -- that entity.

Q And as a fiduciary representing that entity, what was the scope of his responsibilities during that period of time?

A To assist the --

MS. PERRY: Your Honor, I'm going to object.

THE COURT: Hold on. Hold on. Hold on. Yes, go ahead.

MS. PERRY: Assumes facts not in evidence. Whether or not Mr. Martin was in fact a fiduciary is a question of law for the Court to decide. And Ms. Lindauer is assuming that's the case in her question, so I would object.

THE COURT: All right. The objection is sustained. You may rephrase the question, Ms. Lindauer.

BY MS. LINDAUER:

Q Well, what -- what was -- starting in June or July of 2020, based on your testimony, Mr. Martin, what was the scope of Mr. -- I'm sorry, Mr. Martin's -- Jim Martin -- what was the scope of his work for BM318?

A In discussions with Jim Martin, he told me directly that he would do anything he could --

MS. PERRY: Objection, Your Honor.

THE COURT: Hold on. Hold on. Hold on. Hold on.

MS. PERRY: Objection, Your Honor.

THE COURT: Yes. Go ahead.

MS. PERRY: I believe that calls for hearsay.

THE COURT: Sustained.

Hold on. Hold on. Let me see what -- do you think you could move the camera so that they can see.

We're going to move the camera so that hopefully -- I think I have a (Indiscernible), but maybe not. So that Ms. Lindauer or her witness if you see Ms. Perry stand up will know to -- a little bit more over.

UNIDENTIFIED FEMALE: (Indiscernible).

MS. LINDAUER: Don't zoom in too close.

THE COURT: There we go. All right. Thank you. Can you now -- can you all see Ms. Perry sitting there?

Perfect. If you see her standing up, especially Mr. Martin, if you're about to answer a question, if you happen to see her stand up, please hold your thought for a minute to allow Ms. Perry an opportunity to voice your objection.

All right. Thank you. Thank you very much.

All right. You may proceed, Ms. Lindauer.

MS. LINDAUER: Your Honor, I didn't get an opportunity to respond to the last hearsay objection. When I asked about the scope of the retention of Mr. Martin and of Mr. Larry Martin, started to tell us what Mr. Jim Martin had said.

And then there was a hearsay objection had been posed. Your Honor, Mr. Jim Martin is a party opponent. He is a proposed defendant in this proceeding. There have been claims identified to be asserted against him. Moreover, my understanding is he is the corporate representative of Lumar Land & Cattle Company, which is also already a party to these proceedings. So I think whatever he may have told Mr. Martin will be in the capacity as a party opponent, and therefore, would be an exception to the hearsay rule at this time. So I do think we have an opportunity to make inquiry about what Mr. Martin may or may not have told Mr. Larry Martin.

So I would ask the Court to reconsider your ruling on the hearsay objection.

THE COURT: All right. Ms. Perry, any response? I know that Mr. Martin is currently not a party, but --

MS. PERRY: Correct.

THE COURT: -- it’s a --

MS. PERRY: Let me just look to my rules of evidence, Your Honor.

THE COURT: I think for purposes of today because the issue -- the issue that’s before the Court today is whether or not that Danner (Phonetic) knew or had knowledge of these alleged causes of action prior to confirmation. I think the argument, Ms. Lindauer, at the last hearing was that how could Danner specify causes of action to retain them and to assign

them to the reorganized debtor. I'm not -- I'm not ruling one way or the other but I decided to have the full to give her the opportunity to put on a full record to at least put on the record if the evidence establishes whether or not the debtor knew or didn't know. And that may or may not have a legal implication. I just don't know.

But for purposes of this hearing -- he's not a party opponent but plaintiff wants to add him, if he were a party opponent, then the objection would have been overruled.

Help me out with that, Ms. Perry. Why should I just not allow the testimony just for the limited purpose and scope of the matter before the Court today?

MS. PERRY: I think a couple of points there, Your Honor. You know, as -- as we've noted, and I'm looking here at my -- my exceptions here, you know, I don't have case law that says this, but it seems to me like Jim Martin is not a party opponent, he is not a party to this litigation in his individual capacity.

And they are eliciting -- attempting to elicit testimony about his -- whether or not he was acting in his individual capacity as a broker or whatever capacity. So in my view is trying to shoehorn in a party -- shoehorn in to the party opponent exception when that was not applied.

Secondarily, I would also object on the grounds of relevance. What is the relevance of this to the question of

whether or not BM318 knew that they would have supported these claims they now seek to bring, which was my understanding from the transcript was what Ms. Lindauer was going to call Mr. Martin for and why Your Honor reopened the evidence. So we would also object on those grounds.

THE COURT: All right.

MS. LINDAUER: Your Honor, if I might -- if I might briefly respond.

THE COURT: Yes.

MS. LINDAUER: And I think the Court actually hit the nail on the head, which is for purposes of that testimony, and it's not so much the truth of the matters that are being asserted coming out of Mr. Martin's mouth. The question is, who knew what and when as it relates to the claims that are being asserted in connection with the amended complaint, to the extent that Mr. Martin has been designated as a proposed defendant, and to the extent that there have been claims asserted against him both prior to the filing of the bankruptcy and then after the filing of the bankruptcy, and to the extent that he is the representative of Lumar Land & Cattle, LLC. Again, I think it goes to who not what when, and what the roles of the parties were.

So it's not so much what he was talking about, it's more the fact of his involvement in June and July of 2020 with Mr. Larry Martin. And I think for that purpose the Court can

accept the testimony of Mr. Martin without going into whether -- what they were actually talking about was true or not, just the fact that they were, in fact, talking.

So I think, Your Honor, on that limited basis, the Court should permit the testimony.

THE COURT: All right. Based upon the arguments of counsel, the Court is going to reverse my prior ruling. I'm going to allow the witness to testify for the limited purpose, not for the truth of the matter since it would be technically hearsay if the party opponent section didn't apply. I'm not going to have to get there because it's for the limited purpose of what did the debtor believe it knew.

And with -- with respect to the relevance objection, I was thinking about actually myself as well, but I'm usually pretty liberal or conservative, depending upon your point of view on overruling relevance objections since I'm the jury in this case, that will just go to the weight of the evidence, if any, that I give it.

So I'll overrule the relevance objection as well.

So, Mr. Martin, to the extent you remember the question, you may answer it. If not, we can have Ms. Lindauer restate the question for you.

THE WITNESS: If you could restate the initial question, Ms. Lindauer, and I'll go from there.

BY MS. LINDAUER:

Q Okay. Mr. Martin, I think the question involved the scope of Mr. Martin's relationship with BM318 in June and July of 2020. If you could just -- and I -- I asked it a little differently, but if you could just describe for us the scope of Mr. Martin's involvement in June and July of 2020 with the entity BM318.

A I asked Mr. Martin whether or not he could refer us to an appraiser for the property, if he had any knowledge of other properties that sold in the area, if he knew of any other financial institutions that may be interested in a refinancing of the project, and whether or not the -- oh, and also an update on the zoning of the property, since he owned it, and I also asked him if he owned any adjacent property to the BM318 property. And those --

Q Okay.

A Excuse me? And those conversations --

Q No (Indiscernible).

A -- went from -- on and off from June and through January of 2021.

Q Is there any reason that the conversations ended in January of 2021?

A The conversation ended, I would say on or about January 21st of 2021, when I submitted a proposed offer to purchase to Dixon Water.

Q And you're the person on behalf of BM318 that submitted

that particular offer; is that correct?
A That is correct. I drafted the offer and submitted it to Dixon Water Foundation to be considered by their board of directors and that was under the recommendation of Robert Potts.
Q And for the record, who is -- I think you already told us this, but who is Robert Potts in connection with Dixon Water?
A To the best of my recollection, he's an officer of Dixon Water Foundation.
Q Is he a person that you worked with during the time that we've been discussing? That would be the summer of 2020 through January of 2021.
A Right. I spoke with Robert Potts numerous times during that period of time and additionally met with Robert Potts on the property at issue. I think it was maybe July of 2020.
Q And Mr. Martin, other than yourself, were there any other persons -- I should say individuals -- who, on behalf of BM318, were directly working on the Dixon Water matter?
A I was the primary individual that was working on that matter. I recall Mr. Barton telling me that he spoke to Jim Martin, but you would have to ask Mr. Barton about that.
Q Okay. In connection with Mr. Martin's -- Jim Martin's involvement with this particular project, do you know if he was provided with information regarding the debtor's -- BM318's real estate holdings?

A The holding -- yes, he would have known of the property in question, which was owned by BM318, who, through myself -- he also was the individual responsible for obtaining the new zoning for that particular tract of property. So he was very familiar with that piece of property.

Q Who was Mr. Martin obtaining new zoning on that tract of property for?

A BM318, as well as his adjacent piece of property.

Q And do you know if Mr. Martin has a real estate license or brokerage license in the State of Texas?

A I can't tell you that he does, because I've never seen it.

Q Okay. Mr. Martin, were you involved in connection with the filing of bankruptcy by BM318?

A I may have been asked some questions, but I do not recall specifically what input I may have given.

Q Okay. Do you recall attending any hearings on behalf of BM318?

A I cannot recall.

Q Okay. You were aware, though, that BM318 filed for bankruptcy?

A Yes, I was aware of that.

Q And your conversations with Dixon Water, Mr. Potts, and Mr. Jim Martin, when was the last time you had conversations with any of those persons of representative of those persons relating to the real estate transaction between BM318 and Dixon

Water?
A I spoke to Jim -- excuse me. I spoke to Robert Potts, I would say, on or about January 20th of 2021. And there -- and I know that for a fact, since I was commuting with Mr. Potts about any comments that he may have had on the document I finally submitted on the 21st of January.
Q After January 20th of 2021, did it come to your attention from Dixon Water, Mr. Potts, or Mr. Jim Martin that there had been any real estate transactions between Dixon Water and Lumar Land & Cattle?
A Not to my recollection. Was there any conversation ever on Lumar? I did receive an email from Robert Potts that Jim Martin was acquiring a parcel on January 28th of 2021.
Q And other than that Mr. Martin might be acquiring a parcel, did that specifically tell you what property Mr. Martin was acquiring?
A No. I would have to look at that piece of property, or look at that email. But as I recall, without looking at the document, it was that he was acquiring a -- a couple hundred acres from that tract and that Dixon was going to give him an option to acquire the remaining parcels over a period of time.
Q Do you ever recall receiving any notification prior to the plan of reorganization being approved by this court that Lumar Land & Cattle Company had acquired any interest in the same property that BM318 had originally owned that had been dated

back to Dixon Water?
A No. Never we had any communication whatsoever.
Q When was the first time you learned about Lumar Land & Cattle actually acquiring an interest in property that had belonged to BM318 from Dixon Water?
A I'd say in the first quarter of 2022, probably some time in the late part of January, first part of February or the end of February.
Q And how is that you became aware of that particular transfer between Dixon Water and Lumar Land & Cattle?
A I believe there was some legal matter that was filed, and that's how it came to my attention.
Q Okay. Tell you what. Mr. Martin, are you familiar with the plaintiff in intervention, Lumar Land & Cattle, original complainant intervention, filed in connection with this particular matter?
A I probably read it, but not recently.
Q If I represented to you that that has a filing date on it of February 16th, 2022, does that refresh your recollection on when you first became aware of the involvement of Lumar Land & Cattle, LLC?
A It would have to be in around that particular timeframe, because I had never heard of Lumar before that period of time.
Q When Dixon Water transferred property to Lumar in April of 2021 on behalf of BM318, did you receive any notice from any

party regarding that particular transfer?

A No, I did not.

Q At the time that the debtor had its plan approved in this bankruptcy case -- get that date for you. I'll represent to you that -- Mr. Martin, that's August 2nd of 2021. Were you aware of any transactions between Dixon Water Company and Lumar Land & Cattle Company?

A No, I was not.

Q Were you still involved in the Dixon Water matter during the bankruptcy case and up until August of 2021?

A I was involved with -- I know I was involved through January of 2021. I'm not -- probably would have answered some questions that would have been asked to me after that, but I cannot recall exactly what questions or what my answers would have been.

Q Okay. If the information had been provided to BM318 regarding transactions involving Dixon Water or Lumar Land & Cattle, would you have been the person at BM318 that would have received that information?

MS. PERRY: Objection, Your Honor. Calls for speculation.

THE COURT: Could you --

MS. LINDAUER: Or I can ask it a different way.

THE COURT: Thank you.

BY MS. LINDAUER:

Q Okay. Mr. Martin, are you the person at BM318 that has the greatest knowledge during the time that the debtor was in bankruptcy, about the Dixon Water transactions that would have occurred after the bankruptcy case was filed?

A Yes, I was.

Q And, Mr. Martin, I know you're going to be asked some questions about this. The debtor did amend its bankruptcy schedules to list some certain claims that it believed that it had as part of the bankruptcy. Are you familiar with those amendments?

A I recall looking at them, but I can't recall exactly when or what they said.

Q Okay. Do you remember the debtor listing claims, possible causes of action, against Dixon Water Foundation?

A Yes, I did.

MS. PERRY: Your Honor, I'm going --

THE COURT: Hold on. Hold on, sir.

MS. PERRY: I'm going to object. The witness just testified that he didn't know what was contained in the schedules and he didn't remember seeing the schedules, so how can he now testify to what was in the schedules?

THE COURT: Sustained. Re-ask the question. Go ahead and re-ask another one.

MS. LINDAUER: Okay.

BY MS. LINDAUER:

Q All right. Mr. Martin, were you familiar with various claims and causes of action that BM318 might hold and seek to pursue either before or after its plan was confirmed?
A Yes, I am.
Q And were you involved in identifying those various causes of action that ultimately were included in amended schedules that were filed with this court?
A Yes, I was.
Q Did those claims and causes of action include claims against Dixon Water Foundation?
A Yes, they did.
Q Did those claims include claims against a gentleman named Jim Martin?
A Yes, they did.
Q Did those also include claims against a gentleman named Chuck Stark?
A I cannot recall.
Q As we sit here today, Mr. Martin, you're aware that claims have been filed against Dixon Water Foundation by BM318; is that right?
A That is correct.
Q You are also aware of claims that are being asked to be filed against a gentleman named Jim Martin; is that correct?
A That is correct.
Q And you are also aware that the debtor has requested to

file additional claims against Lumar Land & Cattle Company; is that correct?

A That is correct.

MS. LINDAUER: Your Honor, at this time I'll pass the witness.

THE COURT: All right. Thank you, Ms. Lindauer.

Who would like to go first? Ms. Perry?

MS. PERRY: Yes.

THE COURT: And if I could (Indiscernible) over there. Thanks.

CROSS-EXAMINATION

BY MS. PERRY:

Q Good afternoon, Mr. Martin. My name is Deborah Perry. We haven't met before; have we?

A Not to my recollection.

Q And you understand that I represent the Dixon Water Foundation?

A Yes, I do.

Q Mr. Martin, you were referencing a letter on January 28th, 2021, in your direct testimony; correct?

A That is correct. To the best of my recollection, that was about the date that I received an email from Mr. Potts.

Q Thank you. I'm going to ask Mr. Vasek to please put up on the screen what's been labeled Dixon 011175, which I believe is that email. So you can take a look at it, Mr. Martin.

A Yes, that is the email I was referring to.

Q Okay. And in this email, dated January 28th, 2021, I'm going read it. Let me know if I'm reading it incorrectly. Larry, this is to confirm that the Dixon Water Foundation has a contract to sell to Jim Martin 204 acres of our Bear Creek Ranch. We plan on closing this sale within the next 90 days. Then it says, at the closing of the 204 acres tract, Jim will obtain an option, right of first refusal, to acquire the remaining part of Bear Creek Ranch (approximately 1,320). If JMJ is interested in a cash acquisition of some or all of this remaining 1,320 acres, then Jim and I would be willing to discuss it with you. I am available next week to get on a phone call with you, Tim Barton and Jim Martin to discuss it. Did I read that correctly?

A You did.

Q Okay. And Mr. Martin, you know that that 204 acres was part of the property that Dixon took back in the deed in lieu transaction in July of 2020 -- in July of 2020; correct?

A That is my understanding.

Q Also, do you know who JMJ is referring to in this email?

A Referring to a -- an entity owned -- or I would say affiliated with Tim Barton.

Q And would it be fair to say that JMJ is referring to JMJ Development, LLC?

A I don't know what Mr. Potts was referring to.

Q Okay.
A There are a number of entities JMJ.
Q You are aware, though, given your involvement in the summer of 2020, that there was a -- what is referred to as the first buyback agreement, that was entered into between Dixon Water Foundation and JMJ Development, LLC; correct?
A I'm aware of that.
Q And you testified earlier that you did not have any conversations with Mr. Potts after January 20th, 2021; is that correct?
A I believe the last conversation I had with Mr. Potts was around that time, prior to the -- on or about January 21 of 2021.
Q So it's your testimony that the first time you found out that Dixon had a contract to sell the 204 acres was on January 28th, 2021?
A That -- that was the first time I learned that Dixon Water was selling the property -- considering selling the property to Jim Martin, correct.
Q And, Mr. Martin, you've held yourself out as someone who's done various real estate transactions. In your time working on real estate transactions, have you seen situations where initially a contract has one purchaser listed, but at the time of closing, the property is assigned to another party?
A Yes, I have seen contracts like that that typically have a

clause in it where the contract can be assigned to another party with, usually, the written consent of the other party.

Q And certainly no later than January 28th, 2021, you knew that Dixon was going -- had the intention to sell the 204.5 acres, correct?

A The only knowledge I had is what was written in that email from Robert Potts to me.

MS. PERRY: I'll pass the witness, Your Honor.

THE COURT: All right. Thank you, Ms. Perry.

All right. Who would like to take the laboring oar, would that be Mr. Forshey?

MR. FORSHEY: Yes, sir. It would.

THE COURT: All right. You may proceed, sir.

MR. FORSHEY: May I proceed?

THE COURT: Absolutely.

MR. FORSHEY: One thing -- one thing I think we ought to do is I'd like to offer that email that was just used as, I guess, Lumar Exhibit 19.

MS. PERRY: Yes, Your Honor. Apologies. We would also offer that email into evidence.

THE COURT: All right, then. Was that -- was that marked a particular number? I don't have it in front of me. I can look on the docket.

MS. PERRY: It's not -- it's not been previously designated, Your Honor.

THE COURT: All right.

MS. PERRY: It's now been offered to refresh the recollection of Mr. Larry Martin, given that he testified --

THE COURT: Any objection?

MS. PERRY: -- about the email.

THE COURT: (Indiscernible) objection.

MS. PERRY: And it has been produced to opposing counsel.

MS. LINDAUER: Your Honor, I think that's an improper statement that Ms. Perry just made. It wasn't to refresh his recollection. He testified point blank about that particular email, but I don't have any objection to its admissibility, but not on the basis of refreshing his recollection. I think it's just it's a document that can be admitted and we have no objection.

THE COURT: All right. The Court will then admit the email which is dated January 28, 2021. And it's I believe from Mr. Potts to the -- to the --

MS. PERRY: To Larry Martin.

THE COURT: -- to Mr. Jim Martin.

MS. PERRY: Well, yes, Mr. Jim Martin is cc'd on it, but Mr. Larry Martin is --

THE COURT: And it's to Larry Martin. So I would ask -- and we'll identify that as Lumar Exhibit 19, but if somebody could upload that or if somebody has a paper copy of it, that

will work as well.

MS. PERRY: I'll ask Mr. Vasek to -- how would you like that done, Your Honor?

THE COURT: He can just upload it as a supplemental exhibit --

MS. PERRY: Okay.

THE COURT: -- on the docket.

MS. PERRY: All right, Your Honor.

THE COURT: And then just identify it as Lumar Exhibit 19.

MS. PERRY: Okay. It might be simpler --

THE COURT: It's up to you.

MS. PERRY: I don't -- to admit it as Dixon Exhibit F. I think that was where we picked up if we were going to be filing it.

THE COURT: That's fine.

MS. PERRY: If that's all right?

THE COURT: Then we'll also identify it as Dixon Exhibit F.

(Lumar Exhibit 19/Dixon Exhibit F received into Evidence)

MS. PERRY: Thank you, Your Honor.

THE COURT: All right.

MS. PERRY: We'll make sure that gets uploaded.

THE COURT: All right. So that will be on the docket today at some point. And we'll refer to it as either Dixon

Exhibit F as in Frank or Lumar Exhibit 19.

All right. Back to you, Mr. Forshey.

CROSS-EXAMINATION

BY MR. FORSHEY:

Q Mr. Martin, in connection with the land, is it called the Bear Creek Ranch? Is that what it's called?

A That's what it was referred to.

Q Okay. Did BM318 ever hire a broker or real estate person other than Jim Martin?

A Not to my knowledge.

Q Okay. So to your knowledge, the only person that was assisting BM318 and selling that was Mr. Jim Martin; correct?

A I don't know prior to me.

Q But after you got involved, he was the only one you know of?

A That was the only one that I knew of, correct.

Q The Exhibit that's been marked as Dixon Exhibit F as in Frank, is that the first time that you learned about the sale, the 204 acres, by Dixon Water to Mr. Jim Martin?

A That is correct. I learned about a proposed sale to Jim Martin.

Q Okay. Do you have our exhibits in hard copy, or do I need to put them up on the screen, Mr. Martin?

A I have no copies.

MR. FORSHEY: Ms. Lavorio (Phonetic), would you go to

Exhibit Number 12.

Which, Your Honor, that is Lumar Exhibit 12, which is the Plaintiff's Motion for Leave to File the Amended Complaint. And I'd like you to go there to page 9 of 38.

THE COURT: Just so the record is clear, and, Mr. Forshey, I'm assuming you were referring to page 9 of 38, which is in the lower right hand corner of the document.

MR. FORSHEY: Yes, sir.

THE COURT: All right.

MR. FORSHEY: And I'd like to go Paragraph 6 -- I'm sorry, under the Complaint, actually, Your Honor. Make sure we're clear, that Paragraph 26 of the complaint that's attached. But keep on going, Ms. Lavorio, you'll get there. There.

Your Honor, I'd like the Court to take judicial notice of the contents of this document, which were filed by the Plaintiff as the plea that they were requested to be filed.

THE COURT: Any objection?

MS. LINDAUER: No objection to the Court taking judicial notice of the Plaintiff's First Amended Complaint.

THE COURT: All right. The Court will so take judicial notice.

BY MR. FORSHEY:

Q Mr. Martin, could you come back on the screen, please?

A I'm on the screen.

Q I don't see you.

THE COURT: You'll just have to reset -- Mr. Martin, it looks like you lost your video. We need to get your video back.

(Pause)

THE WITNESS: I'm going to have to go off and come back on, I think.

THE COURT: All right. We'll give a short break for Mr. Martin to log off and log back in.

(Pause)

THE WITNESS: Okay.

THE COURT: There you go. Thank you, sir.

THE WITNESS: All right. No problem at all, Your Honor.

BY MR. FORSHEY:

Q Mr. Martin, can you see Paragraph 26 --

A Yes, I can.

Q -- of the amended complaint?

A Yes, I can.

Q Have you read that pleading before?

A Yes, I have.

Q And you reviewed it for authorizing it to be filed on behalf of the plaintiff?

A I reviewed it for my own education of the --

Q Do you --

A -- second part.
Q -- consider it to be accurate?
A This paragraph?
Q No, the -- when you reviewed the pleading, did you see anything that you thought was inaccurate in it?
A I don't recall. I'd have to read the entire document again.
Q Well, I don't want to take that time. Do you recall anything, sitting here today, that you remember being inaccurate?
A I can't tell you either way.
Q Okay. Well then, let's --
A But I --
Q -- look at Exhibit 26.
A All right.
Q Let's look at Paragraph 26. Would you take just a second and read that to yourself?
A Sure. Okay.
Q Is that paragraph accurate?
A I'd have to see the agreement that I was referring to.
Q Okay. Subject to that, do you see any -- any wrong statements in that paragraph?
A I'm not about to guess.
Q I'm not asking you to guess. I'm saying subject to the -- the agreement, the agreement says what it says. Do you see any

misstatements or wrong statements in that Paragraph 26?
A I don't know unless I compare it with the agreement that they're referring to.
Q All right. Well, there was a deed in lieu of foreclosure that was delivered by the debtor to Dixon; is that correct?
A Yes, that is correct.
Q And then on June 26th, 2020, anticipation defendant Dixon, according to the Dixon and JMJ Development LLC and any related complainant entered into a real estate sales agreement for the purchase of the remaining land from Dixon. Do you see that, sir?
A Yes, I do.
Q And is that correct?
A I'd have to see the agreement again. I would be happy to --
Q Okay.
A -- review the agreement and see if that is the agreement they are referring to.
Q Okay. Now, below that it gives the terms of the agreement for a purchase price of 27,500,658 which is closed August 31, 2020. JMJ had three options to extend the closing date for 30 days, each in exchange for depositing $50,000 with the title company for each option; is that correct, sir?
A As I stated, let me look at the agreement and I will tell you.

Q Okay. Now, let's go next to Exhibit 27 -- or Paragraph 27.

MR. FORSHEY: Could you roll down just a little bit please, Tandy (Phonetic).

BY MR. FORSHEY:

Q And would you read that to yourself, please, sir?

A Sure. I've read it, sir.

Q Okay. Now, is there anything that you think is inaccurate in Paragraph 27?

A I don't know about the dates, but I do know that a deed in lieu was entered into.

Q And the deed in lieu was recorded in early July of 2020, correct?

A I have no idea when it was recorded.

Q All right. If it says here that the deed in lieu was recorded on July 2, 2020, do you have any reason to dispute that, sir?

A I don't guess when I testify. Show me the reclamation --

Q I --

A -- and I would tell you if -- when it was recorded.

Q I didn't ask you that, sir. I asked you, do you have any reason to doubt the truth of this statement in the plaintiff's pleading?

A I don't have any reason to doubt that.

Q Okay. Next, let's go over to Paragraph Number -- let's go

to Paragraph 32. Would you look at Paragraph 32 with me, sir?
A Yes, I will.
Q Do you see anything inaccurate in Paragraph 32, sir?
A I don't know what shortly means, but they sold a portion to Defendant Lumar. I don't know what they're referring to.
Q Okay. Well, that -- you do agree that the first buyback contract was terminated by Dixon on or about October 15, 2020; do you agree to that?
A No, I do not.
Q Okay. Why do you disagree with that, sir? That's what it says here, isn't it?
A I believe -- and I would have to see. There were a number of agreements circulated or signed between Dixon Water and JMJ about the extending the timeframe to purchase the property.
Q Here it says, though, that Dixon asserted the default and terminated the first buyback on or about October 15, 2020. Do you disagree with that statement? Is that statement, in this proposed pleading, in your view, inaccurate or untrue?
A I do know that a time came where they terminated the agreement for failure to make a specific extension payment. I don't recall the exact date.
Q Do you have any reason to quarrel with October 15, 2020? What the debtors inform with claims alleged there?
A No, I have no reason to doubt that they had looked at the document.

Q Okay. Then the next thing, it says shortly thereafter, Dixon sold a portion of the remaining land to Defendant Lumar, entity owned, managed and controlled by Defendant Martin, despite Martin having represented clients as a real estate agent under the original purchase agreement to buy the original property from Dixon; do you see that?

A Yes, I do.

Q Okay. Now, it says here that Martin was someone in the -- Lumar was an entity owned, managed and controlled by Defendant Martin. That is Defendant Jim Martin. Do you agree with that statement?

A I agree with what was written there to be the truth.

Q Okay. When you were testifying earlier, you said something to the effect, you considered Jim Martin to be a corporate representative of Lumar Land & Cattle.

A I did not say that at all.

Q Well, what did you say, then, sir?

A I said, in -- that I did not even know the name Lumar until February of 2022.

Q All right. What's your understanding of Mr. Martin's -- his -- what is your understanding of his relationship to Lumar?

A I have no idea what his relationship is to Lumar.

Q Okay. But now, you're -- you're sure, the first time you learned about the sale, that 204 acres, was in the -- the email that we've marked as Dixon Exhibit F, which was in January of

2021. Is that your testimony?
A That is my testimony.
Q All right.
MS. LINDAUER: Actually, Mr. Forshey's statement misstates the -- the letter was 2021. I think you said 2020, so just to clarify. Unless I misheard.
MR. FORSHEY: I had not meant to say 2021. If I did, I apologize, Ms. Lindauer. I misspoke.
MS. LINDAUER: No -- no problem. I just wanted to make sure the record is correct.
BY MR. FORSHEY:
Q All right. Now look at Paragraph Number 36. Now, Paragraph 36, could you read that to yourself too, sir?
A Yes.
Q All right. Is that paragraph accurate?
A That's a correct statement.
Q All right. So there's nothing in Paragraph 36 you disagree with?
A I may have started working with AC (Phonetic) America prior to December of 2020.
Q All right. Other than that it's correct?
A That's correct.
Q All right. Now let's go to Exhibit -- pardon me, Paragraph 41. Now there it says, on January 27, 2021, Dixon deeded 6.5 acres of remaining property to Martin, which was in

addition to the 204.5 acre parcel under contract to Lumar. Do you see that?
A I see that.
Q Now, that appears to turn -- to tie back to the earlier paragraph, where it referred to -- that there was a parcel -- Paragraph 32 -- where it says that Dixon sold a portion of the remaining land to Defendant Lumar. Do you agree with that statement?
A I did not write this complaint, so I don't know what the author had, what they were referring to.
Q All right. Well, you do agree, in Exhibit -- in Paragraph 32, that they said that shortly after October 15, 2020, Dixon sold a portion of land to Lumar; do you see that?
A I saw that.
Q All right. And then comes over here on Paragraph 41 and it says that on January 27th, 2021, which it's the day before the email; right?
A Correct.
Q That Dixon deeded 6.51 acres of the main property to Martin in addition to the 204.5 acre parcel under contract to Lumar; do you see that?
A I see that.
Q All right. So there's only -- as I can see, there's only been one reference to one piece of property that was sold to Lumar, and that's the 204.5 acres; do you agree with that?

MS. PERRY: Your Honor, that's not --

MS. LINDAUER: No. Your Honor, that's not correct. There were actually several parcels sold to Lumar. Mr. Forshey should know that. So we have --

THE COURT: Ms. Lindauer -- Ms. Lindauer -- Mis. Lindauer -- you let the witness answer the question. If you have redirect --

MS. LINDAUER: Sorry, Your Honor.

THE COURT: -- that's the time to raise it. But don't coach the witness.

Well, sir, you may -- you may answer the -- you may answer the question, sir.

BY MR. FORSHEY:

A As I stated before, I do not know what parcel that paragraph is referring to.

Q Okay. And then Paragraph 42 says, on April the 23, 2021, Dixon provided financing to Lumar for the purchase of 204.5 acre tract and deeded 204.5 acres to Lumar and recorded a memorandum of option agreement to Martin as to the remaining portion of the remaining property; do you see that?

A I see that.

Q Is that true?

A It would, I guess, confirm what was written in that -- I'd have to see that email again on January 28th as to what that exactly said.

Q Okay.

MR. FORSHEY: Mr. Vasek, could you put that email up for us? Is he still on?

MS. PERRY: He should be.

BY MR. FORSHEY:

Q Okay. Up on the screen now is Dixon Exhibit F as in Frank. That refers to the 204 acres. Do you see that?

A It will refer to an option of first refusal to acquire the remaining parcel.

Q Okay. But it says at closing, the 204 acres Jim will obtain an option of first refusal. It's talking there about a sale of 204 acres out of the Bear Creek Ranch; right?

A That is correct.

Q And there was only one sale of 204 acres out of the Bear Creek Ranch; wasn't there?

A I have no idea.

Q Do you know of another sale of any acreage, of 204 acres?

A I don't know what Dixon Water may or may not have sold.

Q So the answer is you don't know of --

A I don't know.

Q -- any other 204 acre sale.

A I know of this -- I don't know what -- if there was anything else sold to Jim Martin.

Q Okay. All right. Now, let's go to Exhibit Number 16, which is the complaint, the original complaint filed by the

debtor.

MR. FORSHEY: Can you put that up, Ms. Lavorio.

Your Honor, I'd like you to take judicial notice as well of the contents of that complaint. Would you?

THE COURT: Any objection?

Hearing no objection, the Court will take judicial notice of the complaint, which is Lumar Exhibit 16, which is also EC -- Adversary ECF Number 1.

MR. FORSHEY: Thank you.

BY MR. FORSHEY:

Q Could you read that to yourself quickly, sir?

A Okay.

Q All right. Now, the first sentence of that references a default in termination buyback contract on or about October 15, 2020; do you see that?

A Yes, I do.

Q Was there any -- there was only one termination of a buyback contract in about October 15, 2020; correct, sir?

A I don't recall if there was only one.

Q Or do you recall any other than the one that's referenced in the complaint here and in the proposed amended complaint?

A I think there was another buyback agreement prior to me coming, being involved that I may have seen, but I can't recall.

Q It -- but was it terminated on or about October 15, 2020?

A The one that I am familiar with was terminated on or about October 15, 2020.
Q All right. So it appears that -- that there was one buyback agreement terminated at that time; correct, sir?
A The one that I am familiar with, that I was involved in, was terminated --
Q All right.
A -- on October 15th.
Q Then it says, shortly thereafter, Defendant sold a portion of encumbered land to the broker and a related person or entity who had represented Plaintiff under the original purchase agreement to acquire the 2,055 acres from Defendant; do you see that?
A Yes, I do.
Q Now, we've already agreed there was only one broker involved, and that was Jim Martin; wasn't it?
A That is correct.
Q So that paragraph has to be referring to a sale to Jim Martin; correct?
A A sale to Jim Martin, that is correct.
Q Okay. Then it says, or related person or entity; is that correct?
A That is correct.
Q And over in the proposed amended complaint, it alleges that Martin was the person who owned, managed and controlled

Lumar. Do you remember that?
A Yes, I do.
Q Which I guess would make Lumar a related person or entity to Jim Martin; wouldn't it?
A That's what I understand today.
Q All right. Now, look up there. What's the date on which that was filed?
A August 10th, 2021.
Q All right. So would you agree that no later than August 10th, 2021, someone with the debtor was aware of the sale to Jim Martin?
A Somebody -- maybe not.
Q Well, one -- the debtor already knew about the sale to Jim Martin, as based in his pleading; didn't they, sir?
A They could have discovered that after the fact.
Q The pleading says this -- what date's it filed, sir?
A August 10th, 2021.
Q Okay. So by that date, they had to know about the sale of the property; didn't they?
A Somebody had to know about the sale of the property prior to filing that complaint, correct.
Q All right. I'd like you to go and look --
MR. FORSHEY: Ms. Lavorio, could you take us back to our Exhibit Number 4, which are amended schedules, and go to page 6 of 9.

BY MR. FORSHEY:
Q Now there, you see that they identify certain potential claims against Jim Martin. It says, possible cause of action against Jim Martin for claims including but not limited to tortious interference, breach of contract, misrepresentation, fraud, breach of fiduciary duty, and all related claims and causes of action; do you see that?
A Yes, I do.
Q And are you aware of any other piece of property that had been sold to Jim Martin by the date this was filed on May 12, 2021?
A To Jim Martin specifically?
Q Yeah.
A I don't know of any property sold to Jim Martin specifically.
Q All right. Do you know what this is referring to, sir? Exhibit 4.
A It's referring to the piece of property that was sold to an entity controlled by Jim Martin.
Q Okay. And --
A I assume.
Q -- what -- all right. Correct that.
A Sold to Jim Martin. I don't know about any entity. I take that back after reading that.
Q Okay.

MR. FORSHEY: Now, scroll up to the top of the page, Ms. Lavorio and show him what -- when that was sold -- was filed.

BY MR. FORSHEY:

Q So it looks like that was filed on May 12th, 2021; do you see that?

A Yes, I do.

Q Okay. So would you agree by that point in time, the debtor was aware of the sale of the property to Mr. Martin?

A By 5/12/21, it would appear to -- it would appear to be so.

Q Okay. So now, when you say that the first time you heard about the sale of the property, the debtor sale to Lumar, the debtor already knew about the sale of the property to Jim Martin, the 204 acres; didn't he?

A I did not know about the sale to Lumar, and never even heard the name Lumar until February of 2022.

Q Okay. But I'm asking you about the 204.5 acres. The --

A I --

Q -- debtor knew that that was sold to Jim Martin --

A It was sold --

Q -- well -- well before that; didn't it?

A It was sold to Jim Martin. That is correct. Jim Martin.

Q All right. And Jim Martin, we've agreed, the record shows, and it's alleged in that pleading, was a principal of

Lumar Land & Cattle; correct?
A That's what is alleged in the complaint.
Q All right. So the debtor already knew that that property had been transferred to -- by Dixon to Martin; correct?
A I don't know what else anybody within the debtor knew. I knew that I did not know.
Q Fine. But what we're seeing from the documents, the debtor had to know that that property had been transferred from Dixon to Martin; didn't it?
A I guess that's your opinion.
Q Well, there was an email sent to you January 21 that it happened; correct?
A That they sold a piece of property -- that they were contemplating selling a piece of property to Jim Martin, that's correct.
Q All right. And then we have in -- that'll be marked as Exhibit 16, which was filed in August '21. We also have a record to the same property being sold to Jim Martin; correct?
A I can't tell you without -- the same 204 acres?
Q Yes.
A I assume that could be correct, but it may have been another 204 acres, but I will assume it was the same 204 acres sold to Jim Martin.
Q Okay. And so you know that the debtor, before it got its plan done, then, knew that the acreage had been sold to Jim

Martin and that they knew that Jim was also a principal in Lumar Land & Cattle?
A I don't know what the debtor knew. I can only testify as to what I knew.
Q Okay. Now, wait a second. You can't testify that other people in the debtor didn't know about that sale to Lumar Cattle; can you?
A I can only testify about myself and what I knew.
Q Okay. So if somebody else in the debtor knew about that sale, you can't testify to that; can you?
A How would I know what anybody else knew? I can only tell you that I was the individual representing the debtor. I was the only one having conversations directly with Robert Potts. And I had no knowledge of any property being sold to Lumar until February of '22.
Q Okay. But to make sure the record's clear, you did know about that same property being sold, allegedly to Mr. Martin, in January of '21; correct?
A I knew that in January 28th, pursuant to that letter, that Dixon was selling to Jim Martin a parcel of -- a 204 acre parcel.
Q Okay. So what you're really arguing about is not that you didn't know about the 204 acre parcel being sold, you didn't know about it being sold to Lumar. That's what you're saying, isn't it?

A I don't like you putting words in my mouth.
Q Well, you knew about the 204.5 acres being sold to Jim Martin; correct?
A I knew about that by the letter that Jim -- that Robert Potts sent to me.
Q But what you're saying is, you didn't know that it had been sold to Lumar, but you knew it'd been sold?
A I -- that letter does not say it was sold, does it?
Q Well, it says it has a contract of sale. Let me ask you --
A Like, when -- when --
Q -- this, then. You knew there was a contract of sale between Dixon and Jim Martin; correct?

MS. LINDAUER: Your Honor, I think -- Your Honor, I think this has been asked and answered several times. And Mr. Forshey is being very argumentative with Mr. Martin. So I would object. We've already covered this. The email says what the email says. And I know Mr. Forshey would like Mr. Martin to say something different. But I think we've covered this. The email speaks for itself as to what was put in the email. It's already been admitted. So grilling Mr. Martin over and over and over on this is really not a productive use of any -- of this Court or any party's time at this point.

THE COURT: The objection is overruled. You may answer the question, sir.

THE WITNESS: Please ask the question again.

BY MR. FORSHEY:

Q Okay.

Q Okay. Dixon Exhibit F, the email, says that Dixon Water Foundation has a contract to sell to Jim Martin 204 acres of our Bear Creek Ranch; is that correct?

A Okay. I’m going to tell you what --

MS. LINDAUER: Your Honor -- Your Honor, objection. Your Honor, objection. The email speaks for itself. We don’t need Mr. Martin to confirm what’s already in an email that’s been admitted by the Court.

THE COURT: The objection is overruled.

Mr. Martin is being very, very careful with is responses. So I think that Mr. Forshey has a -- has a right, just like you would when a witness is being very, very careful in each response to try to --

MS. LINDAUER: Sure.

THE COURT: -- inquire around that. So, and again, the witness is being very, very careful with the words he is using and so I’m going to give Mr. Forshey the latitude, as I would you if you were in those shoes, to try to pin the witness down because he is being a bit evasive, because he’s being very, very careful with his responses.

So you may proceed, Mr. Forshey.

BY MR. FORSHEY:

Q The email says the Dixon Water Foundation has a contract to sell Jim Martin 204 acres of our Bear Creek Ranch; is that correct?
A I'd have to look at the letter again, but I thought it said a plan to sell it, if I'm not mistaken. Could you put up the letter again?
Q Sure, Mr. --
A The email?
MR. FORSHEY: Sure. Mr. Vasek, would you -- would you oblige us.
MR. VASEK: Certainly. Just a moment.
BY MR. FORSHEY:
Q Okay. You see it says, Dixon -- Dixon Water Company has a contract to sell to Jim Martin 204 acres of our Bear Creek Ranch. We plan on closing this sale in the next 90 days; do you see that?
A That's what I see.
Q Okay. So based on that, the person that -- you knew that they had a contract to sell that 204 acres to Jim Martin; correct?
A I know what the letter said. They have a contract to sell to Jim Martin.
Q And then they also told you they plan on closing within 90 days; correct?
A That's what it says, but I do not know by this letter if

they really had a contract. It doesn't say that. There's no copy of the contract there. I never saw a copy of the contract there. I only know, I said this is -- they're confirming that Dixon Water has a contract to sell to Jim Martin.

Q All right.

MR. FORSHEY: All right. I'll pass the witness, Your Honor.

THE COURT: All right. Thank you, Mr. Forshey. Any other counsel have any cross-examination questions for Mr. Martin?

Mr. Shepherd is shaking his head no. All right.

Ms. Lindauer, any redirect?

MS. LINDAUER: Yes, Your Honor.

Ms. Umai (Phonetic) I don't have a copy of the Exhibit F, which was just produced. So if Counsel would be kind enough to put that document up again.

REDIRECT EXAMINATION

BY MS. LINDAUER:

Q Mr. Martin, you testified on direct regarding this particular email; is that correct?

A I -- I didn't hear you. There was some background noise.

Q Sorry. Mr. Martin, you testified on direct that you were in receipt of this particular email; is that correct?

A Hold -- hold on one minute. I'm sorry, Ms. Lindauer. Could you repeat the question? I'm sorry for that, there was

something closing in my house at that time.

Q Sure. Mr. Martin, you testified on direct before you even had this email in front of you that, in fact, you had received an email in January 2021 from Mr. Potts regarding a possible sale of property to Mr. Martin; is that correct?

A That is correct. I do recall receiving that.

Q Okay. And this is the email that you were referring to; correct?

A That is correct.

Q And I think you already testified to this, but you had -- did not ever see a copy of the contract to Jim Martin; is that right?

A That is correct.

Q Were you ever provided notice by Dixon Water or Jim Martin or any other person that a sale to Jim Martin of 204 acres had actually closed?

A No, I had not.

MS. PERRY: Objection, Your Honor. I think that actually --

THE COURT: Hold on, hold on, hold on.

MS. PERRY: I think that calls for a legal conclusion whether he received notice.

THE COURT: The objection is overruled. The answer will stand.

You may proceed, Ms. Lindauer.

BY MS. LINDAUER:

Q You were also told that Jim Martin will receive an option to acquire the remaining portion, 1,320 acres as part of this closing or contract, right?

A That is the clear reading of that email.

Q Okay. Do you see any mention in that email of the name Lumar Land & Cattle?

A No, I do not.

Q As you sit here today, you've told us repeatedly, the first time that you heard the name Lumar Land & Cattle was when they intervened in connection with the pending lawsuit; is that right?

A That is correct. In February -- kind of -- some time in February of '22.

Q Mr. Forshey asked you about some allegations or statements made in connection with an amended pleading that was filed with this Court; is that right?

A That is correct.

Q Okay.

MS. LINDAUER: Ms. Ollar, if you're online with us, which I believe you are. Can you pull up for me Plaintiff's Exhibit 13, which is the Motion for Leave to Amend?

It's Plaintiff's Exhibits. I think you might be over in the Defendant's Exhibits. There we go.

And if you could go back, Ms. Ollar, to the first

page you had up of that exhibit.

BY MS. LINDAUER:

Q Do you see, Mr. Martin, the date that this particular filing occurred with regard to the Motion for Leave to File Amended Complaint?

A 8/10/21.

Q No, look at the very -- the following transaction was received. I'm not sure what you're looking at, but do you see that?

A The following transaction was received -- 5/9/22, correct.

Q Okay. All right. So 5/9 of '22, when the Motion for Leave was filed asking to amend the complaint; correct?

A Correct.

Q Mr. Martin, are you aware that there has been a great deal of discovery that has occurred in this case between the debtor and Dixon Water Foundation?

A Yes, I am.

Q And had that discovery occurred prior to this Motion for Leave to File an Amended Complaint?

A I can't recall when that discovery was done, but I assume it was done before 5/9/2022.

Q So the facts that are included in the amended complaint would be in part the result of receiving discovery in connection with this proceeding?

MS. PERRY: Objection, Your Honor. Is counsel now

testifying or asking a question -- a question of the witness?

MS. LINDAUER: Your Honor, I'll phrase -- I'll rephrase the question.

THE COURT: All right. Thank you.

BY MS. LINDAUER:

Q Mr. Martin, Dixon Water and other parties have provided responses to discovery in connection to this proceeding; is that correct?

A Yes.

MS. PERRY: Objection, Your Honor. Leading.

MS. LINDAUER: Your Honor, I think that's a foundational question.

THE COURT: I think so. I'm going to overrule the objection, but to the extent you can avoid leading questions, that would be terrific.

MS. LINDAUER: Sure.

BY MS. LINDAUER:

Q Mr. Martin, what use has the debtor made of the discovery that it's received from Dixon Water and other parties?

A They filed an amended complaint.

Q And so facts contained in that amended complaint, is it your understanding that -- what's your understanding of where some of those facts had actually come from?

A It's my understanding that some of those facts came from discovery that was -- that was filed by the debtor in this

case.

Q Okay.

A Or the plaintiff --

Q You --

A -- I guess, in this case.

Q If we -- if we look at, on this Motion for Leave, look at the amended complaint.

MS. LINDAUER: Ms. Ollar, if you if you could go to that actual document. There you go. And go to Page 14 of 38. Okay. And run back up a little bit.

BY MS. LINDAUER:

Q And if you'll look at Paragraph 41. Does that state, Mr. Martin, that on January 27th, Dixon deeded 6.15 acres of the remaining property to Martin, which was in addition to the 204.5 acre parcel under contract to Lumar; do you see that?

A Yes, that's exactly what it says.

Q Right. Do you have any understanding, Mr. Martin, of -- of whether there were several transfers of property by Dixon to either Jim Martin and now, at this point, to Lumar?

A Yes, I'm aware of some parcels that were transferred to Jim Martin or some other entities that I've learned subsequent to January 28th.

Q All right.

A Or --

Q All right. If you look at Paragraph 42, on April 23rd,

2021, Dixon provided financing to Lumar for the purchase of 204.5 acre tract and then deeded the 204.5 acres to Lumar. Is that the way that reads?

A That's exactly what it says.

Q Okay. So it appears, Mr. Martin, that what we're talking about are two tracts: the 6.15 acre track and a 204.5 acre track; is that right?

A Yes, Paragraph 41 refers to 6.15 acres and we -- which was in addition to the 204.5 acres, and then Paragraph 42 states that they provided financing for the 204.5 acres.

MS. LINDAUER: Ms. Ollar, if you would pull up for me -- and, again, this would be in the Plaintiff's exhibits.

BY MS. LINDAUER:

Q If you look at Exhibit 6, just for the record. What's the date of this particular order, Mr. Martin?

A August 2nd, 2021.

Q Thank you. And the Motion for Leave to Amend, you already told us, was in May of 2022; is that right?

A Correct.

Q If you could take a look at Plaintiff's Exhibit 7.

MS. LINDAUER: And if we take a look -- Ms. Ollar, it would be easier to go from the very end. Four pages from the end.

BY MS. LINDAUER:

Q Counsel asked you about these provisions that were

included in the schedules; do you see those?
A Yes, I do.
Q Okay. And is --

MS. LINDAUER: And is -- go down a little further. Go a little further. There you go.

BY MS. LINDAUER:
Q One of the claim's possible causes of action against Jim Martin were claims including but not limited to tortious interference, breach of contract, misrepresentation, fraud, breach of fiduciary duty, and all related claims and causes of action; do you see that?
A Yes, I do.
Q This claim was added to the debtor's schedules prior to the approval of the debtor's plan. Is that your understanding, Mr. Martin?
A I'd have to look at the date, but I think so.
Q Okay.
A I'm a little confused with dates right now.
Q Okay. If you'll look at the last page of that document.

MS. LINDAUER: Ms. Ollar, if you would go to the last page. There you go.

BY MS. LINDAUER:
Q 5/12/2021, do you see that date?
A Yeah, May 12th, 2021. Correct.
Q And that was before the plan was approved in the

bankruptcy case; correct?

A That is correct.

Q Looking at Exhibit F, again, the letter -- or the email that you looked at, just to be clear, the only mention in that letter is of a gentleman named Jim Martin; is that right?

A That is correct.

Q And if you believed that BM318 -- or BM318 believed it had claims against Mr. Martin, would they relate to that particular letter or claim?

MS. PERRY: Objection, Your Honor. Calls for speculation.

THE COURT: Sustained.

Rephrase the question.

MS. LINDAUER: Thank you. I poorly worded that question, Your Honor. I'm sorry.

BY MS. LINDAUER:

Q Just to be clear, Mr. Martin, claims against Mr. Jim Martin, those are part of the claims that the debtor is requesting to include as part of its amended complaint; is that right?

A Correct.

MS. LINDAUER: Your Honor, I'll pass the witness.

THE COURT: All right. Thank you, Ms. Lindauer.

Ms. Perry, any other -- any cross for this witness?

MS. PERRY: No, Your Honor.

THE COURT: All right. Thank you.

Mr. Forshey?

MR. FORSHEY: No, sir.

THE COURT: All right. Anyone else have any further questions for Mr. Martin?

All right. Thank you, Mr. Martin for your testimony, sir. You are excused as a witness.

THE WITNESS: Thank you very much.

THE COURT: All right.

Ms. Lindauer, back -- back to you.

MS. LINDAUER: Your Honor, we don’t (Indiscernible) any -- doesn’t -- this was the only witness that we had offered at the last hearing, so this is the only testimony we’ve asked to include as part of the record, Your Honor.

THE COURT: All right. Thank you.

With that since -- go ahead.

MS. PERRY: Your Honor, I do have a document I wanted to introduce into evidence.

THE COURT: Of course.

MS. PERRY: And I also have hard copies of the email that I never (Indiscernible) the Court --

THE COURT: Oh, that’s fine. That’s all I would need.

MS. PERRY: -- if you would like.

THE COURT: We would not -- even if you had that,

then I would --

MS. PERRY: I do.

THE COURT: Then you do not need to have Mr. Vasek record that --

MS. PERRY: They are --

THE COURT: -- record that.

MS. PERRY: I do, Your Honor. If I can find it amongst my many manila folders. Here.

THE COURT: Terrific. Thank you.

MS. PERRY: Thank you, Your Honor. May I ask to approach?

THE COURT: That's fine, I guess. That's fine. All right.

Just for the record, then, I'm going to mark this, to be consistent, I'm going to mark it as both Lumar Exhibit 19 and Dixon Exhibit F, so it's already Dixon F and I'm going to also just mark it as Lumar 19. And that is entered into evidence. Thank you.

(Lumar Exhibit 19 received into Evidence)

MS. PERRY: And we'll make sure that we send one to Ms. Lindauer, Your Honor. It -- it is in documents we previously produced, but we'll send it to her. We have one additional document to introduce into evidence, Your Honor.

THE COURT: Um-hum.

MS. PERRY: It -- it --

Mr. Vasek, can you pull up Dixon -- it's labeled 010940.

Your Honor, this is a special warranty deed with vendor's lien. It reflects the transfer of the 204 acres from Dixon to Lumar and if we go to the last page -- Mr. Vasek -- of the document, we can see that the file stamp is filed and recorded in the official public records of Parker County on April 28th, 2021. This is also in a production that we previously made to Ms. Lindauer and we'd ask to admit this into Evidence as Dixon Exhibit G.

THE COURT: Any objection?

MS. LINDAUER: Your Honor, I'm struggling with this a little bit, because the evidence was reopened for the purpose of taking Mr. Martin's testimony and -- and I understand that it's appropriate to ask him about documents during that testimony, which they did and that has been admitted. For them to be offering now additional documents that they could have offered at the last hearing, Your Honor, I'm having some issues with that, because the record really wasn't reopened. They have no sponsoring witnesses for this document. I understand it's a public record, but I guess I'm having some issues with -- that the record wasn't reopened for the purpose of permitting the addition of additional exhibits or witnesses by any other party.

So I guess I'm -- I'm struggling a little bit about

why we should be allowing additional documents to be admitted at this particular hearing, when the reopening was for a very limited purpose. If Ms. Perry had asked Mr. Martin questions about this document, I would probably have less concern, but the fact that she just carte blanche now wants to introduce an exhibit, I guess I'm having some heartburn why this wasn't done previously if she thought this was an important document.

So -- so on that basis, Your Honor, I think the record was opened for a very limited purpose and I would ask the Court to maintain that and not (Indiscernible) introduction of any additional exhibits or witnesses that were not told to be part of this proceeding, Your Honor.

So on that basis, I would ask the Court not to admit it.

THE COURT: All right. The Court is going to overrule the objection. I -- I understand the -- your point, Ms. Lindauer, it's a fair point. I look at it as though it's the Court's faux pas for not allowing you to call Mr. Martin in the first place at the last hearing, and had that happened, then of course any party could have also then sought to include any additional witnesses or exhibits based upon that testimony.

So I'll take part of the blame. The Court's going to go ahead and admit this -- admit this as Dixon Exhibit G, but just -- the Court can take judicial notice since it is a public document anyway, but I think it's just important for the record

to reflect what I think is a noncontroversial document. It just buttons up Dixon deadlines.

So the objection is overruled. The exhibit is admitted.

(Dixon Exhibit G is admitted into Evidence)

MS. PERRY: Your Honor, I have hard copies of the exhibit.

THE COURT: That would be great.

MS. PERRY: May I approach?

THE COURT: Yes.

MS. PERRY: Thank you.

THE COURT: Thank you.

All right. Anything else, Ms. Dixon? Or -- excuse me. Ms. Dixon. Do you have anything else, Ms. Perry? I'm sorry about that.

MS. PERRY: From an evidentiary standpoint, no, Your Honor. We would like to make a closing argument.

THE COURT: All right. I'll give the parties another opportunity just to button up their closing arguments from last time. Anything else, just to make sure before we close, hopefully for the last time, the evidentiary record?

Mr. Forshey, anything from your side?

MR. FORSHEY: None, Your Honor.

THE COURT: All right.

And Ms. Lindauer?

MS. LINDAUER: No, Your Honor. But I -- and I heard your statement about closing arguments, but I think, Your Honor, we had closing arguments. We had opening arguments.

THE COURT: I --

MS. LINDAUER: I think you -- I think you have the evidence. I think you have the arguments that you -- and I know you took this under advisement. I don't see a reason for further closing arguments, Your Honor, at this point. And so -- and I know that's -- that's your prerogative --

THE COURT: Of course.

MS. LINDAUER: -- on this, but -- but I think we spent so much time last time going through cases and all sorts of things, just -- so, Your Honor, if you are going to permit closing arguments, I would -- I would ask, perhaps, that they be very, very short and that we not spend a great deal of time on that, because again, this was supposed to be for the narrow issue of just getting in some missing evidence. It's now in for whatever purpose the Court wants to use that for. And so -- so, Your Honor, that -- that would be my only concern.

THE COURT: All right. The Court just notes for the record that BM318 did file a supplemental -- supplemental response of Document Number 66 and that was filed yesterday on June 29th, 2022. Because of that, and because a little time has passed and because the Court did ask some questions of all counsel towards the end of their closing arguments, I think

it's appropriate for each side to button up their arguments based upon the Court's new inquiry a week and a half or so ago when we were initially here for this matter, plus because the plaintiff has filed a supplemental response, which I think --

MS. LINDAUER: Sure.

THE COURT: -- the other party should have an opportunity to at least respond to that. I'm going to ask, though, a fair point by Ms. Lindauer, you don't need to repeat your closing arguments. Only if there's something new or something very pertinent that you want the Court to specifically address. With that, Ms. Lindauer, it is your motion. I will give you that opportunity to make a final argument that you'd like to make.

MS. LINDAUER: Sure.

Your Honor, when we last met, we asked the Court to allow us to put on some evidence about what BM318 and its representatives knew at different points in time as it relates to, in particular, Mr. Martin and then Lumar Land & Cattle. And all the parties argued, I think, except for the Plaintiff of course, that the Court could imply from different things the knowledge that BM318 might have at different points in time, so we would ask to have the opportunity to call a witness to explain what people did know at particular points in time.

I do think, and the reason we filed a supplemental brief yesterday was it did concern me that there is a huge

timing issue here that the Court has to address. There are, as I mentioned before, buckets of claims. There are claims that exist prior to the bankruptcy filing, there are claims that exist during the bankruptcy filing, and then there are claims that may exist after the plan is confirmed. The claims after the plan is confirmed may be claims that did arise prior to confirmation, but for whatever reason the debtor was not fully aware of the nature of those claims and did not schedule them or list them.

And so it’s in sort of a got-you position if, in fact, a proposed defendant could say, well, you didn’t know about our claims, but you should have listed them anyway. And so now you’re barred from bringing those claims. So, Your Honor, that was the purpose for filing a -- a further supplement.

I think the evidence has established pretty much the following. Clearly, the debtor was aware that it had claims against Mr. Martin. It had claims for tortious interference, breached contract, misrepresentation fraud, breach of fiduciary duty, belated claims and causes of action. And whether those claims arose prior to filing the bankruptcy, after the filing of the bankruptcy or at some other point in time is really immaterial to the claims against Mr. Martin. Mr. Martin was an individual for which claims were disclosed as existing and that the debtor should be able to pursue those.

Moreover, Your Honor, Mr. Martin was not included in the original complaint that was filed by the debtor, and the debtor now seeks to add those claims as part of its amended complaint as there has been, in fact, some discovery, which Counsel has admitted, that did reveal that Mr. Martin did have, in fact, some claims that should -- legally should have been -- should be brought against him. The claims against Dixon Water Foundation were also fairly disclosed and Ms. Perry participated in the confirmation process on behalf of her client. And Dixon Water Foundation, as I pointed out to the Court at the last proceeding, filed documents in May of 2021 entering an appearance to the bankruptcy case but failing to disclose that the property in question had actually been transferred, at least in part, to Mr. Martin or to Lumar Land & Cattle Company. So in some respects, Dixon wasn’t completely forthcoming as to what happened during dependency of the bankruptcy with regard to this particular piece of property.

Your Honor, so again, going back to what the debtor has asked, it has asked to amend its complaint. It had causes of action against Dixon Water Foundation, more specifically, based on discovery that’s been produced during the pendency of the bankruptcy. It’s asked to add claims against various members, board members of Dixon Water Foundation for their involvement with claims that now the debtor’s aware of that involve a 204-acre tract that was, in fact, transferred to

Lumar. A tract which the debtor had originally asked to purchase and was advised was being transferred or possibly transferred to Jim Martin without any notice that, in fact, that -- that transfer had -- had occurred.

And as I pointed out, it’s important that Dixon, in May of 2021, when it did participate in the bankruptcy case, never mentioned in any claims it’s ever filed, that in fact did transfer a tract of what the debtor has contended is its right to reclaim under these transactions, that in fact had transferred that tract to someone else.

There’s a lot of smoke around that particular email and -- and that’s why I had Mr. Martin explain to you before they did that, in fact, there was one email. It did reflect there was a possibility of a contract and a closing of 204 acres. Never mentioned Lumar Land & Cattle company. Never any follow-up, saying that that, in fact, had occurred. And never any indication that, in fact, Lumar rather than Mr. Martin was in fact the ultimate acquirer of that particular property.

So in the debtor’s testimony, Your Honor, the only testimony regarding knowledge, Mr. Martin told you the first time he had heard of Lumar Land & Cattle was when they intervened in February of 2022 which is after the plan was confirmed, after this bankruptcy had been pending for quite some time, that that name actually surfaced, and it surfaced because Lumar chose to intervene in this particular proceeding.

Your Honor, the claims against Lumar, as I mentioned, have already been well fleshed out or at least described, so the debtor should be allowed to amend to include claims against Mr. Martin. The debtor has already filed counterclaims against Lumar Land & Cattle, so I don't think there's really much disagreement over those particular claims. The only claims, Your Honor, that I don't think have been properly addressed, really, are the claims against the various board members. Your Honor, our contention is -- is those relate primarily to the 204-acre transaction that occurred after the bankruptcy was filed to Lumar Land & Cattle, to which the debtor was not aware.

Now, I know Ms. Perry's going to argue, well, Your Honor, there was a deed of record in Parker County, so the debtor should have gone and checked out the deeds to see that, in fact, there had been a transfer. There's no obligation on the debtor to continually search the Parker County records to see if in fact Dixon had transferred -- we -- we don't even know today. Dixon may have transferred more of his property. We don't know. We're not -- we're not obligated, I don't think, Your Honor, to actually continuously search the deed records to find out what properties may or may not have been transferred by various persons after the bankruptcy was filed and after the plan is confirmed.

I -- I think, Your Honor, on this record, and again,

I'll go back to the original provisions of the federal civil procedure, which say that an amendment is to be freely granted. And what they're really asking you is to bar the debtor from asserting claims on the basis that those claims were not properly disclosed as part of the bankruptcy filing, and our position, Your Honor, is -- is that based on this record, there was no obligation for the debtor to disclose beyond what has actually been disclosed. The claims against Jim Martin have been disclosed. The claims against Lumar have not been disclosed, because, as Mr. Martin told you, he didn't know about Lumar, so there was no reason to disclose those.

Those raise basic questions of fundamental due process. If you don't know what you don't know, you can't put it on your bankruptcy schedules and you can't put it in your disclosure statement. Ms. Dixon -- Ms. Perry could have helped us when she showed up at the disclosure statement hearing and said, oh, by the way, there is this transaction you should be aware of. No one told us. And I don't think it's fair to say that the debtor had any burden to go and search records when no one's flagging it that there is an issue here.

So, Your Honor, I would argue that the claims are valid and we should be allowed to amend our complaint. Look, they have remedies. You amend the complaint, they can assert motions for summary judgment, they can assert motions to dismiss, they can file whatever they want to file in response

to that amended complaint. But to bar it from ever being filed, Your Honor, I have a -- a lot of heartburn with that based on the record you have before you.

So I would ask you to grant the Motion to Amend and -- and then we just keep moving forward with this matter. Thank you.

THE COURT: All right. Just a couple very quick questions.

You mentioned a couple times in your argument --

MS. LINDAUER: Yes, Your Honor.

THE COURT: Just a couple quick questions.

You mentioned a couple times --

MS. LINDAUER: Sure.

THE COURT: -- in your argument just now that -- that claims used against Jim Martin had been fully disclosed. Other than the schedule and the amended schedules which were filed on May the 12th, 2021, which can be found at Lumar Exhibit Number 4, it's also on the bankruptcy docket ECF Number 93. Other than those disclosures, were any disclosures against Mr. Martin disclosed anywhere on the claim or the disclosure statement? Or confirmation order, for that matter?

MS. LINDAUER: Your Honor, I -- I don't believe so. I think the way those documents read, if I remember, and I'm going from memory, the disclosure statements says --

THE COURT: Um-hum.

MS. LINDAUER: -- that claims that are on the schedules is what I recall them saying, are preserved for the benefit of the debtor filing the same. So the -- the disclosure statement actually references -- and I -- and I could be wrong on that, but that's normally what those things say. Normally disclosure statement or the plans say the claim's disclosed in connection with the schedules, the statement of affairs. And so -- so that's the way, typically, those matters are handled. And so it would be a reference back, and I could take a look at the disclosure statement quickly and tell you if it --

THE COURT: No, that's okay.

MS. LINDAUER: -- actually said that --

THE COURT: No, no, I can handle that.

MS. LINDAUER: That would have been -- that would have been --

THE COURT: No, I -- I can do that myself. I just want to --

MS. LINDAUER: That would be the normal way -- I'm sorry, that would be the normal way you would handle that, Your Honor, is that they would be reflected in the -- in the -- in the documents themselves that way.

THE COURT: All right. That -- that answered my question. Thank you very much.

MS. LINDAUER: Thank you.

THE COURT: Thank you, Ms. Lindauer.

All right. Ms. Perry, would you like to go next?

MS. PERRY: Your Honor, it seems clear to me that Larry Martin certainly knew that the 204 acres were going to be -- were potentially going to be transferred. And he knew that, as he admitted in January -- on January 28th, 2021, which was five months before the Court held the hearing on confirmation.

Now, yes, the email says Jim Martin, but as Mr. Larry Martin testified, based on his experience, you do see in real estate transactions, that a party that initially enters into a contract ultimately assigns it to another party. That's not unusual. The email couldn't have been clearer, and I feel I have to address Ms. Lindauer's kind of assertion that I should have disclosed this in connection with our negotiations for language in the plan. My client sent an email to Larry Martin telling him that this sale was taking place.

And frankly, the fact of that sale had no relevance to what I was negotiating with Ms. Lindauer in connection with the plan, which was essentially because she had, as the Court may recall, had no class and no plan for secured creditors like my client. If -- if the Court ultimately were to determine that the property should be avoided, the plan needed to provide for how my client would be treated. That has nothing to do with whether some of the property had been transferred.

So, you know, I -- I take seriously my duty of candor

to the Court and that was certainly not something I would have ever thought about at -- at the time, and I know Your Honor can go back and -- and of course look at that third modification or the recording from those hearings and see what was dealt with there.

I think the importance of this email is, January 28th, 2021, Larry Martin, who testified that he was the one who had taken the lead for BM318 on the negotiations with Mr. Potts was given notice that a portion of the Bear Creek property was going to be sold to Jim Martin. It says we plan on closing this sale within the next 90 days. And then we see in the record with Exhibit G, the special warranty deed, that, in fact, it was closed within the next 90 days. Albeit to Lumar, not to Jim Martin, but the debtor is asserting alter ego and piercing the corporate vale claims against Lumar and -- and Jim Martin.

I'm not opining on the validity or invalidity of those claims, but that is their assertion, that essentially Jim Martin and Lumar Land & Cattle are one and the same. You can't have it both ways. So if that's their assertion, then Jim Martin, Lumar, interchangeable, same thing in the email here. And either way, what this email does is it does put someone on notice who had previously owned this property, been unable to service it, my client took it back in a deed in lieu transaction and then -- and ultimately were unable to reach

agreement to sell it back to them. We sold a portion of it to Jim Martin. We're allowed to do that.

But my point is -- my -- my -- my point there is that clearly, Larry Martin had notice, and there's no testimony that anyone else but the debtor did have notice. No, we actually don't know either way. But we certainly know that Larry Martin, who was the point person, did have notice of this. And we also know that -- by Exhibit G, by -- special warranty deed was filed on April 28th, 2021, which is before plan confirmation.

And I -- I disagree with Ms. Lindauer's statement that they had no duty to check that. Mr. Martin clearly knew that this property that -- that -- that there was a contract, an actual contract, which was to sell the property in January of 2021. And the 90 days expired before plan confirmation -- a month before plan confirmation, and frankly four -- three months before the confirmation order was actually entered.

And so Ms. Lindauer, as Your Honor mentioned, did file a supplemental brief yesterday afternoon, and I do want to address a couple of the things she raised there, since I know Your Honor has read that.

Discovery rule. Now, discovery rule, is it -- is it really applicable here? I mean, it's kind of a different animal, because there's a statute of limitations, but I see some analogies here with respect to when you're looking at

knowledge of claims that you had pre-confirmation. So I just want to walk the Court through a couple cases that we -- we looked at yesterday.

All right. So first of all, this circuit in *Cantu v. Schmidt*, which is at 784 F.3d 253, in considering whether a claim accrued pre-conversion of a case or post-conversion of a case, found that as a rule, a cause of action accrues when a wrongful act causes some legal injury, even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred. This circuit sided to Texas Supreme Court precedent for that, and said this: it is not necessary to know immediately the type and extent of the injury. All that is needed is a specific and concrete risk of harm to the party's interest.

Now certainly, we -- we do not concede that there are any damages here. We were free to contract with whoever we wanted to with respect to this property. But since they are taking the position that there is, you know, this damage, this email, Exhibit F, doesn't that show the specific and concrete risk of harm? This is property you wanted to buy and part of it's being sold. I don't know how it gets any clearer than that, Your Honor.

And the Texas Supreme Court is also very clear, and they stated this in -- on May 13th, 2022 in *Berry v. Berry*, which is at 2022 Tex. LEXIS 405. The discovery rule has a

narrow exception that is only applied in exceptional cases.

And when we look at the Texas Supreme Court decision, *Hooks v. Samson* in 2015, the Court ended up specifically stated, land title that occurs and private proceedings create constructive notice, an irrebuttable presumption of actual notice which prevents limitations from being delayed. And the Hooks case is at 457 S.W.3d 52 (2015), an irrebuttable presumption, Your Honor.

The email told Mr. Larry Martin that the property was going to be sold; Exhibit F. The special warranty deed was filed on April 28th, 2021, showed that the property had been sold. And under Texas Supreme Court case law, that land title record was irrebuttable presumption that they had actual notice.

Further, Your Honor, the bare report in finding that certain -- that affirming that certain clients were barred by limitations specifically said, a cause of action accrues when the injury occurs, even if the fact of injury is not discovered until later. An instrument that is properly recorded in the proper county is noticed to all persons of the existence of the instrument. All you have to do is -- is search for Dixon Water Foundation. I'll represent to the Court today as an officer of the court, I went and -- and searched today and you just put in Dixon Water Foundation and the special warranty deed, that's Exhibit G, comes up. You don't have to put in Lumar Land &

Cattle to -- to find it.

So I think the evidence here is clear that Mr. Martin, as representative of the debtor, had notice. And clearly, the debtor reserves some claims against my client in the -- in the plan. I actually think the disclosure of statement does not refer back to the schedule to buy it, but I may be wrong, because it hasn't been really my issue. But, you know, it's 547, 548, 555, it's you. That's it. That's it.

And, you know, Ms. Lindauer said, well, we heavily addressed the board. Not accurate, Your Honor. If we get -- if you go back and look at the transcript, we definitely addressed all these claims as they related to Dixon, Mr. Potts, and -- and the board.

I also feel the need to, you know, point the Court's attention -- well, also, let me round this argument out. So the Property Code of Texas, which the Court can take judicial notice of, Section 13.002, is titled Effect of Recorded Instrument, and this is the provision that the Texas Supreme Court cited, too, when talking about notice to parties. Effective recorded instrument: an instrument that is properly recorded in the proper county is noticed to all persons of the existence of the instrument. To round that out.

Then, Your Honor, I know that Mr. Forshey has sort of said he was going to give on the judicial estoppel argument. We incorporated that judicial estoppel argument into our

objection, and at the beginning of the last hearing, I stated that I -- in my opening I was going to address certain things that Ms. Lindauer had brought up in her reply, but that I stood on all of the bases for the objection. In her supplemental reply, Ms. Lindauer kind of brought up judicial estoppel again, so I wanted to -- I wanted to address that briefly as well.

Because to me, reading it, it seems like there was perhaps some backpedaling on 541(a)(7). And I know that Your Honor reviews transcripts, or someone in your office reviews transcripts before they're approved to be sent out, and I did order a transcript here and I believe it is one of Lumar's exhibits, although I don't know that it -- I -- the Court can obviously take judicial notice of the transcript.

But Your Honor asked Ms. Lindauer at the last hearing, and there may be some typos in the transcript, so it may sound a little weird. But on Page 48 on the transcript from the hearing, you asked the question, so because the claims had appeared, cleared, whatever term you want to use during the Chapter 11, why wouldn't those claims also be property of the estate under Section 541(a)(7) which states, the property of the estate includes, quote, any interest in the property the -- that the estate acquires after the commencement of the case? So what's -- what's the difference of the distinction you're trying to make?

And Ms. Lindauer said, look, Your Honor, I'm not

saying they're not property of the estate, I'm saying that they arose post-petition and they aren't subject to having to be disclosed as part of a plan disclosure modification when we don't know about them until Lumar intervenes in our case in 2021.

We are saying that they are property of the estate. So the way I read the supplemental reply was that she was arguing that they -- they were not property of the estate, and I think she's barred from making that argument based on her statements in the prior hearing from an estoppel standpoint.

And, you know, Your Honor actually then continued on Page 69 to 70 of that transcript. You said, the claims, even if they arose post-petition, doesn't mean they're not property of the estate, and I think you agreed with it. I think it's pretty clear, I don't think you could. And Ms. Lindauer says, right. So to the extent that she's making that argument in that supplemental reply, I think she's barred from making it based on prior statements.

And then I also wanted to bring to the Court's attention a case that Judge King decided in the western district of Texas. It's *TXCO Res., Inc v. Peregrine Petroleum, LLC* and the citation is 2010 B.R. LEXIS 6397. So Judge King granted a Motion to Dismiss on the basis of standing. I realize we're not here on a motion to dismiss, but as the Court knows, you know, we are here based on standing, so I think that

this case is helpful from that standpoint. And the Court stated this, and this is why I think it's important, because these were post-petition claims, Your Honor; post-condition, pre-confirmation claims.

It is undisputed that a bankruptcy debtor is required to schedule all assets and that there is a duty to amend which continues throughout the case. It is also undisputed that none of the debtors listed a potential cause of action against Patterson in their bankruptcy schedules or the plan, even though they had ample opportunity to list such an asset and specifically reserve it in the plan.

And then the Court stated that failure to express or retain a cause of action, the plan of reorganization is fatal to enforcement of that cause of action on several grounds: lack of standing, judicial estoppel, and res judicata. And those were post-petition claims, Your Honor. The Court found the claims were known at the time of the filing of the plan and its subsequent amendments.

And then, Your Honor, the Court said this after finding that they were not properly reserved. Although it is unnecessary to reach this -- this issue, TXCO claims against Patterson are, for the same reason, precluded by the doctrine of judicial estoppel. And it cited to the 5th Circuit case of *Browning v. Mims*, which Your Honor may be familiar with, *In re Coastal Plains*, when the Court held that failure to disclose

claims precludes enforcement.

So I would argue that, under judicial estoppel as well, BM318 is precluded from bringing these claims against Dixon, Mr. Potts, and the Dixon board. And I'm going to try to wrap up now, Your Honor, just a couple more points.

One, there was a lot of discussion about a -- Paragraph 16 of the original complaint, which says -- and I'll read it -- after exercising one of the options to extend the closing under the buyback contract, defendant asserted a default and terminated a buyback contract on or about October 15th, 2020. Shortly thereafter, defendant sold a portion of the encumbered land to the broker (or related personal entity) who had represented Plaintiff under the original purchase agreement to acquire the 2,055 acres from defendant.

And when you then look at the tortious interference claim, Your Honor, with the contract claim, it relates to the first buyback contract, which if we just take, you know, they defined that first buyback contract as being executed around July 26th, 2020. And the alleged tortious interference relates to the acquisition of 6.15 acres and then the 204.5 acres. Well, both of those, Your Honor, happened post-petition.

So it sort of begs the question, in their original complaint, they have this allegation. And then if you look at the proposed amended complaint, what they're complaining about is post-petition conduct, not pre-petition conduct. There's

been a lot of sort of discussion about -- or -- or, you know, well, there's some pre-petition claims against Jim -- Jim Martin. Well, there's some post-petition claims against Jim Martin. I don't think -- I don't think there's been any evidence or testimony as to what those pre-petition claims against Jim Martin are. But certainly we can see from their proposed amended complaint that they think they have post-petition causes of action against Jim Martin for tortious interference, breach of fiduciary duty, fraud, et cetera, which they scheduled.

And it is those same claims that they are now trying to bring my clients into, which I think the Court can look at that and say, those schedules are filed under penalty of perjury. There's no evidence that there were pre-petition transactions that -- whether there's tortious interference, fraud, or breach of fiduciary duty, but there's post-petition ones. So those must relate to the post-petition, which means they knew it, which you put together with the email, I -- I just -- I think it's very clear that they knew about these claims and, if you go back and look at the Motion for Leave to Amend, in the first paragraph this is what it says.

BM318, LLC filed its original complaint against Dixon Water Foundation on August 10th, 2021. The original complaint was a limited action only aiming to call back certain property due to a fraudulent transfer of the same. And here is where I

want to point the Court. Although BM318 also had related claims for damages as a result of the fraudulent transfer, it believed that such claims are more appropriate for more litigation outside of the bankruptcy court. And that seems to suggest they knew about these claims back when they filed their original complaint.

They say in Paragraph 4, as a result of Lumar's intervention, BM318 was forced to bring additional tort-based claims that it had originally intended to litigate outside of the bankruptcy court at the conclusion of this case as these claims were not necessary claims. Again, kind of getting it back to they knew about it at least when they filed their original complaint. So first of all, I think it's -- it's precluded under United Operating. They knew about it. They didn't preserve them. They don't have standing to bring these claims against Dixon, Mr. Potts, or the Dixon board.

But August 10th, when they filed the original complaint, they certainly knew about these claims, because they admitted that in their Motion for Leave to Amend. And it -- we're nine months later. That falls into undue delay, dilatory motive, and so forth, which we also raise in our objection for the Motion for Leave to Amend.

And so I just want to, then, go back, Your Honor, to just close this out with what we talked about at the first hearing. You know, leave to amend should -- should be denied

because it is futile. There is no standing here for these claims. It's clear that the BM318, if we look at -- at their plan and their disclosure statement, they didn't comply with United Operating. There was no specific and unequivocal reservation of the claims, and as we discussed, claims should -- should be reserved and notice should be given so that creditors know what assets will be available to fund the plan and pay claims.

It's not about notice that you're a litigation target, it's about you as a creditor knowing, is this plan feasible? And we went through that with various case law. The only claims that were referenced against Dixon were 547, 548, 550, 502. Not against Mr. Potts, not against the Dixon board, and no other common law claims, and they just didn't preserve them.

In addition, we provided a separate basis for denial and we went through, I'm not going to go through it again, but we went through all of these claims and are (Indiscernible) obligations do not have to be presumed true, and we certainly just on their face, some of those are futile. You can't have a claim for tortious interference with contractual advantage if you're not a party to the contract. And it's clear from their own complaint and proposed amended complaint that BM318 is not a party to the buyback contract. And, you know, we went through, step by step, all of those claims when we think

there's an alternative basis for the Court to deny leave to amend.

And so for all of those reasons, Your Honor, we would ask the Court to deny the motion. And in connection with if the Court finds the motion should be denied, that the Court specifically make a finding in the order that BM318 does not have standing to bring these claims against Dixon, Mr. Potts, and the Dixon board.

THE COURT: All right.

MS. PERRY: Thank you.

THE COURT: Thank you, Ms. Perry.

All right. Mr. Forshey.

MR. FORSHEY: Thank you, Your Honor.

I'd like to take you to the transcript of our last hearing. Would you go to our exhibit 11871, sir?

THE COURT: I'm there.

MR. FORSHEY: If you could, look at the bottom of Line Number 21. And you were asking, basically, Ms. Lindauer about when you put it in the plan and disclosure statement, it -- look what she said. She said, and that's all it is. If you read the amended complaint carefully, it ties 99 percent of time to the Lumar transaction. That's what we're complaining about. We're complaining about participation of people in that transaction.

And it's the word transaction that I want you to

focus on. Is that -- what they had knowledge of, they knew there was a transaction. They knew that their contract had been terminated October 15th, 2020. They knew that there had been sales of the property. They knew specifically there had been a sale to Jim Martin. They knew about that transaction. And if they were going to preserve the claims out of that transaction, they had to properly reserve it in their plan and disclosure statement.

If you don't mind, Your Honor, would you go to Page 87?

THE COURT: I'm there.

MR. FORSHEY: An SI resolution, that's something similar to that, because the Fifth Circuit made it clear that just because you don't know all the facts about the claim doesn't get you off the hook for exposing it. What they're telling you today is they are saying, well, we knew about the transfer. They have to admit they knew about the 204 acres. But then what they're saying is we didn't know about Lumar.

Now, they do admit that Jim Martin, the person that they say the transfer was made to, was a principal and an owner of Lumar, but they're saying, we didn't know about Lumar. I would contend two things, Your Honor.

The first one is, they had an absolute obligation to disclose everything they knew about that transaction if they wanted to use that as a basis for litigation. And I think SI

resolution, and I quoted a little bit of to you about what the Wooley's (Phonetic) knew. The fact they didn't know everything didn't preclude or lose their duty to make disclosure in the plan and the disclosure statement.

The other point is that, I think to go out and say we had no obligation to go through the deed records just to look for everything is -- is probably right. And they knew there had been a transfer to Jim Martin. I think that they did have that obligation to go check that out and see what happened. And I think what Ms. Perry is saying is correct, if you go to the Parker County deed records and simply put in Dixon's name, you're going to pull up that conveyance. You don't have to know who the grantee was. All you have to know is the grantor.

Our argument is pretty simple. One, they -- they've admitted they knew about claims by Jim Martin. And while they put it in their schedules, they never put it in the disclosure statement and plan. To the extent that we're talking about, Lumar and these other people, they admit that there was a transaction and what Ms. -- what was said in there by Ms. Lindauer is that she wants to sue people based on that transaction. If she knew about that transaction, she had to make disclosure of that, which all the facts known to her, and she did not.

Based on that, Your Honor, they're barred. They don't have standing to bring any of these claims against any of

these people, because they didn't properly reserve them as required by United Operators. Thank you, and was -- I hope that was short enough. It's late in the day for you.

THE COURT: Thank you very much, Mr. Forshey. And before I go back to Ms. Lindauer for the final word, anyone else wish to be heard?

MR. SHEPHERD: No, Your Honor.

THE COURT: All right. Thank you, Mr. Shepherd.

All right. Ms. Lindauer, you get the final word.

MS. LINDAUER: Your Honor, first -- yeah, thank you, Your Honor.

First of all, I appreciate Ms. Perry arguing for Lumar and Jim Martin. I'm not quite sure how that fits in here, but in any event, I went back and I looked at who we filed an amended complaint against. We filed amended claims against Dixon Water. They're already party to this litigation. I understand that. We filed amended claims against Lumar. They're already a party to this litigation, we already asserted counterclaims against them. We did add Jim Martin and related companies related to Jim Martin. Those were added. I haven't heard anybody really argue on behalf of those other related parties, and I will name them, because I think it is relevant to see who, in fact, they are.

We have GH Lumar, LLC. We have Aledo West, LLC. GH Lumar, JV --

THE COURT: Hold on. Hold on.

MS. LINDAUER: Okay.

THE COURT: Hold on. Hold on just a sec. I want to do one thing while you're -- while you're listing them out. I've got to find --

MS. LINDAUER: Sure.

THE COURT: -- a piece of paper here.

MS. LINDAUER: Yeah. And, Your Honor, we can pull this out, the Plaintiff's --

THE COURT: All right.

MS. LINDAUER: -- Amended Complaint, Page 4 --

THE COURT: Not that. Just --

MS. LINDAUER: -- through 38.

THE COURT: I've got -- I -- I -- I've got to -- you need -- start over again with the names. I just want to -- I just want to make sure I have them down.

MS. LINDAUER: Okay. So Dixon Water Foundation, Lumar Land & Cattle, LLC. They were already parties to this --

THE COURT: Right.

MS. LINDAUER: -- allegation.

THE COURT: Um-hum.

MS. LINDAUER: All we did was amend our claims. They were already there. We're not -- they were -- they had already been made parties to this. Then we have GH Lumar, LLC, we have Aledo West, LLC, we have GH Lumar, JV, we have Railhead Realty,

LLC. And this is the -- the board member that Ms. Perry was referring to: Robert Potts, Ronald Hughes, and then we have Jim Martin, Gary Hazlewood, and then we have Clinton Josey, Kathy Smyth, Jerry Addison, Hugh Aljoe, Leslie Rauscher, and Richard Teague. Those are the proposed parties, some of which are already parties. And then the request being made is to amend claims against Dixon Water, amend claims against Lumar Land & Cattle, and then to add claims against the various persons that are listed.

And -- and I'm not going to repeat a whole lot of what we've already said, because I think you've heard most of this already, but -- but I do want to point out a few things. If you go to the third modification, to the first amended plan, this is in the plan. There was a provision on Page 2, and I'll read it into the record.

Nothing in the plan or in the order confirming the plan shall operate to release or waive any of Dixon's defenses, affirmative defenses, claims, rights, actions, counterclaims, or rights of settle or recoupment in connection of the causes of action the debtor purports to reserve pursuant to the plan; okay?

So we refer back to, it's the third modification that Dixon requested in the plan, Page 8.01, debtor's causes of action. All claims were coverable under Section 550. All claims against third parties on account of addendums, all other

claims of any kind or character whatsoever owed or in favor to the debtor or reorganized debtor to the estate to the extent not specifically compromised and released pursuant to this plan or any agreement referred to and incorporated herein are preserved or retained for enforcement by the reorganized debtor for the benefit of the creditors, subsequent to the effective date. This plan shall not stop the debtor or reorganized debtor from asserting any claim or cause of action whether disclosed or not.

Clearly, the scheduled claims were disclosed. They were made public record to the world that there were claims out there against Mr. Martin, against Dixon Water, and against Mr. Green and against Mr. Stark. There’s no question about that.

The question that the Court is addressing is, is these other claims and causes of action that arise out of the Lumar transaction, the 204 acres, were those in fact preserved, or did they have to be preserved if they were or were not known; okay?

The only testimony you have is from one witness, Mr. Martin, tells you that he did not know about Lumar claims until February of 2022. You may have known about Jim Martin claims, and those were scheduled in the schedules in May. Ms. Perry participated in that proceeding. I don’t think that the cases Ms. Perry has cited to you regarding public record and notice, those are great cases under state law. This is a bankruptcy

case. And finding a case in bankruptcy court where the notice requirement that would bar the assertion of claims requires a debtor in possession to continuously search the public records to decide if, in fact, it has claims or causes of action post-petition that it should be aware of; okay?

So, Your Honor, I think you're going to infer anything, you can infer that Mr. Martin had no idea, the debtor had no idea that the transaction with Jim Martin had, in fact, closed, because when Dixon appeared a month after that closing and never mentioned Lumar or Jim Martin or a transfer, and in fact agreed to a modification -- this is the frustrating part of this -- agreed to a modification that refers the property that's subject of the deed escrow agreement is defined as 1,531.75 acres in Parker County. That's in the modification.

There is no disclosure in the modification. I agree with them. There's no disclosure of a conveyance to Lumar. But clearly when Dixon provided this modification language to the debtor, it was aware that part of the property had, in fact, been transferred, and there was no mention in the language provided -- I don't think Ms. Perry's going to disagree that this was the language they provided to us to include in the modification. There's no mention of Mr. Martin. There's no mention of Lumar.

So when Mr. Martin tells you -- and he is a lawyer, and he is careful with his words -- that he was not aware that

the contract had closed, he was not aware of the transaction closing, and he had never heard the name Lumar, that those, in fact, were all true statements. I think it's fundamentally incorrect for this court to bar claims and causes of action on the basis of either plan estoppel, judicial estoppel, or any of those legal theories while we are only at the stage of asking you to allow us to amend the complaint.

The proper place to assert those claims would be in the form of either a motion to dismiss or a motion for summary judgment when the evidence can be more fully developed as it is being done through discovery. And as I pointed out to the Court originally, this amendment was filed exactly on the time that the parties agreed for amendments. Mr. Forshey has filed an amendment to his complaint, which we have not objected to. We are going to permit him to amend his complaint and add causes of action that were not originally put in his complaint because, Your Honor, I think that's the way this matter should be handled.

To cut off causes of action at this juncture, I think, would be just soundly improper and probably will result in an appeal, frankly. I think they will have another bite at this apple in a more appropriate manner in a more appropriate forum, which would be in motions to be filed after the complaint is amended. But again, Your Honor, I don't think on this record with these provisions, with this plan, with this

modification, with the participation of the various parties, that the Court should deny the request for leave to amend.

So I would ask you -- I know you're going to take this under advisement, but I would ask you, again, to grant the Motion for Leave to Amend. I thank you for your time.

THE COURT: All right. Thank you very much, Ms. Lindauer. And you are correct, given that it's three minutes to 5:00, I certainly was hoping to -- to be able to issue a ruling, but I was -- typically when I have evidence and testimony, I always like to make sure that I go through it, make sure that I didn't miss anything. And since it is close to 5:00, I -- I am going to take this matter under advisement. It is my hope to issue probably a -- an oral ruling. I will have Ms. Calfee reach out to you when I -- when I schedule that, but I'll just tell you I'm -- I'm hoping that perhaps it can be as early as a week from today, Thursday, at -- at probably 3:00 or so.

That's going to be my -- my hope. I'm not sure I can quite do that, and then unfortunately the week after that I got to go to Judge school so I can learn all the mistakes that I make in front of all of you each day.

But anyway, I do know the parties need to -- to get this ruling so they can move on, but the good news is, I don't think there's any melting ice cream that I have to worry about in the meantime, so with that, the Court will take this under

advisement and I'll have Ms. Calfee reach out to the three counsel directly so she doesn't have to copy everybody, but Mr. Forshey, Ms. Perry and Ms. Lindauer and, of course, Mr. Shepherd.

Any other counsel wanted me to make sure that we reach out to let you know that we're scheduling for an oral ruling? All right. Terrific. All right. With that --

MR. SHEPHERD: I'm sorry --

THE COURT: Go ahead.

MR. SHEPHERD: I'm sorry, I have one housekeeping matter.

THE COURT: Of course.

MR. SHEPHERD: As Ms. Lindauer said, we filed a -- a Motion to Leave -- for Leave to Amend ours. There -- there are no objections. No objections have been filed. Can we upload an order, or would the Court prefer us to set a hearing on that matter?

THE COURT: I haven't looked at it, so I have no idea what's been filed. My guess is if it was filed and there are no objections, there's typically no objections uploaded, I typically sign those orders.

So if the time period is expired and no one has objections, since all parties are here, is anybody objecting to -- to the Motion for Leave or at least going to reserve the right to just look at it before we tell Mr. Shepherd to go

ahead and upload his order?

MS. LINDAUER: Your Honor, we've already looked at it. We don't -- we didn't lodge an objection to it.

THE COURT: All right.

In that event, Mr. Shepherd, go ahead and upload your form of order. I'm granting your motion. But if you could, it's always nice to have -- to have no objection also filed, it just makes the docket more clear; all right?

MR. SHEPHERD: We'll -- we'll do that. Thank you, Your Honor.

THE COURT: All right. Anything else for today?

With that, thank you all very much, and the Court will...

(The proceeding concluded at 4:59 p.m.)

* * * * *

* * * * *

**C E R T I F I C A T I O N**

I, Gillian Lawrence, CER-255, CET-255, court approved transcriber, certify that the foregoing pages 1 to 60 is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.

___________________________________

CER-255, CET-255, COURT TRANSCRIBER DATE: August 5, 2022

* * * * *

**C E R T I F I C A T I O N**

I, Kelli Ray, CER-349, CET-349, court approved transcriber, certify that the foregoing pages 61 to 99 is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.

___________________________________

CER-349, CET-349, COURT TRANSCRIBER DATE: August 18, 2022