UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| BM318, LLC, et al., | . | Case No. 21-04051-mxm |
| | . | |
| Plaintiff, | . | Eldon B. Mahon U.S. Courthouse |
| | . | 501 With. 10th St. |
| v. | . | Fort Worth, TX 76102-3643 |
| | . | |
| Dixon Water Foundation, et al., | . | July 27, 2022 |
| | . | |
| Defendant. | . | 1:31 p.m. |

. . . . . . . . . . . . . . ..

HEARING
BEFORE THE HONORABLE JUDGE MARK X. MULLIN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff BM318, LLC: | JOYCE W. LINDAUER, ESQ.<br>Joyce W. Lindauer Attorney, PLLC<br>1412 Main Street, Suite 500<br>Dallas, Texas 75202 |
| For the Defendant Dixon Water Foundation: | DEBORAH M. PERRY, ESQ.<br>JULIAN PRESTON VASEK, ESQ.<br>Munsch Hardt Kopf & Harr P.C.<br>500 North Akard Street<br>Dallas, Texas 75201 |
| For the Intervener-Plaintiff Lumar Land & Cattle, LLC: | KIMBERLY PAIGE HARRIS<br>Quilling, Selander, Lownds, et al.<br>2001 Bryan Street, Suite 1800<br>Dallas, Texas 75202 |
| Transcribed by: | GILLIAN LAWRENCE, CER-255, CET-255<br>Lawrence Court Transcription & Video<br>P.O. Box 530790<br>DeBary, FLORIDA 32753 |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

INDEX


| | PAGE |
|---|---|
| RULING | 3 |
| MOTION TO COMPEL | 20 |
| | |
| EXHIBITS | |
| EXHIBITS FOR DIXON | |
| Ex. 1, appendix | 38 |

FORT WORTH, TEXAS - JULY 27, 2022 - 1:31 P.M.

THE COURT DEPUTY: All rise.

THE COURT: Good afternoon. Please be seated. We are here this afternoon for the Court's 1:30 docket. We have two matters in the BM318, LLC case. We'll go ahead and take appearances here in the courtroom and then we'll go to the video.

Good afternoon.

MR. VASEK: Good afternoon, Your Honor. Julian Vasek and Deborah Perry from Munsch Hardt Kopf & Harr for the defendant, The Dixon Water Foundation.

THE COURT: Perfect. Thank you. All right.

And, Ms. Lindauer, it's to you. Good afternoon to you.

MS. LINDAUER: Good afternoon, Your Honor. Joyce Lindauer here on behalf of BM318, the debtor in the underlying bankruptcy case and the plaintiff in the pending adversary proceeding.

THE COURT: All right. Any other counsel that would like to make an appearance?

MS. HARRIS: Judge, this is Kimberly Harris here on behalf of Lumar Land. I do not -- I'm having a hard time getting my video to start up, but I am Josh Shepherd today.

THE COURT: All right. Well, good afternoon to you, Ms. Harris. Welcome.

MS. HARRIS: Thank you. Welcome.

THE COURT: Anyone else? Okay. I think what the Court will do, I'm -- there we go.

Ms. Harris, I'm going to go ahead and mute your line. We're getting some feedback. And there we go. So if you need to speak, go ahead and unmute yourself. Otherwise, I just -- I just muted your line, because we were getting feedback.

All right. I think the first thing we -- the Court will do, we have the two matters. One is the Court's going to render its ruling. Prepared to do so a week or so ago, but thought it best just to wait until we were all here together and not cause Counsel to have to put another thing on their calendar. So this will be the Court's oral ruling regarding Motion for Leave to File an Amended Complaint, which is in Document Number 50. This oral ruling constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure as incorporated in Bankruptcy Rules 7052 and 9014.

Before the Court is BM318, LLC's Motion for Leave to File an Amended Complaint, which is located in Adversary ECF Number 50, which I'll refer to throughout this ruling as the Motion to Amend. The Dixon Water Foundation, which I'll refer to as Dixon, and Lumar Land & Cattle, LLC, which I'll refer to as Lumar, have each filed objections to the Motion to Amend. Dixon's objection is at Adversary ECF Number 55 and Lumar's

objection is at Adversary ECF Number 53. BM318 filed its response and a supplemental response to these objections, and those could be found at Adversary ECF Numbers 59 and 66, respectively. By the Motion to Amend, BM318 requests the Court to grant leave to file an amended complaint in this adversary proceeding. The amended complaint seeks in part to add 11 new counts, which are Counts 5 through 16, which I'll refer to as the new causes of action.

The new causes of action are based on various common-law theories against the following potential 16 new defendants: GH Lumar, LLC; Aledo West, LLC; GH Lumar, JV; Railhead Realty, LLC; Mr. Robert J. Potts; Mr. Jimmy Ray Martin; Mr. Ronald Hughes; Mr. Gary Hazlewood; Mr. Clinton With. Josey, Jr.; Ms. Kate Smyth -- excuse me, Ms. Kathy Smyth -- Mr. Jerry Addison; Mr. Hugh Aljoe; Mr. Walt Davis; Leslie C. Rauscher; Dr. Richard Teague; and Ms. Laura Whiting.

As an aside, the Court recognizes that Ms. -- Mr. Davis and Ms. Whiting are included in the Motion to Amend, but were not in the proposed amended complaint, which was attached as Exhibit A to the motion. These two potential defendants' inclusion in the Motion to Amend and absences from the amended complaint does not affect the Court's ultimate disposition of this matter. The Court is including Mr. Davis and Ms. Whiting in this ruling. The amended complaint also states to add the following new claims and causes of action against Dixon: Count

13, aiding and abetting and/or knowingly participation for breach of fiduciary duties; Count 14, conspiracy to commit fraud and/or fraud in real estate; constructive fraud, conversion, tortious interference with a contract or prospective contract and/or breach of fiduciary duties; and Count 16, alter-ego piercing the corporate veil, reverse piercing the corporate veil. Finally, the amended complaint seeks to end the following new causes of action against Lumar: Count 11, constructive fraud; Count 12, negligent representation; Count 13, aiding and abetting and/or knowing participation in breach of fiduciary duties; Count 14, conspiracy to commit fraud and/or fraud in real estate, constructive fraud, conversion, tortious interference in the contact or prospective contract and/or breach of fiduciary duties; and Count 16, alter-ego piercing the corporate veil, reverse piercing the corporate veil.

The Court has reviewed and considered the Motion to Amend, the objections filed by Dixon and Lumar, the response and supplemental response filed by BM318, the testimony of Mr. Larry Martin, the exhibits admitted in Evidence and the arguments of Counsel. For the reasons detailed below, the Court orders that the Motion to Amend is denied. First, some background facts. On November 16th, 2018, BM318 purchased 2,055.7 acres of rural property in Parker County, Texas, for $35,461,480 from Dixon. BM318 paid $2.1 million in cash

closing and Dixon financed the remaining amount pursuant to a loan agreement and promissory note, which was secured by a deed of trust. After various sales, BM318 was left with 1,531.75 acres of property, encumbered by Dixon's deed of trust. On February 27th, 2020, BM318 and Dixon modified the loan agreement, extending the due date to July 1, 2020. In addition, BM318 executed a deed in lieu of foreclosure to Dixon for the 1,531.75 acres to be held in escrow in the event that BM318 defaulted on a promissory note.

On June 26, 2020, in anticipation of Dixon recording the deed in lieu of foreclosure, JMJ Development, an entity related to BM318, and Dixon entered into a real estate sales agreement, or buyback contract, for the purchase of the 1,531.75 acres of land from Dixon in the event that the deed of trust that -- excuse me. In the event that the deed in lieu of foreclosure was recorded by Dixon. The purchase price under the buyout contract was $27,500,658, which was set to close on August 31st, 2020. Under the buyback contract, JMJ Development had three options to extend the buyback contract's closing date by 30 days in exchange for depositing $50,000 with the title company for each option.

On July 1, 2020, BM318 was unable to satisfy its obligations on -- to Dixon. The following day, on July 2nd, 2020, Dixon recorded the deed the lieu of foreclosure transferring title of the property to Dixon. JMJ Development

exercised one option to extend the August 31st, 2020 closing date under the buyback contract. On September 9, 2020, BM318 filed a Chapter 11 bankruptcy petition. On September 22nd, 2020, BM318 filed its original bankruptcy schedules, which can be found in ECF Number 22. BM318 did not list any alleged causes of action as assets owned by the estate in its original schedules. JMJ Development defaulted on its option under the buyback contract, and Dixon terminated the buyback contract on October 15, 2020.

On November 13, 2020, BM318 filed its disclosure statement, which can be found at ECF Number 37, and its Chapter 11 plan, ECF Number 36. And on November 19, 2020, BM318 filed its first amended disclosure statement at ECF Number 40 and first amended Chapter 11 plan at ECF Number 39. BM318 did not list any alleged causes of action as assets owned by the estate in either of the -- of the disclosure statements or Chapter 11 plans. On December 28th, 2020, BM318 filed a first modification to the first amended disclosure statement, which can be found at ECF Number 52.

Again, the first modification did not list any alleged causes of actions as assets owned by the estate. On January 4, 2021, BM318 filed its first amended schedules at ECF Number 54. Again, BM318 did not list any alleged causes of action as assets owned by the estate. On January 4, 2021, BM318 filed its second amended disclosure statement at ECF

Number 56. Although the second amended disclosure statement specifically referenced the causes of action that BM318 asserted against Dixon in the original complaint in this adversary proceeding, at Adversary ECF Number 1, the second amended disclosure statement made no mention of the alleged new causes of action that BM318 now seeks to assert by its Motion to Amend. On January 28th, 2021, Mr. Robert Potts, president and CEO of Dixon, sent to Mr. Larry Martin an email stating, Larry, this is to confirm that Dixon Water Foundation has a contract to sell to Jim Martin 204 acres of our Bear Creek Ranch.

We plan on closing the sale in the next 90 days. At the closing of the 204 acre tract, Jim will obtain an option right of first refusal to acquire the remaining part of the Bear Creek Ranch, approximately 1,320 acres. If JMJ is interested in a cash acquisition on some of all of this remaining 1,320 acres, then Jim and I would be willing to discuss it with you. I'm available next week to get on a phone call with you, Tim Barton and Jim Martin to discuss it. And again, that's Lumar Exhibit Number 19 as well as Dixon Exhibit Number For.

Pursuant to the special warranty deed with vendor's lien dated April 23rd, 2021, which can be found at Dixon Exhibit G, Dixon transferred 204.5 of the 1,531 acres that it had acquired by the deed in lieu of foreclosure. On May 5,

2021, BM318 filed its first modification to its amended Chapter 11 plan, which can be found at ECF Number 79, and its first modification to the second amended disclosure statement, which can be found at ECF Number 80. Section 8.01 of the modified plan specifically identified BM318's alleged causes of action against Dixon related to the deed in lieu of foreclosure, which were, one, preferential transfers under Section 547, two, fraudulent transfers under Section 548, and three, recovery of avoidable transfers under Section 550 of the Bankruptcy Code.

Nowhere in any of BM318's disclosure statements or Chapter 11 plans did BM318 specifically identify any of the alleged new causes of action it now seeks to pursue by its Motion to Amend. On May 10, 2021, BATHROOM 318 filed its second amended schedules at ECF Number 82, which included, for the first time, its alleged causes of action against Dixon for preferential transfers under Section 547, fraudulent transfers under Section 548, and recovery of avoidable transfers under Section 550. On May 11th, 2021, Dixon filed its objection to BM318's Chapter 11 plan which can be found at ECF Number 87.

On a side note, BM318 points out that Dixon did not address or reveal in its objection that, on April 23rd, 2021, it had conveyed the 204.5 acres to Lumar. In response, Dixon contends that it had no reason or obligation to reference the sale to Lumar in its objection to BM318's Chapter 11 plan. The Court agrees with Dixon on this point.

On May 12, 2021, BM318 filed its third amended schedules at ECF Number 93 wherein BM318 listed for the first time its alleged new causes of action against Mr. Tim Green, Mr. Chuck Stark, and Mr. Jim Martin for tortious interference, breach of contract, misrepresentations, fraud, and breaches of fiduciary duty. BM318 did not, however, specifically reference or identify these alleged new causes of action in any of its disclosure statements or plans of reorganization, which constitute the pertinent and relevant documents to adequately preserve and transfer such causes of action in a plan.

On May 25th, 2021, BM318 filed its third modification to its first amended Chapter 11 plan at ECF Number 100. On August 2, 2021, the Court confirmed BM318's modified plan, which was entered on -- at Document Number 106. The plan's effective date was September 1, 2021. On August 10, 2021, BM318 filed its original complaint in this adversary proceeding, again, Adversary ECF Number 1 against Dixon alleging the following four counts, each of which was specifically identified in BM318's modified plan and disclosure statement.

And those, again, are ECF Numbers 79 and 80, respectively. And those four counts were: Count 1, preferential transfer under Section 547; Count 2, constructive fraudulent transfer under Section 548(a)(1)(B); Count 3, recovery of avoidable transfers under Section 550; and Count 4,

disallowance of Dixon's proof of claim pursuant to Section 502(d) and (j). On October 27th, 2021, BM318 filed its notice of lis pendens in the Parker County Official Public Records on the entire 2,055.7 acres of land, which included the 204.5 acres of land that Dixon transferred to Lumar on April 23, 2021. Lumar filed a Motion to Intervene in this adversary proceeding on January 14, 2022. That's in Adversary ECF Number 14, which the Court granted on February 14th, 2022 at Adversary ECF Number 32.

Two days later, on February 16, 2022, Lumar filed its complaint against BM318, and that can be found at Adversary ECF Number 33. To which, on March 21st, 2022, BM318 filed its answer and counterclaims against Lumar for tortious interference with the contract, tortious interference with a prospective contract, breach of fiduciary duties, fraud, conversion, fraud in real estate transaction, conspiracy, and declaratory judgment. And that can be found at Adversary ECF Number 40. On May 9, 2022, BM318 filed the Motion to Amend that is currently before the Court.

Dixon and Lumar present both similar and unique positions for objecting to the Motion to Amend. Dixon contends that the Courts deny the Motion to Amend because, one, allowing the amended complaint is futile given that A, BM318 does not have standing to pursue the causes of action, and B, the amended complaint could not survive a Motion to Dismiss for

Failure to State a Claim. Two, BM318 had duly delayed in bringing these claims, and three, the Motion to Amend is being brought to gain a tactical advantage. Lumar contends that the Court should deny the Motion to Amend because one, BM318 lacks standing to pursue these new causes of action and two, BM318 is judicially stopped from pursuing these new causes of action. First, the standard to allow for the amended complaint. Federal Rule of Civil Procedure 15(a)(2) provides that, "A party may amend its pleading only with the party's -- opposing party's written consent or the Court's leave."

That's from Rule 15(a)(2), which further provides that the Court "should freely give leave where justice so requires." Quoting again, "This standard evidence is a bias in favor of granting leave to amend. The policy of the Federal Rules is to permit liberal amendment." And that's the Fifth Circuit decision in *Caroll v. Fort James Corp.* at 470 F.3d 1171, 1175 (5th Cir. 2006). Trial courts are "entrusted with the discretion to grant or deny motions to amend and may consider a variety of factors, including undue delay, bad faith or dilatory motive on the part of the movant, repeated failures to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of the amendment.'

That's the Fifth Circuit decision in *Marucci*, —A-R-U-C-C-I, *Sports, LLC, v. NCAA*, 751 F.3d 368, 378 (5th Cir. 2014).

Futility; an amendment is considered futile if the amended pleading would be subject to a Motion to Dismiss for lack of standing. See *Official Comm. of Unsecured Creditors v. Pardee in re Stanwich Fin. Servs. Corp.*, 371 B.R. 224, 226 - 227 (Bankr. D. Conn. 2004). Standing; a reorganized debtor may preserve its standing to prosecute alleged claims and causes of action previously owned by the debtor-in-possession and its bankruptcy estate, but only if the plan of reorganization is "specific and unequivocal" for the "retention and enforcement by the debtor" of the claims the reorganized debtor wishes to pursue.

I'll refer the parties to Section 11(23)(b)(3)(B) as well as *In re SI Restructuring*, 714 F.3d 860, 864, (5th Cir. 2008), as well as *In re United Operating, LLC*, 540 F.3d 351, 355 - 356 (5th Cir. 2008). BM318 argues that it did not know until after its Chapter 11 plan was confirmed on August 2, 2021, that the alleged new claims and causes of action that BM318 now seeks to pursue even existed. Therefore, according to BM318, it was not possible for BM318 to specifically and unequivocally identify such unknown claims of -- causes of action in the plan or the disclosure statement.

To support this position, BM318 called Mr. Larry Martin as a witness. Mr. Larry Martin testified that he is an attorney and that he was the advisor to BM318 related -- relating to the buyback contract and events thereafter. Mr.

Larry Martin testified that he personally did not learn of the existence of the new causes of action BM318 now seeks to prosecute until the first quarter of 2022, more than six months after BM318's Chapter 11 plan was confirmed. The Court found that Mr. Larry Martin’s testimony was extremely guarded. But even if the Court what Mr. Larry Martin’s testimony as credible, his testimony is limited to what he personally knew. His testimony did not establish when BM318 and others associated with BM318 such as Mr. Tim Barton may have known of the existence of such claims.

Mr. Larry Martin was the only witness called by BM318. Although Mr. Larry Martin testified that he “was the primary individual that was working on” the BM318 and Dixon matter and that he did not learn of the relevant facts at issue until -- here until the first part of 2022. The following substantial and credible evidence challenges Mr. Martin’s contention that BM318 did not know about the facts that gave rise to the alleged new causes of action that BM318 seeks to prosecute in a Motion to Amend.

First, BM318 filed its second amended schedules, at ECF Number 82, 16 days after Dixon transferred the 204.5 acres to Lumar, which revealed for the first time that BM318 held alleged claims and causes of action against Dixon. Additionally, the amended schedules were signed by Mr. Tim Barton, president of BM318, not Mr. Martin. And, of course,

Mr. Tim Barton was not called as a witness by BM318. Second, BM318 filed its third amended schedules at ECF Number 93, which included, for the first time, the alleged claims and causes of action against Mr. Tim Green, Mr. Chuck Stark, and Mr. Jim Martin, Lumar’s principal. Again, the third amended schedules were signed by Mr. Tim Barton, president of BM318 as opposed to BM318's only witness, Mr. Larry Martin. And again, Mr. Tim Barton never testified.

Third, the complaint itself, filed eight days after the claim confirmation order was entered suggests that BM318 new, prior to plan confirmation, that Dixon had transferred the 204.5 acres to Lumar. Specifically the complaint states that after the buyback contract failed to close on August 31, 2022 -- and I insert Dixon, I assume -- “[Dixon] sold a portion of the [1531.75 acres of land] to the broker or related person or entity who I represented [BM318] under the original purchase agreement to acquire the 2,055.7 acres from [Dixon].”

In his testimony, Mr. Larry Martin conceded on cross examination that he was not aware of any person other than Mr. Jim Martin, Lumar’s principal, who had been the broker for BM318, acting through JMJ Development, when it entered into the buyback contract with Dixon. Fourth, Lumar Exhibit For is an email dated January 28, 2021, from Mr. Potts to Mr. Larry Martin providing Mr. Larry Martin notice that Dixon intended to sell 204 acres of land from the disputed land to Mr. Jim

Martin. The email specifically states, and I -- I won't repeat it now, because I've repeated it -- I already stated it previously in my ruling. But in addition, Mr. Potts offered to discuss the matter with Mr. Larry Martin and Mr. Tim Barton, which again suggests that Mr. Tim Barton, the president of BM318, had notice of that sale. And again, Mr. Tim Barton did not testify. Finally, the Motion to Amend itself supports that BM318 knew about the new causes of action it now wishes to add to the lawsuit.

The first paragraph of the Motion to Amend states, "Although BM318 also had related claims for damages as a result of the fraudulent transfer, he believed that such claims were more appropriate for litigation outside of the bankruptcy court." In the fourth paragraph of the Motion to Amend, BM318 states, "As a result of Lumar's intervention, BM318 was forced to bring additional tort-based claims that it had originally intended to litigate outside of the bankruptcy court at the conclusion of this case as these claims were not necessary claims."

Again, these contentions suggest that BM318 knew of the existence of these new causes of action prior to obtaining confirmation of BM318's plan and the filing of this adversary proceeding. The Court finds that the credible evidence suggests that BM318 was aware of the facts giving rise to the additional alleged claims and new causes of action that BM318

now seeks to add to its proposed amended complaint and knew of those claims in sufficient time for BM318 to have specifically and unequivocally described such claims in BM318's disclosure statements and confirmed plan. That would have adequately preserved and transferred such claims to the reorganized debtor, BM318, but BM318 failed to do so. The burden was on BM318 to specifically and unequivocally describe the alleged new causes of action in BM318's disclosure statement and confirmed plan to adequately preserve and transfer such claims.

*In re MPF Holdings US LLC*, 701 F.3d 449, 455 (5th Cir. 2021); *In re Texas Wyoming Drilling, Innocence*., 647 F.3d 547, 552 (5th Cir. 2011). Although BM318's approved disclosure statement and confirmed plan adequately preserved and transferred the avoidance actions against Dixon, "an explicit reservation of avoidance actions is insufficient to reserve a debtor's standing to pursue common-law claims." *In re Gulf States Long Term Acute Care of Covington, LLC*, 614 For. App'x 714, 719 (5th Cir. 2015). A plan's blanket reservation of "any and all claims" arising under the Code, or a plans's specific reservation of other types of claims under various Code provisions are insufficient to preserve common-law claims like fraud, breach of fiduciary duty, and negligence. *In re United Operating, LLC*, 540 F.3d 351, 356 (5th Cir. 2008).

"In determining whether a proper reservation has been made, courts may consult the disclosure statement in addition

to the plan to determine whether a post-confirmation debtor has standing." *In re SI Restructuring Innocence*, 714 F.3d 860, 864 (5th Cir. 2013), quoting *In re Texas Wyoming Drilling, Innocence*., 647 F.3d 547, 551 (5th Cir. 2011). In this case, the disclosure statements and plan's general retention language is insufficient to retain the new causes of action BM318 now seeks permission to prosecute by its Motion to Amend. As such, the general retention language in the approved disclosure statement and confirmed plan did not confer standing on BM318 as the reorganized debtor to pursue the proposed new causes of action. Like *SI Restructuring*, the Court finds and concludes that "neither the plan nor the disclosure statement references specific state law claims for fraud, breach of fiduciary duty, or any other particular cause of action." Again, *In re SI Restructuring, Innocence*., 714 F.3d 860, 865 (5th Cir. 2013). Because the plan's language in the reservation of causes of action fails to specifically and unequivocally identify the new causes of action that BM318 now seeks to prosecute, the Court finds and concludes that BM318 does not have standing to prosecute such claims.

Therefore, granting BM318 leave to file the amended complaint would be futile. Lastly, because the Court finds that BM318 did not have standing to pursue these new causes of action, meaning that granting BM318 leave to amend its complaint would be futile, the Court does not need to address

whether the amended complaint could survive a Motion to Dismiss for failure to state a claim, whether BM318 unduly delayed in bringing these claims, or whether the Motion to Amend is being brought to gain a tactical advantage. Based on the Court's oral findings of fact and conclusions of law as stated here on the record, the Motion to Amend at ECF Number 50 is denied. The Court reserves the right to make additional findings of fact and conclusions of law. That concludes the Court's oral ruling.

I was going to ask, I don't see anyone from Mr. Forshey's firm on the phone. So it appears, Ms. Perry, that you may have drawn the lucky bean. If you would be so kind as to prepare the Order denying the motion, and you can simply feel free to take what the Court stated and recorded in open court as findings of fact, conclusions of law pursuant to Rule 52, incorporated by 7052 and 9014, and they're adopted therein based upon the Court's rule of findings of fact and conclusions of law, the motion's denied. Or you can detail it. I'll leave that to your discretion; all right?

MS. PERRY: Thank -- thank you, Your Honor. We'll prepare that.

THE COURT: All right.

All right. That now takes us to the second matter before the Court, which is the Motion to Compel, which, Mr. Vasek, are you going to be arguing that motion for the movant?

MR. VASEK: I am, Your Honor.

THE COURT: All right. You may proceed.

MR. VASEK: Thank you. Your Honor, I’m going to share a PowerPoint presentation, if that's all right?

THE COURT: Of course.

MR. VASEK: I have paper copies as well. May I approach?

THE COURT: Surely. Yes, thank you. Let me ask, before we get started, I'm assuming, has there have been any narrowing of the issues to your knowledge? Has there been any discussion or negotiations with the plaintiff's counsel?

MR. VASEK: No, Your Honor. Aside from the letters we've included in our appendix, no. And I was going to point out that the debtor didn't file it’s response until after business hours last night, more than a day after the court-ordered deadline in the order granting the motion for expedited hearing. We're not going to seek to strike it. It doesn't contain anything new or surprising, but I just --

THE COURT: All right. I was just was curious to see if there had been any narrowing of the issues. You may proceed.

MR. VASEK: Thank you, Your Honor. We're here today on a Motion to Compel, which I recognize is no judge’s favorite type of thing to hear. But I would like to assure Your Honor that I feel the exact same way. These are often unnecessary,

and, regrettably, I think we do have to be here, and I think you'll agree by the end of this presentation.

I'm not going to go deep into the facts or allegations, because Your Honor has clearly just done that in ruling on the Motion to Amend. But a few things I wanted to point out are that the petition was filed about two months after the deed in lieu was recorded. The debtor’s schedule has indicated it was solvent on the petition date. The debtors operating reports indicate it was solvent throughout the bankruptcy case. The debtor filed a 100% Chapter 11 plan that in no way depends on a recovery in this adversary proceeding. And it wasn't until the debtor’s affiliate, JMJ, was unable to buy this property that it finally even disclosed the deed in lieu, and then filed this lawsuit.

Now, we think there are a number of problems with that scenario that we don't need to get into today. But they're only exacerbated by the debtor’s refusal to produce certain documents and information. The Court has lots of tools at its disposal in this situation. But I think a good place to start is the *Heller vs. City of Dallas* case. I don’t know if Your Honor has had the opportunity to read this opinion before. I believe it's the seminal case on discovery in the Northern District of Texas. It's been cited over 200 times, almost as many times as *Dondi* has. And I actually believe that you should recommend to your colleagues that this should be

required reading for everyone who gets admitted in this district, because it's extremely thorough. Judge Horan could not have done a better job at going through all of these issues that pop up constantly. So let's talk about a few of those quickly.

The first is no general or boilerplate objections. Here, Judge Frank Donato used stronger language, counsel should cease and desist from raising these sorts of things. It's inconsistent with the rules. And this is true even when inserted -- when asserted in response to a specific discovery request. Another is no response is subject to and without waiving objections. Again, the District Court said not consistent with the Federal Rules not, warranted by existing law, et cetera.

The problem is that these sorts of things leave the requesting party unable to ascertain whether there's been a complete answer or whether all documents have been produced et cetera. So what the opinion instructs is that in these situations, if you've got an objection for vague and ambiguous or you've got an objection for overbroad, or you've got an objection for undue burden, you have to answer to the extent it's not vague. You have to answer to the extent it's not burdensome, et cetera. With vagueness in particular parties should employ ordinary meanings of words. And when we get to the point where we are today, the party resisting this

discovery has an evidentiary burden. The party resisting discovery must demonstrate, for example, how a request is overly broad, unduly burdensome, or oppressive. And, you know, a good example of this, I think, is a case Ms. Perry and I had a few years ago where we were representing a mortgage servicer who had over 1000 employees, I think 1500 employees or something like that. And the debtor asked for, you know, us to go search all of those employees' personal devices. Well, that was unduly burdensome.

On here, it's difficult to imagine this debtor has so many records that it couldn't just search them all relatively quickly. So we'll start with the interrogatories, Your -- Your Honor, and I'm going to have to, unfortunately, go through these one by one. I'm going to try not to do that with the request for production. But the debtor's objections fall into sort of three categories. The debtor says we are already possess the responsive information. The debtor says the interrogatories call for legal conclusions or speculation, or interrogatory calls for irrelevant information.

So the standard for already in possession, that's not a valid objection, Your Honor. The fact that we may possess something is not a reason why the debtor doesn't have to produce it. We're entitled, for example, to determine whether their copy is the same as ours, if it's true. This sort of falls under the Federal Rules of Civil Procedure 37(a)(4) which

says an evasive or incomplete answer or response must be treated as failure to answer or respond.

So basically, what the debtor is saying here is we don't have to answer the interrogatory because you already know the answer. Well, Your Honor, as Your Honor knows, we're entitled to an answer under oath to our client's questions.

So interrogatory number three that's where we'll start. This says identify all instances prior to the execution of the deed and escrow agreement in which you or any of your agents or representatives informed or indicated to Dixon that you believed the agreement was unenforceable or constituted a fraudulent transfer. Now, this goes to the good faith defense under Section 548(c). I think courts define good faith, typically, as did you have any reason to believe the transfer was avoidable? So what we're asking here is tell us if you ever told us that you believe the transfer was avoidable. We, of course, believe the answer is that they didn't ever tell us that. And so all we're looking for here is for the debtor to confirm that or, if the debtor believes they conveyed that information to us, the debtor needs to identify where in the documents it has produced that email or whatever it is, may be.

And I -- these things I can go quickly, Your Honor, because they're basically the same thing. I -- identify all instances -- so we're actually -- we're -- we're asking for things that actually happened here.

Seven, same thing, all instances. Your Honor, I really don’t have much more to say about those than that. I think the debtor has to answer the question. We're not aware of anything in the document production that shows that this information was conveyed. And if that's the case, then that's all the debtor needs to say.

Okay. Interrogatory number eight and nine have to do with the value of the land. As Your Honor knows one of the elements of fraudulent transfer is, you know, lack of reasonably equivalent value. The value of this land is a critical issue in this case. Now the debtor is referring us, I guess, to appraisals that have been produced. I think there are three appraisals that are all different. None of them is as of the dates in question. So all we're looking for here is less than a full sentence, a number, what was the value on this date, or if it's one of the appraisals, fine, say the number in this appraisal. But the debtor can't just vaguely refer to documents that contain all sorts of different answers and expect Dixon to figure out what it's thinking. The same is true for interrogatory number nine.

The next is objections to interrogatories allegedly calling for legal conclusions or speculation. Okay. Your Honor, I think that this objection overlooks the 2007 Amendment to Rule 33 which added the language quoted here, “interrogatory is not objectionable merely because it asks for an opinion or

contention that relates to fact or the application of law to fact."

So let's look at a few of these. Interrogatory number 10, describe in detail your understanding, and I'm paraphrasing, of the treatment Dixon would have received under the plan but for the deed in lieu. This goes to the fifth element of a preference plan, which is what would have happened, what -- what kind of treatment would have Dixon gotten, if, you know, the allegedly avoidable transfer hadn't occurred. Eleven is relevant for the same information. This does not call for speculation or a legal conclusion. It's just what would have happened, I mean, the debtor has to prove what wouldn't have happened, I guess. We are entitled to know what would have happened.

The next two, Your Honor, I think are even more clear. They both start, describe in detail all factual bases. This is not looking for legal conclusions; it's not looking for speculation. What is the factual basis? I mean, Your Honor, the Dixon's position is that if the transfer is avoided, it gets its lien back. This is in the plan. We've alleged -- we've asserted a counterclaim making this claim. The debtor has denied that Dixon is entitled to that relief, and Dixon is entitled to know why.

Same is true of 13. Believe 14, same thing. Okay. Sixteen, Your Honor, we're just asking for the damages

calculation. If for some reason the property can't be recovered, perhaps it will be the case that the debtor asks for a money judgment under Section 550. Dixon just wants to know what that number is. This goes back to Dixon refusing to tell -- to the debtor refusing to disclose what it thinks the -- the value of the property is. I see in here, also, objections to this is, it’s too soon to provide this information. Well, Your Honor, discovery ends soon. That's why we asked for an expedited hearing. So I think it's time to disclose this information.

Okay. Objections that interrogatories allegedly call for irrelevant information. I'm not going to read all of it. I have a couple pages, Your Honor, the standards for what relevance means in the context of discovery. Suffice it to say it's much broader than relevance in the context of admissibility. This bottom quote, I think, sums it up the best, unless it is clear that the information sought had no possible bearing on the claim or defensible party, the request for discovery should be allowed. This is from the Northern District of Texas case.

And I will, Your Honor, I’ll email a copy of this to Ms. Lindauer once I'm done because I think we have cited some cases in here that were not in our briefing, and I want her to have those.

Interrogatory number 15. This is just asking the

debtor to disclose its relationship with JMJ. As we heard from Your Honor’s ruling just now, you're aware that JMJ is all over this transaction. JMJ is listed as a creditor in the schedules. JMJ was potentially going to buy this property. The -- Dixon is entitled to know what their relationship is. Your Honor, it shouldn't take more than a couple sentences to explain it.

Okay. The rest -- request for production I’m going to try to go in categories because there's a lot more of them. I think the debtor actually objected to more than half on the basis of irrelevancy. So the tenor of the objections are the debtor won't produce documents in native format. The debtor won’t produce allegedly irrelevant documents, allegedly vague documents, and documents that Dixon allegedly possesses already.

So Rule 34 says the request for production may specify the form or forms in which electronically stored information is to be produced. Your Honor, we cited cases for the proposition, for example, that the inability to Bates label them is not a ground not to produce native documents. But I also don't agree with the premise that you can't Bates label native documents, we have software that can do it. So it can be done.

The debtor has objected that the metadata could contain privileged information. Your Honor, if that's true,

there's a procedure for that. You withhold it and you log it and provide a privilege log. The debtor has objected that it could -- the metadata could include other confidential information. Your Honor, there's a procedure for that too. You don't just withhold, you seek a protective order.

The worst one, I think, is the debtor has suggested that it can't produce documents in a format that we could manipulate. Your Honor, I'm -- I'm not going to alter evidence. Ms. Perry is not going to alter evidence; her client is not going to alter evidence. Native documents get produced all the time. And I could alter a PDF if I wanted to. It's, you know, it can be done. Any electronic document can be altered. That's not a basis to withhold documents. But I think more importantly, Your Honor, here's the instruction from our requests. The specifically requested metadata and the point I want to make is the debtor didn't object to this instruction. So all of these objections have been waived. The debtor simply didn't comply, which just isn't enough under the rules. An objection was required. And, Your Honor, metadata can be important. I have another case in Judge Jernigan's court where we were looking at the metadata for a promissory note in Microsoft Word. And we quickly realized that the person whose signature was on the note didn't put it there, some lower-level employee took an image of his signature and affixed it to the note. And, I mean, you know, maybe that

would have been proven to have been authorized. But there was no email that said she could do that; there was no way to know that that had happened, except to look at the metadata which said that the person whose signature was on the note had never touched that document.

So I don't know; I can't stand here and tell you exactly what the metadata will show, Your Honor. But it could easily show something useful. And I would add that we have produced all metadata with our documents.

Then here we come back to irrelevancy, Your Honor. Again, this is a broad, broad definition. But I will add here, again, from the *Merrill vs. Waffle House* case, when the discovery sought appears relevant, the party resisting the discovery has the burden to establish the lack of relevance. I don't believe the debtor has ever met that burden, and I don't expect that the debtor will be able to today.

These, I'm going to address in subcategories which are categories that the debtor has put together. So the top of each of these next few pages quotes the debtor’s response it filed last night and then offers a few points.

All documents concerning Dixon. Okay. The first objection is it fails to limit the scope of documents to those in the possession, custody, or control of the plaintiff. Well, Your Honor, a request for production doesn't have to say all documents concerning Dixon in your possession, custody, or

control. The rules provide that the debtor only has to produce documents in its possession, custody, or control. No one is asking him to go out and get documents it doesn't have. That's just not a valid objection.

The other two are sort of more relevance related. Again, Your Honor, I don't, I mean, it's difficult for me to imagine the debtor has so many documents about Dixon that are completely irrelevant to this lawsuit, that looking at them and producing them would constitute some kind of undue burden, particularly when the debtor is suing our client, a nonprofit organization, to recover $27 million worth of property. So, you know, I'll be curious to see how the debtor responds. Normally, you know, all documents concerning Dixon, I would agree, could be a little overbroad, but it's just hard to imagine how it could be in this case. RFPs 15 to 17. And the debtor objects that it doesn't know what the word concern means. Well, Your Honor, this goes back to the *Heller* opinion where Judge Horan said you are to employ ordinary meanings of words. Here I've got Merriam-Webster's definition, to relate to, to be about, or to bear on. So it's not an exotic word, this is not a valid objection. Again, we have the custody -- possession, custody, or control objection. We're not asking for documents that are outside of the debtor's possession, custody, or control.

And, Your Honor, again, the relevance -- test of

relevance is so broad that the debtor has the burden to come forward today to show why these requests are not relevant. And I'll be curious to hear the explanation.

Requests 19 to 33 is perhaps the most important group of requests. These are the debtor's financial documents. Your Honor, as I pointed out earlier, the schedules indicate the debtor was solvent. The operator reports indicate the debtor was solvent. The debtor was able to confirm 100% plan. The debtor's solvency is an element of both the fraudulent transfer claim and the preference claim. It's a major issue in this case. For the debtor to suggest that its financial statements are not relevant just has no basis in reality. Dixon is entitled to test solvency. It is entitled to attempt to rebut the presumption of insolvency for Section 547.

Now the debtor said as well, you can't make us generate reports that don't exist. Your Honor, financial statements exist in QuickBooks. You just have to click a button to generate them. It's -- it's not like we're asking them to sit down with an accountant and a paper ledger and create something that doesn't exist. This information exists. But here I have also cited the *Samsung Electronics vs. Chung* case from the Northern District of Texas. Another Judge Horan case. And so in that case the responding party was saying, well, QuickBooks cannot generate the type of report that you want. And Judge Horan said, okay, that's fine. Then you need

to produce all of the underlying data in the QuickBooks file, which would be fine with us, too. If the debtor doesn't want to generate the reports, then we're happy to take the data and generate them ourselves. But one way or another, Dixon is entitled to see the -- the debtor’s financial history as it's relevant to insolvency. And also there's this other case from Louisiana, it says simply searching the database and providing the results does not require the creation of new documents. It just doesn’t. It's like arguing that an email that's never been opened and never been read hasn't been created. And, you know, we don’t have to produce it. No, it's there; it's in the computer. You just have to go get it. And that's what -- that's what we're talking about here.

So, Your Honor, this is, again, perhaps one of the most important -- we -- we need the financial documents so we can test solvency, which we absolutely dispute that the debtor was insolvent.

Okay, 41 to 45. Seek all communications with no boundaries whatsoever. Well, Your Honor, I mean, this is an example 41, they're all pretty much the same. All documents constitute a concern in communications with Jim Martin and further concerning the real property remaining land, any portion thereof, or Dixon. It's -- it's not asking for all documents constituting communications with Jim Martin. This is true of all of these. So I don't understand this objection.

Forty-nine and 43, documents concerning scheduled plans. And, Your Honor, again, the definition of insolvency requires us to evaluate the debts of the debtor. And so how the debtor came up with the claims it's scheduled is something we're interested in learning more about. We're not asking the debtor to go get information from its creditors. But whatever information it has, whatever it based its schedules on, it should produce.

Fifty-six, this is the land sale contract. Again, Your Honor, any contract related to this land that might include a price or something like that, is relevant to this lawsuit. I just can't imagine any argument why it wouldn't be, particularly given the extremely broad definition of relevance we've seen a couple times.

So now we've got the vague and ambiguous objection. Your Honor, again, according to *Heller*, the responding party should exercise reason and common sense to attribute ordinary definitions to terms and phrases. Here's an example. The plaintiff objects to the request as existing or available capital is vague and ambiguous. Your Honor, I -- I don't think existing or available capital is vague or ambiguous. If the debtor truly believed it is vague and ambiguous, then the next thing *Heller* instructs is that the debtor should choose a definition, state what it is, and answer based on that definition. Not just refuse to answer the question or produce

documents.

Okay. And now we're back to the information already in Dixon's possession. We have actually talked, I mean, we haven't talked directly, but we have considered this one a little more closely, Your Honor. And if what the debtor is really saying is that all we mean is that we're not going to reproduce things we've already produced. Okay. That's fine. We're not expecting that. But if the debtor is withholding any documents because it believes we already have them, even though it hasn't produced them, again, we're entitled to see if its copy is the same as ours. So I would just ask for clarification about that from Ms. Lindauer, which I'm sure she'll give, and hopefully that one could be wrapped up really quickly.

So the conclusion, Your Honor, is that all of these things that *Heller* talks about, what it all comes down to is all of these practices just make it difficult for the requesting party to understand or ascertain what documents or information we provided. Now to the debtor’s credit, they have appeared, I mean, Ms. Lindauer withdrew the general objections. She said the debtor is not relying on the subject to and without waiving. So we're not here on that today. We have made progress on this dispute through our communications, but we're not quite there yet, Your Honor. And so we would request that the Court compel the debtor to answer these

interrogatories and to produce documents responsive to these requests.

Your Honor, we have submitted, in accordance with the local rules, an appendix in support of this motion. It's -- that's at docket 76-1. We filed it again at docket 84 with a witness exhibit list yesterday. I would just move for admission into evidence of the appendix which contains 18 items, numbered one through 18.

Give me one minute.

THE COURT: Okay. I was trying to follow your last offer and exactly what are you seeking to have admitted into evidence?

MR. VASEK: Okay.

THE COURT: I'm looking at the witness and exhibit list that was filed at docket number --

MR. VASEK: Eighty-four, Your Honor?

THE COURT: -- 84.

MR. VASEK: I believe I reattached the appendix to it. If I didn't, it's at docket 76-1.

THE COURT: Here we go. The -- okay. It's just the appendix itself, right? It's 255 page or 255 pages. Is that what you're seeking to have --

MR. VASEK: Yeah. That's correct, Your Honor.

THE COURT: All right. Any objection to the appendix in support being offered into evidence?

MS. LINDAUER: No objection, Your Honor. I assume that he just covered what it is, and that's fine.

THE COURT: All right. And, Ms. Harris, I'm sorry. I just muted you because we get really bad feedback.

MS. HARRIS: I'm sorry. I was just going to say no objection.

THE COURT: Thank you. All right. Then the appendix is admitted; we'll admit it as Dixon Exhibit 1, and that can be found, again, at docket number 84.

(Dixon Exhibit 1 admitted into Evidence.)

MR. VASEK: Thank you, Your Honor.

THE COURT: I do have one question.

MR. VASEK: Of course.

THE COURT: All right. I did review the -- all the papers. I did have one question on request for production number 15.

MR. VASEK: One moment, Your Honor. Okay.

THE COURT: Give me a moment to get back to it.

It says all documents constituting or concerning communications with American Escrow Company or otherwise concerning American Escrow Company. Just remind you, and again, I don't know the case like you do, that seems fairly broad. I have no idea who American Escrow Company is. Is -- can that be an error? The objection on that one seemed like it was a fair objection.

MR. VASEK: Your Honor, I'm going to have to rely on Ms. Perry a little bit for this one, Your Honor.

THE COURT: Sure. Ms. Perry?

MS. PERRY: Your Honor, American Escrow Company was the company that held the deed in escrow. So that could certainly be limited to, you know, communications related to the deed in escrow transaction or something like that. Because that was their only role, is my recollection.

THE COURT: All right. Because you're asking for -- for -- for the debtor. And I don't know how many, you know, they may have 1000 transactions, and so, if you read it on its face, it appears that -- so --

MS. PERRY: Yes. Yes. We would be happy -- happy to know narrow that to just say, you know, related to the deed and escrow agreement, perhaps, or something along those lines.

THE COURT: Or transactions with the BM318?

MR. VASEK: Or Dixon.

MS. PERRY: Or transactions with, you know, BM318 and Dixon. Absolutely, Your Honor.

THE COURT: All right. Thank you. That's the only question I had upon reviewing the papers.

MS. PERRY: Thank you, Your Honor.

MR. VASEK: Thank you, Your Honor.

THE COURT: Thank you.

Ms. Lindauer, it's to you.

MS. LINDAUER: Thank you, Your Honor. And I do appreciate them offering those documents into evidence because I do think they paint a little bit of a picture, Your Honor. So I'm going to look at some of their exhibits first, if we might. Those do appear, I believe, under docket 84. And what I do want to focus the Court on, of course, you have the original complaint, they put in a lot of the pleadings related to the litigation. But I think as it relates to this particular dispute, I do want to point a few things out.

First of all, the request for interrogatories appears at Exhibit 11. It's marked docket 76-1. But in the Dixon documents, it’s Dixon Water Foundations first set of interrogatories. So those are the interrogatories that were originally served by Dixon Water. And -- and most importantly, I guess, I wanted to point out is the original date on those. I believe those were dated back November 23rd, of 2021. So those were sent out last, almost, well, I want to say almost a year ago that those were sent out. If we look at Exhibit 12, that's a request for production also sent to BM318. Those were also sent out, I believe, about the same time period. I’ll flip to the end of those. Those were served, also, on November 23rd, 2021. So again, eight, nine months ago, those were sent out. Okay.

The responses to those documents appears at docket Exhibit Number 13. The responses to those particular discovery

were served on January 7th, 2022. So about two months after, well maybe a little over a month and a half after those discoveries. So January 7th, 2022. Keep that in mind.

We got a letter, look at Exhibit 14, January 21st, 2022. And what I wanted to point out was that in Ms. Perry’s letter, January 21st, 2022, she raises several of the same issues she's raised with you today, Your Honor, which is concerns about the way some of the discovery was answered. And again, that was in January of this year. She also put in Exhibit 15, which was our response to her letter, February 3rd, 2022. Again, responding to each of her concerns, and pointing out that the data had presented over 6,036 pages of discovery, found in hundreds of files that appears on the second page, and in consolidated nine PDF files. And so all of the documents were produced timely, and we did respond to them in February.

And then I get, now February, March, April, May, June 24th, Exhibit 16, I get a letter, after four or five months now, from Ms. Perry saying, hey, we still have concerns about your objections and responses. Now these are the objections and responses that were served, right after the first of the year. Right? So again, and -- and then in response to that letter, she put in Exhibit Number 18, which again, were our responses.

So my concern, Your Honor, is, is if they had these ongoing concerns about discovery, why am I getting an emergency

Motion to Compel answers to interrogatories and production that could have been filed six or seven months ago, could have been timely responded to within a reasonable period of time. There could have been a meeting, which Mr. Vasek said has not happened, to actually sit down and go over this discovery, sort it out, figure out what it is that they're complaining about, exactly what are they looking for that they think we haven't provided to them.

And so, Your Honor, I think part of my frustration here is -- is that on, essentially, no notice, one-week notice, I get an emergency hearing to show up and try to walk through these answers to discovery that they've had now for, what, eight months that we could have done many, many, many, many months ago.

So let's go through and look at some of the responses that were provided. And -- and you're not hearing him tell you that we didn't answer the discovery or that we didn't provide documents; you're not hearing that at all. Let's go to our Exhibit Number 2, that would appear in the Court's docket. Notice I'm using my version because my version's got my notes on it, so, but it's docket 86 in the adversary proceeding. It's our witness and exhibit list. It just includes the objections and responses to the discovery that we did originally provide. And, first of all, I want to point out that there were, on Page 3, general provisions and objections.

And the general provisions and objections, contrary to what Mr. Vasek said, included objections to the instructions, to the request for documents that just general objections to, because he said we didn't object to, and we did. We objected to the format of a lot of the questions in general. So -- so we did preserve, Your Honor, all of our objections to the instructions and definitions that appear specifically on Page 4, question seven, objects to the instructions, definitions, document request, and interrogatories, et cetera.

So we have objected and there are a number of objections there. But what I really want to focus the Court on is on the answers to interrogatories in particular. Under Rule 33, the Court’s aware that contention based interrogatories -- interrogatories that request what do you contend, what's your conclusion? Those kinds are not appropriate, at least in the initial set of interrogatories that are sent out.

So many of the interrogatory questions that they've sent out, actually, our contention based interrogatories. Our objection may say calls for speculation or conclusion, but it's really they’re contention based interrogatories. And so, for example, I don't think they complained about our answer to question one. They started complaining on number three. If you look at interrogatory three, identify all instances prior to execution of the deed and escrow agreement in which you or any of your agents or representatives informed or indicated to

Dixon that you believed the agreement to be unenforceable or to provide a fraudulent transfer. We objected to that. And we just basically said, you would have the same information. Further, we object that it may ask for a legal conclusion. Really, the objection is it's a contention based interrogatory. And the reason I mention that is that you will see throughout a lot of these interrogatories, the actual word contend, which does make it a contention based interrogatory. But what Mr. Vasek fails to point out to you is that we do answer the interrogatories by saying, subject to and without waiving our objection, plaintiff refers -- refers Dixon to the language contained in the deed and escrow agreement, related documents produced herewith that are relevant and responsive to this request. So in every instance, if you go through the actual answers to interrogatories, if there is an objection, it is followed by a subject to and without waiving, here's our answer. And we go through every one of those, and we say exactly what our answer is. They may not like our answer, but we give them an answer. And we point them to particular documents, if there's a document that would be responsive.

If you go to interrogatory number eight, this is a perfect example. Identify what you contend, that's a contention based interrogatory, the value of the remaining land. All right? And what we said on that one is plaintiff contends that the value exceeds any remaining amounts owed to

plaintiff at the time of the execution of such agreement, yada yada yada, yada. So we actually answered the question. They didn’t like the answer that’s on one of the ones that he's complaining about, but we actually did answer the question. Number nine is also identify what you contend, that's a contention based interrogatory again, and we actually said, plaintiff contends and answered the question.

THE COURT: Not really. I mean, Ms. Lindauer, I hear you, but eight and nine you’ve said both that you’ve answered the question; I don’t see the answer. And there's a -- there's a sentence in there, but the question was, what do you contend the value to be? And simply stating that more than -- more than what you’re owed, that's not -- that's not an answer. That's not the contention. That's not what do you believe the value is.

MS. LINDAUER: Well, but read it regarding -- yeah. We said it's more than what is owed.

THE COURT: That's not the question, though. The question is --

MS. LINDAUER: So --

THE COURT: -- well, yeah. What’s the value?

MS. LINDAUER: Right.

THE COURT: And so I think if it's a penny more that might be very important, I don't know, to the litigation as opposed to a million dollars more. I don't know. So that's a

very -- so I -- so clearly, I hear what you're saying and there is -- there are answers there but -- but not really. At least for eight and nine. And I just -- I did want to -- I did want to stop you just because I didn't want my silence to be any sort of agreement that I am agreeing with you, but --

MS. LINDAUER: Well, but also down to --

THE COURT: But then let me ask -- let me ask, how -- and I'm going to look to both, both you, Ms. Lindauer and -- and to Mr. Vasek and Ms. Perry. And I'm going to let you make your record that you want to make, but I don't think it really helps on what I need to rule -- what I need to rule on. I need to rule on whether or not you need to further answer each of these interrogatories or produce documents.

So I hear that you have your -- your arguments as to why you're not in -- as to why you think you've complied. There's a dispute as to whether or not you've complied. So if I let you go on for another half hour, which I'm happy to do, and I think we're still starting off at square one. Okay. I hear you're saying that.

MS. LINDAUER: Sure.

THE COURT: Then I turn back to Mr. Vasek and Ms. Perry say, do -- do you -- does your motion to compel, if we get that answered, do you still pursue it? Yes. Why? Because. And then should we be going one-by-one on these or -- I guess -- I guess you tell me. That's why these -- these type

of hearings are really difficult, I think, at least for me. I don't know how most courts handle them, but --

MS. LINDAUER: Well, and, Your Honor, that's why I wanted to start by pointing out that there was a huge delay here. If there was an issue on the discovery --

THE COURT: That’s again -- again -- again, let me, I don’t mean to cut you off, but unfortunately the video just, we talk over each other and I don’t -- please don’t be offended when I cut you off. And I’m not offended when you cut me off, because the video delays.

I hear you on all that. To me, that's not -- that's -- that might be relevant if and when we get to the issue of whether or not the Court should have ordered attorney’s fees. How was that issue even relevant to you did or didn't properly respond to this interrogatory? Yes or no? If the answer is no, you got to respond to it. If the answer’s yes, motion’s denied. So again, I hear the delay issue but why is that relevant to issue number one, have -- has BM318 properly responded to the interrogatories and request for production, yes or no? I don't think it's relevant to that, is it?

MS. LINDAUER: So, Your Honor, we believe -- so, Your Honor, we believe -- okay, so they send us a letter, okay, in February. We respond to it. Right? January, I’m sorry, January 21st. February 3rd, we respond to it, and we don't hear anything until June.

THE COURT: I understand.

MS. LINDAUER: So we're sitting here -- we're sitting here thinking, okay, we responded to their letter, didn't hear anything, assuming, I guess, silence, assuming things are copacetic. We answered their questions, or at least we thought we had, then what? February, March, April, May, June, four months later I get another letter. And -- and then we respond to that letter. And then I get -- and the day we responded to the letter, Mr. Vasek got my response that morning about his Motion to Compel within about 30 minutes of getting my letter without ever picking up the phone and calling me and saying -- so, yeah, I do think it's relevant on the attorney's fees, but I think more importantly, it's relevant on sitting down. I think the parties should be ordered to sit down and go over these answers. Look, I'm filing a Motion to Compel on them. You wait until you see their answers. You think mine look bad, well let's look at their answers. Okay.

So at the end of the day, Your Honor, I think discovery disputes are not a good place to end up in front of a court. I do think if they have specific questions that they do not think we have fully answered, I'm happy to sit down with them and go over those questions. I've produced over 6000 pages of documents to them. They have those. And, Your Honor, I can tell you we do have one supplemental production that we are going to send to them today. But we believe we have

produced all of the documents responsive; we have not held back things. Okay.

As far as the issue on metadata, and native format, and all of that stuff, if they've got a suggestion on how they want us to produce those, they -- I've got my person, Mr. MacMurray (Phonetic) is on here with us, if they've got a way that they want to gather that information, we're happy to hear that, Your Honor.

But again, what we're talking about, let's talk about what documents we're talking about. We're talking about a special, we're talking about deeds. We're talking about emails; we're talking about correspondence between -- those are not things that are going to be altered. Trust me, if there are financial documents that we have, we have provided them. If we have not provided them, it's because we don't have them. And I heard Mr. Vasek say about QuickBooks. But again, let's remember this is a real estate deal. This is not an ongoing business with employees. These were -- these were land transactions. Okay. There's not going to be a ton of financial information. There's going to be very little financial information. What there is going to be, though, there are appraisals. I made a list of all the Bates numbers of all the appraisals that we gave them. There's plenty of information on value.

But I think the right answer to this situation is for

you to order us to just meet over at Ms. Perry's office and go through these answers with them and see what it is that they really think we have not thoroughly answered, and what documents they think we have not produced. Because, Your Honor, I will tell you, that's why I have people on here, that we have produced all the records that we have that are responsive to their requests. And so, other than I will mention, there is one supplement that we have been working on today. So, Your Honor, I don't know what else to give them that we haven't already given them. Okay. So --

THE COURT: So, for example, if I --

MS. LINDAUER: -- I think that’s the --

THE COURT: -- let -- let me make sure I understood, just as an example, when you mention the QuickBooks --

MS. LINDAUER: Sure.

THE COURT: -- when I think you said that there's not much information in QuickBooks, and I get that. The question is --

MS. LINDAUER: Your Honor, I’m not even sure we have it. I don’t think we have QuickBooks, Your Honor, for this kind of a business. It doesn’t have QuickBooks.

THE COURT: Okay. Okay. But if there is the existence of QuickBooks, whether that it’s much or not, and if it's not that -- that’s even argues the question or begs the question even more. If it hasn't been produced, it should be.

So, again.

MS. LINDAUER: I would agree with you

THE COURT: Okay. So, okay.

MS. LINDAUER: If we haven't produced it, Your Honor, it's because we don't have it. It's not that we're holding it back. We just don't have it.

THE COURT: Okay. Fair enough. Fair enough. And that's why I asked the first question, have there been any -- had there been, at the very beginning of the hearing, has there been any -- or common -- did the parties meet and confer to try to narrow the issues. And the answer was no. Which was a disappointing response, I'll be -- I'll be honest with you, but then that goes both ways. It takes both, you know, you both can't say the other one didn't because it doesn't appear that either one of you did. You pick up the telephone and say, let's meet and confer and go down each of these issues. And so that I don't think that occurred. I may be wrong on that, but I just, from -- from the representations of Mr. Vasek and Ms. Lindauer, I don't think that's occurred. That really should occur before you even walk in the courtroom, regardless of the timing of motion. I understand why it's an expedited motion. That's why I granted it, even though I saw -- I did read your objection to the motion to expedite. I read that. So when I authorized the hearing, I do realize and recognize there are deadlines coming up. When is the discovery deadline, anyway?

MS. PERRY: The --

MS. LINDAUER: August 3rd.

THE COURT: Okay. So --

MS. LINDAUER: 4th. Okay. August 5th.

THE COURT: Okay. So it is coming up. And -- and there were in the defense of -- of the Dixon side of the table, there were some followup letters throughout and there does appear that there have been dispute as to whether or not each of the interrogatories or request for production were responded to appropriately under the rules. I get that. I'm not going to cast stones at either party right now as to the timing. But I do recognize that we have a discovery deadline. Either, and I'd leave it up to let's chat about it. Does it make sense to go down each interrogatory right now, which will take a while, and each request of production, to see if there should be a granting of the motion or -- or a sustaining of the objection? Or does it make more sense to have Ms. Lindauer meet at your office to see if you can narrow the issues? Let me first look at what Ms. Perry and Mr. Vasek.

What's yours -- is it, I don't to waste your time. Because discovery disputes are very costly to your clients. And that's what concerns me, especially when you have a nonprofit. That really does concern me. So is it better to do it right now or to meet and confer?

MR. VASEK: Well, Your Honor, I'm wondering how fast

we could potentially come back if we needed to. If we could meet by the end of the week.

MS. LINDAUER: What’s today?

MR. VASEK: Today’s Wednesday.

MS. LINDAUER: I’ll be -- I'm available, Julian, to meet tomorrow and go over these with you. And I’d prefer, and I'll talk to my client, but I'd almost prefer you would come to their office. Because, frankly, there are people there that I think can better answer some of your concerns, or I'll bring them with me. But I -- I think that would be a better use of everyone's time, to be honest. If you think there is something we should have that you should see or have, I'd rather be someplace where we can sit down and print it out for you and hand it to you. So that's my only thought. And if you're not, if the Court can maybe reset this till Monday, I’m happy to come back Monday, if we need to, if we haven't gotten it sorted out. But I think if we could just sit down and go over it and, look, I'll bring my issues with your discovery too. And we'll cover it all at one fell swoop, and hopefully get that taken care of.

MR. VASEK: I'll just let, I think Ms. Perry wants to add something.

MS. PERRY: Yeah.

THE COURT: Yes. Just for the parties’ knowledge, my Monday afternoon and Tuesday are both open, if I need it. I

will say this, it should have been a clue when -- when I read the interrogatories and I read the responses, the one that stood out was the one I asked about. The others, it appeared to me that the Dixon side of the table had very -- had sound positions. If a -- if it's being withheld because the mandate, unless it’s privileged, those should be produced. If they’re financial records, those should be produced. This is not a, I wouldn't think, a complicated cost-burdening response for a request for production or for the interrogatories. So my -- my knee-jerk, which I -- I'll just be honest with you, I’m willing to send you both to the -- to the office. But this is more of a -- more for you, Ms. Lindauer. I thought they had some very good arguments on most every one of their motion -- on their issues.

And so with that, if there’s that understanding, relevance, I’m pretty broad on that, because it's not what -- you shouldn’t determine whether it’s relevant or not. That's something that it’s either potential or could lead to relevant evidence. And it's -- when it comes to discovery, especially since, Ms. Lindauer, your client brought the lawsuit, I’m going to be very broad-minded on what’s relevant. And that’s -- it goes both ways. But unless there's a burden and cost, then of course, I will try to narrow it. But most of these do not appear to be over-burdensome or costly. It was just either you didn’t produce it if you had it, and you probably should, and -

- and you should answer the question that's -- that a reasonable person would look at. Just like the -- the two I stopped you on. I get that you're saying it's worth more, but that's not -- that wasn't the question. And I think a reasonable person reading that question would say, how much do you think the value is. And then they're looking at a -- at a number or a range or something. But just saying more than what you owed, that's -- that's a non-answer. It's -- it's a very partial answer.

So most of those, I'm -- I'm thinking that if push comes to shove, unless you can come up with a really good argument, you may be able to convince Mr. Vasek or Ms. Perry as to why on a few of these that you have a really good argument, I'm probably inclined, I'm more inclined to grant the motions, except for the one I pointed out. I thought that was way too broad. But other than that, I didn't see much else that was obviously, not offensive, it's not the right word, but -- but where I thought the objection really did have merit. All right?

So if you'd rather do that, and especially if -- if Ms. Lindauer, if you have outstanding discovery which hasn't been responded to yet or to which you think that should be compelled, maybe this should be -- your suggestion is probably very appropriate. All the discovery issues, meet and confer, and then if there are pending issues on either, from the BM318

side or from the Dixon side, then we can have a hearing on whatever remains on each of those. Does that make sense?

MS. PERRY: So, Your Honor, I would ask, I think they're separate. And I -- at this juncture -- and I say that because Ms. Lindauer has never said anything to me about issues with our discovery responses, not orally, not in writing. This is the first time I've heard --

THE COURT: Oh, so it hasn’t been filed?

MS. PERRY: No.

THE COURT: Oh, I misunderstood. I thought Ms. Lindauer said she’d filed a motion. Okay. Well, that’s a fair point.

MS. PERRY: So, if she has a -- so if she has a motion to compel she's about to file, she's --

THE COURT: Yeah. The August 3rd is staring us down, so.

MS. PERRY: Right. So, you know, I certainly understand that there's been some, you know, some time lapse here, but I've not seen anything. She's never raised --

THE COURT: They’ve done nothing. No letters, no nothing?

MS. PERRY: Nothing, nothing.

THE COURT: Okay. That’s different. That’s different than -- than this situation because there have been letters.

MS. PERRY: Right. So I would say --

THE COURT: Okay. I agree. I agree with you.

MS. PERRY: -- I am certainly willing to sit down with Ms. Lindauer tomorrow, and I can see if our tech person is available in-house and we can sit down and try to narrow these issues, absolutely. If we can then get a setting, like, like you said on Monday afternoon, perhaps, to come back --

THE COURT: Or the third is an arbitrary date, unless you tell me if it's not, for discovery deadline.

MS. PERRY: Mr. Vasek --

MR. VASEK: I’m leaving town, Your Honor, on the third.

MS. PERRY: -- on the third. So we’d like to do this before then. Yes.

THE COURT: You’d like to have it before, then. That’s fine. Absolutely. So you -- you pick. That Monday afternoon is available or I’ve got a conference call at 10:00 a.m. on Tuesday morning.

MS. PERRY: I think my preference would be to do Monday afternoon.

THE COURT: That’s fine.

MS. PERRY: Let me just check my calendar and make sure I don’t -- I don't think I have any conflict of it. And I would -- I would also say, just in connection with, as Ms. Lindauer is preparing for, hopefully, our conference tomorrow,

that attached to the MORs, are what looks like QuickBooks documents that show, you know, other current assets and other liabilities. So I don't know what system they have, but --

THE COURT: To the extent there's a system --

MS. PERRY: Right.

THE COURT: -- given the causes of action --

MS. PERRY: Correct.

THE COURT: -- of which -- of which financial -- the financial affairs, that they are very important, whether or not it was insolvent -- was insolvent or wasn't insolvent, those are all fair game and should be produced. Just, I don't know if there was a reasonable objection to that. And I don't think there's -- there's, when it comes to the metadata -- metadata issue, it's a little more stickier, but I agree with Mr. Vasek on that. Unless there is a privilege problem, which there are ways to deal with that, you know, it -- it should be produced. I think that's pretty common nowadays that we've all gotten familiar with -- with electronic discovery over the years.

So again, I thought, just reading the papers and not going through in specific detail, although we tried to be detailed on this from the chamber's side, it looked like most of the complaints had merit, if there are documents that are responsive that weren't produced. And on -- on the interrogatories I'll leave it, like Mr. Vasek said, a lot of those, it's a -- it's a one or two sentence response. And so

the response should be given. And again, a response like that was given for 89 isn't a response, at least I don't think it is. So --

MS. PERRY: And, Your Honor, while I'm happy, when we're with Ms. Lindauer, for her to perhaps tell me what issue she has with our discovery, I -- that is not something that I think would be appropriate to take up on Monday.

THE COURT: I agree. I agree. I agree. And obviously, if -- if you can work through issues, great. I'm not going to order that, simply because it's not -- there's been nothing filed. And I'm taking the representations on their face, and I agree with you, because there hasn't been any. That's a different situation than what's here before the Court today.

So, again, I don't want to waste your time, and I'm happy to go through line by line, but I don't know how else to agree on this case because I -- I kind of figure where you're going to go, Ms. Lindauer, and I agree. We can go down and look, and I'll let you make your argument for 30 minutes, then I got to back and figure out each one. How else would I do it unless we go line by line. So --

MS. PERRY: We also struggled with the presentation, Your Honor --

THE COURT: It's hard.

MS. PERRY: -- as to how we would it.

THE COURT: Discovery disputes are really difficult to -- and especially when they're like this, unless they're narrowed. And that's usually where the meet and confer is really important. It really is. So I'm disappointed there hasn't been a meet and confer, but I'll just leave it at that.

MS. PERRY: Let me just check my calendar really quickly, Your Honor, if you don't mind.

THE COURT: Sure.

MS. PERRY: I think , I think Monday for me is fine, assuming it's fine for Mr. Vasek too.

MR. VASEK: Joyce, are you talking to us?

MS. PERRY: Oh, maybe not. Okay. Yes. Yes, Your Honor. That is -- and actually I'm glad I looked at this. I'm not available on the second. I'm going to be -- I had forgotten, so --

THE COURT: Okay. We'll -- August -- the August 1st, what time would you like it at --

MS. PERRY: I have a 6:00 p.m. flight I'm supposed to catch on Monday.

THE COURT: -- one-thirty?

MS. PERRY: I'm flying down to Austin for another case, so the earlier in the afternoon the better.

THE COURT: Okay. We could -- I probably shouldn't do it before 1:00, but I can do 1:00. It's --

MS. PERRY: That -- that works for us, if it works

for Ms. Lindauer.

THE COURT: You're on -- you're on mute, Ms. Lindauer.

MS. LINDAUER: Your Honor, one o'clock on Monday is fine.

THE COURT: All right. So hopefully if you can just narrow it down, and then what I suggest you do is, we'll just come straight in and go down each interrogatory or request for production. And I'll let Mr. Vasek or Ms. Perry say, here is the interrogatory we don't think has been responded to. I'll let -- hear your response, and then I'll rule. And we'll just do it on each of those that are in dispute.

MS. PERRY: Thank you, Your Honor.

THE COURT: And same with the request for production.

MR. VASEK: Thank you, Your Honor. And probably we can narrow it before that, but --

THE COURT: All right. And then, of course, I don't mean this to be any sort of a heads up or nod what I'm -- of the Court's ruling, the motion did ask for the attorney's fees issue. We'll take that up, if it's being pursued, at the end of that. Okay?

MR. VASEK: Thank you, Your Honor.

THE COURT: So I'm not ruling anything on that today. And I don't want my, what I just said to be an indication that I'm -- I'm thinking that it should be or that I'm thinking not

-- it should not be. The problem is, I've got to address it and unless you all resolve it. So, be prepared to tell me, at the end of going through each one, whether or not you're still seeking that, and if so, then we'll deal with that issue at that time. All right?

MR. VASEK: Thank you, Your Honor.

MS. PERRY: Thank you, Your Honor.

THE COURT: Anything else, then, for today? And I appreciate the -- us chatting about this to see if we can narrow the issue. Make sense?

MR. VASEK: It does. Thank you.

THE COURT: All right.

MS. LINDAUER: Yes, Your Honor.

THE COURT: All right.

MS. LINDAUER: Thank you, Your Honor.

THE COURT: Okay. Then -- then with this, then, the Court will be adjourned in the BM318 case until Monday, August 1st at 1:00 p.m. All right?

MS. PERRY: Thank you, Your Honor.

MR. VASEK: Thank you, Your Honor.

THE COURT: Thank you all very much.

(The proceeding concluded at 3:02 p.m.)

* * * * *

**C E R T I F I C A T I O N**

I, Gillian Lawrence, court approved transcriber, certify that the foregoing pages is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.

___________________________________

CER-255, CET-255, COURT TRANSCRIBER     DATE: September 2, 2022