IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS (FORT WORTH)

| | |
|---|---|
| IN RE: | Case No. 20-42789-MXM-11 |
| BM318, LLC, | Eldon B. Mahon U.S. Courthouse<br>501 West 10th Street |
| Debtor. | Fort Worth, Texas 76102 |
| BM318, LLC, *et al.*, | Adv. No. 21-04051-MXM-11 |
| Plaintiffs, | |
| v. | |
| THE DIXON WATER FOUNDATION, *et al.*, | |
| Defendants. | Thursday, August 11, 2022<br>11:02 A.M. |

TRANSCRIPT OF HEARING ON MOTION TO COMPEL RE: DISCOVERY FILED BY COUNTER-CLAIMANT THE DIXON WATER FOUNDATION (76)

**BEFORE THE HONORABLE MARK X. MULLIN**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES ON NEXT PAGE.

Audio Operator: Jeanette Almaraz

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

---

**LIBERTY TRANSCRIPTS**
**7306 Danwood Drive**
**Austin, Texas 78759**
**E-mail: DBPATEL1180@GMAIL.COM**
**(847) 848-4907**

APPEARANCES:

| | |
|---|---|
| For The Dixon Water Foundation: | Munsch Hardt Kopf & Harr, P.C.<br>BY: DEBORAH M. PERRY, ESQUIRE<br>3800 Lincoln Plaza<br>500 North Akard Street<br>Dallas, Texas 75201 |

APPEARANCES VIA WEBEX:

| | |
|---|---|
| For BM318,LLC: | Joyce W. Lindauer Attorney, PLLC<br>BY: JOYCE W. LINDAUER, ESQUIRE<br>1412 Main Street, Suite 500<br>Dallas, Texas 75202 |
| | Law Office of K. Walji<br>BY: KHUDABUKSH K. WALJI, ESQUIRE<br>10701 Corporate Drive, Suite 350<br>Stafford, Texas 77477 |
| For Lumar Land & Cattle, LLC: | Forshey & Prostok, LLP<br>BY: J. ROBERT FORSHEY, ESQUIRE<br>777 Main Street, Suite 1550<br>Fort Worth, Texas 76102 |
| | Quilling, Selander, Lownds, Winslett & Moser, PC<br>BY: KIMBERLY PAIGE HARRIS, ESQUIRE<br>2001 Bryan Street, Suite 1800<br>Dallas, Texas 75201 |
| Also Present: | RAGHAV HANDA<br>CHRIS RIDDELL |

(Proceedings commenced at 11:02 a.m.)

THE CLERK: All rise.

THE COURT: Thank you. Good morning. Please be seated.

Good morning everyone. This is Judge Mullin here for our 11:00 docket which this morning we are returning to the BM318, LLC versus Dixon, et al.

We'll take appearances here in the courtroom first.

Good morning, Ms. Perry. How are you?

MS. PERRY: Good morning, Your Honor. Deborah Perry on behalf of The Dixon Water Foundation.

THE COURT: Good morning to you.

Now we'll go on to the video. I see we have Ms. Lindauer. Good morning, Ms. Lindauer.

MS. LINDAUER: Good morning, Your Honor. Joyce Lindauer here on behalf of BM318. I'm joined by my co-counsel also, Mr. Khudabuksh Walji who is also on the WebEx this morning.

THE COURT: Good morning to each of you.

Good morning, Ms. Harris. How are you this morning?

MS. HARRIS: Your Honor, Kimberly Harris here on behalf of Lumar Land.

THE COURT: And, Mr. Forshey, how are you this morning?

MR. FORSHEY: Thank you, Your Honor. Good morning.

Bobby Forshey also here on behalf of Lumar Land.

THE COURT: All right. Any other counsel wishing to make an appearance this morning?

(No audible response)

THE COURT: All right.

Ms. Perry, it's to you.

MS. PERRY: Good morning, Your Honor. Deborah Perry on behalf of The Dixon Water Foundation.

So since we last saw Your Honor in August 1st, a little bit of progress has been made, but there is still outstanding issues. So as Your Honor saw, I ordered the transcript of the hearing and I've reviewed it. Your Honor may have reviewed it, too.

I think it was pretty clear at that hearing that Your Honor ordered opposing counsel to produce the documents in native format. And it was also agreed that they would be produced by Monday.

Wednesday shortly after noon, so yesterday, we received a production of documents. What that production included was an Excel spreadsheet with about 1,600 rows of data, and each row represents an email. And there's email metadata in the spreadsheet and then there are additional columns identifying whether there's an attachment. And then if there's an attachment, then there's a location and file name

for that.

The Bates numbering field is blank. Those attachments are in native format, but there are no emails that were produced with them. So we have essentially a spreadsheet that has then links to native format attachments attempting to identify it to an email it is supposedly attached to but no email in native format.

For us to then try to match that up with prior emails that have been produced is virtually impossible because we attempted it -- and I have my IT sort of e-discovery in-house person, Chris Ridell here -- to where the parent email and child association isn't there. It appears that --

THE COURT: So if I understand --

MS. PERRY: Yes.

THE COURT: -- if there was a series of five emails, one, two, three four, five, we generally would see them all in a chain. Does the Excel sheet just show one email with attachment and then a separate line but you don't know if it's part of the chain? Is that what you're saying?

MS. PERRY: So I think what I'm saying is there is no email produced with the attachment in one production.

Theoretically, maybe that attachment that's been produced in native format might be linked to an email that was produced in a massive PDF file to us previously, but there's no easy way to link those up. And if they have apparently the

attachments in native format, it sort of begs the question why was the email not produced in native format.

And when we look at the prior production of emails where we don't have attachments behind it, you cannot easily link that email up to the attachment that's now being produced. Like you would have to go to the Excel spreadsheet, then try to find the email here, then try to link it to the attachment, And even when we tried to do that, the time is off. For example, the timestamp is off.

So the emails were not produced in native format is the bottom line there. There were no emails -- there have been no emails produced to us in native format.

THE COURT: And let me make sure I understand. So when you're saying there are no emails in native format, is what was received an electronic version of the email or was it paper or both?

MS. PERRY: So previously before the motion to compel, there were some emails produced to us.

THE COURT: In what form?

MS. PERRY: And they're just like a scanned PDF.

THE COURT: Okay. Scanned PDFs, okay.

MS. PERRY: So --

THE COURT: So it's not in native format, okay, so it's not like -- okay.

But it's a written -- arguably a written copy of the

email. Is that correct?

MS. PERRY: Correct.

THE COURT: Okay.

MS. PERRY: Although we have questions with that because the -- for example, the font on the header doesn't match the rest of the email. There's questions there which is also one of the reasons why we want it in native format.

And I actually have -- if it would be helpful, I can kind of fire up the laptop and like show -- we did a little PowerPoint that kind of shows the issue with it, if that would be helpful.

THE COURT: Anything will be helpful because I'm trying to understand.

MS. PERRY: Okay.

THE COURT: I guess from the big picture point of view, the question I would have for Ms. Lindauer is why -- or for both of you, actually.

MS. PERRY: Right.

THE COURT: What do you, Ms. Perry, think is the easiest way to produce this in the most cost-effective manner? Is there a way? And that may require --

MS. PERRY: Right.

THE COURT: -- your IT expert --

MS. PERRY: Right.

THE COURT: -- as opposed to lawyer/judge.

MS. PERRY: Right. Right.

THE COURT: So is this an easy thing to do and then the question because if it is easy, then the question for Ms. Lindauer is why don't you just do it that way.

MS. PERRY: Right.

THE COURT: If it's hard, what's -- then it's the whole cost-benefit problem --

MS. PERRY: Right.

THE COURT: -- that the Court's going to have to weigh.

MS. PERRY: Right. Because as we sit here today and I think -- and I'll ask Ms. Riddell to kind of chime in just a second, you know, here would be an example. As we -- like so say I go into a deposition and I want to show a witness an email with an attachment, I don't have that. I don't have something that I definitively know this is the email, this is the attachment that went with it.

THE COURT: I get it. Because you either got PDFs of just emails with no attachments --

MS. PERRY: Correct.

THE COURT: -- or now you have links to various attachments but you don't know to which email it applies.

MS. PERRY: Correct.

THE COURT: And, therefore, why wasn't there a production of the email and attachment --

MS. PERRY: Correct.
THE COURT: -- whether it's printed or whether it's electronic.
MS. PERRY: Correct. Correct.
THE COURT: Why hasn't that been done, I guess that's the question for Ms. Lindauer.
MS. PERRY: Right.
THE COURT: It seems like that would be a very easy thing to do.
MS. PERRY: Right. And, also, you know, when the documents were produced physically, not electronically, we don't have, you know, one behind the other. It's not email and attachment, email and attachment, email and attachment. I mean that's --
THE COURT: It's just a bunch of emails and bunch of attachments.
MS. PERRY: Yeah. That's --
THE COURT: Okay.
MS. PERRY: -- which is part of the problem and why we --
THE COURT: And that's not an acceptable way to produce documents.
MS. PERRY: Another reason why we need it in native format so that we can --
THE COURT: Understood.

MS. PERRY: -- and also then the metadata, of course.

Now, you know, it appears that it looks like this metadata is in this spreadsheet that goes with the attachments. But, again, we can't marry it up. And I can certainly ask Ms. Riddell to kind of explain much better than I can about like how you would go about doing that kind of production.

THE COURT: Okay. So is that the only issue is the production of -- is it just emails with the attachments in native format --

MS. PERRY: So --

THE COURT: With the metadata included? Is that it or is what -- so is that one category of problems?

MS. PERRY: That's one category.

THE COURT: Okay.

MS. PERRY: That's one category.

THE COURT: What's the next --

MS. PERRY: Okay.

THE COURT: What are the -- let me --

MS. PERRY: All right. So we'll say that there's --

THE COURT: Category one.

MS. PERRY: That's category one.

THE COURT: Okay.

MS. PERRY: Category two, the QuickBooks.

Last night after 10:00 a couple of financials were sent to me in PDF format. As I got to the courthouse, a file

was sent to me that supposedly is going to give us access to QuickBooks. It had a password and so on. I don't know if it will because it came in between when I left the office and when I got here.

THE COURT: Okay. So the question, and Ms. Lindauer I'm sure is taking notes, why that occurred yesterday as opposed to prior to Monday.

MS. PERRY: Right.

THE COURT: Given and I understand the issue --

MS. PERRY: Right. Right.

THE COURT: -- that debtor co-counsel was dealing with in Houston --

MS. PERRY: Of course. Of course.

THE COURT: -- with his wife. I get that. But, again, this is the third hearing on this. And I thought I was fairly clear last time, and I thought I was at least aiming in a direction the hearing before that that a majority of this needs to be produced.

MS. PERRY: Right.

THE COURT: So Ms. Lindauer's going to have to answer those questions why the delay. It doesn't seem like that should have been that difficult to produce that.

MS. PERRY: And, also, I don't know if this additional file that's been produced with the password, if that is going to comport with what we've asked for with respect to

production in native format and the data from QuickBooks because I just haven't had a chance to look at it or get someone to look at it. So that's still an open question.

So hopefully, that will, you know --

THE COURT: Hopefully, that's going to resolve --

MS. PERRY: But --

THE COURT: -- but we won't know until you've had an opportunity to look at it.

MS. PERRY: Yes.

THE COURT: And if it turns out it's not, then arguably, there may be a fourth required hearing on this motion to compel.

MS. PERRY: Yes.

THE COURT: At some point it's costing each of your clients a lot of money through no fault of yours. You're just trying to get the information. Which then goes back to the plaintiff in the case why the delay and dragging your feet in providing these documents.

All right. So QuickBooks. We got the email/native format/those issues in category one.

MS. PERRY: Right.

THE COURT: We have the QuickBooks issue in category two, which may or may not resolve the issue. Is there another?

MS. PERRY: Right.

So the other -- I think there are still two

outstanding issues. One, at the last hearing, there had been discussion that if there are financials, that then the responses need to be amended to reflect that because currently they state that there are none. So the responses need to be amended with respect to the financials.

THE COURT: So there are financials?

MS. PERRY: Well, it looks like it. From the PDFs --

THE COURT: Okay.

MS. PERRY: -- they look like balance sheets and --

THE COURT: Okay. Understood. Okay.

MS. PERRY: In addition, because of the way they answered that tax return question saying there are no tax returns because BM318 didn't have earned income, there's still the question of it really should be either there's no tax returns or there are tax returns or -- either there are none and there's -- that data resides nowhere else or there are none but that the data does reside somewhere else.

So that question still needs to be answered.

THE COURT: So that hasn't been answered yet?

MS. PERRY: Correct.

THE COURT: Okay.

MS. PERRY: The last, I believe, open issue is that BM318 was going to check with former employees to see if they had information in their possession, custody -- well, if they had --

THE COURT: If they had documents in their --

MS. PERRY: Documents that the --

THE COURT: -- that are BM318's --

MS. PERRY: Correct.

THE COURT: -- that are in --

MS. PERRY: Correct.

THE COURT: -- these former employees' possession?

MS. PERRY: Correct.

And if -- and then either they're going to be produced or they're not going to be produced. The former employee declined or if it's not a former employee, it's a third party, they declined.

THE COURT: And they let you know and (indiscernible)?

MS. PERRY: Correct.

THE COURT: Okay.

MS. PERRY: So we don't have any information on that at this point.

THE COURT: Okay. So even though that was I thought resolved last time, you still don't have that information?

MS. PERRY: Correct.

THE COURT: All right.

MS. PERRY: So those are the what I believe are the outstanding issues.

THE COURT: All right. Anything else as a general overview?

MS. PERRY: Right. As a general overview, that's --

THE COURT: Let me see what Ms. Lindauer has to say about these five categories of general overview.

Ms. Lindauer, it's to you. Why don't we take these in the order that Ms. Perry raised them. What's the issue with the category one issue which, of course -- which are, let me finish my question -- which are the emails and attachments being produced in a native format that includes metadata but that shows each individual email with whatever attachment was attached to it as opposed to here's a stack of emails either electronically or in PDF format, and then here's a stack of attachments either in PDF format or in electronic form and you, Ms. Perry, and your team have fun matching them up.

What's the problem? I don't understand why we're here for the third hearing on this. Why can't that be produced? What's the problem?

MS. LINDAUER: So, Your Honor, I'm going to pass this to Mr. Walji because he actually has been the one that's been handling all of the discovery issues, working with the IT expert, and doing all the things --

THE COURT: All right. All right, thank you.

MS. LINDAUER: So if you don't mind?

THE COURT: Mr. Walji?

MS. LINDAUER: Yeah.

MR. WALJI: Mr. Walji, what's the problem with producing the emails and the attachments, which I thought I was fairly clear at the last hearing which I thought clarified the first hearing which I thought I was sort of clear on.

Those need to be produced. What's the holdup? What's the problem? Why can't they be produced in the type of production that is required without a stack of documents either PDF version or electronically with another stack of documents either PDF or electronically requiring the opposing counsel to try to match them up? What's the problem? How come the holdup?

Mr. Walji, are you there? If you're there, you're on mute, so you'll have to unmute yourself.

MR. WALJI: Good morning, Your Honor. Can you hear me?

THE COURT: Now I can. Yes, sir.

MR. WALJI: Let me make sure that I'm also appearing. Okay.

Your Honor, a list of five points, I'll go one by one. The first response to your native file issue, I believe that the discussion that we had, we have produced the information that is in the same format that Dixon provided because we were struggling. And in the last hearing, the

question was back and forth.

And so what I engaged an IT consultant who is on -- who is present at this hearing, Mr. Raghav Handa (phonetic), to map exactly the way Dixon had provided it.

THE COURT: Wait.

MR. WALJI: And he can show that on the screen.

THE COURT: Mr. Walji, let me ask a question so that I can understand. When you say the way Dixon has provided it, I mean Dixon has requested in its document request that you provided it, that the debtor provide it and that the debtor provide, for example, emails and the attachments in both natural and in the format where it includes the metadata, which in my view and I think any normal reasonable view would have been, here's email number one with the three attachments, here's email number two which is four successive emails with the attachments.

So why wasn't it produced --

MR. WALJI: Your Honor?

THE COURT: -- in that manner?

MR. WALJI: Your Honor, I'm not -- I'm in agreement with Ms. Perry's assessment of it. But I will produce that. I'll request if you allow for our IT consultant to show you that it is in fact produced such that is not consistent with the way it's been communicated to me.

THE COURT: Fair enough.

MR. WALJI: And I could be corrected otherwise. So I think, as you said, between lawyers and the Court arguing about what is right and wrong, why don't we produce what we have electronically so that you can see. And if there's an issue about it, we can resolve it because unlike last time, we do have an IT consultant and he has produced it in the same manner format-wise so that we don't have an issue with Dixon.

And so if you would be kind enough to allow me, I can introduce --

THE COURT: Of course.

MR. WALJI: Mr. Raghav Handa who will put it on the screen and then we can clarify item number one. Similarly, with the item two and the rest of it I can go one at a time if you would be kindly allow me to do so.

THE COURT: Of course. You may.

Good morning, Mr. Raghav Handa. How are you? You may unmute yourself.

MR. HANDA: Good morning, Your Honor.

THE COURT: I don't know -- and let me ask, we were just chatting. We were trying to get through so that we get past this discovery issue. I'm not swearing anybody at this time unless the parties want to have sworn testimony we can. But I'm just trying to make sure that the right hand knows what the left hand is saying. And so let's see if --

MR. WALJI: Thank you.

THE COURT: -- if we can get the IT experts answer the questions that we lawyers and judges don't quite thoroughly understand.

All right. Mr. Handa, it's to you.

MR. HANDA: If you allow me, can I share my screen?

THE COURT: Of course.

MR. HANDA: I think I do not have access to the screenshare. Just give me a moment.

THE COURT: Yeah. Take your time.

MR. HANDA: I think I cannot -- I do not have access to the screenshare. Should I just --

THE COURT: You should.

MR. HANDA: Is there someone from the administration.

THE COURT: You should be able to access, I think. Yeah, you should be able to. Again --

MR. HANDA: Allow me to just log back in. Just give me one second, sir.

THE COURT: All right.

(Pause)

MR. WALJI: Raghav, you're on mute.

MR. HANDA: Can you see my screen, sir?

THE COURT: Yes.

MR. HANDA: So this was the format that was provided to us by Dixon. Right?

And this is how the emails were provided to us with

the filepath and the emails sent to CC recipient. We followed exactly the same path apart from the Bates number because that was not something that I was qualified to do. And here are the EML file, the date, the from, to, CC from email, subject, the body of the email in its exact state with the IP addresses, the SLPP addresses in its most native form, if there's an attachment, along with what is the source of the attachment.

If we go back to the Google Drive where it was shared -- just a moment -- all the attachments are in this folder and are exactly located the way it's been described that they are located. It's in the attachments folder and then comes the attachment.

You'll see attachment folder and then there is the attachment. So for each email, there is a corresponding attachment in case there is one.

THE COURT: Okay. Let me ask -- that seems fairly simple to me. Does that -- why doesn't that work?

MS. RIDDELL: Your Honor, I'm Chris Riddell. I'm a litigation support specialist at Munsch Hardt. What Mr. Handa is showing is only one part of the production that was provided for our -- from Dixon. The production contains images of the emails, extracted searchable text of the emails, a load file which contains the metadata which is what you see here on this screen, and then if any attachments were produced in native such as Excel spreadsheets, those would be in a separate

folder.

So all of those combined create a record in a review platform or a document, not one part of these alone.

THE COURT: I'm not sure I follow.

MS. RIDDELL: So all of this load file that they're showing you here works in combination with the image of the document, the picture of the document, the text of the document. So it's basically broken out into four pieces that when married together create a whole email and attachment family.

THE COURT: And why doesn't that satisfy the request that you have each email with each attachment? I was under the understanding that you could do the email but you didn't know which attachment, but if I'm --

MS. RIDDELL: This is our production.

MS. PERRY: This is our production.

THE COURT: Oh, this is your production.

MS. PERRY: Correct.

THE COURT: Ah, so your production actually does -- hold on a second. Your production actually does show here's the email and then here's the attachment to that email. And so it's all very simple in that line and the lawyers can figure out how to do that. Right?

MS. RIDDELL: We produced in a very industry standard production --

THE COURT: Okay.

MS. RIDDELL: -- format that's been used for many years.

THE COURT: So this is not what was produced to you?

MS. RIDDELL: What was produced to us yesterday was this --

THE COURT: Hold on, sir. I'll let you --

MS. LINDAUER: Your Honor, this is --

THE COURT: Ms. Lindauer, let her finish. Let me finish. Let me finish asking my questions. I'll come back to you.

MS. LINDAUER: Okay.

THE COURT: All right.

MS. RIDDELL: What we received yesterday was this spreadsheet and a folder of attachments in native file, so only one or two of the four pieces that make up a production.

THE COURT: So just so I understand, what is on the screen now is not in fact what the debtor or what the plaintiff produced to Dixon but was rather what Dixon had produced to -- is that --

MS. RIDDELL: What he's showing at this moment --

THE COURT: Yes.

MS. RIDDELL: -- is their production yesterday.

THE COURT: Okay.

MS. RIDDELL: But what I understood him to say was

that he based their production off of what we had provided.

THE COURT: Okay.

MS. RIDDELL: And he only took one part of what we provided.

THE COURT: Okay. So but here, this is -- so this is the debtor's/plaintiff's production to Dixon. Is that -- am I correct on that?

MS. RIDDELL: This is what they produced to us yesterday, this spreadsheet along with a folder of attachments in a --

THE COURT: Understood. So am I -- so if I wanted to see what the email was, I could actually --

MS. RIDDELL: You have the pieces of an email, but you don't have a picture of the email.

THE COURT: Okay. So there's no -- so this is like -- okay, whereas, what you produced was a picture of the email?

MS. RIDDELL: And all of these pieces.

THE COURT: And all that. But here this is just pieces of the email and not the actual -- you can't click a button to actually see the email itself?

MS. RIDDELL: Correct.

THE COURT: Okay. But you can click a button to see what the attachment was? Yes or no?

MS. RIDDELL: You can go to a separate folder that you saved on your computer and --

THE COURT: So you can just --

MS. RIDDELL: -- scroll down the list to find.

THE COURT: So you can't -- so I thought what he just showed, he just showed where he clicked a button and is that not the attachment?

MS. RIDDELL: The version we have does not have an automatic link. You have to look in the folder. You have to look at the file name on the spreadsheet and then go to the folder that they provided and then scroll down and find the matching file.

THE COURT: And try to find it in the folder. So this isn't a direct link to the document?

MS. RIDDELL: No, sir.

THE COURT: Okay. So -- okay, so I guess we'll go back to, Mr. Handa, if you could explain that again because the way I was understanding your explanation of the document that's on the screen was that you could click on a link to take you to the email and click on a link to take you to the attachment. And is that what this does?

MR. HANDA: No, sir.

So what this does is it gives you the exact address where the attachment is and you can reference it with the email. And here's the exact body of the email, so if you just see the column in full --

THE COURT: Understood. Understood. But that's not

the email itself, so that's -- so it's the position of the plaintiff/debtor are making the representation that that's the body of the email, but that's really -- but there's no actual email itself to verify that. And I'm not saying that you or your client would purposefully not --

MR. HANDA: Right.

THE COURT: -- have it exact. Mistakes are made that Dixon should not have to rely upon that. They should be able to look at the document itself. So there's no production that shows the document itself with the attachment. Is that right?

MR. HANDA: Correct, sir. But, additionally, we've also added the court -- and this was added a little later, but we've added the court files, which is in the native format. Those are not generally readable, you know, with a general computer, but this is the exact native format of .eml files and .msg files with the reference.

THE COURT: Okay.

MR. HANDA: So these are the exact images of the emails, sir.

THE COURT: Could you click on one just so that I can just see?

MR. HANDA: So they won't open on a web format. They need Outlook to open the .msg file or the .eml file.

THE COURT: Okay. Fair enough.

MR. HANDA: But it's the core native format of the

email, sir.

THE COURT: Okay.

MR. WALJI: Your Honor, may I speak? This is K. Walji.

THE COURT: Yes, sir.

MR. WALJI: Your Honor, just to be clear, the actual emails have been produced --

THE COURT: I understand.

MR. WALJI: -- in the format that Mr. Handa -- right. So just to clear the confusion, the question that I have for Mr. Handa that can help is, Mr. Handa, can you add a column on that original Excel spreadsheet where the email can automatically be linked there by a link so they don't have to open another folder?

MR. HANDA: I can do that.

MR. WALJI: Okay.

THE COURT: And same question --

MR. WALJI: Your Honor, it's a the product which --

THE COURT: -- same question about the attachment. Could there be a link?

MR. HANDA: Yes, sir.

THE COURT: Okay.

MR. HANDA: Yeah.

THE COURT: Is that difficult to do?

MR. WALJI: If you add on the --

THE COURT: Is that difficult to do, Mr. Handa?

MR. HANDA: Not too difficult, sir.

THE COURT: All right. All right.

Mr. Walji?

MR. WALJI: So, Your Honor, I think the issue on the native file is instead of a two-step process that we had created -- recall that in our earlier conversation this was not in a native format. We have produced a native format. But this was the way we could produce it as a two-step.

After today's discussion, we will put those files by adding two columns so that will on the same row that you're seeing will have a separate row to access the exact email in its entirety and a separate row for the attachments in its entirety.

THE COURT: Does that cure --

MR. WALJI: That way you have the entire native --

THE COURT: All right. Thank you, Mr. Walji.

And I don't mean to cut you off on the video. It's just there's a delay and sometimes -- I apologize if I'm coming across as rude. But I do want to move it along.

If those links --

MR. WALJI: Not at all.

THE COURT: If those links are added to what's produced where you can actually click a button and you see the actual email and you click a button and see the actual

attachment along with the other information that's been provided, does that satisfy the production in your eyes?

MS. PERRY: Just a moment, Your Honor.

THE COURT: Yeah, you may.

(Pause)

THE COURT: You may stay there.

MS. PERRY: Okay.

THE COURT: It's just as easy. Yeah.

MS. PERRY: I think so, Your Honor.

I will say just so the record's clear and I think it was clear from what Mr. Handa said. He has now added the .eml files and the email files. But that was not what we got yesterday.

THE COURT: Understood.

MS. PERRY: Okay.

THE COURT: No, understood.

MS. PERRY: Okay.

THE COURT: I'm trying to get to the end of the day.

MS. PERRY: Yes. And I --

THE COURT: Or the end of story.

MS. PERRY: Agree.

THE COURT: And I think from what I understand -- again, I'm not the expert --

MS. PERRY: Right.

THE COURT: -- in this, but it sounds like that from

what Mr. Handa said that it's not too difficult to then do a link to show here's the actual email, here's the actual attachment. And that way you don't have to try to find the needle in the haystack --

MS. PERRY: Yes.

THE COURT: -- in the way that it was originally produced.

MS. PERRY: So I think -- I mean subject to us seeing it once it's provided --

THE COURT: Understood.

MS. PERRY: -- to us, I think that should solve that. I think I would ask this question if opposing counsel knows, are all of these documents that are being produced, have they previously been produced as PDFs or is some of this a supplemental production? And if so, do they know which ones are, you know, new documents?

THE COURT: Okay. That's probably a harder question.

MS. PERRY: Yeah.

THE COURT: But I guess I'll ask. Ms. Lindauer?

MS. PERRY: If they don't know, then -- but I --

THE COURT: Yeah. I understand. This is basically and potentially a reproduction -- in my words, not anyone else's -- if, say, 100 documents are previously produced, now there's 103 here, what are the new three?

MS. PERRY: Which ones are the new ones?

THE COURT: Okay.

MS. PERRY: If they know.

THE COURT: If that's easy.

MS. PERRY: Right.

THE COURT: If that's easy to determine.

MS. PERRY: Do they --

THE COURT: If not, then at least you're getting all of the 103 here and that should be able to resolve it.

MS. PERRY: Understood. Understood, Your Honor.

THE COURT: All right.

Ms. Lindauer or Mr. Walji, any comment to that? Yes, sir?

MR. WALJI: Yes, Your Honor.

The way that you've articulated is correct. It's 103 because we could not reverse engineer comparing the Bates stamp of what was produced in paper format to match the digital version.

THE COURT: Okay.

MR. WALJI: We just don't have that ability to do so, and it would lose the integrity of the data. And so what we did was produce the entirety equivalent of your 103 in a digital format --

THE COURT: Okay.

MR. WALJI: -- so that you have all the information that you have. And Ms. Perry is correct, there may be new

information, but it is the entirety in all the digital native format once we add those two columns.

THE COURT: Okay. All right. Thank you, sir. That's very helpful.

All right. Does that resolve the category one concern if you get a -- if a new spreadsheet is produced with the links as, at least I understand it, push a button, there's going to be the email in whatever format, PDF or whatever it is in, push another button and there's the attachment or attachments?

Does that resolve the dispute? I think it does.

MS. PERRY: I believe so, Your Honor.

THE COURT: All right. All right. Terrific.

So I guess if, Mr. Handa, if that's an easy fix, then let's do that and that will resolve the concern about category one.

All right. Category two, QuickBooks.

MR. WALJI: Your Honor?

THE COURT: Yes, sir.

MR. WALJI: This is K. Walji.

THE COURT: Yes, sir.

MR. WALJI: Just to clarify so that there's no misunderstanding and hopefully not a need for a fourth visit with you. We will produce item number one with two more columns, and that should satisfy today's resolution. Correct?

THE COURT: That's my understanding, yes. Let's give Ms. Perry --

MR. WALJI: Subject to their (indiscernible), but just in principle --

THE COURT: I understand.

MR. WALJI: -- that's what we will have. And Mr. Handa will get that to you. With regards to the second item --

THE COURT: Hold on. Hold on. Hold on.

MS. PERRY: Right.

THE COURT: Hold on. Hold on, sorry.

MS. PERRY: Right. I think --

THE COURT: Is that Ms. Perry?

MS. PERRY: Yeah. I think it's just, yes, produce the spreadsheet but embedded in the spreadsheet the native files or --

THE COURT: Exactly.

MS. PERRY: -- however.

THE COURT: Yes.

MS. PERRY: Yeah.

THE COURT: All right.

MR. WALJI: Correct.

THE COURT: All right. Terrific.

All right. So hopefully we've resolved category one. But we won't know until that's been produced and the defendant Dixon has had an opportunity to determine if that resolves the

issue.

All right. The QuickBooks, category two.

Mr. Walji, back to you?

MR. WALJI: Thank you.

Your Honor, with regards to the QuickBooks, we acknowledged the issue that Ms. Perry raised at the last hearing that there were -- you know, the information was not complete. And so what we did was went through all the bank statements of 2018, 2019, 2020 and produced them. We engaged a new accountant and have provided that information in its entirety in the draft format.

I do not want to make a point about this whole week has been a little challenging for me because of my wife's surgery and I don't want to make that as a reason or an excuse. But we were able to engage both the IT consultant and the accountant. And you've seen the results of the IT work, albeit a day late or two.

The same thing with the accountant. We had all the information entered in QuickBooks, and this morning my mistake, I did not send the link to the QuickBooks drive which I submitted as Ms. Perry pointed out on her way to court. So she has that, and I would request that once they have looked at it, if there's any issues, let us know. The password was not included, which I have provided to them this morning.

THE COURT: Terrific.

MR. WALJI: So that will produce the QuickBooks information. and if there's any questions, my request would be to ask Ms. Perry to communicate with me directly along with Ms. Lindauer and we try to resolve it expeditiously now that we have the professionals on the team.

THE COURT: Does that resolve it subject to your having ability to actually go back and review it with not only yourself but with your IT team?

MS. PERRY: I mean perhaps it resolves it, although what I think I heard was -- so I think yes and no, Your Honor. Because what I heard was they went and took data and input it in QuickBooks now and generated draft reports post-litigation. That's not what I'm looking for.

What I was looking for was apparently they had QuickBooks pre-litigation. Maybe that license has lapsed and now, you know, that data and documents are gone. If that's the case, then they need to respond and disclose that.

I think at the last hearing Your Honor was fairly clear of when did the license lapse or what software did they use, when did the license lapse because it doesn't sound to me like they'd be able to revive that and get that historical data. They've just taken data, put it into QuickBooks now and generated something which is not what I'm looking for.

THE COURT: Understood.

Mr. Walji, any response to that?

MR. WALJI: Yes, sir.

Your Honor, the data that has been provided is from the -- is exactly the same data that should have been in the original QuickBooks that we did not have access to.

THE COURT: All right.

MR. WALJI: I believe what Ms. Perry wants is we'll get you a declaration which I -- and make the statement that confirms to the requirement that it is not accessible and we have no way of producing that -- the historical data. So there's a distinction between the data being historical versus current. It's the same data. And so if I don't have access to it, I just don't have it. And I think we've taken an enormous amount of time to make sure that we produce the information correctly that we have in the new QuickBooks that we have acquired.

THE COURT: All right. I think --

MR. WALJI: So I believe --

THE COURT: Thank you. I think you understand the issue or concern Ms. Perry had. And it sounds like Ms. Perry was correct in her assumption.

So what -- to respond accurately to the request would be what I requested last time, if there were QuickBooks or whatever format or whatever was being used that explain what happened, when the license expired, and when those QuickBooks financial statements or whatever, when you lost -- when the

debtor lost access to those. I think the debtor or the -- yeah, the defendant Dixon is entitled to that information.

And then I guess the declaration can include it's the representation of the declarant that the information in what is produced was what was lost. It may or may not be; we don't know because if it's lost, it's lost. But I think the defendant's entitled to know what happened to the documents of the plaintiff if they're no longer accessible, the original documents, QuickBooks, whatever it might be.

So I think we're on the same page on that. But I think --

MR. WALJI: Yes, Your Honor.

THE COURT: Go ahead, Mr. Walji.

MR. WALJI: Your Honor, you're correct. And if you recall, I believe I made the statement that I was going to go to Dallas over the weekend subject to my wife's condition and get myself familiarized with this information so that we could produce -- we could provide the declaration accordingly.

Unfortunately, my wife's health is not -- was not in the condition that I could go from Houston to Dallas. But I believe I should be able to depending on her condition. I will personally handle this issue and provide you the declaration as to the specific questions that Ms. Perry has asked so that we don't have any generic answer: when was the QuickBooks license acquired, when does it terminate, and the data, and then ensure

that there is no -- that it's a transparent declaration if you would -- and I apologize that I was not able to be in Dallas over the weekend to get the declaration in time.

THE COURT: Understood. And as I said at the last hearing, I'll say it again, first things first. Take care of your wife. Her health is the paramount issue. We will get through the discovery issues, and I'm sure Ms. Perry is good and cooperating on those issues. But we do need to get that information responded to the defendant Dixon.

But I think we're on the same page. It sounds like --

MR. WALJI: Right.

THE COURT: -- the prior software package is no longer accessible and potentially lost, but you'll have to -- debtor's going to have to explain that, the debtor/plaintiff's going to have to explain that -- and I'm not talking to Ms. Perry --

MS. PERRY: Yeah.

THE COURT: -- explain that because it is what it is. And then whatever the consequences of that, if anything, we'll deal with that down the road. And then at least the representation is that the plaintiff/debtor has attempted to recreate. Whether that's helpful or not, I don't know and we'll find out one way or the other.

All right. So that should resolve category number

two. Does it not, Ms. Perry?

MS. PERRY: I believe so, Your Honor.

THE COURT: All right. Now we go to category number three, and this is the -- you know, to the extent if there were financials, apparently the response is that the -- the initial response to their no -- there were no financials. Correct? Or what was the --

MS. PERRY: Yeah. I --

THE COURT: State that for me again.

MS. PERRY: Right. I think some of the requests, Your Honor -- let me just come here.

There were some requests, for example, BM318's general ledger as of July 2nd, 2020. So if that doesn't exist, and it sounds like it doesn't. I mean I don't know about these drafts. I'm not going to opine.

But it says plaintiff has their documents responsive to this request. That response may now be accurate because of the QuickBooks situation. But -- so I would say that with respect to those responses, the debtor just needs to go back and look at those and see if any amendments need to be made. Perhaps they don't given what we've just learned today.

THE COURT: That will be up to -- yeah, that's up to the plaintiff/debtor.

MS. PERRY: Right.

THE COURT: And if it turns out that responses should

have been updated and didn't, there are consequences of that down the road. But I'm not going to compel them to do something. They know that they have an obligation to continue to update any responses if circumstances or issues have changed.

So I guess they're on fair notice that if there are any responses that need to be amended, it's perhaps in their best interest to do so.

MS. PERRY: Thank you, Your Honor.

THE COURT: Is that category number three?

All right.

MS. PERRY: I think that was category number three. Yes, Your Honor.

THE COURT: Okay.

MR. WALJI: (Indiscernible).

THE COURT: Yes. I don't think there's really a response to that. It's you're on notice that -- yeah, go ahead.

Go ahead, Mr. Walji.

MR. WALJI: Well, Your Honor, if I may just make a comment on number three. Ms. Perry is correct. I cannot amend the responses until I get a chance to get you the declaration so that the responses are consistent and also the information that's already been provided. So we say, you know, we're on notice to provide that response appropriately --

THE COURT: All right.

MR. WALJI: On number three.

THE COURT: Terrific.

All right. Now category number five [sic] was the task return issue. I'm not sure how to -- you know, typically, you would think that the LLC is included in some tax return somewhere. And if so, then that tax return or tax returns, you know, should be produced. If they don't exist or were never included in any tax return, I guess that's the answer.

How else do we deal with that, Ms. Perry? Any suggestion?

MS. PERRY: Agreed, Your Honor. I think that, you know, our concern was the way the answer is phrased, it suggests that there were no tax returns during those particular years, but there could be tax returns in other years.

And, you know, when it says no documents responsive to this request since BM318 did not earn taxable income during the referenced period, my understanding is like that's not a reason no to file a tax return. So, again, if there aren't any and they aren't -- and that data's not anywhere upstream, in my view, that's when we would like an amended response to.

I hear Your Honor --

THE COURT: Well, that one -- yes, that one will need to be amended to make it clear --

MS. PERRY: Yes.

THE COURT: -- because it's an ambiguous response --

MS. PERRY: Correct.

THE COURT: -- for the reasons that you stated. Because arguably under that response, it could have been included in a tax return of another entity.

MS. PERRY: Correct.

THE COURT: Well, if that's the case, it needs to be produced. That's -- but if the entity -- if BM318 was never included in any sort of tax return as a flowthrough LLC, then the answer might still be correct.

Well, no, no, excuse me.

MS. PERRY: Yes.

THE COURT: That's not true. The answer needs to be amended to say so to make it so it's very clear --

MS. PERRY: Correct.

THE COURT: -- what the status was because it's an ambiguous response which begs the question, well, are there other documents that come within the request.

MS. PERRY: Correct.

THE COURT: And I think we're on the same page what that means. So I'll go to again, Mr. Walji or Ms. Lindauer, any question or misunderstanding about category number four?

MR. WALJI: There is no misunderstanding. The tax returns are in the process of being prepared. There are none at this time, so I think the response that was provided about

some information about financial information needs to be clarified, so we'll amend that response. And when we file the tax returns, we will submit a copy to them.

As of right now, we haven't. We've just finished the tax -- the QuickBooks and then we will proceed with the tax returns, so.

THE COURT: All right. Terrific.

MR. WALJI: We'll amend our response accordingly.

THE COURT: All right. Terrific. That should resolve the category four concerns.

And that takes us now to the last category which is the issue of the former employees which we chatted about at the last hearing that, you know, if the former employees have documents, books, records, whatever, that constitute BM318's property, that needs to be produced. But, obviously, if it's not within the control of BM318, it can't do that.

And I think what we chatted about at the last hearing was I thought that Mr. Walji or Ms. Lindauer were going to see if the employees would voluntarily give to BM318 that information so that it could produce it. But if they chose not to -- they being the employees chose not to, I thought BM318 was going to give Ms. Perry a list of employees that had the computers and other documents on those computers which constitute BM318's books and records.

And it's going to be up to Ms. Perry and her client

to then subpoena those parties directly. But they don't know who to subpoena until they're told who the employees are.

So where are we on getting that information to the Dixon parties?

MR. WALJI: Your Honor, may I respond?

THE COURT: Yes, of course.

MR. WALJI: So, Your Honor, the information that we were able to provide in the original from Mr. Handa we believe is old information that we have. I wanted to -- when I went -- when I was supposed to be in Dallas was good before extending a specific list of the employees to Ms. Perry. I wanted to look at the documents for myself which I was unable to do, sir, so I apologize.

And I'll have that list of specific employees that we have not been -- we believe may have information and are not providing it to us and provide that list this -- I won't be able to do it this week because -- I don't know, but I'll try to get it done by next Monday.

THE COURT: All right.

MR. WALJI: If that's okay with the Court and Ms. Perry.

THE COURT: Ms. Perry, is that -- response?

MS. PERRY: Yes. That's acceptable, Your Honor.

THE COURT: All right.

MS. PERRY: And I do think we're going to have to

talk about scheduling, obviously, before --

THE COURT: Understood.

MS. PERRY: -- we close the hearing.

THE COURT: Understood.

All right. So as long as that information either the documents or -- and/or answers from BM318 or -- and/or -- I guess and the employee names should be produced to Dixon. If you can do that by Monday, the 15th, that will be terrific.

All right. So that takes care of that issue.

So now we're still kind of in the same position we were last hearing in that we think we're all on the same page, but we won't know definitively until BM318 provides the additional information that we just discussed in categories one through five and that Dixon's had an opportunity to go through what it receives.

When should it -- and this is, again, Mr. Walji or Ms. Lindauer, now that we've gone through one through five, our categories that we've discussed today, what's the timing on getting that information to Dixon so that Dixon will then have an opportunity to review it? Is that -- I don't know if Mr. Walji or Mr. Handa. What's the last date that we should have that information to Dixon?

MR. WALJI: With respect to items one through five, specifically one, the native file to the PDF and three, the list of employees, are the pending items from our side. We'll

provide it all by Monday, the 15th.

With regards to the amended responses that are required for the financial bank statements and the tax returns, I'll defer to Ms. Lindauer because she's the counsel that will have to make those amendments when she can get that done.

Can we do that by Monday, Joyce?

MS. LINDAUER: I don't see any problem. We'll have that by Monday, also.

MR. WALJI: So, Your Honor --

MS. LINDAUER: Just set one date for everything.

THE COURT: All right. Terrific.

MR. WALJI: Monday, the 15th of August. Ms. Perry and her team should have all the information on those five hopefully to their satisfaction and they can review.

And I leave it to them to then to communicate with us if there's any deficiencies on our part.

THE COURT: All righty. So do you think it makes sense to just pencil in a date just in case there are follow-up issues? And we'll see if we can find a date.

MR. WALJI: Your Honor?

THE COURT: Yes, sir.

MR. WALJI: Me or Ms. Perry?

THE COURT: I'm talking to Ms. Perry right now, but I'll --

MS. PERRY: Right.

THE COURT: -- move to both you and Ms. Lindauer to make sure you're available.

MS. PERRY: I think that would make sense, Your Honor. And hopefully there won't be.

THE COURT: So what time period do you think? IF you were to get in everything by say Monday or Tuesday -- and, again, and I mean this very sincerely, Mr. Walji, you must look out for the health of his wife first and foremost.

MS. PERRY: Of course.

THE COURT: And if there's a day or two delay, you know, we'll all live with that.

MS. PERRY: Understood.

THE COURT: I know that he's doing his -- he's representing he's going to do his best to get the information. But assuming you get the information by the 15th or 16th, you know, sometime early next week, how long do you think you need to look at it before you know and rather than saying this doesn't work, let's go to court again, give you the opportunity to chat with Mr. Walji --

MS. PERRY: Right.

THE COURT: -- or Ms. Lindauer to see if you could --

MS. PERRY: Of course.

THE COURT: -- resolve any questions before coming back?

MS. PERRY: I would think a placeholder hearing

sometime the week of August 22nd.

THE COURT: Okay. That's a week. Okay. So we have the 22nd is open. The 23rd, I might have 3:00 and thereafter. I'll be conducting a mediation all day the 24th and all day the 26th, so those days are completely out. And I'm pretty full on the 25th.

So it would either have to be Monday or Tuesday or the following Monday morning, the 29th.

MS. PERRY: I'd say the 22nd or 23rd would work with my schedule, Your Honor.

THE COURT: All right.

MS. PERRY: Either --

MR. WALJI: Your Honor, may I --

THE COURT: Yes.

MR. WALJI: Sorry.

THE COURT: Yes, sir.

MR. WALJI: I just think that the logistics are confusing to me. If we produce information to them on the 15th and give them a few days, let's say by the end of the week, they'd then inform us information that they need. It would be very difficult to turn around and clarify and again show up on the 22nd.

My request would be that we be given an opportunity to clarify any deficiencies the following week so that on the 29th both sides have had an opportunity to review everything

and have an opportunity to respond and hopefully avoid the need for the 29th hearing.

I believe if you put it on the 22nd, we'll be back because we may not have -- get a response from them on a Friday and we have to show up on a Tuesday and we will not be able to get all that information back to them, which we could if we had some additional time.

So my humble request is to make it the 29th.

THE COURT: Okay. I agree with that position of Mr. Walji.

So are you available the morning of the 29th? I have an all afternoon hearing on the 29th, but I am available on the morning of the 29th. Does that work, Ms. Perry, on your calendar?

MS. PERRY: I think so, Your Honor. I --

THE COURT: I also have the morning -- no, no, no.

MS. PERRY: I can make it work, Your Honor.

THE COURT: All right.

MS. PERRY: I have another hearing that morning, but I can get someone else to cover it. It's not something I have to be at, whereas, this one I have to -- I need to be at. So that would be fine on the 29th.

THE COURT: Would you prefer -- I've got a 1:30 which is going to take up the afternoon, but 9:00, 9:30, 10:00, 11:00? What works best if that helps you with your other

matter?

MS. PERRY: Right. It's not going to matter to me.

THE COURT: Okay.

MS. PERRY: I'd probably -- I don't know what the rush hour traffic is like coming over here, Your Honor. So I don't know if it's better to be earlier or later, right?

THE COURT: Ms. Wood, can you give her any indication coming from Dallas? It depends.

MS. WOOD: It's really not that bad.

MS. PERRY: Okay.

MS. WOOD: I drive from 7:30 to 8:30.

MR. WALJI: Your Honor, I'd like to be present at your court on Monday, so the latest time would be preferred so I can drive and be there in time.

THE COURT: I've got a 1:30 already that's going to be all day. So if this is going to be -- I'm fine with -- if we do like at 10 or 11, I'm good with that. But it doesn't leave us a lot of time. It would give us --

MS. PERRY: I would hope because this hearing has only taken us an hour, Your Honor, which is --

THE COURT: That's good.

MS. PERRY: It is good for us. It was good for us.

If we did it at 11, then --

THE COURT: 11:00? How does that work?

MS. PERRY: -- we should be done?

THE COURT: That's fine

Mr. Walji, does 11:00 work for you if need be on the 29th?

MR. WALJI: Your Honor, we'll make 11:00 work. And hopefully, if all goes well, we won't need to be in -- we won't be able to -- we won't need to be at the court. But if we do, I'll be there at 11:00. Thank you, Your Honor.

THE COURT: All right. Terrific.

So then we will continue this matter to August 29th, 2022 at 11:00 a.m. And, again, if the parties resolve their issues, great. But I agree with Mr. Walji that if there are additional issues that it sounds like that Mr. Walji and Ms. Lindauer can get together with you, Ms. Perry, or Mr. Vasek, whoever.

MS. PERRY: Certainly.

THE COURT: And as importantly, if need be, with your IT specialist and perhaps Mr. Handa, if we can have that meet and confer and give you at least some -- a week to do that, you might be able to resolve whatever pending disputes there are before you come back. All right?

MS. PERRY: All right. That's fine, Your Honor.

THE COURT: Now --

MS. PERRY: Now.

THE COURT: Now that we've resolved sort of this (indiscernible) again --

MS. PERRY: Right.

THE COURT: -- what's the next issue as you see it?

MS. PERRY: Well, I think the next issue, Your Honor, is you may recall at the last hearing we had fact discovery close and experts on which parties bear the burden of proof. Those designations were coming up, so Your Honor told those --

THE COURT: Correct.

MS. PERRY: -- deadlines at the last hearing.

I don't think there's going to be a way to keep the November trial setting.

THE COURT: That's fine.

MS. PERRY: But I also believe that this case needs to be tried this year for a lot of reasons, including that this property is tied up at the moment.

And so a couple of things, you know, we're obviously told right now, but we either need some type of additional tolling, you know, in the interim while we work out a new proposed scheduling order or we need -- you know, we're going to have to do something here because I don't want our fact discovery deadlines to start running and our expert discovery deadlines to start running again while we're still in a bit of flux here.

THE COURT: Understood. And that goes for all the parties.

MS. PERRY: Correct.

THE COURT: And the good news is we have Ms. Harris and Mr. Forshey are both listening in so -- and I think -- so I think all the parties are -- have their counsel at least listening in today. I will just give you a heads up I do have a four-day trial set the week of December 5th, so that week is all trial and then one day set aside for everything else.

But the week of the 12th right now except for the morning of the 15th is wide open. And the week of the 19th is fairly wide open except for the 22nd, which is -- my Thursdays are usually -- and every Thursday's usually taken. But I can fit things in.

So it does appear that we have time to get a trial in at least in December. It would have to be the week of the 12th or the 19th. And if you're talking about November, the week of the 28th, which of course is the Monday after Thanksgiving.

MS. PERRY: Right.

THE COURT: You know, that's still available. I just don't know of that -- because right now we have you down for a two-day trial on November 14th and 15th.

MS. PERRY: Yeah.

THE COURT: So we could bump you down to that last week in November or a couple of weeks in December.

MS. PERRY: Okay.

THE COURT: But I do want all the parties to have their full opportunity to be prepared for trial. It's your

case, not mine. I will fit it in on the calendar, but I do understand that it's probably for everyone's best interest to try to get it this calendar year --

MS. PERRY: Yes.

THE COURT: -- as well as the Court. So I'm good with that as long as all of you are good with that. So I've given you some dates. You can chat about it.

MS. PERRY: Okay.

THE COURT: Or if you want to do it right now. I don't want to hijack or -- I don't know if Ms. Lindauer or Mr. Walji or Mr. Forshey or Ms. Harris are prepared. We can, or would you rather talk offline about an amended scheduling order putting the discovery deadlines and all that. It may be best if you all chat about that, but I'm happy to do it now.

Ms. Perry, what's your request? I mean we can go around the horn if needed.

MS. PERRY: I think it's fine for us to discuss that offline and not take up the Court's time with it.

THE COURT: That's fine.

MS. PERRY: But in the interim, I guess I would ask that the Court continue to toll --

THE COURT: Yes.

MS. PERRY: -- the current deadlines. And maybe it's tolling it until -- hopefully we get a scheduling order put together and we get it, you know, uploaded soon in the next

couple of days or something. But if not --

THE COURT: The 29th is available.

MS. PERRY: The 29th.

THE COURT: We can chat about --

MS. PERRY: Exactly.

THE COURT: -- the revised scheduling order on the 29th. So why don't we -- we will toll everything until either an agreed scheduling order has been uploaded by --

MS. PERRY: Yes.

THE COURT: -- all the parties or the 29th.

MS. PERRY: Okay.

THE COURT: So all the dates and deadlines will continue to toll, and we all know what that means --

MS. PERRY: Right.

THE COURT: -- until the 29th --

MS. PERRY: Okay.

THE COURT: -- of August.

MS. PERRY: Thank you, Your Honor.

THE COURT: All right. Anything further?

MS. PERRY: Not from me, Your Honor.

THE COURT: All right.

Ms. Lindauer or Mr. Walji, anything else for today?

MR. WALJI: No, Your Honor.

MS. LINDAUER: No, Your Honor. I do appreciate the comments Ms. Perry made because I do think that shed some

light, the tolling idea.

THE COURT: Yeah.

MS. LINDAUER: I think that's a good plan right now.

THE COURT: I think it's a good plan, as well.

Mr. Forshey, you're here, anything you need to apprise the Court of in this matter today?

MR. FORSHEY: No, sir. No, Your Honor.

THE COURT: Terrific. Thank you.

And Ms. Harris?

MS. HARRIS: Not a thing, Your Honor.

THE COURT: Terrific.

MS. HARRIS: I think we've covered it all.

THE COURT: I think we covered it all, and we are -- these hearings are becoming a little shorter and shorter which is the good news.

Hopefully, the 29th will come and go without the necessity of a hearing, but if need be, we will all -- I will see all of you on the 29th. But until then, this matter is adjourned, and the Court will be recess until 1:30.

MS. PERRY: Thank you, Your Honor.

THE COURT: All right. Thank y'all very much.

MR. WALJI: Thank you.

(Proceedings adjourned at 12:05 p.m.)

* * * * *

**C E R T I F I C A T I O N**

I, DIPTI PATEL, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.

/s/ Dipti Patel

DIPTI PATEL, CET-997

LIBERTY TRANSCRIPTS DATE: August 19, 2022