absolved from trying to do so. *Barton*, 79 F.4th at 580. This Court rejected that assertion as sufficient to seize assets through a receivership. *Id.*

And rightfully so. Expert testimony in this case demonstrated that it was not only possible to distinguish affected and unaffected funds in a common corporate account—and to determine whether an onward payment was from the affected funds—it was expected under well-established accounting principles. **ROA.15419-21.**

There was none of that in this case. Neither the Commission nor the Receiver nor the District Court identified or adopted any methodology for tracing funds through a company or account that also had unaffected funds. They all just threw their hands up and treated everything a company receiving any amount of lender funds did and spent going forward as tainted. When pressed on cross-examination, what Commission's Staff Accountant—who actually was not an accountant (*see infra* Section I.B.6)—declined to identify any one method she consistently used to address the common fund problem. Prior to the evidentiary hearing, whoever was doing the Receiver's accounting work was not even

identified. **ROA.15363**. At the evidentiary hearing, the Receiver refused to admit to any particular method or effort, for that matter, on this issue. **ROA.15331; ROA.15371.**

The consequences became particularly unjustified when it came to the Defendant's main operating entity: JMJ Development LLC. That company existed and handled significant projects for two decades before the first dollar of subject funds was received by any of the Wall Entities. It performed work to advance the Wall projects forward, but also for many other projects having nothing to do with the Wall Entities. The undisputed evidence in the record is that, during one relevant period, JMJ Development received $16.4 million in revenue having nothing to do with the lenders or their funds. **ROA.15442**. But during that same period, the Commission, the Receiver, and the District Court treated every dollar leaving JMJ Development as tainted, after having found that it had received some lender funds.[1] They did so, despite expert and

[1] Similarly, neither the Commission nor the Receiver nor the District Court made any effort to determine whether the lender funds allegedly received by JMJ Developments were legitimate payments for services or funds advanced on the Wall projects. **ROA.14557-58; ROA.15423; ROA.15397-99**; *see also Barton*, 79 F.4th at 580–81.

unrefuted testimony that it was possible to determine whether the onward payment, even if from a commingled account, was from tainted funds. **ROA.15419-21**.

### 4. The District Court Erred By Finding That Temporary Receipt of Alleged Lender Funds Sufficed to Seize an Entire Company and All Its Assets.

In several instances, the Commission and the Receiver argued for, and the District Court adopted as grounds for seizing assets, the temporary possession of alleged lender funds. **ROA.14565-66**. In these cases, the funds were either returned to the sending corporation as having been sent in error or expressly passed along to another company that now possessed them. *Id.* Undisputed expert testimony in the record demonstrated that doing so was a violation of generally accepted principles regarding the tracing of assets: To attach the receivership remedy to the property, the Government seeking seizure and the District Court granting it had to follow the property to its final destination. **ROA.15415**.

The requirement to do so is a necessary corollary to this Court's holdings that a pre-judgment receivership is a remedy against property,

rather than the person of any defendant or corporation. *See Netsphere*, 703 F.3d at 306. As a result, the remedy must reside *where the property is*, not where it once was for a short time.

The District Court's legal error led to some particularly aberrant results. The District Court seized four apartment complexes—the construction of which was financed by the Department of Housing and Urban Development and identified third parties—because the Defendant's operating development entity advanced those companies five-figure sums on two occasions. Even assuming against doubt that those funds were lender funds (*see supra* Section I.B.3), the undisputed evidence in the record was that these sums were almost immediately returned to the operating development entity, leaving that company (or some onward location) as the final destination of those funds. More strikingly, the undisputed testimony in the record—backed up by accounting records—is that the funds in question were sent to the apartment companies in error, as they were unneeded, and parties quickly acted to reverse the transactions within 30 days. **ROA.10991-97**. Without addressing any of these arguments, however, the District

Court used the *temporary possession* (not even temporary use) of five figures of funds to seize nine figures of assets. That was error.

### 5. The District Court Erred by Not Demanding That the Commission Use the Wall and Other Entities' Accounting Records, Which Documented the Sources and Uses of the Lender Funds.

The District Court erroneously countenanced a Receiver using speculation and shifting methodologies to answer the question—Where did the lender funds go?—as follows: To every single entity of the Defendant's that had any assets. This was a self-serving answer, as it was designed to facilitate the continuation of the Receiver's stream of fees to the maximum extent possible. And it was an answer the Receiver—and to a lesser extent, the Commission—strained to reach. So much so that neither the Commission nor the Receiver analyzed the one category of evidence directly addressing the question: The Wall and Carnegie entities' accounting records, which documented exactly where the lender funds were or went.

It was not as if the Receiver viewed the accounting records as unimportant. For months, it accused the Defendant of hiding log-in credentials to those records, despite assurances that he did not have

them, but that accounting personnel did. **ROA.3672**; **ROA.3679**. The Receiver obtained that access long before when the case was remanded. **ROA.15329**. But the Receiver's background accountants *never even analyzed this data*, much less made any meaningful attempt to reconcile it with their claims of where lender funds were located. **ROA.15361**; **ROA.15371**. The Receiver tried to excuse this by claiming that the accounting records were somehow inaccurate, but admitted that neither he nor his team had done any meaningful work to so determine. **ROA.15330-31**.

For his part, the Defendant's expert used the ten days the accounting records were made available to the Defendant to cross-reference the Commission and Receiver's work against them. **ROA.11611-16**; **ROA.15414-16**. This analysis revealed numerous errors in the Commission and Receiver's attempted accounting that no one from that side attempted to explain. **ROA.11611-16**; **ROA.15414-16**.

This inexcusable oversight was repeatedly raised to the District Court. But the District Court said *nothing* about it in his opinion. This was legal error. A District Court opinion attempting to apply law to fact

*must address* significant evidence in the record and determine its weight. *Teague v. Attala Cnty.*, 17 F.3d 796, 798 (5th Cir. 1994) (per curiam). In a bench decision, that cannot occur *sub silentio*. *Id.*

The accounting records also undermine assertions and findings strewn throughout the Commission's analysis, and the District Court's findings leading to the second receivership. The Commission sought to justify its request for an injunction freezing assets, and the District Court gave the Commission and the Receiver the benefit of the doubt, because the Defendant was alleged to have recklessly commingled lender funds with those of other companies associated with him, to the point that it was impossible to sort out. **ROA.14825**; **ROA.10480-81**; **ROA.15396-97**. Those bases for the Commission's motion and for the District Court's order simply cannot be reconciled with any uses or transfers of lender funds being documented in the receiving companies' (and their parent company's) accounting ledger, at least without a detailed analysis of why those accounting records are defective or not credible. And that cannot be excused by some kind of time crunch, as the Receiver and the

Commission had access to these accounting records months before remand.

### 6. The District Court Erred by Not Requiring Competent Expert Testimony on the Apparently Complex Accounting Issue of Tracing Lender Funds Through Multiple Business Entities.

Neither the Commission nor the Receiver offered expert testimony to support their asset tracing claims. The Commission's staff accountant disclaimed offering expert testimony and admitted to not being a Certified Public Accountant or having specialized knowledge in asset tracing or structured transactions. **ROA.14779, 15388**. The Receiver did not even reveal the accountant who prepared his "tracing examples" until the hearing, and he too disclaimed offering expert testimony. **ROA.15366**.

Expert testimony was necessary to establish the propriety of the tracing that the Commission and the Receiver purportedly conducted in this case. As this Court has held, "*any* part of a witness's opinion that rests on scientific, technical, or specialized knowledge must be determined by reference to Rule 702 [of the Federal Rules of Evidence]." *United States v. Yanez Sosa*, 513 F.3d 194, 200 (5th Cir. 2008). Here,

tracing lender funds to various distinct entities requires specialized knowledge of accounting and forensic accounting practices. **ROA.15412-13**. These practices are governed by professional accounting standards, which provide for several different methodologies for forensic accountants to use with varying suitability for specific situations. **ROA.15413-21**.

This Court's opinion in *United States v. Davis*, 53 F.4th 833 (5th Cir. 2022), does not compel an alternative finding. In *Davis*, the Court found that the District Court properly admitted lay witness testimony of a Department of Veterans Affairs auditor where the auditor's testimony "relied on basic math" to calculate the proportion of VA funds in the defendant's bank accounts. *Id.* at 848–89. It was not close, with the VA funds accounting for more than 99 percent of the account. *Id.* The limited nature of the calculation in *Davis*, which involved a single entity's bank accounts, is clearly distinguishable from the complex financial asset tracing analysis for hundreds of entities at issue here.

Nor did the District Court or the Commission suggest that the tracing could be accomplished by mere "addition and subtraction." *Id.* at

848. Rather, Ms. Hahn's own testimony indicated that she was unable to perform a comprehensive asset trace because the funds were commingled. **ROA.10480-81**; **ROA.15396-97**. And the unchallenged testimony of the Defendant's accounting expert demonstrated that accepted accounting standards establish different methodologies for tracing commingled funds, such as the "lowest interim balance" and "specific identification" methods. **ROA.15419-20**.

These failures made a difference. Expert testimony, which would have been accompanied by the disclosure of methodology, an explanation of how it was consistent with generally accepted principles in the field, and a disclosure of the documents relied on. *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 991 (5th Cir. 1997). By not demanding it, the District Court enabled the Commission to bounce between different goalposts as needed to justify its expansive requests. Indeed, the absence of any explanation as to the methodology that Ms. Hahn employed makes her testimony improper even as a summary witness. *See United States v. Jennings*, 724 F.2d 436, 442 (5th Cir. 1984).

### 7. The District Court Erred by Accepting Purported Tracing Evidence from the Receiver, Whose Appointment and Seizure of Records Was Illegal.

The proceedings below were driven by assertions, allegations, speculation, and submissions from the Receiver, rather than the Commission. The Commission only bothered to assert—much less prove—that a little over two dozen of the over 150 companies at issue had somehow received or been benefitted by lender funds. **ROA.10482-87**. The Receiver wanted more—and submitted a sprawling document, claiming some benefit or receipt of lender funds *by every company remotely associated with the Defendant that had any assets*. **ROA.10235-413**. To do so, the Receiver used the Defendant's money to compile this submission, seeking reimbursement for millions of dollars in his own and other professional fees.

Whatever the proper responsibilities of the Receiver, it is not the Receiver's job to spend massive sums to investigate the Defendant and to help satisfy *the Commission's burden* to justify the existence and scope of the receivership. If the Commission wants to prosecute civil claims and seek attendant remedies against the citizens of this country, that is its prerogative, within certain limits. But that is to be done using taxpayer

dollars. It was and is improper to take the object of the Government derision's money and to use it to set up a private prosecutor to do the Commission's job for it. Not only did the District Court permit this, the District Court encouraged it, ordering the Receiver to make the case for his continued existence. **ROA.10239**.

In addition, the Receiver's seizure of assets and company records—and its work leading to its submissions to the District Court—was illegal. This Court held that the Receiver was illegally appointed and vacated the Initial Receivership Order doing so. *Barton*, 79 F.4th at 581-82. In any other context, the illegal Government seizure of assets and data would taint purported evidence derived from it. *See United States v. Runyan*, 275 F.3d 449, 456 (5th Cir. 2001). Illegal government seizure of evidence through a receiver should be no exception.

Finally, the District Court erred by taking evidence from the Receiver who was, and continues to be, sitting on both sides of the bench. The District Court expressly held that the Receiver was an extension of the Court and, at the hearing leading to the new receivership order, placed him next to the bench to emphasize the point. **ROA.15273**. For

purposes of its determination to appoint a new receiver and over what companies, however, the District Court treated the Receiver as a party, allowing him to sponsor evidence. This included allowing the Receiver to sandbag the Defendant with reams of purported evidence, just after the evidentiary hearing had concluded, such that it was insulated from adversarial testing and cross-examination. Worse, the District Court made clear that it was having *ex parte* discussions with the Receiver about the evidence the Receiver was submitting, allowing the Receiver to make unknown arguments about what to focus on and how to weigh it, outside the parties' view.

### 8. The District Court Ultimately Did Not Exercise Any Discretion Over What Assets Should Be Included in the Receivership.

Once the District Court determined that a receivership was warranted generally, it repeatedly held that it could not exercise any discretion over what assets are placed in the receivership.

Instead, it claimed its task was strictly mechanical, on unbreakable instructions from this Court to include all entities that received or benefitted from subject lender funds. To quote the District Court: "The [District] Court's job on remand at this posture is to determine whether

entities 'received or benefited from' Wall Investor Funds." **ROA.14784**. The District Court went on to explain that it was in no position to evaluate the equities of seizing large companies that might have relatively small amounts of lender funds or benefits, because "for now, the Court's *marching orders* are to determine whether entities like [one of the apartment complex companies] received Wall Investor Funds, and it did." **ROA.14784**; *see also id.* (rejecting argument that funds were received in error and quickly returned by holding "[a]gain, the Fifth Circuit has only instructed that the Court look to whether the entities 'received or benefited from' Wall Investor Funds"); **ROA.14785**.

A District Court errs when it incorrectly concludes it is legally bound to act in a certain manner and lacks discretion. *See United States v. Robinson*, 741 F.3d 588, 601 (5th Cir. 2014). When the District Court concluded that it must include in the receivership any company that had received any lender funds or benefitted from the lender funds, it erred. *That is not what this Court said.* Instead, this Court held: "Should the district court decide that a new receivership is warranted on remand, it *can only extend* over entities that received or benefitted from assets

traceable to Barton's alleged" wrongdoing. *Barton*, 79 F.4th at 580. "Can only extend:" These are words restricting action, not commanding it. They are words setting a necessary condition for including assets in the receivership, not a sufficient one.

The District Court's manifest error—seizing every asset that, in its erroneous and stretched view, "received or benefitted" from lender funds, as a "marching order[ ]" from this Court—infects every single one of the District Court's decisions as to the scope of the receivership. And it requires the receivership order to be reversed and vacated.

### C. The District Court's Errors Combined to Improperly Seize Several Significant Entities.

The above identified legal errors pervaded the District Court's findings connecting lender funds to the entities it determined to seize. Again, the District Court seized everything that had any assets. **ROA.14768**. Those seizures reached even the Defendant's only home, from which the Receiver evicted him as his first order of business. **ROA.2653, 15098**. None of the District Court's tracing analysis can be separated from these errors. This Court should vacate the receivership

for that reason, as it did in the first appeal in this case. *Barton*, 79 F.4th at 580-82.

There are multiple examples of how these errors, sometimes separately but often in combination, directly led to the improper seizure of assets.

First, the District Court seized companies that owned four apartment complexes: The Bellwether Ridge, Windmill Farms, Ingleside, and Opelika complexes. **ROA.14780-86**. Together, these complexes cost nearly $100 million to build. All of the construction costs were financed by loans from the U.S. Department of Housing and Urban Development and from third parties having absolutely nothing to do with the Chinese-national lenders in this case.

Today, these complexes are worth well over $100 million in gross, and tens of millions of dollars in net equity after the secured Government and third-party debt is paid. **ROA.14561**.

The District Court seized these businesses based on inchoate benefits and the temporary receipt of tens of thousands of dollars very contentiously alleged to have been traced to lender funds. *See supra*

Section I.B.4. Most remarkably, the District Court rested its seizure on the content of the paperwork seeking the HUD loans. **ROA.14782**. They listed some of the properties purchased with subject lender funds as properties associated with the Defendant, as the form required the applicant to disclose. *Id.* The District Court held that the apartment complex companies would not have gotten the HUD loans without listing properties that lender funds went to purchase. *Id.*

There is zero evidence to support this conclusion. The HUD loans were not secured by any properties other than those the construction of which they financed. **ROA.11069-133**; **ROA.11157-69**; **ROA.11173-225**; **ROA.11275-339**; **ROA.11387-444**. They were otherwise non-recourse to the applicant. **ROA.11069-133**; **ROA.11157-69**; **ROA.11173-225**; **ROA.11275-339**; **ROA.11387-11444**. The listing of properties associated with the applicant was required by HUD, not so the Department could judge collateral, but so it could judge whether the applicant presented conflicts for the Department.

In any event, this type of soft benefit is absolutely contrary to this Court's limitation that the receivership remedy is strictly *in rem* and

must attach to subject property, not to secure other forms of damages. *See supra* Section I.A. The benefit argument is in the manner of seeking disgorgement of profits or gains from allegedly improper activity.

The District Court also rested the seizures on the Defendant's main operating entity "paying the salaries of employees who worked on the development of the HUD apartments." **ROA.14785**. This extended the concept of "benefit" beyond any mooring in this Court's cases focused on the remedy being limited to the subject property. *See Netsphere*, 703 F.3d at 305.

The District Court also held that payments of $25,000, $30,000, and approximately $100,000 were from lender funds and justified seizure. **ROA.14783-84**. The District Court assumed these payments were lender funds, because they came from JMJ Development. But, as explained above, neither the Commission nor the District Court did any work to distinguish between lender and other funds in JMJ Development. It erred by holding that every dollar spent by that company was tainted, whether it came in form of a salary benefit or the advance of funds. **ROA.14785**. As important, the District Court acknowledged that these

funds were returned within weeks to JMJ Development and other companies and were transfers in error that were not needed or used. **ROA.14783-85**. This analysis was error as it failed to trace the property to where it rested and failed to take any proportional look at using small payments to justify seizing tens of millions in assets. *See supra* Section I.B.3, 4, 8. The District Court further erred by ignoring the undisputed evidence that the HUD apartment entities were by far a net contributor to JMJ Development, paying it significant fees for services provided. **ROA.14562**.

Most strikingly, the District Court repeatedly erred by holding it lacked discretion to take the magnitude of the payment or benefit into account, in comparison to what was being seized, as it was under "marching orders" from this Court to seize the entirety of any company that received any amount of funds or benefit. **ROA.14784-85**.

Second, the District Court seized FHC Acquisitions LLC, an entity that owned and was developing a property in Frisco, Texas valued at more than $9 million, funded through identified third parties unrelated to the Chinese-national lenders at issue in this case. **ROA.14563-64**;

**ROA.14780**. The District Court's analysis spanned a footnote sentence, claiming that lender funds "were used to pay down . . . [a] loan [on the company's] property[.]" **ROA.14780**. This summary conclusion is entitled to no deference. To the extent it adopts the reasoning of the Receiver and the Commission, the District Court commits many of the above-identified errors. They focused on a $100,000 escrow deposit from JMJ Development and a $168,000 loan payment from Broadview Holdings without doing any work to determine whether the funds were lender funds or other legitimate funds. **ROA.14563-64**. Here, the error was direct and specific, as each of these transferring entities had substantial sums in their accounts from sources not traced to lender funds. **ROA.14563-64; ROA.11650**. In the case of Broadview, there were intervening deposits of $2.917 million into its accounts entirely unrelated to any lender funds, some 18 times the outflow the Receiver claimed was tainted. *Id.* The District Court dealt with none of these problems, nor the disproportionality of relatively small transfers leading to the seizure of a company with millions of dollars in assets. *See supra* Section I.B.4.

Similar errors infected the District Court's seizure of companies that JMJ Development had ownership claims to and were developing an office building on Turtle Creek Boulevard in Dallas and a hotel—Amerigold Suites—purchased by Goldmark Hospitality in 2010, long before anyone had even met the Chinese-national lenders at issue. In each case, the Commission and Receiver claimed these companies received funds from JMJ Development, without doing any work to disaggregate other sources of funds for that company. *See supra* Section I.B.4; *see also* **ROA.11615**; **ROA.11654**. These alleged receipts of funds also were fractions of the value of the companies' assets. And the District Court simply engaged in no analysis, and no exercise of discretion, as to whether those companies should be seized, uncritically accepting the Commission and Receiver's claims in footnotes. **ROA.14780-81**; **ROA.14787**. This lack of analysis is hardly entitled to deference, and undoubtedly stems from the District Court's express view that it lacked discretion to exempt any company that received a drop of lender funds or the slightest economic benefit. *See supra* Section I.B.8.

The legal issues discussed above even led to the seizure of the Defendant's only home, which was held by an LLC (SF Rock Creek LLC), the only purpose of which was to hold title to it. The Commission did not even try to trace subject lender funds into the Defendant's house, classifying it as an "additional Barton controlled entit[y]" that "the Commission cannot yet confirm . . . received, or otherwise benefitted from" subject lender funds. **ROA.10481**; **ROA.10488-89**. The Receiver claimed that some of the funding for the house came from entities that received Small Business Administration Loans that noted that they had some association with the projects that were being financed with lender funds, another inchoate benefit that is unmoored from the *in rem* nature of the receivership remedy. **ROA.10256-57**; *see supra* Section I.A. The Receiver also claimed the house received some funding from a company that possessed the proceeds of the sale of a property whose purchase was partially financed through lender funds, without accounting for an intervening $2 million deposit in that entity from sale of another property completely unrelated to the lender funds. *Id.*; **ROA.10352**; *see supra* Section I.B.4.

While perhaps some of these other multi-million dollar seizures are abstract, the incursion of liberty arising from Government seizure of an American citizen's home, and evicting him from it, while making these legal errors, is horrifying and all too concrete and real. For its part, this momentous upheaval in the Defendant's life earned only a sentence of analysis from the District Court. **ROA.14781**.

The District Court's sweep extended beyond the Defendant. There were third parties who owned many of the seized companies. They include the TC Hall Company, owned in part by the Trammel Crow family. These efforts did not sort tainted funds from those that are untainted, as this Court has long required. *United States v. Lee*, 248 F.3d 449, 466 (5th Cir. 2011). The Government also had to show that these companies' receipt of funds was illegitimate. *Janvey v. Adams*, 588 F.3d 831, 834 (5th Cir. 2009). And why the "less drastic" remedy of the Receiver just accepting repayment of those loans on their terms, rather than seizing the companies, was not warranted. *Netsphere*, 703 F.3d at 305. The District Court, however, took these companies through one

sentence of analysis, erroneously addressing none of these arguments repeatedly raised to the court. **ROA.14781**.

### D. This Court Should Vacate the Receivership Order with Immediate Effect as to All But the Wall Entities and Those Companies Holding Designated Replacement Projects.

The District Court's largely summary analysis is inseparable from the above-identified legal errors, and the receivership order should therefore be vacated in its entirety, with immediate effect. This Court should not stay the effect of its vacatur for a second time: The legal error in limiting the remedy to affected property is too pervasive, and the Commission's attempt to justify its desired seizures too scant to deliver the Commission an effective win in tying up all the Defendant's assets and keeping him from defending against the Government's allegations.

Should this Court be inclined, however, towards another bridge remedy, it should be limited to a continued receivership over eighteen companies that directly received the lender funds, and to the parent entity (Carnegie Development LLC) that facilitated and executed intercompany loans from these direct recipients to companies running replacement projects when the originals became not viable. Those loans

are documented on the accounting ledgers of the Wall Entities and Carnegie Development. **ROA.11610**; **ROA.15330**; **ROA.15424**; **ROA.15446**. The Receiver can enforce those loans, and this less drastic measure is exactly what this Court has demanded as to the extraordinary remedy of a receivership. *Netsphere*, 703 F.3d at 305.

## II. The District Court Erred by Imposing a New Receivership.

The District Court also erred more fundamentally, by determining that a receivership of any scope was appropriate here.

The stakes here are substantial. A "drastic" remedy once reserved for the most "extraordinary" of circumstances, requests for receiverships have become standard operating procedure for the Commission to seek whenever it believes its complex web of regulations have been violated. And why not? After a lengthy investigation, when defendants choose not to settle, it is to the Commission's enormous advantage to starve their defense of resources from the case's inception. The Commission is not seeking to strip defendants of their resources because—all of the sudden, after years of investigation—there is a risk of asset flight. It is doing so to secure an unfair strategic litigation advantage, to further widen the resource gap between the Government and the governed in litigation.

The only bulwark against this abuse is the judiciary's assiduous enforcement of the high standards for obtaining a receivership. That did not happen below, and this Court should now correct that error.

This Court reversed the first receivership because the District Court made no attempt to enforce the high legal standards for obtaining a receivership over the assets of an adversary. *Barton*, 79 F.4th at 579. This time, the District Court recited the shell of the *Netsphere* standards. But the District Court assigned incorrect legal content to them and thereby erred.

In general, none of the District Court's concepts of the three general factors for a receivership reflected a rigor consistent with the seriousness of the remedy. This Court has correctly recognized it as a "drastic remedy." *Netsphere*, 703 F.3d at 305. "Receivership is 'an extraordinary remedy that should be employed with the utmost caution' and is justified only where there is a clear necessity to protect a party's interest in property, legal and less drastic equitable remedies are inadequate, and the benefits of receivership outweigh the burdens on the affected parties." *Barton*, 79 F.4th at 579-80 (citing *Netsphere*, 703 F.3d at 305).

### A. The District Court Erred in Determining That the Receivership Was Clearly Necessary to Protect an Interest in Property.

The District Court erred in determining that the Commission met the "necessity" requirement for imposing a receivership. **ROA.14773-75**. As an initial matter, a District Court cannot simply hold that things would be better or easier if a party of the Court's choosing were given control over all a party's assets. Instead, the "drastic" measure of a receivership has to be "clear[ly] necessary to protect a party's interest in property." *Barton*, 79 F.4th at 579-80; *Netsphere*, 703 F.3d at 305.

1. This Court should interpret its clear necessity standard to require the Government to show a significant and imminent risk of asset flight that cannot be controlled by other means. This circumstance represents the mine run of receiverships that this Court has approved, where liquid assets are at high risk of being transferred outside the court's jurisdiction. *See, e.g., SEC v. Stanford Int'l Bank, Ltd.*, 927 F.3d 830, 836 (5th Cir. 2019).

The consequences of a receivership are just too grave for the standard to be otherwise. Take the instant case. The main assets of companies associated with the defendant are real estate interests, many

of which were being progressed through the development process. Those interests are not secreted around from bank to foreign bank in private. They are recorded, transparently, with public officials. Worse, the District Court's receivership stopped the projects in their tracks, blocking their maturation into more valuable assets.

That retardation of business progress might be justified if assets were headed to Switzerland. But here, the main assets were, by nature, stationary and planted in the ground.

The Commission made no meaningful attempt to show a significant risk of imminent asset flight. Nor did the District Court find one. At most, the District Court held that there was—past tense—asset flight, not through transfers to far flung lands, but through historical spending. To make this claim, the District Court turned to Commission allegations that Mr. Barton used "Wall Investor Funds" to pay various personal expenses, to a buy a plane, and (in the wake of the surprise Government parallel lawsuits) to hire lawyers. **ROA.14774**.

There are numerous problems with this finding. First, the finding is infected with legal error in concluding that the funds expended were

lender funds, as it indulges the same mistakes the Commission made in purporting to identify what were, and what were not, lender funds in the first place. That includes assuming that every single dollar spent by JMJ Development was lender funds. That stems from an error of law. *See supra* Section I.B.

Second, the Commission's allegations cited by the District Court are even more flawed than its summary attempts to trace lender funds into particular companies. That is because the assertions tracing these personal expenditures or the plane purchase is backed by no analysis or explanation of any kind; it is just the SEC staff accountant's "say so."

Third, what the Commission has cited spans several years prior to the filing of the Commission's case, and it is not of a financial magnitude to make it significant historical asset flight. **ROA.14774**. The scale of this case, according to the Commission, concerns $26 million in lender funds. Moreover, a receivership is a "drastic remedy," reserved for only the most extraordinary of circumstances. Government allegations of privately-held business owners using relatively small amounts of corporate funds to pay personal expenses are common. *Netsphere*, 703

F.2d at 305. And the District Court's reference to a plane does not change this reality. **ROA.14774**. The undisputed evidence in the record is that JMJ Development put down a $300,000 deposit on a light jet to assist in reaching regional real estate development projects, a deposit that was nearly immediately refunded when the plane was quickly financed.

Fourth, the District Court seems to imply that filing of civil and criminal charges would not curb future spending, because some of it occurred after the charges were filed but before the receivership was imposed. But look at what the District Court and the Commission is complaining of, funds spent on lawyers (most of whom have long ago abandoned this case for non-payment) to defend against the Commission's allegations. **ROA.14774**. It betrays the improper purpose of the receivership to prevent the expenditure of resources on rebutting the Government's allegations.

Fifth, the District Court takes no account of the current nature of the assets. On the one hand, it holds that not much cash is at issue; on the other, it does not address that the remaining assets are real estate, which is not easily sold, transferred, or shifted out of public view.

**ROA.14773**. They are not cash, bearer bonds, or securities that can move to foreign banks with the click of a mouse or stroke of a pen.

In sum, the District Court misconceived the legal standard and misapplied it to the facts, errors that are both reviewed *de novo* by this Court. It did not demand a risk of *significant* asset flight. And it did not document a risk that it would occur in the future—that is not what historical expenditures, over a period of years, not properly traced to lender funds would show.

2. This Court should reject the risk of potential future mismanagement of the businesses as grounds for a receivership in a case that is not seeking to protect a business's owners from its shareholders. It is one thing to say that shareholders, as owners of a company, and perhaps the Commission attempting to act on their behalf, should be able to remove incumbent management because they are bad at their jobs. *See, e.g., SEC v. Spence & Green Chem. Co.*, 612 F.2d 896, 900 (5th Cir. 1980).

It is quite another to take an owner of the company out of its control. And that is precisely what the Commission is trying to do here. Nearly

all of its motion for a new receiver, wholly embraced by the District Court, is dedicated to the proposition that someone other than Mr. Barton would do a better job of managing these companies. **ROA.10438-39**. But, here, the Commission is purporting to act on behalf of debt-holders, with no ownership interest in even the companies to which they loaned money, much less the far flung companies that the District Court seized.

If allegations of mismanagement in this context are to be considered, they must rise to the level of the severe existential mismanagement that would destroy the assets. The District Court did not hold the Commission to this standard. It cited the low cash situation of the main development entity on the day of seizure, but engaged in no analysis of whether that is abnormal for a real estate development entity or of the anticipated receipts if the District Court had not frozen the companies' operations. **ROA.14776**. The District Court turned to a number of lawsuits facing various Barton-related entities, but did not determine whether they had any merit or whether that level of litigation was abnormal in a real estate development business of this size. *Id.* The District Court noted that the real estate assets seized had secured debt

on them, but the District Court demanded no evidence that the level of that leverage was abnormal as developers progress properties through the development process. *Id.* Most importantly, the District Court did not even mention the effect of bringing on a lawyer-receiver who paused all operations in what would have been the greatest value potential of these businesses: To progress pending projects to the point of construction and optimal sale. *Id.*

In the end, the District Court's reliance on alleged risk of future mismanagement misconceived the content of the legal standard (receiverships are either not appropriate to stem mismanagement when sought on behalf of those other than the company's owners) or misapplied the law to the facts, not demanding indicia of extraordinary and existential mismanagement in this context, and neglecting key inquiries tied to its findings. All those errors are subject to *de novo* review, and all are fatal to the necessity determination. *In re Nat'l Gypsum Co.*, 208 F.3d 498, 504 (5th Cir. 2000).

### B. "Less Drastic Equitable Remedies" Than a Receivership Were Available and Adequate.

The District Court erred in determining that less drastic remedies than a receivership were inadequate in this case. **ROA.14775-76**; *Netsphere*, 703 F.3d at 305.

The concept of requiring the least restrictive means when the Government exerts coercive action is one familiar to the Court, as it is closely akin to the strict scrutiny standard applied against restrictions of fundamental constitutional rights. The restriction must be "narrowly tailored." *Perez v. San Antonio*, 98 F.4th 586, 611 (5th Cir. 2024). When another, less drastic remedy would serve the proper government interest, it must be employed. *Id.* It is not enough for the lesser remedy to present some inconveniences or be less effective at the margins. It must be wholly inadequate. *See id.* at 603.

The District Court's analysis did not reflect the gravity of this test, spanning just over a page. **ROA.14775-76**. The District Court rejected the concept of the Court enjoining certain transactions without the approval of the Court or an independent monitor. **ROA.14775**. In doing so, the District Court was attacking a straw man, claiming that it would

be up to Mr. Barton to decide what was "a major business decision" and bring it to the monitor's attention. *Id.* That is not how such injunctions or monitor arrangements work. The orders prohibit certain categories of transactions without appropriate approvals, including selling or incumbering any asset, taking out a loan, and making an expenditure over a certain threshold. *See, e.g.*, *In re American Registrar & Transfer Co.*, Exchange Act Release No. 77,922, at 8 (May 25, 2016). Nor did the District Court say anything about the advantages of real estate development professionals, familiar with pending projects, being in place to advance them to maturity, which Barton raised in his objections to the new receivership. **ROA.14775**.

In addition, the District Court imbedded a clear legal error in its analysis: "[A] monitor couldn't stay litigation." *Id.* Why is that? If the District Court felt a stay of third-party litigation was necessary to protect assets, it could have accompanied its injunction against transactions with a targeted litigation stay. No law is cited that litigation stays can only occur with receivership orders, and indeed courts regularly issue stays of third party litigation without them. *See, e.g.*, *Wolf Designs, Inc.*

*v. Donald McEvoy Ltd., Inc.*, 341 F. Supp. 2d 639, 642–43 (N.D. Tex. 2004).

Nor is the monitor's inability to "trace assets" relevant. **ROA.14775**. That is the Commission's job, to have done during its two year investigation and before seeking a receivership. *Barton*, 79 F.4th at 580.

### C. The Benefits of Receivership Have Not Outweighed the Burdens on Affected Parties.

The District Court erred in determining the benefits *of this receivership* outweighs its burdens, as this Court has required. *Barton*, 79 F.4th at 579. That is particularly so because of the District Court's selection: Cort Thomas. He is a litigator, charging high law firm hourly rates to create controversy. He is not capable of doing what needs to be done for this business: Advancing pending real estate projects to maximize their value. Mr. Thomas has conceded as much. Just as an example, the undisputed evidence in the record is that certain Barton-entity owned properties located in Venus, Texas would be substantially increased in value—by two or three times—if further advanced through government approvals. **ROA.11665-71**; **ROA.15317-18**. Yet Mr.

Thomas had little grasp on the details of how to do so. **ROA.11665-71**; **ROA.15318-19**.

Perhaps to fit the Commission's narrative, Mr. Thomas testified at the District Court hearing that current asset values would fall short of paying back Chinese-national lenders. **ROA.11668-69**; **ROA.15302-04**. But Mr. Thomas's chart supporting this conclusion failed to value more than a third of the properties, carrying them at zero. **ROA.11668-69**; **ROA.15317-18**. On cross-examination, Mr. Thomas had no information on what these were worth and how they should be advanced.

On the other hand, the burdens the receivership has put on Mr. Barton have been immense. Among other things, Mr. Barton has been ousted from his family home and largely unable to fund his defense in both the immediate matter and in the Government's parallel criminal prosecution of him. The District Court deals with none of this. It does acknowledge the high "cost of violently wresting property rights from the companies' owners before discovery much less a trial proving wrongdoing and liability." **ROA.14777**. But the District Court's little more than one-page analysis of the *Netsphere* factor demanding a thoughtful cost-benefit

analysis provides this Court with only the boilerplate claimed benefits of receivership and summarily concludes that they outweigh the identified burdens. **ROA.14776-78**.

## III. The District Court Erred by Misinterpreting the Standards for Preliminary Injunction.

The District Court erred by ordering a preliminary injunction freezing the assets of the empty entities that it did not place in the receivership. If appellate relief is granted on the scope of the receivership, it should not be to shift them into the District Court's unjustified preliminary injunction imposing an asset freeze.

### A. The District Court Misinterpreted and Misapplied the Legal Standard for Ordering a Preliminary Injunction.

The District Court relied upon *SEC v. First Financial Group of Texas*, 645 F.2d 429 (5th Cir. 1981), to impose the injunction freezing assets. It held that "there is significant record evidence of Barton's 'past substantive violations' of federal securities law." *Id.* at **ROA.14824**. The very next sentence in the District Court's opinion reads as follows: "The SEC alleges the following facts." *Id.* This analysis makes numerous errors.

First, what "the SEC alleges" is not evidence. *Id.* And in every similar case brought by the Commission, there are allegations of securities fraud. But the extraordinary remedy of a preliminary injunction is not appropriate for every case.

In any event, the District Court erred in not demanding from the Commission a detailed alleged fact showing that this Defendant knowingly made a false statement to lenders in procuring the subject loans. *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 956 (5th Cir. 2016). As described above (*see supra* Background Section I), the Commission alleges that lender funds were used on projects other than those originally contemplated by the loan agreements. But the Commission alleges no specific facts showing that Mr. Barton intended to use the funds on projects other than those contemplated when he took out the loans. To the contrary, the evidence is that the contemplated projects were the initial use, until projects encountered difficulties and funds were redeployed in consultation with the lenders' agent. *Id.* The subsequent use and failure to repay might be the makings of a breach of contract case, but not all breaches of contract

cases are fraud cases, much less federal securities fraud cases. *Arruda v. Curves Int'l, Inc.*, 861 F. App'x 831, 836 (5th Cir. 2021).

Second, even evidence of past violations is not sufficient for a preliminary injunction. This Court's discussion in *First Financial* of past misconduct involved a defendant having been charged or adjudicated to have violated the law in past separate cases and presenting the risk of recidivism. *First Fin.*, 645 F.2d at 434 (relying on *SEC v. Savoy Industries, Inc.*, 587 F.2d 1149, 1168 (D.C. Cir. 1978) (emphasizing previous adjudicated violations)); *see also SEC v. AmeriFirst Funding, Inc.*, Civil Action No. 3:07-CV-1188-D, 2007 U.S. Dist. LEXIS 55479, at *12 (N.D. Tex. July 31, 2007); *CFTC v. C & R Fin., Inc.*, Civil Action No. 10-CV-706, 2010 U.S. Dist. LEXIS 165291, at *2 (S.D. Tex. May 12, 2010) (recognizing the distinction). Even then, as this Court has determined, the "mere fact of a past violation does not *ipso facto* establish the SEC's right to injunctive relief." *SEC v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir. 1981). But Mr. Barton has never before been alleged to have violated the securities laws.

Third, the District Court also erred by ignoring the other traditional factors for securing a preliminary injunction. The Commission did not make, and the District Court did not demand, a showing that the preliminary injunction was necessary to avoid irreparable harm. *Direct Biologics, LLC v. McQueen*, 63 F.4th 1015, 1020 (5th Cir. 2023). Any suggestion of flight or dissipation elsewhere is both strained and irrelevant for funds not shown to be lender funds. Nor is starving a criminal defendant of all resources in the public interest or equitable. Rather, the public interest demands that Government criminal allegations, in a complex case, do not become a *fait accompli* for lack of resources to defend them and that the Government is instead put to its proof.

This Court should reject any argument the Commission lives by some special set of rules when it comes to preliminary injunctions, where it makes some drive-by showing on the merits and then need go no further to the other factors. In any event, the District Court did not enter the typical injunction against future violations of the securities laws. The District Court entered it to freeze assets to aid the Commission

in winning a case and having money around to execute against if it does, a strategic move the Supreme Court and this Court repeatedly has rejected. *Netsphere*, 763 F.3d at 309 (explaining *De Beers Consolidated Mines Ltd. v. United States*, 325 U.S. 212, 222-23 (1945)).

### B. The District Court Erred in Ordering a Preliminary Injunction Over Assets Not Shown to Be Lender Funds.

Commission-sought preliminary injunctions cannot sweep any more broadly than receiverships. They too are directed at the property at issue in the case, here the lender funds. This Court has permitted the Commission to seek injunctions, for a short period of time, when it is still determining whether assets are the subject of litigation. *Barton*, 79 F.4th at 580; *Netsphere*, 703 F.3d at 309 (citing *In re Fredeman Litig.*, 843 F.2d at 824. But there is no excuse for such a measure now.

The Commission opened its investigation of Mr. Barton nearly *four years* ago. It interviewed the Defendant for two days. It obtained bank records by administrative procedure. It had access to information gathered by the Receiver on demand. **ROA.647-48**. And the Receiver had access to accounting records documenting the funds and their use and all company bank records.

The District Court's preliminary injunction order further noted that "[p]reserving assets also protects this Court's ability to provide a recovery for the defrauded investors." *Id.* But "[t]he general federal rule of equity is that a court may not reach a defendant's assets unrelated to the underlying litigation and freeze them so that they may be preserved to satisfy a potential money judgment." *In re Fredeman Litig.*, 843 F.2d at 824.

## IV. The District Court Erred in Failing to Rule on Whether the Loans Are Securities and this Case is Within the Commission's Jurisdiction.

The District Court did not decide whether the loans are securities and therefore whether the Commission had the power to bring this case and whether the District Court had the power to hear it. That failure is error alone and grounds for reversing the receivership order. *See GBJ Corp. v. Sequa Corp.*, 804 F. Supp. 564, 565 (S.D.N.Y. 1992); *Mishkin v. Peat, Marwick, Mitchell & Co.*, 744 F. Supp. 531, 553 (S.D.N.Y. 1990) ("If the transaction does not involve a "security," the court lacks subject matter jurisdiction."). The District Court made this inexplicable error despite the Defendant addressing the issue at length.

This error was not harmless. The loans in question are short term, for a specific business purpose, where the rate of return does not depend on the borrowing company's performance. Courts have held such loans not to be securities.

The Commission's authority is restricted to its regulation of interstate offerings and sales of securities. *See generally* Securities Act of 1933, 15 U.S.C. § 77a, and the Securities Exchange Act of 1934, 15 U.S.C. § 78a. The definition of security includes the term "any note," but the Supreme Court has made clear that term does not reach all loans. *Reves v. Ernst & Young*, 494 U.S. 56, 63 (1990). Notes "issued in a commercial or consumer context" are among those not securities. *Id.* at 61-63; *Kirschner v. JP Morgan Chase Bank, N.A.*, 79 F.4th 290, 304 (2d Cir. 2023).

The Supreme Court identified a non-exhaustive list of instruments that are categorically not securities, including a "short-term note secured by a lien on a small business or some of its assets." *Id.* at 65. And the Court disqualified as securities notes that "bear[] a strong resemblance . . . to one of the enumerated categories of instruments" or otherwise

warrants designation. *Id.* at 67. The Court provided four factors to consider in making this determination:

> (1) The motivations that would prompt a reasonable seller and buyer to enter into the transaction;
>
> (2) The plan of distribution of the instrument;
>
> (3) The reasonable expectations of the investing public; and
>
> (4) Whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary.

*Id.* at 66-67; *Kirschner*, 79 F.4th at 304.

In this case, the relevant loans resemble the type of "short-term note[s] secured by a lien on a small business or some of its assets," contemplated in the Supreme Court's view of non-security loans. *Reves*, 494 U.S. at 65. They are short-term, due in two years. The interest rate is fixed. No aspect of the co-lender agreements provided the co-lender with any greater interest or compensation if any of the Wall Entities performed better than expected. *Cf. Wu v. Passive Wealth Builders, LLC*, 2024 WL 1445101 (W.D. Tenn. Apr. 3, 2024) (holding that notes issued to buy properties, refurbish them, and *split the profits* upon subsequent sale were securities).

And it is for a small business to meet a temporary cash need: To bridge work on a real estate development project from the costs of property acquisition and initial development to being ready for traditional construction financing.

Also, the loans are "secured by a lien on a small business," given that the collateral is a pledge of interest in the Wall Entity taking its loan and all of its assets. *Matthews v. Stolier*, 207 F. Supp. 3d 678, 685–686 (E.D. La. 2016).

Alternatively, the four *Reves* factors indicate the subject loans are not securities. *Reves*, 494 U.S. at 67.

*First*, a loan intended to bridge the gap between purchasing a property and refinancing it through construction financing is not obtained for investment purposes. *Kirschner*, 79 F.4th at 306 (stating that notes intended for commercial purposes reflect a motivation consistent with non-security instruments); *Shiny Investments, LLC v. Zeoli*, No. 1-20-1353, 2021 WL 5906043, at *16 (Ill. Ct. App. Dec. 14, 2021) (citing *Reves*, 494 U.S. at 66) ("[Borrowers'] motivation, however, was to obtain short-term cash to purchase and refinance properties.").

Regarding the lenders' motivations, their financial stake was tied solely to the application of a fixed annual interest rate on the loan and did not vary based on the borrower's business success. Moreover, the lenders were not actually "interested primarily in the profit the note [was] expected to generate;" their true motive was apparently to funnel money out of China and into the United States. Nothing in the record indicates that the lenders issued these loans as part of a speculative or investing strategy. And the Commission has not brought even one of the lenders forward to provide evidence on this point.

*Second*, these loans do not resemble an instrument of common trading as it was not "offered and sold to a broad segment of the public." *Reves*, 494 U.S. at 68; *Matthews*, 207 F. Supp. 3d at 685. Indeed, all lenders originated from a select group of Mr. Fu's associates. These funds were then used to facilitate the acquisition of assets and "not to obtain general capital." *See Matthews*, 207 F. Supp. 3d at 685.

*Third*, members of the investing public would not regard the co-lender agreements to be investments rather than loans. That a loan to a Wall Entity was broken up by Mr. Fu and shared with his business

associate do not make them a "security." *Kirschner*, 79 F.4th at 308-11. In such circumstances of breaking up or syndication, the Second Circuit placed great emphasis on the language of the co-lending agreement, which referred to the transaction as a loan and to the parties to the agreement as "the borrower" and "the lender" and which omitted any reference to the terms "investment" or "investor." *Id.* at 308. So too here. The loan agreements never referred to the lenders as an "investor," nor to the funds provided as an "investment." Instead, the agreements consistently referred to the Chinese national as a "co-lender," the Wall Entity as a "borrower," and the transaction as a "loan."

Nor are the loans "investment contracts" under the Commission's jurisdiction. To establish an investment contract, the Commission must show all of the following: (1) an investment of money; (2) in a common enterprise; (3) with an expectation of profits; and (4) which profits are generated solely from the efforts of others. *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946).

The first *Howey* prong cannot be met, because there was nothing "purchased or otherwise acquired in exchange for value," as would be

common with an equity interest. *See* SEC, *Framework for "Investment Contract" Analysis of Digital Assets*. Instead, money was simply loaned and for the primary purpose of providing the Chinese national lenders an excuse to move money to the United States.

Second, there was no "common enterprise" into which the lent monies went. Rather, each Loan Agreement was associated with a single real estate project. The Fifth Circuit applies the "broad vertical commonality" test in determining the common enterprise issue, which requires that "the fortuity of the investments collectively is essentially dependent upon promoter expertise." *In re Living Benefits Asset Mgmt., LLC*, 916 F.3d 528, 536 (5th Cir. 2019) (quoting *SEC v. Cont'l Commodities Corp.*, 497 F.2d 516, 522 (5th Cir. 1974)). Not so here. The lenders were entitled to a pre-determined repayment, no matter how the Wall Entities performed.

Similarly for the third and fourth prongs, the Loan Agreements were not conditioned on the success of the Wall properties, any other Barton-related entities, or Mr. Barton's efforts. "[R]epayment of the loans was merely a function of the [Wall Properties'] ability to repay the

loans," and the Commission does not allege that the Chinese lenders would "accept or that the [Wall Properties] could force [them] to accept any less than the amounts loaned." *Wolfe v. Bellos*, No. 3:11-CV-02015-L, 2012 WL 652090, at *8 (N.D. Tex. Feb. 28, 2012) (citing *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 838 (1975)).

## V. The District Court Made Several Errors in Implementing The Receivership.

The District Court's receivership order is error. If this Court somehow allows the receivership to stand, it should address and reverse several errors the District Court made in implementing it.

### A. The District Court Should Have Permitted Use of Receivership Estate Resources for the Appellant's Defense.

In his opposition below, Mr. Barton requested that the District Court set aside a portion of assets for Mr. Barton to pay his defense costs. **ROA.11581**. Again, the District Court failed to even consider this issue. That was error.

Government-sought injunctions freezing assets must permit for payment of defense costs, as "the court cannot assume the wrongdoing before judgment in order to remove the defendants' ability to defend

themselves." *Federal Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 565 (5th Cir. 1987). A receivership is no different than an asset freeze, as it has the same effect of draining the defendant of all assets. The Commission should not be heard to cry that the Defendant should not be able to use lender money to fund his defense. After all, the District Court expressly held it was entitled to, and in fact did, seize whole companies because they had ostensibly received a small amount of lender funds or a small benefit from them. **ROA.14784-85.** That was error. *See supra* Section I. But it also means the receivership estate includes loads of assets that are not lender funds.

The risk of Mr. Barton being unable to access funds to defend himself is especially pointed in light of the ongoing, parallel criminal proceeding. As the Seventh Circuit explained when approving the use of seized funds for a criminal defense, "the wound could be deep: wrongful imprisonment." *United States v. Michelle's Lounge*, 126 F.3d 1006, 1008 (7th Cir. 1997).

### B. The District Court Erred by "Blessing" Certain Vacated Receivership Sale Orders and Authorizing the New Receiver to Sell Property.

This Court vacated the order appointing the previous receiver because he was illegally appointed. *Barton*, 79 F.4th at 581-82. That means the prior receivership and everything that occurred in it was without legal authorization. This Court rendered the order a legal nullity, effectively restoring the parties to their pre-receiver status. *See Alicea v. Comm'r of Soc. Sec.*, 855 F. App'x 494, 496 (11th Cir. 2021). Vacated orders are treated as though they never went into effect. A.C. Freeman, *A Treatise of the Law of Judgments* 594–95 (5th ed. 1925).

This Court's vacatur blocked the District Court's "blessing order," a blanket adoption of virtually all of the vacated receiver's previous actions without further analysis. **ROA.14835**. The District Court reinstating its prior actions *nunc pro tunc* was wholly inappropriate. A court's "incorrect action[] can never authorize a *nunc pro tunc* entry." *In re Recile*, 496 F.2d 675, 680 (5th Cir. 1974).

That is especially so here, where this Court expected that the District Court might entertain a Commission motion to appoint "a *new* receiver" or impose "a *new* receivership." *See Barton*, 79 F.4th at 579-81.

The District Court, if it were to authorize the new receiver to sell property, needed to do so on the basis of current evidence and current market conditions. It did not.

### C. The District Court Erred in Authorizing the Receivership to Sell Assets Instead of Preserving them Pending Resolution of Litigation.

Both the purportedly ratified sale orders and the District Court's new sale orders were error because it allowed the receivership to permanently change the status quo of assets, rather than preserve them for use or return upon final judgment. *See, e.g.*, **ROA.15100**. That is improper. *See SEC v. Current Fin. Servs., Inc.*, 783 F. Supp. 1441, 1445 (D.D.C. 1992); *Los Angeles Tr. Deed & Mortg. Exch. v. SEC*, 285 F.2d 162, 182 (9th Cir. 1960). Real property, like the assets at issue, are not fungible like cash or bearer bonds. Once those unique assets are sold or disposed of, they are permanently gone and can never be adequately replaced.

### D. Each Order Authorizing the Sale Property Was Not in the Interests of the Receivership Estate.

As for the purported blessed sale orders, the Appellant has presented arguments to this Court that the District Court erred in

finding them in the best interests of the estate. The District Court did not undertake a fresh appraisal of the evidence, or give the Defendant an opportunity to present any. The briefs assigning error to those pulled across orders are attached to this brief and incorporated by reference here.[2]

The District Court also erred by determining that the three uncompleted sales were in the best interests of the estate, including a sale of the Defendant's own home. **ROA.15100**. The revived sale orders also included the proposed sales of a hotel, Amerigold Suites and a large mixed-used development property, Frisco Gate. **ROA.15096-101**. Each of these prior sales orders, which would now be revived by the District Court, notwithstanding this Court's vacatur of the authority under which they were issued, were months, if not years, stale.

At the brief hearing on these revived sale orders, Mr. Barton pled to the District Court that these sale orders should, at a minimum, be revisited to account for the significantly changed market factors in the

[2] Mr. Barton adopts his arguments from the briefing submitted in those Fifth Circuit appeals and attached hereto as an addendum to this brief. *Barton*, No. 22-11242, Dkt. 31 (Add. Ex. A); *Barton*, No. 23-10516, Dkt. 58.

interceding period and to ensure maximum benefit to the receivership estate. *See, e.g.*, Dec. 14, 2023, Hr. Tr. at 44:11-25-45:1. The District Court ignored these supported pleas, in favor of generating cash to pay the Receiver's mounting legal fees.

Perhaps most troubling was the timing of these retroactive sale order approvals—again, in the midst of Mr. Barton's legal challenge before this Court of the Receiver's authority to hold his property and, of course, dispose of it. Under no circumstances should a pre-judgment equity receivership be permitted to dispose of property when its legality is being challenged.

### E. The District Court Erred by Authorizing the Receiver to Spend Estate Resources to Assist the Commission's Investigation.

The Government is entitled to initiate investigations, civil enforcement actions, and prosecutions against its citizens. But under our system of justice, the burden of funding those activities stands with the Government, at least until final judgment. The District Court erred by giving the Receiver sweeping and unnecessary investigatory powers and creating a direct line, on demand, to the Government. Experience shows that this Receiver is focused on assisting the Commission in making its

case, at the expense of focusing on pressing the real estate assets to maturity. *See generally* **ROA.15806-99**; *see also supra* Sections I.B.7 and III.C.

The Defendant presented the District Court with an alternative proposed receivership order that focused the Receiver on asset preservation and management, not assisting the Government investigation. **ROA.14486-87**. The District Court did not even address the issue. That was error.

## VI. This Case Should be Reassigned to a New Judge on Remand.

On remand, the Court should reassign this case to another District Judge. "A federal appellate court has supervisory powers to [reassign a case] as part of a remand order." *Johnson v. Sawyer*, 120 F.3d 1307, 1333 (5th Cir. 1997).

This Court applies two different tests when determining whether to reassign a case on remand. One test "requires th[e] Court to reassign 'when the facts might reasonably cause an objective observer to question [the judge's] impartiality.'" *United States v. Khan*, 997 F.3d 242, 249 (5th Cir. 2021) (second alteration in original) (quoting *In re DaimlerChrysler*

*Corp.*, 294 F.3d 697, 701 (5th Cir. 2002)). Under the other, "more stringent" test, the Court considers:

> '(1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected'; '(2) whether reassignment is advisable to preserve the appearance of justice'; and '(3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.'

*Miller v. Sam Houston State Univ.*, 986 F.3d 880, 892–93 (5th Cir. 2021) (quoting *In re DaimlerChrysler Corp.*, 294 F.3d at 700–01).

Reassignment is appropriate under either test. First, the District Judge's consistent misapplication of binding precedent suggests that he would have "substantial difficulty" putting aside his previously expressed views about the relevant standards and burden of proof. *See Cooper Tire & Rubber Co. v. Farese*, 248 F. App'x 555, 561 (5th Cir. 2007) ("[G]iven the history of this case on remand, we find that it is reasonable to expect the original judge to have substantial difficulty in putting out of his mind his previously-expressed views[.]").

It is also apparent that the District Judge has "pre-judged the case against [Barton] from the outset." *Pulse Network, LLC v. Visa, Inc.*, 30

F.4th 480, 495–96 (5th Cir. 2022); *see, e.g.*, **ROA.14772**, **14775** (District Court referring, unequivocally, to "defrauded investors"); **ROA.14827** (District Court assuming, without any showing, that "Barton will dissipate, conceal, or transfer assets" and that "unless retrained or enjoined" he "may alter or destroy documents relevant to this action"). For this reason, reassignment is necessary "to preserve the appearance of justice." *Khan*, 997 F.3d at 250.

Finally, reassignment will not involve waste or duplicative proceedings. This case is still in its procedural infancy; Mr. Barton has not yet filed an Answer, and discovery has not started. As such, concerns about resetting the litigation clock "lack[] traction here." *Pulse Network*, 30 F.4th at 497.

## CONCLUSION

The District Court erred by imposing the receivership beyond the subject lender funds and through misconstruing this Court's clear necessity standard. The District Court also lacked jurisdiction to impose the "drastic" receivership remedy to address loans the Commission has

not shown to be securities. The Court should reverse and vacate the receivership order and other implementing orders with immediate effect.

This Court further should reverse and vacate the District Court's preliminary injunction order, which was based on an incorrect legal standard and improperly froze assets that are not the subject matter of this litigation.

Finally, this Court erred in determining the substantive content of and implementing the receivership order. This Court should reverse the receivership, blessing, and sale orders to the extent they (i) do not permit the use of estate funds for the Appellant's defense against the Government's charges; (ii) allow consumption of the estate funds for the receiver to conduct investigative work for the Government; and (iii) authorize the sale of real property assets prior to a final judgment of liability.

Because of repeated deviations from the exacting standard for receiverships, this Court should remand this case to another District Judge.

Respectfully submitted,

*/s/ Michael J. Edney*
Michael J. Edney
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue NW
Washington, DC 20037
(202) 955-1500
*medney@huntonak.com*

ATTORNEY FOR APPELLANT
TIMOTHY LYNCH BARTON

Date: May 21, 2024

**Certificate of Filing and Service**

I hereby certify that on May 21, 2024, this document was filed and served in PDF format using the United States Court of Appeals for the Fifth Circuit's CM/ECF system upon all counsel of record, as follows:

Ezekiel L. Hill
hillez@sec.gov
Securities and Exchange Commission
100 F Street, NE
Washington, D.C. 20549

Keefe M. Bernstein
bernsteink@sec.gov
James E. Etri
etrij@sec.gov
David B. Reece
reeced@sec.gov
Securities and Exchange Commission
801 Cherry Street, Suite 1900

Fort Worth, Texas 76102

*Counsel for the Securities and Exchange Commission*

In addition, I further certify that this electronic filing is an exact copy of the paper document and any privacy redactions have been made. This filing has been scanned for viruses and has been found to be free of viruses.

*/s/ Michael J. Edney*

## Certificate of Compliance

I hereby certify that this document complies with the word limit of Fed. R. App. P. 32(a)(7) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), the document contains 16,000 words, as calculated using the word processor used to prepare this document, Microsoft Word for Microsoft 365. I also certify that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Michael J. Edney*

**_United States Court of Appeals_**
**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

May 08, 2024

Mr. Michael J. Edney
Hunton Andrews Kurth, L.L.P.
2200 Pennsylvania Avenue, N.W.
Washington, DC 20037-1701

No. 23-11237 SEC v. Barton
USDC No. 3:22-CV-2118
USDC No. 3:22-CV-2118

Dear Mr. Edney,

We have determined that your brief is deficient (for the reasons cited below) and must be corrected within 14 days. We note that our Quality Control Program advised you of some of these deficiencies when you filed the document.

A Table of Contents with page number references is missing/misspelled or includes additional text, etc. A Table of Contents is required. See Fed. R. App. P. 28(a)(2).

We have identified a potential problem with the signature required by 5th Cir. R. 28.2.1(b)(2) to follow the Certificate of Interested Persons. The signature is either missing or does not match the name of the attorney as reflected in our records. 5th Cir. R. 25.2.10 requires the signature of the filing attorney (the attorney whose log-in was used for the filing). That rule further requires the filing attorney's name be typed on the line where the attorney would normally sign, and be preceded by an "s/". An image of the signature is not allowed.

A short Conclusion stating the precise relief sought is missing/misspelled or includes additional text, etc. A Conclusion is required. See Fed. R. App. P. 28(a)(9).

The caption on the brief does not match the Court's Official Caption as required by FED. R. APP. P. 32(a)(2)(C). See the Official Caption, below:

No. 23-11237
consolidated with
No. 24-10004

Securities and Exchange Commission,

Plaintiff - Appellee

v.

Timothy Barton,

Defendant - Appellant

Note: Once you have prepared your sufficient brief, you must electronically file your 'Proposed Sufficient Brief' by selecting from the Briefs category the event, Proposed Sufficient Brief, via the electronic filing system. Please do not send paper copies of the brief until requested to do so by the clerk's office. The brief is not sufficient until final review by the clerk's office. If the brief is in compliance, paper copies will be requested and you will receive a notice of docket activity advising you that the sufficient brief filing has been accepted and no further corrections are necessary. The certificate of service/proof of service on your proposed sufficient brief **MUST** be dated on the actual date that service is being made. Also, if your brief is sealed, this event automatically seals/restricts any attached documents, therefore you may still use this event to submit a sufficient brief.

Sincerely,

LYLE W. CAYCE, Clerk

Christina Rachal

By: ______________________
Christina C. Rachal, Deputy Clerk
504-310-7651

cc:
Mr. Keefe Michael Bernstein
Mr. Ezekiel Levenson Hill
Mr. David B. Reece