IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

IN RE: ) BK. NO: 20-42789-MXM
)
BM318, LLC )
D E B T O R. )

* * * * * * * * * *

TRANSCRIPT OF PROCEEDINGS

* * * * * * * * * *

BE IT REMEMBERED, that on the 20th day of May, 2024, before the HONORABLE MARK X. MULLIN, United States Bankruptcy Judge at Fort Worth, Texas, the above styled and numbered cause came on for hearing, and the following constitutes the transcript of such proceedings as hereinafter set forth:

I N D E X


| | PAGE |
|---|---|
| COURTNEY THOMAS | |
| DIRECT EXAMINATION | |
| BY: Mr. Carrillo | 26 |
| CROSS-EXAMINATION | |
| BY: Mr. Forshey | 33 |
| BY: Ms. Lindauer | 37 |
| BY: Mr. Coker | 45 |
| BY: Ms. Perry | 63 |
| RECROSS-EXAMINATION | |
| BY: Mr. Forshey | 67 |
| BY: Mr. Coker | 68 |


E X H I B I T I N D E X


| | PAGE FIRST REFERENCED |
|---|---|
| Exhibit 1 | 33 |
| Exhibit E | 65 |

P R O C E E D I N G S

THE COURT: All right. Here's going for the Court's 9:30 docket. And this morning we have the BM318, LLC case. We're going to take appearances here in the courtroom first and then we'll venture off to the video.

MS. PERRY: Good morning, Your Honor. Deborah Perry on behalf of the Dixon Water Foundation.

THE COURT: Good morning.

MS. CHOU: Good morning, Your Honor. Emily Chou, Forshey Prostok, for Lumar Land & Capital -- Lumar Land & Cattle, LLC. And on video is my partner, Bobby Forshey.

THE COURT: All right. Good morning to you too. Good morning, Mr. Forshey.

MR. CARRILLO: Good morning --

MR. FORSHEY: Good morning, Your Honor.

MR. CARRILLO: Alan Carrillo on behalf of Brown Fox representing the Receiver, Courtney Thomas, for the debtor BM318.

THE COURT: Thank you, sir.

Good morning.

MR. COKER: Good morning, Your Honor. Kyle Coker on behalf of Tim Barton individually.

THE COURT: All right. Good morning, sir.

All right. Now we'll venture off to the video. Mr. Forshey has already made his appearance. And we have --

hold on. We have Mr. Shepherd. Good morning to you, sir.

MR. SHEPHERD: Good morning, Your Honor. John Shepherd on behalf of Lumar Land & Cattle.

THE COURT: All right. Any other counsel wish to make an appearance this morning?

All right. I see some counsel there. I'll give you another 5 seconds to un-mute.

Ms. Lindauer, good morning. Ms. Lindauer, can you hear us?

All right. It looks like Ms. Lindauer is having some technical issues.

All right. While Ms. Lindauer is trying to figure out her technical issues, do we have any other counsel on video that would like to make an appearance?

Ms. Lindauer, can you hear us? You're on mute on your end. You're still on mute on your end.

Want to shoot her a quick message to see if she can hear us?

Ms. Lindauer, can you hear us? If you do please -- there you go. Can you hear us now?

MS. LINDAUER: I can. I can. I'm trying to pull out the audio from the Webex to get rid of it.

THE COURT: Okay. Let's make a note that Ms. Lindauer has made her appearance. And she can hear us.

MS. LINDAUER: Yeah.

THE COURT: So -- all right. Perfect. Now we hear you just fine.

All right. So with that --

MS. LINDAUER: Thank you, Judge.

THE COURT: Thank you, Ms. Lindauer.

All right. How would we like to proceed? We have two different motions. Ms. Perry.

MS. PERRY: Good morning, Your Honor. Deborah Perry on behalf of the Dixon Water Foundation.

I think what we would propose, Your Honor, is that all of the evidence -- that we take up the two motions in one evidentiary presentation. Meaning that all of the exhibits that are entered with respect to the motion filed by Dixon and the motion filed by Lumar would be admitted into evidence for purposes of the Court's consideration of both motions, as well as any testimony that is elicited today would be utilized for purposes of both motions so that we're not having to basically do the same thing twice, because there are so many overlapping issues, if that's acceptable to the Court.

THE COURT: All right. Of course. Makes perfect sense.

MS. PERRY: Thank you, Your Honor.

I think how we propose to proceed is I would make my opening. Mr. Forshey would make an opening. Then any other

party who wants to make an opening could proceed. And then we would proceed into the evidence.

THE COURT: All right. You may proceed.

MS. PERRY: Thank you, Your Honor.

As a housekeeping matter, I'd like to offer into evidence Dixon's Exhibits A through Q, which were filed on the docket at docket number 154. And these are actually joint exhibits between the Receiver and Dixon. And in addition, we did courier over a hard copy to Your Honor on Friday. Hopefully you received that.

THE COURT: All right. The technical is just fine.

So any objection to Dixon Exhibits A through Q, which can be found at docket 154?

Hearing none, seeing no reaction, the Court will admit Dixon Exhibits A through Q. Again, those are at docket 154.

MS. PERRY: Thank you, Your Honor. And with that I would proceed into opening.

THE COURT: All right. What about -- so are those the same exhibits that Mr. Forshey had proposed?

MS. PERRY: Mr. Forshey has separate exhibits.

THE COURT: Okay. Why don't we go ahead and offer those, as well.

Mr. Forshey, or, Ms. Chou, would you like to --

MR. FORSHEY: Thank you.

THE COURT: -- would you like to offer your exhibits into evidence at this time?

MR. FORSHEY: We would, Your Honor. We'd like to offer Lumar Exhibits 1 through 21. And Ms. Chou has hard copies for the Court, if the Court wishes one.

THE COURT: All right. Any objection to Lumar Exhibits 1 through 21? And those can each be found at docket 152.

Seeing no objection, then Lumar Exhibits 1 through 21 are each admitted. And, again, those are at docket 152.

All right. With that, we will proceed.

MS. PERRY: Thank you, Your Honor. Good morning. As previously mentioned, Deborah Perry with Munsch Hardt Kopf & Harr on behalf of the Dixon Water Foundation, a non-profit corporation.

This Court is well aware of the standards applicable to a Rule 9019 settlement motion, as well as the well-settled governing case law in the Fifth Circuit with regard to standards for approving a settlement agreement. The adversary proceeding was initially filed in August of 2021 and was stayed in the fall of 2022 when the SEC proceeding was initiated and Mr. Thomas was appointed the Receiver over many entities, including BM318 who is the debtor in this bankruptcy case and the plaintiff in the related adversary proceeding brought against the Dixon Water Foundation, in

which Lumar Land & Cattle intervened.

In April 2023, the Receiver, Dixon, and BM318 engaged in an all-day mediation with the Honorable Harlin Hale. Judge Hale went between the three parties multiple times and it was a hard-fought and arm's length negotiation. As the parties were preparing to seek relief from the District Court to lift the stay so that they could bring their 9019 motions before this Court, the Fifth Circuit vacated the order appointing Mr. Thomas as Receiver effective 90 days from the issuance of the mandate to allow the District Court to consider and make more fulsome findings under the standards articulated by the Fifth Circuit. The District Court did so. Mr. Thomas was reappointed as the Receiver. And actions taken prior to the entry of the second receivership order were ratified.

For almost three years land owned by Dixon, a non-profit, has been tied up in this litigation. And has had a lis pendens imposed on it. The impact of this has been to impede Dixon's mission. Dixon has been forced to steadily circumscribe its work at a time when the need for and interest in sustainable watershed management and ranching practices is substantial and growing. Since the filing of the adversary proceeding, Dixon has limited its bestowing of grants and providing educational programs out of financial necessity, as Dixon's primary financial asset for funding its

work is the Bearcreek Ranch, which is the subject of the adversary proceeding.

On January 5th, 2024, the Receiver filed a motion to lift the stay to allow this Court to consider approval of the settlements with Dixon and with Lumar. On April 15th, 2024, the District Court granted that motion.

As Your Honor knows, the Fifth Circuit has set out the following test with regard to considering approval of a settlement under Rule 9019 of the Bankruptcy Rules of Procedure. The probability of success in the litigation with due consideration for the uncertainty in fact and law, the complexity and likely duration of the litigation and any attended expense, inconvenience, and delay, and all other factors bearing on the wisdom of the compromise. Which element has been interpreted to include consideration of the best interest of the creditors with proper deference to their reasonable views, and to the extent to which the settlement is truly the product of arm's length bargaining and not fraud or collusion.

Taking those forgoing elements in turn. The probability of success in the litigation with due consideration for the uncertainty in fact and law. The claims brought by BM318 are for avoidance as either a preference or a constructive fraudulent transfer. Lumar's counsel has done an excellent job briefing some of the issues

that relate to the probability of success in the litigation. And that brief can be found in the exhibits, in Dixon's exhibits at Exhibit Q, docket 154.

Namely the following; the fact that the debtor, itself, has admitted solvency in multiple pleadings filed in the bankruptcy case, as evidenced in Dixon Exhibits G, H, I, J, K, L, and M. Second, the fact that at best the only title that BM318 held during the preference period was bare legal title, which will not support a 547 or 548 claim, because there is no interest in property to avoid. Third, the fact that BM318 would be unable to meet the element of subsection 547(b)(5), because it cannot demonstrate that the transfer enabled Dixon to receive more than it would have, if the bankruptcy case had been one under Chapter 7. The transfer had never been made. And Dixon received payment of its debt, to the extent provided by the provisions of the Bankruptcy Code. It's blackletter law that a creditor who receives its own collateral receives no more than it would have received had the transfer been retained by the debtor, subject to the creditor's security interest.

Fourth, the third modification to the plan at Exhibit D, which was negotiated between counsel for Dixon and counsel for BM318 specifically preserves all of Dixon's rights under the deed and escrow, should the transfer be avoided. More specifically, the third modification at Exhibit D states in

part, if the transfer of the property from the debtor to Dixon is voided, avoided, or set aside for any reason whatsoever in whole or in part, then all of the liens and security interests that evidenced or secured the payment of the indebtedness owned and held by Dixon, said indebtedness being described in Exhibit C attached to the special warranty deed, including without implied limitation the liens and security interests described in Exhibit C attached to the special warranty deed, and other liens and security interests related thereto shall be automatically revived and reinstated as part of such action. Dixon shall have the right to exercise all of its rights and remedies under the loan documents.

As determined by a Court of competent jurisdiction, the property shall be subject to the legal, equitable, and contractual rights and claims of Dixon pursuant to the loan documents between the debtor and Dixon. And all costs incurred by Dixon in connection with enforcement of the liens may be deemed to be a part of the indebtedness secured by the liens. Further, nothing in the debtors first amended plan of reorganization dated November 19, 2020 as amended or modified, or in the order confirming the plan shall operate to nullify, strip, remove, count, cancel, or otherwise release any lien, claim, interest, or encumbrance that Dixon may possess should the debtor or any assignee of the debtor

avoid the transfer of the property in whole or in part.

These four elements that I've referenced are not exhaustive. And as Your Honor knows, the Court is not required to conduct a mini trial in order to approve a settlement. However, the foregoing are indicative of the probability of Dixon succeeding in defeating the claims brought by BM318.

Second, the complexity and likely duration of the litigation a,nd the attendant expense. As the Court could see from the fact that the litigation had already gone on for over one year with significant discovery disputes -- as the Court may recall, we were here three or four times on one motion to compel. And the fact that either side would assuredly appeal any judgment, the litigation would likely be protracted for years and expensive.

As mentioned, the negotiations were conducted through a mediation conducted by the Honorable Harlin Hale, retired bankruptcy judge. Those negotiations were conducted without collusion and at arm's length. Given the issues in dispute, the chances of success, the intendant cost, it is Dixon's position that it's in the best interest of the estate and its creditors for this Court to approve the settlement. Therefore, today we're asking this Court to approve the settlement as set forth in the motion was filed by Dixon at docket 147 under the terms of the settlement agreement

attached thereto.

I'll cede the podium. Thank you, Your Honor.

THE COURT: All right. Thank you.

Mr. Forshey.

MR. FORSHEY: Thank you, Your Honor.

I'm going to try not to go over and replough ground that Ms. Perry had very ably already done that.

I'd like the Court to note that our Exhibits 5, 6, and 7 are schedules that were filed by the debtor in which it's stated that it was solvent by various amounts, seven figures in excess of a million dollars. Exhibits 10 and 11 are MORs; one filed pre-confirmation, one filed post-effective date, again which shows solvency by seven figures.

Exhibit Number 12 is perhaps the most damning exhibit in terms of solvency. In the disclosure statement, which was signed by both Mr. Barton and Ms. Lindauer, they represented that on a going-concern basis, the debtor had a solvency of approximately 1.2 million. And then behind that is a liquidation analysis wherein they concluded that even on a liquidation analysis, there would be $173,276 left after a complete liquidation.

So based on that, Your Honor, it's very difficult to see how someone can assert a preference action when you have sworn in your schedules, your MORs, and to get your disclosure statement approved and your plan put out for a

vote, you have represented solvency.

Exhibit Number 21 is -- pardon me. 16 is the third modification. And that's a loan document and I think Ms. Perry hit on it. But I want to make sure that we've explained the significance of that to the Court. Is the way this was structured, is that the debtor, BM318, put a deed into escrow under an escrow agreement. And all that's being attacked here under their preference action is the delivery of the deed out of escrow. And the reason that had to be true is because all of the other transactions took place outside the 90 days. So the only thing that was within 90 days which could be attacked by the debtor as a 547 preference was the delivery of the deed out of escrow.

The third modification to the plan basically says that if for any reason the transfer of the escrow is avoided, that things go back to where they were before. And that means that where you stand is that Dixon, based upon the delivery of the deed and the escrow, holds equitable title. And that the debtor only has a bare legal title. And presumably, since there would be no automatic stay, Dixon can simply take the deed and go re-record it again.

So we tried -- we filed a brief with the Court. We wanted to illustrate what we thought were the absolute lack of merit that these claims had. And our basis for that is really pretty straightforward. The first one is, one, the

U.S. Supreme Court has held in the Bazhay (phonetic) case that a bare legal title will not support an avoidance action. That's all that BM318 had here was a bare legal title. The equitable title passed to the Dixon Water Company based upon the deed and escrow.

The second problem that they have is this simply a solvency? And showing that Dixon got more from the conveyance than it would have otherwise. According to the documents that were filed by the debtor to obtain approval of its disclosure statement and send the plan out for a vote to creditors, they were solvent both on a going concern and liquidation basis. So it's really hard to see how if Dixon simply got back its collateral, how that would possibly constitute a (inaudible word due to audio cutting out).

And then lastly we have the third modification, Your Honor, that we've just alluded to. If you were to avoid that, it would be a vain act. You would just simply be back where you are. Lumar got dragged into this because we bought 204 acres from Dixon. And then basically this is a case to get rid of a lis pendens. That's what we're paying the money for is to get a release of the lis pendens that's been filed. Lumar has been just like Dixon. We can't go sell our land. Our title is clouded. For that reason, we have negotiated this particular agreement.

I think the testimony will show you that this was an

arm's length mediation. Judge Hale was very active. There were multiple sessions and multiple offers back and forth. It's arm's length. I think the testimony is going to show that Mr. Thomas is an experienced Receiver. He understands the rules of the game and how it's played. And he understands litigation settlements. This fits all the three prongs which show the merits of this are very doubtful. The costs of going forward we think the estate would be extreme.

Finally, the last thing is I noted Ms. Lindauer's objection filed Friday. Obviously we're in sympathy for counsel not getting paid. We've all been there before. But the issue of what to do with the money is different from that of approving the settlement.

And then the other point that I think we would make to the Court is Exhibit 21, we've introduced the second receivership order. The receivership order is pretty clear -- it's not pretty clear, it's absolutely clear that anything that is owned by BM318 is going to be sucked into that receivership estate. So that once this gets approved, if anybody wants to make an issue out of who gets the money, I think they have to go to Judge Starr in the receivership action. Otherwise, Your Honor, we would ask the Court to approve this based upon the record and overrule any objections that may be made.

Thank you.

THE COURT: All right. Thank you.

All right. Any counsel in support of the motions like to be heard?

MR. CARRILLO: Your Honor, Alan Carrillo on behalf of Court Thomas, the Receiver of the debtor.

I have nothing further to add. I just want to note for the record that the Receiver agreed with representations made by the Dixon Water Foundation and Lumar Land & Cattle this morning.

Thank you for your consideration to the motions.

THE COURT: All right. Terrific. Thank you very much.

All right. Any other counsel wish to be heard in support of one or both motions?

All right. How about counsel opposing one or both motions?

MS. LINDAUER: Your Honor, Joyce Lindauer here on behalf of my firm.

And we raised just two issues in our objection. And one of them I think counsel mentioned was what happens with the money. And, of course, we believe if the Court approves the settlement, that the money needs to stay in the bankruptcy estate because these were claims of the bankruptcy estate that were settled and there are creditors in the bankruptcy case that should have the right to receive payment

from those funds. So if the Court does approve a settlement, we would request that the funds remain in the bankruptcy case.

I heard Mr. Forshey say, you know, the funds get sucked up into the receivership. Well, maybe, maybe not. We have the same issue before Judge Everett in a case called -- what is it -- 299TC where Mr. Phelan and I have raised exactly the same issue, which is when you have a confirmed plan and you have priorities for creditors under that confirmed plan and you have creditors that have not been paid under the confirmed plan, we don't believe that the Receiver has the right to strip that money out of the estate and upstream it to the receivership estate, or at least that issue needs to be ruled on, I think, by an appropriate Court. We think you're the appropriate Court.

So one issue is obviously we think any settlement of the funds need to stay here. And it may require other Court orders to be obtained. But I do think, given that there are unpaid creditors here, that the funds stay here.

Second is I spent with Mr. -- Ms. Perry and others about a year and a half doing the discovery and litigating this case. And while I hear everybody's claims, none of those things have actually been decided, whether the debtor was, in fact, insolvent at the time of the transfer, various issues that they've raised. So those are very much live

issues for this Court to ultimately decide, if the adversary were to go forward.

My only concern, Your Honor -- and you'll hear some more information about this, but the value on these claims was way more than what's being offered for the settlement. So we think the settlement number tends to be a bit on the low side. And let me explain what we think would have happened.

If, in fact, the conveyance to Dixon had been -- was set aside, they're exactly right, under the third modification to the plan, Dixon would have all of its lien rights back. Okay. And then -- but here's the big difference is the debtor would then have the, or Receiver, whatever, would have the ability to sell that property, which we think is worth a lot more now than what Dixon would be owed, even with interest and fees. And so the debtor would have the ability to pay off Dixon and recover any excess funds, which I think we believe would be significant. So that was the ultimate I guess position of the debtor in the lawsuit was that we would get the right back to sell the property. And if the property were sold, even paying off Dixon what they would be owed, there would be significant funds left. And I'm talking in the millions of dollars of funds left. I understand you have to win the lawsuit or reach some kind of an agreement. But that was the ultimate

thought.

As far as the mediation was concerned, of course the BM318 entity wasn't included. We weren't included. Mr. Barton wasn't included. So there were some pretty important people that were missing from the mediation that maybe should have been involved.

The other thing too is, is the Receiver has never contacted my firm or Mr. Cowagi's (phonetic) firm, anybody's firm that was on the debtor side of that litigation to get our side of the story. Now, they may have conferred with Ms. Perry and various counsel on the other side, but none of them ever called us and said, tell me about this lawsuit. Tell me the pros and cons. Nothing. Zero. So this settlement is being approved without the Receiver having done what we contend is proper due diligence. Because, again, there were no conferences, no calls, nothing with anybody on the debtor's side of the adversary to ask, give us the pros and cons. Tell us the good news, the bad news, whatever. No discussion.

So, Your Honor, we're concerned that, one, this is a valuable asset of this estate being sold -- or settled for what we think is insignificant dollars. And then ultimately the money, we believe, needs to stay in the bankruptcy case. Put in the Registry of the Bankruptcy Court, or whatever, until there's a decision on who that money ultimately would

go to. That doesn't affect Ms. Perry or Mr. Forshey. I'm sure they don't care where the money goes, if you approve a settlement. But I will tell you that I care and I think the creditors that have not been paid in the BM318 case, we care.

So, Your Honor, that was the two issues we raised in the objection I filed.

THE COURT: All right. Thank you, Ms. Lindauer.

I typically don't ask questions in opening statements, but I do have one question for you. You mentioned that there was the issue in front of Judge Everett. Has that issue -- has Judge Everett ruled on that issue? Has there been a hearing on that issue?

MS. LINDAUER: There's -- no. And it's interesting you should raise that question.

So in the 2999TC -- I should have remembered that name right -- case, very similar to this one, there was a plan confirmed. There was a settlement between the Receiver and an entity also called 29 -- I think it was 29TC. But any way, it was essentially the secured creditor. They reached a settlement. They did not file anything with the District Court to go back to the Bankruptcy Court. In fact, what they did was they asked the District Court to consider and approve the settlement. That settlement was for a little over 2 1/2 -- I think it was $2 1/2 million. The issue that

Judge Everett still has live in front of him that Mr. Phelan and I have raised is where does that $2 1/2 million go?

Again, like this case, we have a confirmed plan. We have creditors that have not been paid. And so -- so, yes, to answer your question, Judge Everett hasn't ruled on that issue. It actually has come up at status conferences, and so it's been basically kicked down the road many times. But Mr. Phelan and I both have argued the same issue to Judge Everett and he has not ruled on it yet.

And I don't -- he doesn't actually -- I wouldn't say he has it under advisement because, again, it's come up at status conferences where we've raised the issue of where does the money go when you have a confirmed bankruptcy plan and some sort of settlement proceeds. So, yes, to answer your question --

THE COURT: All right. Thank you, Ms. Lindauer.

All right. Yes. Yes, sir, Mr. Coker.

MR. COKER: Good morning, Your Honor. I'm here to join in Ms. Lindauer's objections here. And I hate being the one to do this this morning, but we -- we did just this morning get an offer to purchase the claims against the Dixon's. I believe Gary Corley is on the call now and he's the one that put that forward. And it's for cumulative $25,000 more than the other offer. And this was in part, in

the timing here to go get a greater offer. And the reason we were able to do that is because the valuation of these claims is just off here.

And as far as Ms. Lindauer's objections go, when it relates to the value of these properties, I believe that Lumar, themselves, valued this property at $30 an acre. It was purchased for about 17.50, I believe. Now we're talking about the value of this claim, if we prevail, is worth $175,000. If it's frivolous claim, you don't pay $175,000. But $175,000 certainly isn't the millions in additional value that's sitting there. And so I'd like Mr. Barton to testify to those issues, because he was central here. He's, I believe, the principal/president of BM318 at the time of these events. And so he's kind of a critical piece of the puzzle here just to understand what happened, because I think this all boils down to having BM's broker be the one to go take the deal from them at the end of the day. And I know that that is (indecipherable word). I'm not making assertions one way or another. But just the background with that I think is important before this Court. Because if there's any chance to prevail, there's other 0s to get added on to the value of this claim.

And so I provided the offer letter to Mr. Thomas. I haven't spoken to Mr. Corley. I think it would be valuable to hear that out, as well, as we consider this Court's

approval of the existing offer on the table to settle those claims.

THE COURT: All right. Thank you.

MR. COKER: Thank you, Your Honor.

THE COURT: All right. Any other counsel wishing to be heard before we get into the evidence?

All right. Ms. Perry, it's to you. How would you like to begin?

MS. PERRY: Yes. I guess I would say one thing, Your Honor, just to preview.

I'm assuming that Mr. Coker represents Mr. Barton. He didn't necessarily say.

THE COURT: He made his appearance as counsel for Mr. Barton.

MS. PERRY: All right. Excellent.

So Dixon's position would be that Mr. Barton does not have standing to object to this settlement. He's not a creditor of the bankruptcy estate. He has not filed an objection. And the objection deadline passed on Thursday. In addition, any potential offer should also be excluded, given that if there is an offer that's going to be made, that party also would not have standing for purposes of this hearing. So just to preview that, Your Honor.

THE COURT: Understood. We'll get to that. We'll get to that. To the extent any party wishes to offer

something into evidence, we'll obviously take those issues up as evidentiary issues.

MS. PERRY: Thank you, Your Honor. Because we will also object to Mr. Barton being called, given that no witness and exhibit list was filed --

THE COURT: Understood.

MS. PERRY: -- in this case. Thank you.

I believe -- I'll turn it over to Mr. Carrillo now. I believe he's going to call Mr. Thomas to the stand.

THE COURT: All right. Mr. Carrillo.

MR. CARRILLO: Good morning, again, Your Honor. I'd like to call the Receiver of the debtor, BM318, Court Thomas to the stand.

THE COURT: All right. Please come forward, sir, and stand right over here. I'll swear you in and then you may have a seat.

Please raise your right hand.

(The witness was sworn by the Court.)

THE COURT: Thank you, sir. You may have a seat right there.

(no omission)

COURTNEY CHRISTOPHER THOMAS

The witness, having been duly sworn to tell the truth, testified on his oath as follows:

DIRECT EXAMINATION

BY MR. CARRILLO:

Q. Good morning, Mr. Thomas.
Can you please state your name for the record.
A. Courtney Christopher Thomas.
Q. And, Mr. Thomas, what is your role with the debtor in this case?
A. So I'm the Court-appointed Receiver over BM318.
Q. And how long have you been the Receiver of BM318?
A. Since October of 2023.
Q. Could you briefly describe why BM318 is in receivership?
A. Sure. So the SEC has alleged that various entities controlled by Mr. Barton raised funds from investors and those funds were misappropriated. And so Judge Starr entered a receivership order back in October of 2022. There's since been a second receivership order November of '23 that reconfirms that BM318 is a part of the receivership.
Q. And in addition to serving as Receiver over the debtor in this case and its related entities, have you served as a Receiver in any other matters?
A. Yes. I've served as a Receiver in one other case.

Q. How long have you been a practicing attorney?
A. Since 2010.
Q. And in the course of your law practice, have you advised clients in connection with entering into settlement agreements?
A. Yes.
Q. How many -- well, first, have you entered into any settlements before as a Receiver in this case or in any others?
A. So, yes. Both in this receivership and the prior one.
Q. And approximately how many settlements have you entered into in your capacity as a Court-appointed Receiver?
A. So on the Barton receiverships, maybe five or six. In the Gallagher receivership, it was dozens and dozens.
Q. Now going back to this case, Mr. Thomas. Are you familiar with the issues that were raised in the adversary proceeding which were briefly discussed this morning?
A. Yes. I'm generally aware of them.
Q. And how -- how are you aware of them?
A. So I don't remember the exact timing when I became Receiver in October of 2022. At some point after that, in the months after counsel for Dixon and Lumar reached out to me. There's roughly three dozen lawsuits that were pending at the time of my appointment as Receiver. And so counsel

for parties reached out. Getting everything going on, it took quite a bit of time to reach back out to them. And we set up a meeting in my office some time last spring. So prior to that meeting, I went through and tried to read up on not each and every thing that happened in the bankruptcy case in front of Judge Mullin, but as much as I could to get ready for that meeting. And then from that meeting we quickly realized we weren't going to be able to reach an agreement just among the parties. We needed a mediator involved. And so the parties selected Judge Hale. And during that interim period between the informal settlement conference, or informal conference and the mediation, I read up on the case more in connection with your preparation of the mediation statement and my reading of documents associated with that.

Q. Could you describe -- you mentioned this in your prior answer. But could you briefly describe a little bit more of the negotiation process with Dixon and Lumar on the debtor's alleged claims as well as Dixon and Lumar's alleged defenses in the adversary proceeding?

A. Sure. So we had that informal meeting. Like I said, it didn't go anywhere. It appeared pretty clearly that if anything was going to be resolved, it needed to be with a mediator. And so we mediated with Judge Hale. It was a full-day mediation. Lots and lots of back and forth. Just like any good mediator, lots of pressure from Judge Hale, at

least in our room. I assume there was lots of pressure in the other room, as well. And then by late afternoon, we reached a settlement. So fully -- the epitome of a typical arm's length mediation.

Q. And just to confirm for the record, did you -- you had -- did you attend the mediation with Judge Hale and the other parties?

A. Yes, I was there. I was -- I'm the party, for lack of -- I mean, I stand in the shoes of BM318 pursuant to the receivership order.

Q. And could you briefly describe a little bit more of that mediation process? You mentioned discussing things with Judge Hale. But were there multiple sessions?

A. Yes. Multiple, multiple sessions. Like I said, it lasted all day. And Judge Hale is not the type that he was sitting in a room doing nothing while the parties sat there and did nothing. It was -- it was very active all day.

Q. And so ultimately BM318 settled with Dixon and Lumar, correct?

A. That is correct.

Q. And why -- why did you ultimately decide to settle the adversary proceeding and all claims against Lumar as part of that mediation?

A. So ultimately my role as Receiver is to maximize the assets of the receivership estate. So specifically with

BM318 and its claims against Dixon and Lumar, having reviewed everything, I would say the challenges presented by the lawsuit, or by the adversary proceeding compared to the cost it would cost the receivership estate to go pursue those claims to completion, I think the risks -- I determined the risks outweighed the benefits of pursuing those claims.

Q. And at any point did you receive any offers to buy the claims in this bankruptcy case?

A. So Mr. Coker referenced this about 5 minutes before the hearing. Yes, I received an email offer that seemed to come from Mr. Gary Corley.

Q. And is that the only offer you've received in this case?

A. It is the only offer. And --

Q. Go ahead.

A. So the offer, from me looking at earlier sitting over there on my phone, appears to be for $200,000, which is $25,000 more than the settlements we've reached with Dixon and Lumar. It calls for a due diligence period, so it's not a hard offer. It's a contingent offer on this due diligence. Again, in the 5 minutes before the hearing, I didn't have adequate time to really -- I've never met Mr. Corley. I don't know who he is. As I sit here, I still think it's in the best interest of the receivership, best interest of BM318 to go ahead and settle these claims for the settlement for

all the reasons that we decided to settle in the first place. The risk of an extra $25,000 that may never materialize is not -- it doesn't seem appropriate in my role as Receiver today.

Q. You mentioned earlier that in your experience as a Receiver you've reached dozens of settlements. Just in terms of your personal experience, you know -- in your personal experience and your personal opinion, were all the negotiations between you as the Receiver with Lumar and you as the Receiver with Dixon conducted at arm's length?

A. Yes, 100 percent. We were adverse the entire time until we reached a settlement.

Q. And, Mr. Thomas, are you generally familiar with the standards applicable for obtaining approval of settlement agreements in bankruptcy court?

A. Yes.

Q. And with that knowledge, what did you all consider when you took into account reaching a settlement with Lumar and then the settlement with Dixon?

A. So we consider all sorts of things. We've already gone through some of them. I guess the only thing I left out is we actually reached out to Ms. Lindauer's office. We received all of the discovery that had happened in the underlying case. I had my team actually review that underlying discovery in preparation -- I don't know if it was

in preparation for the informal settlement conference or for the mediation itself to see the validity of the claims. And, again, assess the cost benefit of continuing to pursue those claims.

Q. And one final question, Mr. Thomas. You've given all of your -- you said dozens of settlements you've reached in your experience as a Receiver in two different cases. In your personal experience and personal opinion, would you consider that the terms of these settlements are fair and equitable and in the best interest of the bankruptcy estate and its creditors?

A. Yes.

Q. And why is that?

A. For all the reasons we've talked about. I don't think the -- the risk of the amount of fees that would be spent -- some Receivers go and just spend, spend, spend on lawsuits. They spend 300 grand to pursue 200 grand. Here analyzing the risk of the spend versus the benefit of -- and the likelihood of success, the risk far outweigh the benefits.

Q. Thank you, Mr. Thomas.

MR. CARRILLO: Your Honor, I pass the witness.

THE COURT: All right. Thank you.

All right. Who would like to go next?

Mr. Forshey -- well, those in favor of the -- of the

settlement go first and then I'll give those who oppose it the opportunity.

Mr. Forshey, do you have any cross-examination questions for the Receiver?

You're on mute, sir.

MR. FORSHEY: I apologize, Your Honor. It would probably be better to let Ms. Perry go first, who is in the courtroom, and then I'll follow up very briefly, if that's acceptable to the Court.

THE COURT: Of course.

Ms. Perry.

MS. PERRY: Your Honor, I don't have any questions.

THE COURT: All right.

MS. PERRY: Thank you.

THE COURT: That was quick and easy.

Mr. Forshey, back to you.

CROSS-EXAMINATION

BY MR. FORSHEY:

Q. A couple of things I wanted to ask you.

On Exhibit 1 --

MR. FORSHEY: Ms. Chou, could you take an Exhibit 1 up to the --

A. I have it here.

MR. FORSHEY: -- please?

Q. Okay. Our Exhibit 1, that's our settlement agreement, correct?

A. Yes, sir, it appears to be.

Q. That was heavily negotiated at arm's length, as well, correct?

A. Correct.

Q. Each of us had our own counsel and we did a lot of back and forth and drafting on that; would you agree with that, sir?

A. Yes, sir.

Q. And then the mediation, it was arm's length both as to Lumar and to Dixon; is that your testimony?

A. Yes, that's correct.

Q. The process we had to go through to get here, first we had to get the litigation stay lifted. Do you remember that?

A. Yes, I remember that.

Q. Would you explain to the Court what the significance of that was and why we had to do that?

A. Sure. So upon my appointment in these receiverships, there's very often pending litigation. Like I referenced, there were three dozen lawsuits. Mr. Barton's business was in commercial real estate, generally speaking. And so in a receivership like this, a litigation stay is put in place to keep lenders from foreclosing on properties, to

keep judgments from being entered in lawsuits. So there's an automatic litigation stay put on all litigation involving the receivership entities. In order to get any sort of settlement approved, we either, like we did in that HNGH settlement, we got the District Court to ratify or approve the settlement. Here Dixon and Lumar assisted as part of the settlement. They wanted to come before Your Honor first and go through the 9019 process before -- if Your Honor were to approve the settlement, it would then go in front of Judge Starr to be ratified, which was -- I was insisting on Judge Starr ratifying it, because that's where my power comes from. And Dixon and Lumar really want this to come before Your Honor. I don't know legally which one's correct -- or both are correct. But that's why we went through the process and that's why the litigation stay had to be lifted to end up back in front of Your Honor.

Q. We filed a motion -- or rather, you filed a motion with Judge Starr in the receivership to lift the litigation stay, correct?

A. Correct.

Q. And that was filed in early January of this year?

A. That sounds right.

Q. And then it was granted on April 15th of this year; would you agree with that being approximately correct, sir?

A. That's right, mid April, yes.

Q. Okay. So the proposed settlement that we're running up the flag pole to the judge today has been in the public record for Mr. Barton since early January of this year?
A. That's fair. I don't have the motion to ratify in front of me. So he was aware the settlement. I can't remember if we attached the settlement or not to that motion to ratify. But the general terms were definitely in the motion to ratify.
Q. Okay. All right. Now you basically testified for Mr. Carrillo that you did a cost benefit analysis on the lawsuit and concluded that it didn't make sense to pursue. Is that an accurate summation?
A. Yes, it is, correct.
Q. And you did that independently for Lumar, as well?
A. Yes.
Q. And reached the same conclusion?
A. That's correct.
Q. Okay.
MR. FORSHEY: Thank you, Your Honor. Pass the witness.
THE COURT: All right. Thank you, Mr. Forshey.
Any other counsel in support of the motions have any cross-examination questions for Mr. Thomas?

All right. What about Ms. Lindauer first. You filed an objection. Do you have any cross-examination questions?

MS. LINDAUER: A few, Your Honor.

CROSS-EXAMINATION

BY MS. LINDAUER:

Q. Mr. Thomas, what's the current status of your receivership order with the Fifth Circuit?

A. So the receivership order is currently on appeal. Mr. Barton filed an appeal. I believe he filed his initial brief maybe last week or the week before. I believe it was last week. Maybe two weeks ago. And so briefing is pending. No oral argument has been set. I assume it will happen some time in the fall.

Q. And there was a prior appeal to the Fifth Circuit from the receivership order entered by the District Court and that resulted in the receivership order being vacated; is that correct?

A. Correct.

Q. Okay. And the second appeal to the Fifth Circuit also seeks to vacate the receivership order; is that right?

A. That is correct.

Q. Okay. All right. Counsel asked you about buyers of claims. Have you offered for sale to anyone the claims that are part of the BM318 adversary proceeding?

A. So, no, we have not marketed the claims that we've

settled, no.
Q. All right. And you mentioned that you received from us some documents, I think some of the discovery in the adversary proceeding. Did anyone from your firm talk to us about the pros and cons of that adversary?
A. So I definitely did not. And I don't know if any member of my team did or not. But you mentioned they didn't, so I don't have any reason or basis to dispute it. But I can't say that it never happened. I don't know that. I know my office reached out, you know, about the litigation. I don't know if they ever spoke.
Q. And -- okay. And I know, Mr. Thomas, you are not a bankruptcy attorney; is that right?
A. That is correct.
Q. And I don't believe you all have a bankruptcy attorney at your firm; is that right?
A. So Mr. Carrillo was in Akin Gump's bankruptcy group before he joined our firm. He does some bankruptcy work still. I think he would rather do commercial litigation. But that's more for him to answer.
Q. Okay. All right. And as far as the mediation, you would agree with me that Mr. Barton nor anybody from the actual BM318 group was present at that mediation?
A. Typical lawyer, I would take exception to the actual BM318 group. But I agree that you weren't there and

Mr. Barton was not there. Anyone prior to the receivership order was not there.

Q. And, Mr. Thomas, have you spoken to Mr. Barton at all about this particular litigation, the pros and cons of going forward with that litigation?

A. So in the first months of the receivership we made several attempts to talk to Mr. Barton. I was able to speak with him once over the phone. It was more through his lawyers, but Mr. Barton was in the room and Mr. Barton did answer some questions. We certainly discussed pending litigations. I don't remember anything distinctive from this lawsuit, other than there being the potential opportunity to recover funds. But, again, as Receiver, I was interested in what are the lawsuits where there's potential recovery versus lawsuits where other parties have sued us. Because in the lawsuits where other parties have sued us, that's a simple process. That's just they become a part of the process. We don't need to pursue that litigation. And usually attorneys and litigants are happy with that. It's different when there is a chance for a recovery where we have to go through this process that we've gone through determining whether to litigate those claims or not.

Q. All right. And you mentioned, I wrote it down, that SEC receivership focuses in part, at least, on what are called misappropriated funds; is that right?

A. I -- sure. I know I was trying to give a very quick overview of the SEC's lawsuit. So I'm not the SEC --
Q. Sure.
A. I'm the Court-appointed Receiver. We'd have to look at their complaint to see what language they used. But, yes, in general I'm sure I used those words.
Q. Okay. Do you know how much money BM318 or any of its affiliates paid to Dixon Water Foundation prior to the filing of the bankruptcy?
A. Sorry, can you ask the question one more time?
Q. Sure. So in doing your due diligence and research, do you know how much money BM318 or any of its affiliates paid to Dixon Water Foundation prior to the filing of the BM318 bankruptcy?
A. Sure. So I can speak in generalities. I don't have the specific numbers in front of me. I remember some of them. So part of what happened -- I'll give a little bit of back story and I'll give you the specific numbers. So part of this appeal of the initial receivership order was an argument that Judge Starr applied the wrong standard. That because there was no injunction in place, he couldn't rely on this first financial standard, instead he needed to rely on this Netsphere standard where Judge Starr had to trace money from the investors into the entities that received the funds. And so when the Fifth Circuit last summer entered an order

saying they would -- the receivership order would be vacated 90 days after the mandate unless Judge Starr -- and gave Judge Starr an opportunity to enter a new receivership order. The idea was, okay, we need -- Judge Starr determined he needed to apply the new standard, this Netsphere standard. And so as part of that process, my firm's accountants went in and traced, okay, here are the funds that flowed into or benefited the different entities. And so as part of that process combined with the work getting ready for the mediation, we determined, specifically as to Dixon, I think it was $2 million flowed from Carnegie Development into Dixon. And 1.8 of that went to Dixon.

Now, this -- I -- the way that this settlement works with Dixon is those claims, my fraudulent transfer claims as Receiver on behalf of those payments made by non-debtor, non-BM318 entities on behalf of BM318, my fraudulent transfer claims have not been released as part of the settlement. And those will be dealt with separately in the -- in the receivership in terms of Carnegie Development's payment on behalf of BM318's debt. But so I think the number you're getting at is, sure, it's about 1.8. There was a $100,000 escrow payment. I can't remember which entity that came from for the benefit of BM318. And there may have been two other payments that were made. So roughly $2 million.

Q. And so just to be clear, your proposed settlement

here with the Bankruptcy Court, I think you just clarified, does not include releasing Dixon Water for claims that can still relate to the possible fraudulent conveyance of funds to Dixon Water; is that what I'm understanding?

A. So I'm not quite sure on your questions. So the -- my claims as Receiver are excepted. Those are not being released.

Q. Right.

A. So my fraudulent transfer claims I hold as Receiver are not being released. But the -- the bankruptcy claims are being released.

Q. Okay. And is that also true for Lumar, that whatever claims might exist against Lumar that you hold as Receiver are not being released?

A. So, no, that's not correct. Lumar is a different situation. So Lumar did not receive the funds directly from the receivership. Or if it did, it was smaller -- smaller amount, if I remember right. So the claims that were brought against Lumar in the adversary proceeding were common law state law claims; breach of fiduciary duty, tortuous interference, claims like that. And so those aren't -- we determined it was in the best interest of the receivership to go ahead and settle those claims.

Q. You would agree with me those types of claims don't necessarily require a proof that BM318 was insolvent in order

to pursue those claims?
A. So I do not know that one way or the other.
Q. Okay. But, again, I think you mentioned more like state law claims that were brought against Lumar and those, as brought in the adversary, you're asking that those be released also as part of the settlement; is that right?
A. That's correct.
Q. And do you know if the debtor, BM318, also had state law types of claims against Dixon Water Foundation?
A. That were asserted or that could have been asserted? Sorry, I just wanted to clarify.
Q. Either. The first -- well, let's start with were asserted.
A. So as I sit here, I don't remember seeing any state law claims that were asserted. I could be mis-remembering. But I was pretty sure it was the avoidance claims. I don't remember any discussion of state law claims that could have been asserted but weren't.
Q. And what investigation did you do on the question of insolvency, whether, in fact, the debtor was insolvent at the time that the transfers that are at issue were made?
A. I didn't do any evaluation of whether or not the debtor was insolvent.
Q. Okay. I know that you've been offered $200,000 for the claims that you are proposing to settle. And I think you

told us you really haven't made an effort to try to market those claims. At this point would it benefit you or your estate to try to market those claims and see if anybody has an interest in buying them?

A. So I would say, no. Now, for $25,000, certainly not, for a delta of $25,000. If someone had come in and said, hey, we'll pay you $4 million for these claims, I would have to sit there and analyze it and determine whether or not I can even assign those claims. It would be very unique in the context of a receivership where under the receivership order all assets have been put under my control. Other than kind of post-judgment trying to wind up a receivership, I've seen assignments in that context. But I haven't seen it in the context of if these claims are valid and worth pursuing, the Receiver wouldn't assign them. The Receiver would bring them him or herself.

MS. LINDAUER: Your Honor, I'll pass the witness.

THE COURT: All right. Thank you, Ms. Lindauer.

Any other counsel wish to be heard?

Yes, Mr. Coker.

MR. COKER: Thank you, Your Honor.

MS. PERRY: Your Honor, I think we renew what we mentioned to Your Honor earlier. Mr. Barton is not a

creditor in the bankruptcy case. He has not timely filed an objection to this settlement motion. And so we would object to his counsel asking the witness questions or him participating in this proceeding.

THE COURT: All right. The Court will overrule that in part. The Court will allow Mr. Coker to develop the record. But in the Court's ultimate ruling, the Court will make it very clear whether or not the Court considered any evidence that was elicited. So for purposes of just making sure the record is as wholesome as possible, I'll allow Mr. Coker to go forward.

All right. You may proceed.

MR. COKER: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. COKER:

Q. So first -- and I'm new to this Court so --

THE COURT: By the way so it's clear, that's why I said, in part. I'm going to allow the questions and then we can take up whether or not the Court should consider the evidence in closing arguments. The Court will consider that and then its ultimate ruling with make it clear.

Sorry for interrupting. You may proceed.

Q. Mr. Thomas, I've come into this late in the ball game, so let me know if there's something that doesn't make sense to you, because I'm probably misunderstanding something

and need to ask my question differently. Okay?
A. Okay.
Q. All right. So we talked about earlier the first appeal to the receivership. And that order came down from the Fifth Circuit vacated the receivership; is that correct?
A. Ultimately, yes. It was remanded to the District Court and said that the first receivership order would be vacated within 90 days of the mandate. And so if the District Court didn't enter a new receivership order, there would be no receivership after late November of 2023.
Q. And heading into that appeal, you believed that the SEC was going to prevail and not Mr. Barton; is that correct?
A. Sure. I did think that.
Q. Okay. And so, you know, I guess you were wrong the first time around on whether that appeal would be successful; is that correct?
A. So -- that's right. The first time around Mr. Barton's challenge was that Netsphere had not been applied.
Q. And as you understand it, because I know you kind of see the pleadings go back and forth, there's a second appeal in place right now over the very, very similar issues, substantially similar; would that be correct?
A. That's not quite correct, no.
Q. Okay. What's the difference with this (inaudible

word)?
A. So the -- the second time around Judge Starr had an evidentiary hearing. There were hundreds of pages of briefing that were filed while Netsphere standard was applied. And so Mr. Barton's appeal this time is not that the wrong standard was applied. It's that now the standard has been implied improperly. And so it's going to be an evidentiary challenge whether or not Judge Starr did the full amount of work or not.
Q. Understood. So my understanding is that there's a challenge on whether proper tracing took place by the SEC to put on evidence to establish a receivership. Does that sound right?
A. That's right.
Q. Okay. And there was no tracing done the first time around; is that correct?
A. I don't know if it was no tracing. The SEC did some limited tracing the first time around.
Q. Okay. The Fifth Circuit found that it was substantially lacking as far as the tracing analysis went; is that correct?
A. The Fifth Circuit decided that Netsphere had not bee satisfied, correct.
Q. Okay. And part -- you were called in, I think the second time around, the second hearing on establishing the

receivership to help the Court or assist the Court in some of the background with these entities; is that right?

A. So Judge Starr asked me, I forgot the exact ruling, but, yes. Judge Starr asked me to submit a declaration of my position on the tracing.

Q. And you presented a, what would be a pretty lengthy explanation as to what's gone on thus far, correct?

A. It was -- yeah, it was something around 100 page declaration.

Q. Have you established -- let me back up. How many entities are under the receivership right now roughly?

MR. CARRILLO: Your Honor, may I object?

I understand there's a reason why counsel is asking these questions. And if it's helpful for the Court -- we obviously defer to the Court. But all of these questions and all of the answers to these questions are available on public dockets for the Fifth Circuit and for Judge Starr's court. You know, I'm not sure it's appropriate just to have Mr. Thomas opine on the Court's opinions when they're available for the Court's consideration as entered by Judge Starr and the Fifth Circuit.

THE COURT: I guess I'll -- response?

MR. COKER: Your Honor, standing has been challenged today, so a lot of these questions go -- and I'm getting there as to why we have standing in this court right

now.

THE COURT: All right. Based on that the Court will overrule the objection without prejudice to raising, re-raising the objection or any other that you might have.

You may proceed.

A. So I think your question is how many entities are in receivership?

Q. Sure.

A. I believe there are 55 under the second receivership order.

Q. Okay. And out of those 55, do you -- do you have a rough understanding of where the 20 some odd million dollars that you're tasked with recovering have gone as far as how much money has gone to which entity?

A. So it's a complicated answer. So, again, I filed about a 100 page declaration.

Q. Uh-huh.

A. Traced funds into each receivership entity. The standard for the Fifth Circuit was entities where funds could be traced or that benefited from investor funds. And so each of these 55 entities, yes, we've traced investor funds into them. The forensic accounting is not complete. So we have examples where money flowed into BM318. Do I have all of those investigated today? No. And I would say that that's

not the most cost effective use of the forensic accountant's time. We will have -- we're getting closer to having kind of the buckets of here's where the funds went.

Q. Uh-huh.

A. But as of right now, no, I don't -- we have not traced every single dollar to see which entities it flowed into.

Q. Okay. What happens if the -- if the receivership is vacated again by the Fifth Circuit?

A. I have no idea what will happen.

Q. Does -- do these assets go back to the control of Mr. Barton, the JMJ entities, and so on and so forth that are currently held up in the receivership?

A. So it will depend. If it's similar to the last order where it was vacated, but giving Judge Starr time to enter a new receivership order --

Q. Uh-huh.

A. -- then, no, that won't happen. If it's vacated immediately or if Judge Starr decides not to enter a new receivership order, then I'm sent out of the picture, so it would go to wherever. Some entities, I think there were multiple owners, potentially. So that might be a little more complicated. But for entities wholly owned by Mr. Barton, yes, it would return to Mr. Barton.

Q. Okay. And how much fund wise have you recovered in

this receivership the first go round with what's been ratified and then now in the second receivership?

A. So if you'll look at my status reports, it will give you the most accurate number. As I sit here, I can sort of ball park it from some of the settlements. The issue is this was a commercial real estate enterprise.

Q. Uh-huh.

A. Mr. Barton has appealed every sale of receivership property so far. And so we've been unable to sell any property. So there's a chance for substantial recoveries. Roughly 2 million in interest gets lost every year. So I don't know -- it's on my report.

Q. Sure.

A. So if we went and found that, I could give you exact numbers.

Q. I just -- I really didn't know. I was asking for a general number. Is it a couple of million dollars? Is it -- or we in the hundreds of thousands of dollars?

A. So it was -- the HNGH settlement was referenced. That's $2 1/2 million. But that's paid out over time. So we haven't recovered that full amount. So I would say between a million and $2 million is probably the most accurate guess as we sit here.

Q. Okay. So I'll move on from the receivership. I needed the background. And I apologize for that, because I

know you've been through that a few times.

So let's talk about this -- this settlement leading up to it. What was your first demand to their side at mediation?

MS. PERRY: Your Honor, I guess I'm going to just object here, because of mediation privilege. So --

THE COURT: Sustained.

Q. Okay. Was your demand substantially higher than the settlement value, your first demand at mediation?

MS. PERRY: Your Honor, I'm going to object again. I mean --

THE COURT: Sustained. We're not going to get into the specifics of what happened during the mediation.

MR. COKER: Okay.

Q. Leading up to mediation, did you believe that this claim was worth far in excess of what the settlement value is?

A. So, no. Leading up to mediation, I was hopeful that we could find some path towards, hey, let's just have the property sold. If it sells for a lot more than the note on the property was, then, hey, maybe we can find a path forward and we figure out how we split that. I was trying to be practical. Dixon and Lumar, understandably, weren't interested in that because the position they're in is if I were to succeed on my claims, my understanding is we -- well,

I think it's all -- it's been talked about today, we're back in the shoes of where we were pre-receivership. And the receivership doesn't have funds to service the debt that would be there, so we'd be right back starting the wheel over again. And, again, I don't feel in good conscience that I can then go spend more receivership money pursuing claims to end up in the -- probably a worse seat than I was at that point.

Q. Okay. Leading up to mediation, did you believe this was one of the larger claims in the receivership control at the time?

A. No.

Q. Okay.

A. Well, I should clarify. There were three dozen lawsuits.

Q. Uh-huh.

A. Maybe five or six -- maybe a few more. There was just a small handful that involved claims where there could be a recovery. Of those, I guess it was in the upper -- it was in the upper half. So it's all relative what we're talking about. I didn't think this was multi-million dollar claims. But it was more substantial than some of the other claims that we've settled.

Q. Was your understanding that Ms. Lindauer believed that these claims were multi-million dollar claims leading up

to mediation?
A. I don't --
Q. Had she ever communicated that to you?
A. I don't remember her communicating that to me. When I first -- I'm going to try to be careful. So as Receiver, when I step into the shoes of the receivership entities, I hold the privilege of the entities. And so during that first day I spoke with Mr. McMurray, who worked in Mr. Barton's office. I spoke with him briefly and then members of my team spoke with him in depth about the different litigations that were pending and assessment of the value. And he did indicate that the -- generally speaking that these claims could be substantial, if they were successful.
Q. Okay.
A. But expressed his own doubts about ultimate recovery.
Q. And you spoke to the defendant's counsel in this case, I guess to get their view of this at mediation and probably leading up to it; is that right?
A. When you said defendant's -- when you said defendant's counsel, I thought you meant Mr. Barton in the receivership. You're talking about Dixon and Lumar?
Q. Yes.
A. So I met with them informally.

Q. Uh-huh.
A. And then we set up mediation. And I don't remember there being any discussion really back and forth between those two meetings. I only met with them once prior to the mediation.
Q. And have you interacted much with, or had many cases with Ms. Lindauer?
A. Prior to this receivership, no.
Q. Okay. Did you know who she was leading up to this receivership?
A. No, I did not.
Q. Okay. Would it surprise you that she had a good reputation as an attorney?
A. No.
Q. And why wouldn't you want her side of the story and ask her why she was bringing these claims in the first place before deciding what their value was?
A. So -- so, like I said, there were roughly three dozen cases when we took over the case. Specifically with this case, we asked for the discovery. I felt like it was in the best interest of the receivership to make our own independent examination of the pleadings, the lawsuit. Generally speaking, a defendant in a receivership is prior counsel, always view claims in a more inflated way. And so I guess I didn't even -- I didn't think through, okay, that it

would be a big benefit and worth the time spent talking to prior counsel about this particular case.

Q. And Dixon and Lumar haven't produced much in the form of discovery in this case thus far, right? And I'm genuinely asking that question.

A. So I remember they did produce some documents, because I had Mr. Carrillo review those documents. I can't remember if we're talking about hundreds or thousands or tens of thousands, but I know he spent time reviewing those records prior to that initial informal meeting.

Q. And as of today, discovery is not complete because it's been stayed -- the case has been stayed; is that your understanding?

A. No discovery has happened since October of 2022 when the case was submitted.

Q. All right. So we spoke a little bit about, yes, I did come in this morning. I was the -- I was the bad guy that had to show up with a piece of paper that we got this morning. And I apologize for not having more notice on that. But I want to ask you about that -- that settlement offer. It was for $200,000; is that correct?

A. Contingently, but, yes, it's for $200,000.

Q. Okay. And is it your belief that because -- or in your experience as a Receiver in settling these cases, do you believe that Dixon or Lumar would be willing to potentially

put on more money now that there's a competing offer on the table?

A. You're asking as the Receiver -- so my guess is if I said, oh, I might be willing to do that, sure, they would pay $25,000 extra to get this done today. But that's not my role as Receiver. I'm maximizing the value of the estate, but I'm doing so in a way that honors Judge Starr, who I'm his agent. And I -- I would have a hard time believing Judge Starr would want me to engage in those kind of settlement practices at a hearing.

Q. But -- and I understand that. But we have all the time in the world, because -- in this case, because there's a stay in place, isn't there? There's no rush to liquidate this property today, or this claim against this property today.

A. All right. So we're not looking to liquidate any property -- to liquidate the claim. Could we wait a week? Sure, as the Receiver we could wait a week. At the same time, I've got three dozen lawsuits and a whole lot of other issues. And so I do need to start buttoning up issues, which is part of why we've been cleaning up the litigation matters over the last few months.

Q. So if Mr. Barton and Ms. Lindauer believe that this, this claim is worth far in excess of $175,000 and have incentive to bring other offers, wouldn't that help you as

the Receiver vet out whether the other side is willing to put more money on the table to benefit the, you know, allegedly defrauded investors in this SEC case?

A. So in the abstract, yes. But in the practicality, no. So, for instance, we had a property we contracted to sell last year in far North Dallas. And I believe the price was $5 1/2 million. Mr. Barton objected and said that it was worth substantially more than that. I think he said it should be worth 7 million. He ultimately -- Judge Starr approved the sale. It got appealed. The buyer walked. And so we went through and marketed the property earlier this year widely, nationally. And the highest offer we received was several hundred thousand dollars less. So I give that as an example of I understand I'd probably be having similar views as Mr. Barton in terms of a more inflated view of the value of assets. But my job is to try to maximize the value of the assets. And I don't think an extra $25,000 does that here today.

Q. Well, I mean, there's at least one individual, Mr. Corley, that believes that this claim is worth more than what's currently in that settlement offer; is that correct, by the piece of paper that you have on that?

A. So that's not correct. It's $200,000 subject to doing due diligence. And so I have no idea if he really views it that way or not. He could go -- I would argue there

would be no due diligence needed to be done. He could look at the pleadings and determine the value -- the claims. But he feels the need to do due diligence so that -- that combined with the fact that it was given to me 5 minutes before the hearing after it had been pending since early January makes me skeptical. But I've never met Mr. Corley. He could be the most honest man in the world and he really wants to pay 200,000 and that statement about due diligence was just accidentally put in there. I have no idea.

Q. Wouldn't -- wouldn't take too long to ask whether the due diligence term was going to be a hold up in proceeding to Mr. Corley, would it?

A. Well, that's what I'm saying.

Q. Yeah.

A. The timing is just skeptical. Five minutes before the hearing, I don't know why he couldn't have asked this a month ago.

Q. Okay. A couple of final questions. Mr. -- to your understanding, Mr. Barton hasn't been convicted of anything or had any adverse ruling as to the merits of the SEC and DOJ cases that are pending; is that correct?

A. So the DOJ case has not gone to trial. There's been no adjudication of guilt in the SEC case. As to Mr. Barton's civil liability, it's been stayed.

Q. Okay.

A. In terms of other issues, I probably shouldn't speak to those.
Q. As far as this BM318 entity, do you understand how this is connected to Mr. Barton, or his ownership or control? Or I guess let me -- let me switch that question around.
How is BM318 connected to Mr. Barton?
A. In this receivership?
Q. Uh-huh.
A. So I don't have my declaration in front of me. Like I said, we went through each entity. And so there was money that flowed from the Wall investors into BM318. And so that's why it's part of the receivership.
Q. So you wouldn't necessarily have a problem, or anything in front of you right now that would indicate otherwise that Mr. Barton is not a derivative beneficial owner or beneficiary of BM318?
A. So there were over 100 entities initially part of the receivership. We went through each of those to tie to Mr. Barton in some way in terms of his ownership. So I don't have those documents in front of me. But I would assume that he -- whether it's individually or through the flow of entities that he is the ultimate owner or one of the ultimate beneficial owners of BM318. I'm sorry, I'm being the typical lawyer and trying to talk --
Q. It's fine. That's -- I'm just asking what's your

knowledge based on that issue is. So let's assume for a second that he's a beneficial owner in a derivative form of BM318. If he prevails on his case before the SEC, which has not been adjudicated on the merits yet, he would -- and this Receiver has already taken action to dispose of this, he won't be able to unwind those actions even though he's been found innocent later on in the SEC case; is that your understanding?

A. I would say generally speaking, yes. But generally speaking, that's the case in every receivership. That's the nature of the receiverships.

Q. Understood. And with that in mind, you are tasked with recovering how much in assets as far as this receivership? Is it 26 million?

A. So not quite. So I'm tasked with maximizing the receivership assets. There will potentially be a claims process where everyone who has a claim against any of the receivership entities comes in -- it's similar to a bankruptcy process --

Q. Okay.

A. -- and submits proofs of claim. So you will have the Wall investors, I assume, will submit proofs of claim. But then also the other creditors who have lost money submit proofs of claim. And so I don't know how much that will reach. The Turtle Creek property, there were lots of other

investors who put money into that that I assume will want to be part of the claims process. And so the number -- the overall number will be much higher than the, I think 26 or 28 that's alleged in the SEC's complaint. And that's typical. In the Gallagher receivership, they alleged 12. And just the investors ended up being, I think, 26 million.

Q. And Mr. -- assuming you get in excess of whatever that claims number is, Mr. Barton or the Barton entities in the receivership would be entitled to the excess of what is recovered; is that correct?

A. So I actually don't know the answer to that. Very rarely do receiverships recover in excess of the amount of losses.

Q. Didn't the SEC early on in this case represent that there were over $80 million worth of assets under the receivership order?

A. So we had to look at it. As best I recall, they're talking about the value of the properties was $80 million. The problem is, every single property is heavily leveraged.

Q. Okay.

A. And so while the properties may be worth 80 million, the net value to the receivership is nowhere near the 26 million, unless these HUD properties are included in the ultimate receivership.

Q. Understood.

MR. COKER: No further questions, Your Honor. Thank you.

THE COURT: All right. Thank you.

Any other counsel have any first round of questions for Mr. Thomas?

All right. We'll go back to redirect.

MS. PERRY: Your Honor, I'll try to keep this limited to just a few questions.

CROSS-EXAMINATION

BY MS. PERRY:

Q. Mr. Thomas, I know that Mr. Coker was asking you about the second receivership order and the fact that it's on appeal. Is there a stay pending appeal that's been entered by the Fifth Circuit?

A. No.

Q. And did Mr. Barton seek a stay pending appeal?

A. He sought one with the first receivership order that was denied. He has not sought one with the second receivership order.

Q. All right. So no -- no stay pending appeal currently.

With respect to -- there was some discussion --

MS. PERRY: I apologize, but I don't have a copy of the settlement agreement to put in front of you. But, Your Honor, at docket 147, 147-2, it's Exhibit B to the

motion, there's page 2 of 5.

Are you there, Your Honor?

THE COURT: I am, yes.

MS. PERRY: Okay. Great.

Q. Okay. So, Mr. Thomas, you spoke about this a little bit. There is this release by BM318 in paragraph 4 of the settlement agreement. And, I'm sorry, I don't have a copy to give you. But essentially there is a release -- and obviously the language speaks for itself -- but there is a release of all of the claims and causes of action that were brought in the adversary proceeding, or could have been brought in the adversary proceeding. But there is also a provision at the end, and you spoke about this a little bit with Ms. Lindauer, is expressing understood, however, that the Receiver is not a party to this release. And accordingly, the Receiver is not providing any release of any claims he may hold, including but not limited to claims for the recovery of any investor funds that may have been transferred to Dixon by BM318 or other receivership entities.

Does that sound familiar?

A. Yes, that's correct.

Q. And so that's what you were talking about with Ms. Lindauer about there is this carveout for potential claims that you, as the Receiver, might have separate from claims that BM318 has that are being released, correct?

A. That's correct. Because the claims on behalf of these other receivership entities that had Wall investor funds that went for the benefit of BM318. So they wouldn't be BM318 claims.

Q. Right.

So Dixon still may end up in litigation with you as the Receiver with respect to those claims, potentially?

A. That is correct.

Q. Also can you please turn to Exhibit E in the Dixon exhibits? So it's docket number 154-5, Exhibit E. And if you'll turn to page 3 of 44 in that document.

A. Okay.

Q. So in the first single spaced paragraph you can see about midway down it says, for purposes herein, the defined term, final payoff shall mean an amount equal to 27.5 million in principal and accrued interest plus any and all costs and expenses of lender as of the date of such payment.

Do you see that?

A. I do.

Q. Is it your understanding that at the time that Dixon entered into the deed and escrow agreement, that was the estimated final payoff?

A. Yes. I mean, having not looked at this particular document since last spring.

Q. Understood.

A. But the 27 million number is what is in my head.
Q. And you recall that it's Dixon's position that since that time interest and attorney's fees have continued to accrue on this amount and that's in the ten -- millions of dollars since -- and it's just our position -- above the $27.5 million amount?
A. Yes, I understand.
Q. And in addition, this matter was settled back in 2023, correct?
A. Correct. Shortly before the Fifth Circuit's order came down.
Q. So we've been waiting for over a year now to now be thankfully in front of the Bankruptcy Court today?
A. That's correct.
Q. Thank you.
MS. PERRY: Thank you.
THE COURT: All right. Thank you.
MS. PERRY: Pass the witness.
THE COURT: Mr. Carrillo, any further questions?
MR. CARRILLO: No, Your Honor.
THE COURT: All right. Mr. Forshey, any other questions for Mr. Thomas?
MR. FORSHEY: Very briefly, Your Honor.
THE COURT: All right.

RECROSS-EXAMINATION

BY MR. FORSHEY:

Q. Mr. Thomas, the Corley offer letter, when was the first time you saw that?

A. About 5 minutes before the hearing Mr. Coker emailed it to me after we met this morning.

Q. So you had never seen that before or had any communications on that?

A. That's correct.

Q. Now, I've got a note down that you said something to the effect that the settlement's been out there since January and you were somewhat skeptical of that offer 5 minutes before the hearing. What did you mean before -- about that?

A. Just what I testified about. That there was plenty -- if this was a genuine offer to be negotiated, I would think it would be raised more than 5 minutes before the hearing. Just -- it's just general skepticism timing wise. No other basis for that skepticism.

Q. Thank you.

MR. FORSHEY: Pass the witness, Your Honor.

THE COURT: Yes, sir, Mr. Coker.

MR. COKER: Thank you, Your Honor.

(no omission)

RECROSS-EXAMINATION

BY MR. COKER:

Q. Just a couple of questions, Mr. Thomas.

First one, when was the motion to confirm this settlement filed?

A. The motion to ratify the settlement?

Q. The motion to ratify, yeah, sure.

A. I believe it was in January of this year.

Q. For this hearing?

A. Well, so we filed a motion to ratify in the district court. It's actually a motion to lift stay for Judge Mullin to consider this. So let me step back. We have not file a motion to ratify yet, I don't believe. I think it was a motion to lift stay for Judge Mullin to consider approval of the settlement agreement. That was filed in January, if I remember right. And then Judge Starr granted the motion to lift stay in April.

Q. Okay. So it's -- it hasn't been a imminent issue before this Court until Judge Starr lifted the stay on that in April; is that fair to say?

A. I don't believe anything was filed with this particular Court until April.

Q. Okay.

A. That sounds -- that sounds right. But in terms of Ms. Lindauer and Mr. Barton having knowledge of it, I think

it would have been earlier.

Q. And just now counsel was asking about some of the claims involved going both directions, both -- any potential claims that Dixon would have against BM318, as well as going back any claims reserved by the receivership. So I want to ask you about those two things.

First off, in the year, or a little bit over a year since the case was pending prior to the receivership being in place, so BM318 is the case we're talking about, did they bring any counterclaims?

A. Did Dixon bring --

Q. Did Dixon bring any counterclaims?

A. As I sit here, I don't remember. I don't remember any. So --

Q. Okay. Knowing if Dixon brought counterclaims would be important in evaluating whether the settlement was a good settlement, if the release had any value with that; is that fair to say?

A. So, yes and no, but largely, no. In a receivership, if they had claims that survived they wanted to assert against the receivership, those would be brought in the claims process.

Q. Okay.

A. And I would guess -- it's ultimately Judge Starr's discretion. But I would guess that any claims Dixon might

have against the receivership estate would be subordinated to claims of the Wall investors and other creditors where they wouldn't receive anything. And so I put limited value on any counterclaims they might have. And I don't -- I'd have -- I don't have the settlement agreement in front of me. I'd have to look at it. I don't remember them reserving claims against the receivership. I think they were just reserving maybe defenses they could bring to my claims for fraudulent transfer. But I don't remember the release not being a total release.

Q. And that's -- I apologize. That's what I'm asking about. So counsel, I think, was trying to show that a full release here was more valuable than what Mr. Corley's offer that did not contain a full release of those claims. But you're not aware of any counterclaims at this time?

A. As I sit here, I'm not aware of any.

Q. Okay. And then on the other side of that, I guess leading up to the last few months, the -- your office has filed a number of lawsuits for statute of limitations purposes to preserve claims related to potential fraudulent transfers; is that correct?

A. Our office has brought a number of lawsuits.

Q. Uh-huh.

A. We brought certain lawsuits, keeping in mind that there is a statute of limitations argument that could

potentially be made.
Q. Uh-huh.
A. I am not going to say that Dixon's statute of limitations has already run. I would argue very stridently it hasn't. But we have not pursued a claim against Dixon yet.
Q. Okay. But you pursued a claim against all of Mr. Barton's attorneys between the years of 2019 and I believe 2020; is that fair to say?
A. I don't think we've sued all of his lawyers. We've sued the ones that knew of --
Q. Five or six of them, I believe. Does that sound right?
A. It sounds about right.
Q. And you sued his son, his daughter, and his ex-wife, as well, to preserve potential claims. Does that sound familiar?
A. We did sue a bunch of recipients of funds, yes.
Q. But you haven't brought any claims against the (indecipherable word) related to fraudulent transfer?
A. Not at this time.
Q. So to -- in summary, you can't say that there's any value to release counterclaims you're not even aware of, or for fraudulent transfer claims that you haven't brought despite suing, I believe, four attorneys, two law firms, and

his kids and ex-wife. So it doesn't sound like that -- the idea of a release really impacted your decision on the settlement, did it?

A. No. 100 percent impacted my view of the settlement at the time.

Q. So I guess what -- what factor am I missing? If there's no counterclaims that you're aware of and you didn't feel that you needed to file a fraudulent transfer suit to preserve the statute like you did on the, I guess 16 or 18 other individuals and entities, what's different here?

A. So as of last May, my accounting was very limited. I had not been given access to accounting records. From May through November, we were able to get access to accounting records and did a much more fulsome analysis of the amount of funds that flowed to Dixon and how they flowed to Dixon. As I sit here, I'll tell you the investigation is still pending. And so they're -- I'm not willing to testify in front of Dixon how I value those claims.

Q. Understood. Well, I'll ask you a different question.

So for the case against Dixon, there are deadlines in that case. And the deadline to bring a counterclaim, unless there's new information made available, leave of Court had already run; isn't that correct?

A. That sounds right.

Q. Okay. So you weren't really worried about any counterclaims coming back in your direction. You didn't have a reason to, I guess I would ask?

A. So there is some value to buttoning everything up.

Q. Uh-huh.

A. But generally speaking, my view of counterclaims as a Receiver, I'm not terribly worried about counterclaims. It's an unfortunate reality of receiverships. But there is -- there is some value. I just -- I wouldn't ascribe tons and tons of weight to it.

Q. Okay. Thank you, Mr. Thomas.

MR. COKER: Pass the witness, Your Honor.

THE COURT: Thank you, Mr. Coker.

Any final redirect?

All right. Thank you, Mr. Thomas, for your testimony. You're excused as a witness.

All right. Mr. Carrillo, Ms. Perry, Mr. Forshey, any other witnesses you'd like to call at this time? I guess I'll go in that order.

MR. CARRILLO: None from the Receiver, Your Honor.

THE COURT: All right.

MS. PERRY: None on behalf of Dixon, Your Honor.

THE COURT: All right. Mr. Forshey, any other

witnesses you'd like to call?

MR. FORSHEY: No, sir. None on behalf of Lumar.

THE COURT: All right. So the movants rest on evidence?

MS. PERRY: Yes, Your Honor.

MR. CARRILLO: Yes, Your Honor.

MR. FORSHEY: Yes, Your Honor.

THE COURT: All right. So then we'll go to Ms. Lindauer. Any witnesses or exhibits?

MS. LINDAUER: Your Honor, no -- there you go. No witnesses and no exhibits at this time.

THE COURT: All right. Thank you.

All right. I'll just ask for the record, any other counsel wishing to offer any evidence? Mr. Coker?

MR. COKER: No, Your Honor. I don't -- I don't think we need anything further. Thank you.

THE COURT: All right. Thank you. So the evidentiary record is now closed. We can go to final argument.

Who would like to go first? We'll go with the two movants first and then anyone in support and we'll end up with those opposing.

So, Ms. Perry.

MS. PERRY: Thank you, Your Honor. Deborah

Perry on behalf of the Dixon Water Foundation.

So I will just try to address some of the -- some of the points and not re-hash my opening, which I think laid out the elements. And I know Your Honor has read all of the -- all of the pleadings here.

I do -- I do think that with respect to Ms. Lindauer's objection on her firm's behalf with respect to what happens with the money, I defer somewhat to the Receiver's counsel on that issue. However, I don't think that it's an impediment to Your Honor making a decision with regard to the settlement today. It's very akin to a situation where say you have a sale and there's not a determination yet of how the proceeds are going to be distributed. It's the same -- the same analysis. And Courts approve sales all the time where there's not a decision on the priorities of the lienholders, for example. So I think here today, you know, we're asking Your Honor to approve this settlement under the 9019 standards.

And as Your Honor knows, we're kind of doing all -- say a Texas three step today. My law firm actually had that as a slogan one time. It wasn't my favorite, because we'd opened a Houston office. The Texas three step, Dallas, Houston, Austin. But I'll use it today.

So Texas three step from the standpoint of the Receiver went to Judge Starr in January and filed a motion to lift the

stay. Mr. Barton actually opposed that. Judge Starr in a thoughtful, well-reasoned opinion overruled that objection and entered an order in April lifting the stay to allow Your Honor to consider this. And one of the basis for that is that Your Honor is uniquely positioned to consider this settlement. Why is that? Because Your Honor has been the one who has overseen the bankruptcy case, which went on actively for over a year. Your Honor is the one who oversaw the adversary proceeding which went on for about a year and a half until it was stayed. And it was an active adversary proceeding.

I mean, Your Honor, I think, certainly remembers our disputes on the motion to compel and also the motion for leave to amend that BM318 filed that was overruled and then, also, Your Honor's opinion was affirmed on appeal to the District Court. And that appellate order is final. So it was an active case.

In addition, these are the types of claims that Bankruptcy Courts deal with every day; preference actions and fraudulent transfer actions. They are core bankruptcy proceedings. And Your Honor through practice and on the bench has seen hundreds, if not thousands of these types of claims.

In addition, as we've mentioned, we -- the parties had the great benefit of having Judge Hale as our mediator here.

And I was there. I can definitely say that it was a vigorous mediation. Judge Hale going back and forth amongst the rooms. And we were there all day in our separate corners, so to speak. So we appreciate -- we appreciate Judge Hale's assistance in getting us to this point.

Your Honor has -- has heard today and seen the evidence of the third modification that was part of the -- that was added to the plan. In that regard, we saw that in the deed and escrow agreement, the final payoff amount. And that is Exhibit D which is entered into evidence. But at the time that the deed and escrow was put in, it was about 27 1/2 million. I'll represent to the Court that in April of 2023, our calculations show that with interest, that would have arisen to almost $39 million. And that just continues to rise. So for purposes of assessing things like the likelihood of success on the merits, and the position that the parties would be in if it were avoided and came back, you have a substantial debt that would -- that is accruing interest on a daily basis with respect to this property that has been tied up now for several years.

Therefore, Your Honor, we would ask respectfully that you approve this settlement. We think that the issue of how the proceeds are distributed is certainly appropriate to be dealt with by Judge Starr. And as you can see from the procedural posture that we have pitched this, should Your

Honor approve the motion today, then the next step will be to go to Judge Starr and move to ratify that approval. And at that point in time, or at some later step, then it can be dealt with with respect to how the settlement proceeds are distributed.

Thank you, Your Honor.

THE COURT: All right. Thank you.

All right. Who would like to go first, Mr. Carrillo, or, Mr. Forshey? I'll let you both speak.

MR. CARRILLO: Your Honor, if Mr. Forshey has any comments, I'll defer to him and then I'm happy to wrap up.

THE COURT: Makes sense.

Mr. Forshey.

MR. FORSHEY: Thank you, Your Honor.

First point is that the objecting parties have brought forward no evidence. They have raised objections. They have asked questions. They have not adduced any evidence before the Court. The evidence before the Court is very clear. That, one, these claims have severe issues in terms of their merit. The third modification to the plan is in evidence. The various statements, Ms. Lindauer signed a disclosure statement, so did her client, stating that the debtor was solvent both on a going concern and on a liquidation basis. We've also introduced the monthly operating reports also

sworn which state that the debtor was solvent.

You've heard a very experienced Receiver testify here today that he has analyzed this. He doesn't think it works on a cost benefit basis. And, Your Honor, that should be it. It's a good faith, arm's length settlement. It was negotiated after a lot of back and forth through a receivership. You've heard him testify our documents were negotiated after a lot of back and forth between the counsel. And it's a valid exercise of business judgment here that there are very huge issues with these. And that he's made an economic judgment that's in the best interest of the receivership. And there's no evidence to the contrary that's been adduced by Ms. Lindauer or by Mr. Barton.

The second thing I'd point out is that while they ask a lot of questions, they offer no answers. We've marked as Exhibit 16 the third amendment to the plan, third modification to the plan. And if the Court looks at that, and I know you have, is it basically if they set aside the delivery of that deed out of escrow, all they're going to be back is where they were. And Ms. Lindauer says, well, we'll go sell the land. How would that ever happen? Is -- the title is already subject to an escrow agreement. Beneficial equitable title has already been passed to Dixon. I'm not sure how you could possibly go in and do any type of sale. She also said, well, there's never been a determination that

the debtor was insolvent. And that's probably true. But what you have is both Mr. Barton and her, either Mr. Barton swearing to schedules and signing MORs and such, or her tendering pleadings to this Court that were based upon the concept that this debtor was solvent both on a going-concern basis and liquidation. Point of fact, she had to get that disclosure statement approved in order to send it out to be approved by the creditors. We would submit that there's overwhelming evidence that there was -- that they were solvent under these questions.

Finally on the issue of the offer that came in today 5 minutes before the hearing. We would object to that being considered in any way. Our offer was put on the table publicly back in January when the motion was filed with Judge Starr to lift the litigation stay. As you can see in the order, without a lift of the litigation stay, we could not come to you to ask you to approve this. They've known what this is now for five months. And we are very, very skeptical when they walk in the morning of the hearing with a letter and nothing else. We'd ask the Court to disregard that. It's not reliable and it should not be considered.

Finally, Ms. Lindauer made the comment that we really don't care who gets the money. And she's right. That's another argument for another day. We merely want to point out to the Court what's before you today is the approval of

the settlement. The issue of what's going to be done with the money is another argument for another day and we don't have a dog in that hunt. So thank you. Thank you for the Court's time, Your Honor.

THE COURT: All right. Thank you, Mr. Forshey.

Mr. Carrillo.

MR. CARRILLO: Thank you, Your Honor.

This morning, Your Honor, you've heard from two very esteemed bankruptcy lawyers here, Ms. Perry and Mr. Forshey. I'm here to share that Dixon provided a great perspective on the length of this case and their involvement in this case. Lumar provided the perspective of the bankruptcy claims themselves. As counsel to the Receiver and a recovering bankruptcy lawyer, my job, Your Honor, is to help represent the interest of the receivership and why this settlement ought to be approved today by Your Honor.

Before I do that, Ms. Lindauer had made some comments about another proceeding that's before Judge Everett that I'd like to just give a little bit of perspective on, because I represent the Receiver in that matter. The case number is 21-31954. It's 2999TC Acquisitions.

Your Honor, the procedural posture of that case is that the settlement between the Receiver and the receivership entity and the creditor in that case was approved by Judge

Starr. The procedural posture of that case is a motion to close the case. And so the question before Judge Everett and what Judge Everett has been wrestling with is whether or not the assets belong to the receivership or the bankruptcy estate.

At our last hearing in January -- and more than happy to file the transcript of those proceedings, if it would be helpful for Your Honor -- Judge Everett essentially opined that he wanted Judge Starr to provide a perspective on where those receivership assets should go. But the difference between that case, Your Honor, and the decision before you today is in that case, Judge Everett was concerned about Judge Starr opining on where the assets should go. And secondly, making any decision on to close the case. Not to approve a settlement, but to close the case while the Fifth Circuit considers the appeal of the receivership order.

The difference is today Your Honor has the judgment, the experience, and the knowledge of the claims at issue in this case. To rule on the settlement, if you pass on those findings and conclusions to Judge Starr, he'd then make a judgment in receivership case on where assets should go. And so the questions that are open in the 2999TC bankruptcy case on whether or not to close the case are really in opposite to the questions here before Your Honor.

And I mention all that to say if Ms. Lindauer appeals

to that case, as well, to, you know, ask Your Honor to delay the ruling on the settlement motions, or to wait for the Fifth Circuit to rule, we would argue that the procedural posture is very different. And actually favors a hearing on the settlement today, because we've gone directly to you here in the bankruptcy court. You've dealt with the claims. You know the parties. You know the procedural history. You know the law. You can offer those findings to Judge Starr who can then make a determination how it applies in the receivership case.

THE COURT: So let me ask a question on that.

MR. CARRILLO: Yes, Your Honor.

THE COURT: So if the Court were to approve the settlement, what's your understanding of what happens to the settlement proceeds?

MR. CARRILLO: Your Honor, we'd argue that under the receivership order --

THE COURT: I mean, if I approved it, at the end of the day are you saying that this Court holds those proceeds until there's another resolution, or they automatically go?

MR. CARRILLO: When you approve a settlement, the proceeds -- there are no proceeds immediately. The settlement agreements require Judge Starr to ratify the agreement first before any transfer of consideration. And so

that's how the procedure works, Your Honor.

THE COURT: I understand.

MR. CARRILLO: And so with all of that, unless you have any other questions --

THE COURT: I don't.

MR. CARRILLO: -- we would ask you to approve the settlement. And thank you so much.

THE COURT: All right. Terrific. Thank you.

All right. First we'll go to Ms. Lindauer.

MS. LINDAUER: Thank you, Your Honor.

Going back and looking at where we are in this case -- and everybody agrees that the adversary was being hotly contested. There was no question about that. And counsel pointed out there were motions to compel. There was a ton of discovery being done. But one thing that was missing as I look through the docket was there really was no -- there was no motion for summary judgment. Anything of that nature. So one thing that concerns me is the fact that the Receiver really didn't -- he says he did his homework on this case. But he really didn't. He didn't speak to me. He didn't speak to any of the counsel representing BM318 to see what our side of the story was on some of these issues. To talk to us about the numbers, the amounts at issue, and all of that. So that I find troubling. I mean, the fact that we may have sent them part of our file really doesn't answer the

bigger question there.

So for you to approve a settlement, you're really getting pretty much one side of the story. You're getting the story of Lumar and Dixon who, of course, want the settlement approved. They're willing to pay what we think is a small amount of money to get rid of this claim or case and be able to move on.

Delay, let's talk about that for a second. The notice of the Receiver's stay was November 2nd, 2022. Almost a year and a half ago. That wasn't a delay caused by BM318 or any of the creditors of BM318, or its counsel. That was the delay created by the receivership. So I know Dixon complains that, well, we're going to be owed a lot more money. Maybe yes, maybe no. I mean, that ultimately will be a question for the Court to ultimately decide. All we did in the third amended modification to the plan is we preserved their right to assert a claim and for the Court to ultimately decide that claim.

In a nutshell, Your Honor, we think that the evidence doesn't show that this is an adequate settlement. You didn't hear anything about values of the claims. You didn't hear anything about current pending litigation. You heard about a mediation that didn't include Mr. Barton or parties -- I mean, basically you had the Receiver and Dixon and Lumar mediating. And so the Receiver is looking for money. Lumar

and Dixon are looking to get out of this litigation, so they put some money on the table. And we've objected to that in saying, we don't think it's adequate. That there should be additional monies considered here, or the case should be litigated. Okay. And that's one thing Mr. Thomas didn't do, is he didn't come and ask us, would you be willing to stay on and continue to litigate this case? Would Mr. Cowagi be willing to stay on and continue to litigate this case? We had multiple lawyers that were working on this adversary proceeding at the time that it was stayed. I put in my objection that we had spent over $168,000 in legal fees on the adversary proceeding. So you can see, this was not a just lay down, roll over process.

So I do have serious concerns about the amount of the settlement. I do have serious concerns about where the funds will go. I don't see anything that they stay -- if you approve it, that they stay with your Court until some other Court, perhaps, tells you they need to go somewhere else. But, again, we're clearly settling something that's property of this bankruptcy estate. There is no question that these claims are property of this bankruptcy estate and that you're being asked to settle those claims for what we think is not enough money.

I just don't think the evidence -- I've seen a lot of 9019s proved up. I don't see enough evidence here to approve

this settlement and walk away from the potential that there were not a few hundred thousands of dollars, millions of dollars. And, again, it's interesting to me that the Receiver said, well, we think there was a couple of million dollars paid to Dixon before the bankruptcy was filed and we're looking at trying to recover that. Well, that's the same claims that the debtors have too. I mean, to the extent there were avoidable transfers that were made, along with the property, those would also be property of the estate and claims of this estate.

So we would ask you to not approve this settlement. Have them go back to the drawing board. Have counsel for the Receiver do a little more homework. Talk to us and we can explain to them why we think these claims are worth so much money and why they should be pursued. At least pursue them to the point where you get some rulings, like a summary judgment or something like that where you get a better understanding of what's at issue here. We never got to that point. The case stopped at discovery. And so, Your Honor, I have serious concerns about the amount at issue and also where those funds go. So thank you.

THE COURT: All right. Thank you, Ms. Lindauer.

All right, to Mr. Coker.

MR. COKER: Thank you, Your Honor.

First I'd like to say that I think as counsel stated earlier that there was no evidence put on by Ms. Lindauer or by the parties objecting and joining in her objections. The issue here is that Mr. Thomas testified to exactly what our case was. And I think in summary it comes down to there were too many cases. I think when asked several different times about some of the details it was, I can't remember, because there were too many lawsuits that I was trying to resolve. That's no fault of his. But it's not the Court's problem and it's not a valid excuse or justification for pushing through this settlement.

There's no reason that this Court can't wait to rule on this or to send the Receiver back to do additional due diligence, including something that hasn't been done. And what hasn't been done is the marketing of these claims. Even though there was an assertion that, well, there's some value on having additional release language that wasn't present in Mr. Corley's offer, Mr. Thomas couldn't come up with what that value was. It was just a, well, it helped to wrap things up. And I do understand that. But it's not of great value.

And so what you do have is Mr. Corley put on a greater -- greater value to this claim than what was brought in the settlement. And as far as the timing, I've noticed that counsel has thrown -- from all sides has thrown, I

guess, allegations of there must be some kind of wrongdoing. What they haven't done, even after I pointed it out several times, is called Mr. Corley to ask him how he came about that or anything else to substantiate that. And so I think before this Court considers any type of malfeasance, that since that witness who testified -- submitted the offer was here and ready to testify, that the fact that counsel did not call him and vet out those claims means that, you know, they had the opportunity and they didn't put on any evidence themselves that this Court should consider as far as the timing goes.

Ultimately, Mr. Thomas didn't speak to counsel for Mr. Barton or any of the attorneys bringing this. He couldn't remember anybody in his office speaking to them. They may have received some files. That's what is in evidence before this Court. He claims that he spoke to somebody with Mr. Barton's office early on in the receivership about all of the claims, but he couldn't even remember what they spoke -- spoke about related to this one, or any details related to that. He couldn't remember whether there were any counterclaims filed in this case, even though he's here to testify that this is to settle these claims. This release has value. And he really couldn't remember several of the underlying facts. And I'd submit to this Court it's not because Mr. Thomas is a bad Receiver. It's because Mr. Thomas has a lot on his plate. Like I said and

like he said, too many cases.

And the issue here is if he's wrong, this is disposing of the only assets before this Court, or a substantial amount. And correct me if I'm wrong on that. But we've got to be right on this one because every single creditor is going to be hurt if the Court's wrong. And the beneficiaries are going to be wrong -- remaining from BM318. So what we have is oral argument coming in July in the Fifth Circuit case. This Court can wait until then and allow the Receiver more time to vet out these claims. In fact, the Court's ruling today, as the Receiver testified, it's not even going to allow any action to be taken, because they still have to go back to Judge Starr for anything to take place.

I would ask the Court to allow the benefit of time here that already exists. The stay's already here. We don't have to move on these claims. They're not expending money from the receivership assets to litigate these claims, because they're all stayed. Give time to vet out other offers. Give time to market the claims. And if there's not a greater amount that comes back out of the settlement, then I think everybody's objections are going to be null and void. And by the way, in that time period, nothing has harmed anybody, but it potentially in a substantial way has allowed for the creditors and the beneficiary owners of BM318 to have their ability to receive a greater amount in this court just from

the benefit of the time we already have, Your Honor. And so that's what we're asking is just allow the time to work in favor of the creditors and the beneficial owners before this Court.

THE COURT: All right. Thank you.

MR. COKER: Thank you, Your Honor.

THE COURT: Final word.

Ms. Perry.

MS. PERRY: Your Honor, just a couple of points.

Ms. Lindauer keeps using the word, we. We say this, we think that. I don't know who the, we, is. Because her objection is filed on behalf of Joyce W. Lindauer, Attorney PLLC. So clearly that's not an objection on behalf of BM318. It can't be, because the Receiver is effectively BM318. Also, her comments aren't evidence. Just as my comments aren't evidence. What Your Honor has in front of you is the evidence in the form of all of the exhibits that have been introduced and admitted. And you have the testimony of Mr. Thomas here today.

It is incorrect for Ms. Lindauer to say that Dixon would just have a claim that the Court would decide. It's very clear from that third modification that all of the liens and security interests would spring back into existence. And we would find ourselves back in the same place we were now

with interest rates rising and it more difficult to sell property.

In addition, as Your Honor knows, you're not required to conduct an independent investigation in formulating an opinion as to the reasonableness of the settlement. You're permitted to defer to the judgment of the parties and approval of the compromise is committed to the sound discretion of this Court.

And in addition, you know, one of the things the Receiver did testify to -- and there were many things that he took into account. His testimony speaks for itself. But one thing that he did discuss was the cost benefit analysis, the risk versus the cost. And you've heard here today from Ms. Lindauer that BM318 had incurred at least $186,000 in attorney's fee prior to the stay being put into place. If this case were to go to trial, and I can assure Your Honor that we would try it, we're talking about hundreds of thousands of dollars in attorney's fees, if not up into the millions. And expert witnesses, expert retainers, and so forth. So I think that Mr. Thomas', you know, testimony certainly supports that the Receiver has exercised business judgment in this -- in arriving at the decision during a mediation in front of a retired bankruptcy judge who beat up on all of the parties to reach this settlement and bring it to Your Honor for approval. And so we would ask Your Honor

to approve it today so that we can continue to proceed forward with the next steps with regard to the settlement in front of Judge Starr.

Thank you.

THE COURT: All right. Thank you, Ms. Perry.

Mr. Forshey.

MR. FORSHEY: Three brief points, Your Honor.

Point one, no evidence. There's been on evidence introduced by Ms. Lindauer in support of her objection. Her comments are not evidence and cannot be taken as such.

Two, they raised the point, Ms. Lindauer did, and to some extent Mr. Barton's counsel, that they needed to tell their side of the story. That is what today's hearing is for. If they wish to assert that there were issues with the settlement, then they needed to put up evidence and bring witnesses. They chose not to do so. Mr. Barton filed no objection. Ms. Lindauer filed a limited objection.

And finally, third, we filed a brief and explained in detail why these claims are very, very weak on the merits. They didn't even respond. They didn't take the trouble to respond. And today they have never addressed the problems that they have in this lawsuit. What Ms. Perry says is exactly correct. They raised various issues around the periphery. But what they never addressed is really the core issues in this adversary proceeding and that's how do they

get around solvency? How do they get around the third amendment? How do they deal with those things? They provided no answer.

You had good testimony from an experienced Receiver that he did a cost benefit analysis. He didn't like it. And he chose to settle. That's what the Court needs here and the Court should approve the settlement as requested.

As always, thank you for your courtesy and your time this morning, Your Honor.

THE COURT: All right. Thank you, Mr. Forshey.

I'll give you the last word.

MR. CARRILLO: Your Honor, the Receiver echoes the words of Dixon and Lumar and asks that you approve both joint motions and send the settlements up to Judge Starr for ratification.

THE COURT: All right.

MR. CARRILLO: Thank, Your Honor.

THE COURT: Thank you very much. With that closing arguments have concluded.

Whenever I have an evidentiary hearing like this, especially with the history of these cases, I think it warrants a thoughtful recitation of facts and conclusions that the Court makes as opposed to just trying to do it off the top of my head just hearing the evidence and the

arguments of counsel. So I'm going to take it under advisement. But I plan to rule this week in an oral ruling. And I'm considering -- and, again, you don't have to be here. You can all log in if you want to hear the oral ruling. But to make sure I have sufficient time, I'm thinking either 11:00 on Thursday or 1:00 on Thursday.

Does that work for your respective calendars, or is there another time that might work better?

MS. LINDAUER: Your Honor, my only concern is I am in Judge Larson's court right now for the whole day on Thursday on a motion to dismiss. So I don't think I would be available either of those times on Thursday. Wednesday, Friday are fine. But Thursday is just a bad day right now.

THE COURT: Understood. I was just trying to give myself a bit more time. Give me one second.

How about Wednesday at 1:30 or 1? It doesn't matter, Wednesday 1 -- any time between 1 and 2?

MS. PERRY: That's fine with Dixon, Your Honor.

MR. FORSHEY: It's fine with Lumar. We'll make that work, Your Honor.

THE COURT: Alrighty.

Mr. Coker, is that time okay, works for you?

MR. COKER: Yes, Your Honor.

THE COURT: 1:00? How about, Mr. Carrillo?

MR. CARRILLO: Yes, Your Honor. That time works for us.

THE COURT: All right. So why don't we just go ahead and set this for oral ruling on Wednesday, May 22nd, 2024 at 1 p.m.

And with that, the Court will be in recess. Thank you all very much.

(End of Proceedings.)

C E R T I F I C A T E

I, CINDY SUMNER, do hereby certify that the foregoing constitutes a full, true, and complete transcription of the proceedings as heretofore set forth in the above-captioned and numbered cause in typewriting before me.

______________________________

CINDY SUMNER, CSR #5832
Expires 10-31-2024
Cindy Sumner, CSR
5001 Vineyard Lane
McKinney, Texas 75070
214 802-7196